## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MILLER INVESTMENT TRUST,

      Plaintiff,

               v.

MORGAN STANLEY & CO.
INCORPORATED and KPMG HONG
KONG,

      Defendants.

**Civil Action No.**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Miller Investment Trust, on behalf of its mutual fund the Miller Convertible Fund[1] ("Plaintiff" or "MCF"), by its undersigned attorneys, for its complaint against Defendants Morgan Stanley & Co. Incorporated ("Morgan Stanley") and KPMG Hong Kong ("KPMG") (collectively "Defendants"), alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters.

## SUMMARY OF THE ACTION

1.      This is an action to recover damages caused by Defendant Morgan Stanley's violation of the Massachusetts Uniform Securities Act, as well as its negligence in underwriting an offering of $130 million of debt securities issued by ShengdaTech, Inc. ("ShengdaTech" or the "Company") that took place in December of 2010 (the "Offering").  Plaintiff's statutory remedies are provided by Section 410 of the Uniform Securities Act of Massachusetts General Laws (G.L. c. 110A § 410).

---

[1]  The Miller Convertible Fund is a series of shares issued by the Miller Investment Trust and operates as a mutual fund.

2.      Plaintiff purchased approximately $8.0 million of debt securities in the Offering directly through Morgan Stanley.

3.      Plaintiff also brings claims against KPMG for negligent misrepresentation. KPMG was ShengdaTech's registered independent accountant.  In this capacity, KPMG issued a "clean" audit opinion for ShengdaTech for both fiscal years 2008 and 2009 that was included in the Private Placement Memorandum ("PPM") for the Offering that was provided to Plaintiff.

4.      KPMG knowingly permitted ShengdaTech to include its clean audit opinion in the PPM for the Offering with the intention that Plaintiff and other investors would read and rely on its audit opinion in purchasing notes in the Offering.  KPMG knew that Plaintiff and other investors in the Offering would read and rely on KPMG's clean audit opinion in deciding whether to invest in the Offering.

5.      In a letter dated November 8, 2010, KPMG also consented to the use of its audit letter in a proposed $100 million equity offering that would have taken place in 2010.  The equity offering never took place, as ShengdaTech decided to raise funds in debt rather than equity, using the same underwriters.  Nevertheless, as it was specifically instructed to, Plaintiff relied on the clean audit letter issued just one month before the Offering.

6.      ShengdaTech is an international hybrid -- a U.S. publicly traded company whose operations are entirely in China.  ShengdaTech came to U.S. markets via a "reverse merger" -- a process that has recently attracted the attention of SEC commissioner Luis Aguilar, who expressed his concern that many of these Chinese reverse-mergers either "have significant accounting deficiencies or [are] vessels of outright fraud."

7.      ShengdaTech is a vessel of outright fraud.

8.     ShengdaTech's true financial condition -- and the fact that it was lying about its financial condition -- would have been ascertained if Morgan Stanley and KPMG had conducted the elementary due diligence they were each required to, and paid to, perform.

9.     Soon after the Offering, it was revealed that ShengdaTech had been engaged in massive fraud.  Soon after this revelation, ShengdaTech filed for bankruptcy.

10.    As revealed in the bankruptcy court's findings of fact, the post-offering investigation that revealed the fraud used such simple methods as attempting to confirm sales amounts, terms, and balances with alleged customers.  The investigation also attempted to verify bank account statements with the banks themselves.

11.    From this simple due diligence, the investigation confirmed that ShengdaTech had been inventing customer contracts and bank account balances.

12.    Had either KPMG or Morgan Stanley undertaken these standard auditing procedures or underwriting due diligence, respectively, prior to the $130 million offering, they would have detected (as the investigation did), that ShengdaTech's financial statements filed with the SEC were false.

13.    Morgan Stanley and KPMG should also have detected that ShengdaTech's financial statements filed with the SEC were false by examining the filings ShengdaTech was required to make, and did make, with the Chinese Administration of Industry and Commerce (the "AIC").

14.    AIC filings include balance sheets, income statements, and cash flow statements, which entries correspond to items found in SEC-filed income statements, balance sheets, and cash flow statements.  A third party requesting AIC filings must be a China-licensed lawyer, and

must pay a fee.  Moreover, AIC filings are, obviously, in Chinese, and the third party must have some knowledge of Chinese law in order to be aware that AIC filings exist.

15.     However, a company and its agents have unfettered access to the company's AIC filings, and therefore Morgan Stanley and KPMG had unfettered access to ShengdaTech's filings.  Nor is Chinese language or knowledge of Chinese law a cognizable barrier to Morgan Stanley or KPMG, who by underwriting the offering and auditing ShengdaTech's financial statements, represented that they had the competence to understand its business, which was conducted in Chinese.

16.     In its annual report for fiscal year 2009 filed with the SEC, ShengdaTech reported $102.12 million in net sales, and $23.10 million in net income.  ShengdaTech's subsidiaries reported to the AIC combined net sales of $6.07 million, and a combined net <u>loss</u> of $6.23 million.[2]  In other words, ShengdaTech's audited financial statements contained in its SEC filings overstated net sales by 1482% and concealed a loss that was <u>greater than actual net sales</u> by falsely reporting a large profit.

17.     In short, ShengdaTech maintained two sets of financial books.  One filed with U.S. regulators (the SEC), the other filed with Chinese regulators (the AIC).  The U.S. SEC filed financial statements showed materially higher revenue and net income than the China AIC filed financial statements

18.     Morgan Stanley and KPMG should also have detected ShengdaTech's misrepresentations for an additional reason, had they exercised reasonable due diligence.  Zibo Haize, one of ShengdaTech's five subsidiaries, reported to the Chinese government that it did not begin operations until June 2010.  The Private Placement Memorandum claims that Zibo Haize

---

[2] All of the Company's revenue came from its subsidiaries in the People's Republic of China ("PRC").

produced 13,350 metric tons of a specialty additive known as nano-precipitated calcium carbonate ("NPCC") in 2009.

19.     Relying on Morgan Stanley and KPMG's due diligence and audit certification, respectively, Plaintiff invested in ShengdaTech's debt securities sold in the Offering.

20.     On March 14, 2011, after the market closed, trading in ShengdaTech's equity securities was suspended by ShengdaTech.

21.     On March 15, 2011, ShengdaTech issued a press release relating that it had appointed a special committee "to investigate potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records".

22.     On March 15, 2011, NASDAQ changed the reason for the halt, stating that "trading [would] remain halted until ShengdaTech, Inc. has fully satisfied NASDAQ's request for additional information."

23.     On June 9, 2011, ShengdaTech announced that it was in default on debt securities dated May 28, 2008.

24.     On August 19, 2011, ShengdaTech filed a bankruptcy petition under Chapter 11 of the Bankruptcy code.  (*In re ShengdaTech, Inc.*, Case No. BK-11-52649 (D. Nev.)).  Plaintiff's notes, pursuant to their terms, became immediately due and payable.

25.     On August 20, 2011, ShengdaTech filed an adversary proceeding against its CEO.  (*ShengdaTech, Inc. v. Chen*, 11-05082-btb (D. Nev.)).

26.     On August 24, 2011, ShengdaTech obtained a Temporary Restraining Order against its CEO, preventing him from interfering with the restructuring effort.

27.     On September 2, 2011, the Bankruptcy Court entered an order approving ShengdaTech's findings of fact. (*Id.* at Dkt. # 26).  A true and correct copy of the Court Order is

attached as Exhibit 1 and incorporated by reference herein.  The court found that ShengdaTech's employees prevented the independent investigation from verifying ShengdaTech's cash accounts, giving rise to an inference that ShengdaTech had fabricated those accounts.  (*Id.* at ¶ 12).  The independent investigation also attempted to verify the authenticity of U.S. certificates of deposits proffered by ShengdaTech.  The court found that the financial institutions named in those certificates of deposit had no record of issuing them to ShengdaTech's subsidiary.  (*Id.* at ¶ 13).  Finally, the court found that "investigative findings" cast doubt on whether alleged customers ever made payments to ShengdaTech or its subsidiaries.  (*Id.* at ¶ 20).  Moreover, the investigation uncovered that some of ShengdaTech's large customers were actually owned by ShengdaTech's CEO.  (*Id.*)

28.     The investigation's findings make it clear that ShengdaTech was a largely fraudulent company operating behind the thinnest of screens.  Any due diligence reasonably conducted in underwriting a $130 million debt offering would have discovered that ShengdaTech was fabricating its customers, sales and financial statements.  Any reasonably competent audit would have discovered the same.

29.     Plaintiff's notes, bearing an $8 million face value, are very likely worthless.

**<u>PARTIES</u>**

30.     Plaintiff is a mutual fund managed by Wellesley Investment Advisors, Inc. ("Wellesley Advisors").  Wellesley Advisors is a registered investment adviser located in Wellesley, Massachusetts.

31.     From December 2010 to February 2011, MCF purchased net $8,000,000 of ShengdaTech's 2015 Notes, all from Morgan Stanley, through the following transactions: 1) it purchased $5,400,000 on December 10, 2010, during the Offering; 2) it purchased $2,000,000 on

January 21, 2011; 3) it purchased $410,000 on February 4, 2011; 4) purchased $1,000,000 on February 11, 2011; 5) it purchased $1,000,000 on February 16, 2011; 6) and it sold $310,000 and $1,500,000 on December 21 and December 23, 2010, respectively.

32.     Prior to those investments and during the period thereafter, MCF relied on company information necessary to purchase these notes including information and audited financial statements contained in ShengdaTech's SEC filings, and information provided in the Private Placement Memorandum.     Plaintiff relied to its detriment on Defendants' misrepresentations and omissions.

33.     Defendant Morgan Stanley is a global financial services firm headquartered in New York City.   Morgan Stanley acted as the sole underwriter of the Offering and as representative of the initial purchasers of the Offering.   Morgan Stanley was also the lead underwriter for the Offering.   Morgan Stanley was also set to act as lead underwriter for an equity offering for $100 million, but advised ShengdaTech not to proceed with the equity offering (and to do a debt offering instead) because of "market conditions".   This Complaint refers to the planned equity offering as the "Equity Offering".

34.     Defendant KPMG is a Hong Kong independent legal entity that is a member of KPMG International Cooperative, a Swiss entity. KPMG provides audit, accounting, financial advisory, tax, and risk management services.   KPMG International Cooperative is one of the largest professional services firms in the world and one of the so-called Big Four auditors. KPMG has been serving as ShengdaTech's auditor from at least November 11, 2008 until April 29, 2011.  KPMG signed the audit reports for fiscal years 2008 and 2009 that were incorporated into ShengdaTech's 2008 Form 10-K and 2009 Form 10-K, which were included in the PPM.

35.     On November 8, 2010, KPMG also formally consented to the use of its audit report for fiscal years 2008 and 2009 in the Equity Offering.

36.     KPMG knew and consented to Morgan Stanley and ShengdaTech's using its audit reports for fiscal years 2008 and 2009 in the PPM with knowledge that investors like Plaintiff would read and rely on KPMG's audit reports in deciding to purchase ShengdaTech's 2015 Notes.

37.     Collectively, KPMG and Morgan Stanley are the "Defendants".

38.     Non-party ShengdaTech, Inc. is a Nevada corporation with its principal place of business in China.  It purports to manufacture a specialty additive known as nano-precipitated calcium carbonate ("NPCC").  NPCC is used in a variety of products to enhance their durability and efficiency and is widely applied in the paint, paper, plastic and rubber industries and used for building materials such as PVC. ShengdaTech conducts its manufacturing operations through several affiliated companies in China (the "PRC Companies").

39.     ShengdaTech owns Faith Bloom Limited ("Faith Bloom"), a Singapore Corporation.  Faith Bloom, in turn, owns five companies established under the laws of the PRC, namely, Shandong Haize Nanomaterials Co., Ltd. ("Shandong Haize"), Shandong Bangsheng Chemical Co., Ltd. ("Shandong Bangsheng"), Shaanxi Haize Nanomaterials Co., Ltd. ("Shaanxi Haize"), Zibo Jiaze Nanomaterials Co., Ltd. ("Zibo Jiaze") and Anhui Yuanzhong Nanomaterials Co., Ltd. ("Anhui Yuanzhong").   All operate in the PRC and are the sole sources of ShengdaTech's revenue and income.  A corporate chart of ShengdaTech is as follows:



40.     In August 2011, ShengdaTech filed for bankruptcy under Chapter 11 of the bankruptcy code with the U.S. Bankruptcy Court of Nevada.

## JURISDICTION AND VENUE

41.     Subject matter jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

42.     The matter in controversy exceeds $75,000 exclusive of interests and costs.

43.     Plaintiff's principal place of business is in Massachusetts.  Defendant Morgan Stanley's principal place of business is in New York.  Defendant KPMG is a citizen of a foreign state.

44.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a), because Plaintiff received and relied upon the PPM in this District, and purchased the debt securities at issue in this lawsuit in this District.

45.     The majority of the conduct and transactions giving rise to the violations of law complained of herein occurred in Massachusetts.  Thus, the transactions giving rise to Plaintiff's claims occurred in Massachusetts.

## DEFENDANTS' MISCONDUCT

### Background of ShengdaTech and the 2015 Notes Offering

46.     ShengdaTech became a U.S. publicly traded company through a process called a "reverse merger".  In a reverse merger, a non-operating U.S. publicly-traded company "buys" a closely-held company.  In return, the closely-held company's owners receive substantially all of the shares of the publicly-traded company. The reverse merger process, particularly where the closely-held company is Chinese, has recently raised concerns among regulators that it is too open to fraud.  Notably, in a speech on April 4 2011, SEC commissioner Luis Aguilar stated that "a growing number of [Chinese reverse-merged companies] are proving to have significant accounting deficiencies or being vessels of outright fraud."[3]  Over a dozen of ShengdaTech's peer companies - Chinese closely-held companies that have gone public on the U.S. markets via reverse mergers with market capitalizations of $100 million and up --  have been exposed as largely fraudulent companies whose operations were only a small fraction of what they pretended to be.  Several including, RINO International Corp., and Orient Paper, Inc., were exposed months before the Offering.

47.     ShengdaTech's reverse merger occurred on March 31, 2006.  That same day, ShengdaTech filed a registration statement for the resale of 8,312,603 shares.  In response, the SEC filed a so-called "bedbug letter" -- a letter indicating that the registration statement "is so poorly prepared or entails problems so serious that the staff will not review the statement."  On August 31, 2006, the Company refiled its registration statement.  After multiple rounds of comments and revisions back-and-forth with the SEC, the registration statement was declared effective on January 16, 2007.

---

[3] Full text available at:  http://www.sec.gov/news/speech/2011/spch040411laa.htm

48.     On May 14, 2008, ShengdaTech restated its annual report of FY 2007 on Form 10-K/A to "correct some financial data and explanations including Management's Discussion and Analysis of Financial Condition and Results of Operations and to restate the Consolidated Financial Statements."  A restatement is a drastic accounting remedy; it is to be used for material accounting errors that existed at the time the financial statements were prepared.  See Statement of Financial Accounting Standards ("SFAS") 154 and APB Opinion No. 20.

49.     Changes in accounting principles or changes in accounting estimates do not result in a restatement of financial statements.  SFAS 154 ¶B10, pg. 25.

50.     Since ShengdaTech issued a restatement, it therefore admitted that all of the changes required by the restatement were the result of accounting *errors*.

51.     The same day, it announced an offering of an aggregate of $100 million of 6.0% senior convertible notes.

52.     On June 25, 2008, ShengdaTech issued $100 million of debt securities, convertible into common stock at a fixed ratio (the "2008 Offering").  The 2008 Offering was underwritten by Oppenheimer & Co, Inc., Roth Capital Partners, LLC, and Brean Murray, Carret & Co, LLC.

53.     On April 1, 2009, ShengdaTech filed its annual report on Form 10-K for FY 2008.  The annual report contained financial statements for FY 2008 and an audit opinion by KPMG.  The financial statements vastly overstated ShengdaTech's true financial performance in FY 2008.

54.     On March 15, 2010, ShengdaTech filed its annual report on Form 10-K for FY 2009.  The annual report contained financial statements for FY 2009 and an audit opinion by

KPMG.  The financial statements vastly overstated ShengdaTech's true financial performance in FY 2009.

55.     On November 8, 2010, ShengdaTech filed its quarterly report on Form 10-Q for the quarter ending September 31, 2010.  The Form 10-Q contained financial statements for the nine months ended September 31, 2010, which vastly overstated ShengdaTech's true financial performance in the nine months ended September 31, 2010.

56.     All three sets of financial statements were provided to plaintiff in the PPM.  The reasons why all three are false are as follows.

57.     PRC companies are required to submit annual financial reports to the Chinese Administration of Industry and Commerce ("AIC") – the business regulating agency in China.  When the reporting company is a foreign owned entity like ShengdaTech's PRC companies, the AIC-filed financial reports need to be audited.

58.     Reflecting their importance, AIC filings must be signed by the legal representative of the entity submitting it.  The legal representative must state "I confirm that the content of the submitted company's annual inspection report is true."

59.     On revenue recognition, there are no differences between U.S. GAAP and Chinese GAAP.  Revenue recognition for the sale of goods in China is governed by Accounting Standards for Enterprises No. 14,[4] which provides (identically to U.S. GAAP):

> No revenue from selling goods may be recognized unless the following conditions are met simultaneously:
>
> (1)  The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;

---

[4]   Revenues; Promulgation date: 02-15-2006; Effective date:01-01-2007;  Department:  China Ministry of Finance; Subject:  Accounting.

(2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods;

(3) The relevant amount of revenue can be measured in a reliable way;

(4) The relevant economic benefits may flow into the enterprise; and

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

60.     Authoritative bodies have specifically noted that there are no differences between U.S. GAAP and Chinese GAAP on revenue recognition. Thus, the Committee of European Securities Regulators ("CESR") noted that there are no differences between U.S. GAAP and International Financial Reporting Standards ("IFRS").  CESR's advice on the equivalence of Chinese, Japanese and US GAAPs 25 (2007), 2nd entry on page.  The Committee further noted that there are no significant differences between IFRS and Chinese GAAP on revenue recognition.  *Id.* at 35, 6th entry on page. Thus, by inference, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition.

61.     As further evidence of the reliability of AIC filings, well-known auditing firm Deloitte & Touche Tomatsu LLP ("DTT") noisily resigned as registered independent auditor to Chinese-based company ChinaMedia Express Holdings, Inc. ("CCME"), citing in part the fact that CCME's  AIC filings did not match CCME's SEC filings.

62.     The financial statements of ShengdaTech's PRC Companies filed with the AIC showed much less revenue and net income than the Financial Statements presented to Plaintiff in the PPM soliciting its purchase of ShengdaTech's notes.

63.     ShengdaTech's financial statements for the years 2008, and 2009 and the nine

months ended September 30, 2010 (all included in the PPM) are as follows:

| in USD | **For the Year Ended Dec. 31,** | | **For the Nine Months Ended Sept. 30,** |
|---|---|---|---|
| | **2008** | **2009** | **2010** |
| Net sales | $82,419,689 | $102,121,804 | $97,881,755 |
| Net income | $36,028,302 | $23,104,607 | $20,648,597 |
| Total assets | $243,806,829 | $271,054,359 | $295,426,018 |
| Total liabilities | $96,758,448 | $100,450,941 | $99,049,277 |

*(Source: 2015 Notes PPM dated Dec 9, 2010)*

64.     However, ShengdaTech filed financial statements with the AIC in China that tell

a totally different story:

| in USD[5] | **For the Year Ended Dec. 31,** | | |
|---|---|---|---|
| | **2008** | **2009** | **2010** |
| Net sales | $9,504,107 | $6,071,697 | $8,154,054 |
| Net income | ($1,998,863) | ($6,232,503) | ($10,171,640) |
| Total assets | $113,018,941 | $165,893,756 | $177,474,216 |
| Total liabilities | $36,754,809 | $79,022,029 | $84,911,036 |

*(Source: combined financials of ShengdaTech's five PRC indirect subsidiaries filed with the AIC.)*

---

[5] Exchange rates used are those from the PPM:
 2008 average: 6.9511
 2009 average: 6.8330
 2010 Dec. average: 6.66

65.     A comparison of the above two tables shows that ShengdaTech's sales and net income provided to Plaintiff in the PPM were wildly overstated.  Here is a table showing the overstatement by percentage.

**Overstatement by % = PPM/AIC -100%**

|  | For the Year Ended Dec. 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010 (at least)**[6] |
| Net sales | 767% | 1582% | 1100% |
| Net income | from negative to positive | from negative to positive | from negative to positive |
| Total assets | 116% | 63% | 66% |
| Total liabilities | 163% | 27% | 17% |

66.     Here is another table showing the overstatement by discrepancy in dollar amount.

**Discrepancy = PPM - AIC**

|  | For the Year Ended Dec. 31, | | |
|---|---|---|---|
| in USD | **2008** | **2009** | **2010 (at least)**[7] |
| Net sales | $72,915,582 | $96,050,107 | $89,727,701 |
| Net income | $38,027,165 | $29,337,110 | $30,820,237 |
| Total assets | $130,787,888 | $105,160,603 | $117,951,802 |
| Total liabilities | $60,003,639 | $21,428,912 | $14,138,241 |

67.     It is apparent that the figures reported by ShengdaTech's PRC subsidiaries in their AIC filings are accurate - rather than those stated in the PPM - for several reasons:

1) ShengdaTech's PRC subsidiaries are subject to serious penalties for making false statements in their AIC filings, including fines and revocation of the entity's business license.[8]  Without a business license the entity cannot legally conduct business in the PRC.  If an entity's business license is revoked, the

---

[6] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.

[7] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.

[8] "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20.

People's Bank of China[9] also requires that the bank account of that entity be closed.[10]

2) Because ShengdaTech's PRC subsidiaries are foreign-owned, the financial statements its PRC subsidiaries file with the AIC must be audited by a Chinese certified public accountant in accordance with Chinese GAAP.[11]

3) When independent professionals finally attempted to confirm the numbers cited in ShengdaTech's SEC filings, they found that ShengdaTech had invented customers, contracts, bank accounts, and U.S. certificates of deposit.

68.     Thus, ShengdaTech's revenue and net income in the PPM provided to Plaintiff and other investors were largely overstated.

69.     ShengdaTech's 2008 and 2009 10-Ks included a "clean" audit letter from KPMG.  The audit letters stated, in relevant part:

"We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of [December 31, 2008, or December 31, 2009], and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. [...]  We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  *An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.* [...] *In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries* [...]"

---

[9] People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.

[10] "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 (No.5 [2003]), Article 49.

[11] For example, Shaanxi Haize's 2008 AIC annual filing was audited by Shanxi Xinyuan CPA Firm and signed by its legal representative Yong Zhao.  Zibo Jiaze's 2008 and 2009 AIC annual filings were audited by Tianjin Zhongshenlian CPA Firm and Shandong Xincheng CPA Firm respectively, and both were signed by its legal representative Fei Chi. Anhui Yuanzhong: ShengdaTech acquired it in December 2009.  Its 2009 and 2010 AIC annual filings were both audited by Chaohu Guangsheng CAP Firm and signed by its legal representative Zhengdong Li.

70.     On September 15, 2010, ShengdaTech issued its second restatement for its annual report for 2009 on Form 10-K/A and quarterly report for the three-month period ended March 31, 2010 on Form 10-Q/A.  This resulted from receipt of a staff letter from the SEC.

71.     Two weeks later on October 1, 2010, its CFO Andrew Chen resigned.

72.     The announcement that two of three years' annual reports on Form 10-K contained accounting errors should have alerted KPMG to the risk of potential errors in subsequent 10-Ks.   In turn, KPMG should have, but did not, exercise caution in auditing ShengdaTech's financial statements.

73.     Similarly, Morgan Stanley should have been alerted to the risk of fraud by these successive errors.

74.     On June 15, 2010, ShengdaTech filed a shelf registration statement on Form S-3. The shelf registration statement was for the sale of $100 million in equity securities, with proceeds going to ShengdaTech.

75.     On November 8, 2010, ShengdaTech amended its Shelf Registration statement on Form S-3 to a registration statement on Form S-1.  A registration statement on Form S-1 is used for the immediate sale of securities.  Therefore, ShengdaTech aimed to sell the securities covered in the registration statement -- $100 million of equity securities -- as soon as the SEC declared the Registration Statement effective.

76.     ShengdaTech obtained Defendant KPMG's consent to use KPMG's audit reports for FY 2008 and 2009 in its registration statement by letter dated November 8, 2010.

77.     The underwriters for the offering were Defendant Morgan Stanley, Oppenheimer & Co. and William Blair & Co.

78.     On December 9, 2010, ShengdaTech issued a press release announcing plans to offer an aggregate of $90 million of senior convertible notes due 2015 in a private offering, instead of the previously planned public offering of equity securities. The Company also announced that it intended to grant the initial note purchasers an option to purchase an additional $30 million of such notes.

79.     On December 10, 2010, ShengdaTech announced that it entered into a purchase agreement with Morgan Stanley, relating to the sale by the Company of $130 million aggregate principal amount of the Company's 6.50% Senior Convertible Notes due 2015 (the "2015 Notes"), in a private offering to "qualified institutional buyers" as defined in Rule 144A under the Securities Act of 1933.  ShengdaTech also announced its intention to use the net proceeds from the Note Offering to repurchase $67 million of the Company's 2018 Notes and to finance its NPCC production capacity expansion, research and development activities and other working capital requirements.

80.     On December 15, 2010, ShengdaTech announced that it had issued $130 million aggregate principal amount of the 2015 Notes in the Private Placement.

81.     On December 17, 2010, ShengdaTech filed a document related to the debt security offering entitled "ShengdaTech, Inc. - Investor Questions and Responses".

82.     Question 2 was "Why did [ShengdaTech] choose to raise capital through a convertible debt offering and not conduct an equity offering?"  ShengdaTech's answer was that:

> The Company, its Board and financial advisors considered a number of alternatives for raising capital, including securing loans using our RMB bank deposits as collateral, an equity offering and a convertible debt offering.  Given the near-term need for capital and prevailing market conditions, our financial advisors advised us that an equity offering would be difficult to achieve and advised a convertible debt offering.  The Company, its Board and its financial advisors evaluated these options in detail before making a decision.

**Relying on the PPM and ShengdaTech's SEC Filings, MCF Purchased $8 million of the 2015 Notes Directly From Morgan Stanley.**

83.     Plaintiff read the Private Placement Memorandum, including the financial statements and other business information contained therein, and ShengdaTech's SEC filings, including KPMG's audit reports.  In reliance thereon, Plaintiff bought ShengdaTech's 2015 Notes.

84.     From December 2010 to February 2011, Plaintiff purchased net $8,000,000 of ShengdaTech's 2015 Notes, all from Morgan Stanley, through the following transactions: 1) purchased $5,400,000 on December 10, 2010, during the Offering; 2) purchased $2,000,000 on January 21, 2011; 3) purchased $410,000 on February 4, 2011; 4) purchased $1,000,000 on February 11, 2011; 5) purchased $1,000,000 on February 16, 2011; 6) sold $310,000 and $1,500,000 on December 21 and December 23, 2010, respectively.

85.     As the underwriter and auditor, respectively, Morgan Stanley and KPMG had access to ShengdaTech's internal reports and other data and information about those companies' finances, operations and sales at all relevant times and should have conducted due diligence on ShengdaTech's PRC Companies.  Had defendants conducted the most basic investigation, they would have discovered that ShengdaTech's Financial Statements were false and misleading.

**Morgan Stanley Sold the 2015 Notes To Plaintiff by Means of Untrue Statements of Material Facts, Which in the Exercise of Due Diligence it Should Have Known Were False for the Reasons Stated Above.**

86.     To solicit Plaintiff and other funds to purchase ShengdaTech's 2015 Notes in the Private Placement, Morgan Stanley provided to Plaintiff the PPM which was drafted in part by Morgan Stanley – and which featured Morgan Stanley's name prominently on the front cover.

The Offering Documents included KPMG's audit report of ShengdaTech's financial statements for FY 2008 and 2009, and the unaudited financial statements for the nine months ended September 30, 2010 (the "Financial Statements"). The PPM also invited recipients to consult ShengdaTech's SEC filings.

87.     For the reasons stated in ¶¶ 57-68, *supra*, the Financial Statements vastly overstated the extent of ShengdaTech's operations and profitability.

88.     Overstatements of ShengdaTech's revenue and net income were misstatements of material fact in the sale of ShengdaTech's 2015 Notes to Plaintiff and other investors.

89.     Unlike with SEC filings, filings with the AIC are not publicly available without authorization of the submitting company.   In order to obtain the annual report, and in particular the financial information contained therein, a person (unless previously authorized by the company to obtain the information) needs to engage local Chinese attorneys to submit requests to the AIC and must pay certain fees to the local office of the AIC.

90.     The AIC filings are, however, readily available to a company's authorized agents, *e.g.*, auditors and underwriters.   Apparently, neither Morgan Staley nor KPMG asked ShengdaTech to provide its AIC financial statements or bothered to engage a local attorney to obtain ShengdaTech's filings with PRC regulatory authority to verify its purported financials in the PPM and SEC filings.

**Statements as to ShengdaTech's Production Were False.**

91.     Other statements in the PPM and ShengdaTech's 2008 10-K and 2009 10-K show that Morgan Stanley negligently conducted its due diligence and KPMG negligently conducted its audits.

92.     Morgan Stanley and KPMG knew or should have known, that ShengdaTech's operations and annual output were far less than represented.

93.     The PPM falsely stated that "Our Phase I NPCC facility in Zibo started production in late August 2009.  The facility reached 90% capacity utilization at the end of 2009 and 100% capacity in January 2010."  It also falsely stated that the Zibo facility produced 13,350 Metric Tons of NCPP in 2009.

94.     Zibo Jiaze's AIC filings indicated that Zibo Jiaze had no production in 2009. Zibo Jiaze's 2009 AIC filings submitted on June 23, 2010 stated that 1) in 2009 Zibo Jiaze's sole facility was still under preparation and construction and had not started operating; and 2) its revenue was $0 for all of 2009. In addition, the AIC filings include a petition for an environmental permit to begin Phase I production in Zibo Jiaze's sole facility, dated June 2010. The petition states that the facility's construction was completed in September 2009.  The facility then entered trial production stage.

95.     In carrying out their obligations of due diligence and care, Defendants should have visited Zibo Jiaze's facility, observed its operation, interviewed its management, customers and suppliers, and reviewed its books and records.  They would then have discovered that this facility had not started operations until 2010, and thus could not have produced 13,350 Metric tons of NCPP in 2009.

## A Cursory Investigation Reveals that ShengdaTech Had Been Engaged in Massive Fraud.

96.     In its audit of ShengdaTech's financial statements for the fiscal year ended December 31, 2010, KPMG reported discovering "potentially serious discrepancies and unexplained issues" relating to ShengdaTech's financial records.

97.     On March 2, 2011, KPMG informed ShengdaTech's Audit Committee of "potentially serious discrepancies and unexplained issues" KPMG had discovered in auditing ShengdaTech's financial statements for FY 2010.  These issues included, among other things, the inability to confirm sales amounts, sales terms, and outstanding balances, and discovery of undisclosed related party transactions with ShengdaTech's CEO.

98.     On March 4, 2011, one day after KPMG informed the Audit Committee of the issues it discovered, ShengdaTech formed a special committee (the "Special Committee") to oversee an internal investigation.  The Special Committee was composed of the independent directors comprising the Audit Committee.

99.     The Special Committee engaged the law firm of O'Melveny & Myers LLP ("OMM") to conduct an independent investigation into the potential issues raised by KPMG. In turn, OMM retained PricewaterhouseCooper LLP ("PwC") to provide forensic accounting support for its investigation.

100.    On March 14, 2011, after market close, trading in ShengdaTech's equity securities was suspended by NASDAQ.

101.    On March 15, 2011, ShengdaTech issued a press release relating that it had appointed a special committee "to investigate potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records".

102.    On March 15, 2011, NASDAQ changed the reason for the halt, stating that "trading [would] remain halted until ShengdaTech, Inc. has fully satisfied NASDAQ's request for additional information."

103.    On April 29, 2011, KPMG informed ShengdaTech of its resignation as the Company's independent registered public accounting firm effective immediately.

104.    According to a current report on Form 8-K filed by ShengdaTech on May 5, 2011:

> "KPMG previously informed the Company's Audit Committee of certain concerns arising during its incomplete audits of the Company's consolidated financial statements as of and for the year ended December 31, 2010, and the effectiveness of internal control over financial reporting as of December 31, 2010.  **These concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT [Value-Added Tax] invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables."**

**[Emphasis added]**

105.    On June 9, 2011, ShengdaTech announced that it was in default on debt securities dated May 28, 2008.

106.    On August 19, 2011, ShengdaTech filed a bankruptcy petition under Chapter 11 of the Bankruptcy code.  Plaintiff's Notes, pursuant to its terms, became immediately due and payable.

107.    On August 24, 2011, ShengaTech obtained a Temporary Restraining Order against its CEO.  ShengdaTech also sought a preliminary injunction confirming the terms of the Temporary Restraining Order.

108.    Pursuant to this request for a preliminary restraining order, on September 2, 2011, the Bankruptcy Court entered an order approving ShengdaTech's findings of fact (Exhibit 1). The court found that ShengdaTech's employees prevented the independent investigation from verifying ShengdaTech's cash accounts, giving rise to an inference that ShengdaTech had fabricated those accounts.  (*Id.* at ¶ 12). The independent investigation also attempted to verify the authenticity of U.S. certificates of deposits proffered by ShengdaTech.  The court found that the financial institutions named in those certificates of deposit had no record of issuing them to

ShengdaTech's subsidiary.  (*Id.* at ¶ 13).  Finally, the court found that "investigative findings" cast doubt on whether alleged customers ever made payments to ShengdaTech or its subsidiaries. (¶ 20).  Moreover, the investigation uncovered that some of ShengdaTech's large customers were actually owned by ShengdaTech's CEO.  (*Id.*)

**KPMG's Liability**

**Conduct linking KPMG to Plaintiff**

109.    As stated above, financial statements for ShengdaTech for fiscal years 2008 and 2009, which were included in the PPM and on which Plaintiff relied were both audited by KPMG, and were both materially false and misleading.

110.    KPMG consented to the use of its audit reports of ShengdaTech's annual financial results for 2008 and 2009 and other statements regarding ShengdaTech's finances in the PPM.

111.    Because the Offering was for more than $7,500,000, Rule 502(b)(2)(B)(3) of Regulation D required ShengdaTech to provide the same financial statements it would have provided in a registration statement.

112.    Because ShengdaTech's financial statements were more than 135 days old at the time of the Offering, Rule 3-12(g) of Regulation S-X required that ShengdaTech include financial statements for the nine months ended September 30, 2010.

113.    Rule 10-01(d) of Regulation S-X required that ShengdaTech's financial statements for the nine months ended September 30, 2010 be reviewed by ShengdaTech's independent public accountant.

114.     Hence, ShengdaTech was required to, and did, obtain independent review from KPMG for its financial statements for the nine months ended September 30, 2010, before distributing these financial statements to investors, including Plaintiff.

115.     KPMG also knew that its audit reports for 2008 and 2009 would be, and were, included in  ShengdaTech's 2008 and 2009 10-K and would be used in trade and commerce in the United States and relied upon by investors.  Indeed, KPMG explicitly consented to the use of its audit reports in the 2010 Form S 3/A that was filed with the SEC.

116.     In late 2010, as the Offering was being prepared, KPMG would have been undertaking preliminary steps for its audit of ShengdaTech's 2010 financial statements.

117.     These preliminary steps would have included testing internal controls and conducting factual investigations to determine the scope and content of management representation letters.

118.     This preliminary work would also have included confirming certain key items -- for instance, bank balances

119.     Based on this preliminary work, KPMG would determine how stringent its audit of ShengdaTech's FY 2010 financial statements should be.  KPMG would also determine how it would conduct its audit.

120.     Upon information and belief, facts determined in this preliminary audit work should have alerted KPMG that its audit reports of ShengdaTech's 2008 and 2009 financial statements should no longer be relied upon.  Based upon this realization, KPMG was negligent in giving ShengdaTech permission to include audit letters for FY 2008 and 2009 in the PPM.

**KPMG's negligence**

121.   KPMG's audit was negligent.   Among other things, KPMG represented in its audit opinion letter dated March 15, 2010 that

> "We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).   In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles."

122.   KPMG also certified that ShengdaTech's 2009 financial statements were "in conformity with U.S. generally accepted accounting principles" and KPMG's audits provided a "reasonable basis" for its opinions.

123.   These statements were materially false and misleading when made because had KPMG actually followed the standards of the Public Company Accounting Oversight Board (the "PCAOB"), it would have known that ShengdaTech had fundamentally misrepresented the condition of its business, and that ShengdaTech's financial statements for fiscal year 2008 and 2009 were materially misstated and not presented in conformity with U.S. GAAP.

124.   Generally Accepted Auditing Standards ("GAAS") are those standards adopted by the PCAOB to govern professional practice standards for registered public accounting firms to follow in the preparation and issuance of audit reports.   The PCAOB has authority to adopt these standards pursuant to the Sarbanes-Oxley Act of 2002.

125.   GAAS require that when planning the audit, an auditor such as KPMG should perform analytical procedures including "identify[ing] such things as the existence of unusual transactions and events, and amounts, ratios and trends that might indicate matters that have financial statement and audit planning ramifications." AU 329.06.[12] Auditors are also required to

---

[12] "AU" and "AS" refer to generally accepted auditing standards currently promulgated

understand the client's industry and business and to be knowledgeable about matters that relate to the nature of the entity's business, including "matters, such as accounting practices common to the industry, competitive conditions, and, if available, financial trends and ratios." AU 311.07.

126.    GAAS also requires that auditors plan and perform their audits to obtain reasonable assurance that the financial statements subject to audit are free of material misstatement, whether caused by error or fraud. AU 230. "Although fraud usually is concealed and management's intent is difficult to determine, the presence of certain conditions may suggest to the auditor the possibility that fraud may exist. For example, an important contract may be missing . . . or the results of an analytical procedure performed during the audit may not be consistent with expectations." AU 316.11.

127.    During its audits, KPMG failed to perform adequate analytical procedures required by GAAS. Had KPMG understood ShengdaTech's business and industry and performed the analytical procedures required by GAAS, it would have identified a myriad of unrealistic relationships, which should have elevated KPMG's risk assessments and resulted in additional procedures with heightened skepticism that would have, in turn, resulted in discovery of the true facts.

128.    KPMG failed to adequately confirm representations of ShengdaTech management.  KPMG's negligence includes, but is not limited to, the following:

i)    ShengdaTech's subsidiaries' official filings with the AIC, to which KPMG had access, showed that it made a fraction of the revenue it reported to the SEC and in the PPM, and consistently lost money. KPMG should have reviewed the AIC filings.

---

by the Public Company Accounting Oversight Board.

ii)     KPMG failed to properly and reliably confirm ShengdaTech's cash balances at banks. KPMG violated GAAS by failing to obtain sufficient evidence to support its opinion.  AS 15 ¶ 3.

iii)    Zibo Jiaze could not have had any operations and sales in 2009, as its facility was still in the construction and trial stage and had not started production. Indeed, according to AIC filings, it was not legally permitted to have any operations in 2009.

iv)     Many of ShengdaTech's transactions involved undisclosed related parties, including its CEO.  (Exhibit 1 at ¶19).

v)      The Special Investigation determined that "financial records of [ShengdaTech] may have been falsified *in whole*".  (Exhibit 1 at ¶ 20) (emphasis added).

vi)     ShengdaTech claimed as assets certain U.S. certificates of deposits.  (Exhibit 1 at ¶ 13).   The banks which ShengdaTech alleged issued it these certificates of deposits had no record of issuing them to ShengdaTech.  (*Id.*)   If KPMG had attempted to verify that ShengdaTech actually held these assets by confirming with the banks that allegedly issued them, it would have discovered that ShengdaTech had fabricated the certificates.  KPMG was therefore negligent in failing to obtain sufficient evidence to support its opinion.  AS 15 ¶ 3.

129.    AS No. 15 ¶ 10 provides that "[w]hen using information produced by the company as audit evidence, the auditor should [...] [t]est the accuracy and completeness of the information."

130.     As reported in ShengdaTech's 8-K filed on May 5, 2011, KPMG admitted that it was unable to "confirm sales amounts, sales terms, and outstanding balances; and undisclosed related party transactions."

131.     Therefore, it is a reasonable inference that KPMG did not test the accuracy and completeness of the information provided by management in KPMG's 2008 and 2009 audits. Otherwise, KPMG would have uncovered the same discrepancies.

132.     AS No. 15 ¶ 22 requires auditors adequately to test the company's representations by direct confirmations.  For example, in testing whether a company accurately reports its sales to customers, the auditor should directly confirm sales with these customers.

133.     AS No. 15 ¶ 22 provides three methods by which auditors can select the particular set or subset of transactions to verify.  An auditor may test every item, certain specific items, or a sample of items.

134.     Upon information and belief, KPMG did not obtain sufficient evidential matter to support its audit opinion regarding the financial statements.  Since ShengdaTech only had a small fraction of the revenue it claimed in its SEC filings, even if KPMG determined that it need only test a sample -- the smallest possible set -- of customers, suppliers, and bank balances, a competent audit would have uncovered evidence that sales ShengdaTech claimed happened never took place, that suppliers never sold ShengdaTech goods, and that bank balances were fabricated.  When a reasonably competent audit was finally performed, it did uncover all these facts.

135.     AS No. 12 ¶ 9 requires the auditor to "obtain an understanding of relevant industry, regulatory, and other external factors [...] including the legal and political environment."  AS No. 12 ¶ 11 provides that "the auditor should consider [...] [r]eading public

information about the company relevant to the likelihood of material financial statement misstatements."

136.    Upon information and belief, KPMG did not consult and was therefore negligent in not consulting ShengdaTech's subsidiaries' audited financial statements filed with the AIC.

137.    If KPMG did consult ShengdaTech's subsidiaries' audited financial statements filed with the AIC, it was negligent in failing to note the discrepancies between AIC and SEC filings.

138.    AS No. 12 ¶ 65 provides that "the auditor should evaluate whether the information gathered from the risk assessment procedures indicates that one or more fraud risk factors are present and should be taken into account [...] Fraud risk includes (1) an incentive or pressure to perpetrate fraud, (2) an opportunity to carry out the fraud."

139.    AU 316.85A.2:  Opportunities specifically provides that auditors should consider fraud risk where "[s]ignificant operations [are] located or conducted across international borders in jurisdictions where differing business environments and cultures exist."

140.    The Accounting Defendants failed to consider, among other things, that the PRC-based nonparties were effectively beyond the reach of the SEC and DOJ's enforcement of the securities laws, and could therefore violate the securities laws without fear of civil or criminal enforcement from the SEC or DOJ, respectively.

141.    AS No. 15 ¶ 29 provides that "[i]f audit evidence obtained from one source is inconsistent with that obtained from another, or if the auditor has doubts about the reliability of information to be used as audit evidence, the auditor should perform the audit procedures necessary to resolve the matter."

142.    Upon information and belief, the auditors never conducted the audit work necessary to resolve the discrepancy between ShengdaTech's subsidiaries' AIC filings and its SEC filings, or the discrepancy that would have arisen had the auditor consulted with a significant proportion of ShengdaTech's alleged sales.

## COUNT I

## VIOLATION OF M.G.L. c. 110A §410

### (Against Morgan Stanley)

143.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

144.    Morgan Stanley is a broker-dealer.  Morgan Stanley sold ShengdaTech's debt securities to Plaintiff in Massachusetts.

145.    The Private Placement Memorandum through which Morgan Stanley sold the securities to Plaintiff contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

146.    Plaintiff was unaware of the untrue statements of material fact and could not have discovered them in the exercise of reasonable care.

147.    Morgan Stanley knew, or in the exercise of reasonable care should have known, that the Private Placement Memorandum contained untrue statements of material facts and omissions whose disclosure was necessary to make other statements not misleading.

148.    Plaintiff is entitled to damages as provided by M.G.L. c. 110A §410(a)(2).

149.    This action is brought less than four years after the discovery of the materially untrue statements.

## COUNT II

## NEGLIGENT MISREPRESENTATION

### (Against KPMG)

150.    Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

151.    KPMG owed Plaintiff a duty. KPMG was aware that its audit reports of ShengdaTech's Financial Statements were to be used to conduct a financing of approximately $100 million in late 2010.   KPMG intended that investors in that financing rely on KPMG's audited reports of ShengdaTech's financial statements in deciding whether to purchase the ShengdaTech 2015 Notes.   KPMG engaged in conduct linking KPMG to investors in the ShengdaTech 2015 Notes financing, which evinced KPMG's understanding of investors' reliance. For example, upon information and belief, KPMG consented to the use of its audit reports in the Bond Offering, and KPMG reviewed ShengdaTech's financial statements for the nine months ended September 30, 2010, so that they could be included in the PPM.   Plaintiff was one such investor.

152.    In addition, KPMG issued audit letters that certified that ShengdaTech's 2009 and 2008 financial statements "represent[ed] fairly, in all material respects," ShengdaTech's financial position.   The purpose of the audit letters was to induce reliance on the part of, among others, Plaintiff.

153.    KPMG breached its duty by, among other things, negligently performing its audits and its nine months review, as set forth above. KPMG also failed to take reasonable care in obtaining relevant information and in communicating it to investors, and was therefore negligent.

154.     Plaintiff acted in direct reliance on the representations made by KPMG in its audit certifications, including but not limited to the statements made in ShengdaTech's 2008 10-K filed April 1, 2009 and 2009 10-K filed on March 15, 2010, and the audited financials contained within these 10-Ks.

155.     As a direct and proximate result of KPMG's wrongful conduct, Plaintiff suffered damages in connection with its purchase of the ShengdaTech's 2015 Notes.

156.     Plaintiff has suffered damages in that, in reliance on these false and misleading statements, it paid artificially inflated prices for ShengdaTech's 2015 Notes.   As a result, Plaintiff has suffered a total loss of its investment.

157.      Plaintiff would not have purchased ShengdaTech's 2015 Notes at the prices it paid, or at all, if it had been aware that the purchase prices had been artificially and falsely inflated by Defendants' misleading statements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against defendants as follows:

Against Defendants and in favor of the Plaintiff for damages, in an amount determined to have been sustained by Plaintiff;

Against Defendants and in favor of the Plaintiff for all general and special damages necessary to make the Plaintiff whole;

Against Defendants and in favor of the Plaintiff for pre-judgment and post-judgment interest;

Against Morgan Stanley for statutory legal fees and interest as provided by M.G.L. c. 110A §410; and

Awarding Plaintiff costs of this suit, including experts' fees and other costs and disbursements; and such and other further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: December 1, 2011                     By its attorneys


**/s/ Thomas G. Shapiro_____**
Thomas G. Shapiro (BBO # 454680)
tshapiro@shulaw.com
Adam M. Stewart (BBO # 661090)
astewart@shulaw.com
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134


Laurence M. Rosen, Esq.
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com


*Attorneys for Plaintiff*