**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MILLER INVESTMENT TRUST and JURA LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>MORGAN STANLEY & CO. LLC and KPMG, a Hong Kong Partnership,<br><br>Defendants. | **Civil Action No. 1:11-cv-12126-GAO**<br><br>**SECOND AMENDED COMPLAINT**<br><br>**LEAVE TO FILE UNDER SEAL GRANTED JANUARY 31, 2014**<br><br>**LEAVE TO FILE GRANTED ON MARCH 5, 2014**<br><br>**JURY TRIAL DEMANDED** |

**I. SUMMARY OF THE ACTION** ........ 1

**a. Claims.** ........ 1

**b. Summary.** ........ 2

**II. PARTIES AND IMPORTANT NON-PARTIES** ........ 12

**a. Plaintiffs.** ........ 12

**b. Defendants.** ........ 14

**c. Non-parties.** ........ 14

**III. JURISDICTION AND VENUE** ........ 16

**a. Personal jurisdiction and subject-matter jurisdiction based on federal question** ........ 16

**b. Subject-matter jurisdiction based on diversity of citizenship** ........ 17

**IV. AUDITORS' OBLIGATIONS** ........ 17

V. **TIMELINE** ........ 20

a. **ShengdaTech lists on a U.S. exchange, restates its financial, and quickly sells a hundred million dollars of its bonds** ........ 20

b. **ShengdaTech lies to its auditor, and both Ernst & Young and KPMG determine that ShengdaTech has materially deficient internal controls on financial reporting. KPMG assists ShengdaTech in covering up materially false statements in its SEC filings.** ........ 21

**c. KPMG blesses ShengdaTech's 2009 financial statements.** ........ 24

**d. ShengdaTech discovers that one of ShengdaTech's purported top ten customers for 2009 had been bankrupted and deregistered in 2008.** ........ 25

**e. In December 2010, KPMG states that it did not know of any reason why ShengdaTech's financial statements were inaccurate, Morgan Stanley claims it has conducted adequate due diligence, and ShengdaTech sells $130 million of its bonds.** ..... 26

[redacted] ..... 30

**g. ShengdaTech quickly collapses.** ..... 32

**VI. KPMG FALSELY STATED THAT ITS AUDIT** ..... 35

**COMPLIED WITH PCAOB STANDARDS.** ..... 35

**a. KPMG culpably conducted third party confirmations.** ..... 36

*i. Cash balances.* ..... 37

*ii. Accounts payable and expenditures.* ..... 42

*iii. Accounts receivable and revenues.* ..... 43

*iv. Taxes paid and tax liabilities.* ..... 44

*v. General evidence of fraud from the confirmation process.* ..... 46

**b. KPMG culpably represented that ShengdaTech's financial statements did not contain errors even though these financial statements omitted to disclose material related-party transactions.** ..... 47

*i. Auditors must ensure their client discloses all related-party transactions, and must conduct additional review to verify that such transactions were not fraudulent.* ..... 47

1. ShengdaTech management lie about their positions at SSCM/Haiqing, and then spin an implausible story when they are caught. ..... 50

[redacted] ..... 53

***c. KPMG had evidence available to it before the Private Placement that showed that ShengdaTech was engaging in fraud.*** ........................................................................ 57

*i. ShengdaTech's purported revenues exceeded the likely global market for ShengdaTech's products.* ........................................................................................ 57

*ii. KPMG discovers that one of ShengdaTech's purported largest customers in 2009 had been bankrupted and deregistered in 2008, and thus could not lawfully conduct business in 2009. 58*

*iii. KPMG mentions in passing to a ShengdaTech board member that it had received more confirmations than it usually did, the ShengdaTech director urges KPMG to review the matter, and KPMG agrees to review the matter in its next audit but not before.* ................. 59

*iv. In November 2010, KPMG discovers that ShengdaTech is providing clearly forged bills to evidence transactions to KPMG; KPMG cites these bills in March 2011 as evidence that ShengdaTech is engaged in fraud.* ........................................................................ 59

*v. ShengdaTech's AIC filings, available to KPMG, showed that ShengdaTech was engaged in fraud.* ................................................................................................ 61

*1. AIC filings are reliable.* ........................................................................................ 62

*2. There are no significant differences in accounting standards between the U.S. and China that could account for the vast differences between AIC- and SEC-filed revenue numbers.* ...................................................................................................... 64

*3. ShengdaTech claimed one of its subsidiaries produced 13,350 metric tons of NPCC in 2009, though the subsidiary only applied for the government permits necessary to start production in June 2010.* ........................................................................................ 65

*vi. ShengdaTech threw up red flags that should have alerted KPMG that it was committing fraud.* ................................................................................................ 66

*1. Months before the Private Placement, ShengdaTech's CFO resigned, and was replaced by an interim CFO who ShengdaTech's directors and management believed was unqualified.* ........ 68

*2. ShengdaTech's internal controls were deficient.* ........ 69

***VII. RELYING ON THE PPM AND SHENGDATECH'S SEC FILINGS, PLAINTIFFS PURCHASED $8.70 MILLION MILLION OF THE 2015 NOTES DIRECTLY FROM MORGAN STANLEY*** ........ 74

***VIII. LOSS CAUSATION*** ........ 75

## SECOND AMENDED COMPLAINT

Plaintiffs Miller Investment Trust, on behalf of its mutual fund the Miller Convertible Fund ("MCF"),[1] and Jura Limited (the "Plaintiffs") by their undersigned attorneys, for their complaint against Defendants Morgan Stanley & Co. LLC ("Morgan Stanley") and KPMG, a Hong Kong Partnership ("KPMG") (the "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I. SUMMARY OF THE ACTION

### a. Claims.

1. This is an action to recover damages caused by Defendants KPMG and Morgan Stanley's culpable conduct in auditing ShengdaTech Inc.'s financial statements and underwriting its sale of bonds.

2. ShengdaTech was a U.S company that conducted its operations entirely through Chinese subsidiaries. It claimed to have earned it more than $100 million in revenues in each of 2008 and 2009. But it was, in fact, a Potemkin Village, with less than one tenth the revenues it claimed and virtually no money in bank accounts it claimed held tens of millions of dollars.

3. Morgan Stanley underwrote ShengdaTech's December 2010 private placement (the "Private Placement"), in which it sold $130 million in convertible bonds. The Private Placement Memorandum distributed to Plaintiffs included ShengdaTech's financial statements, which ShengdaTech later admitted "may have been falsified in whole or in part." Morgan Stanley thereby violated Section 410 of the Uniform Securities Act of Massachusetts General Laws (G.L. c. 110A § 410).

[1] The Miller Convertible Fund is a series of shares issued by the Miller Investment Trust and operates as a mutual fund.

4. KPMG was ShengdaTech's auditor, and issued audit reports certifying that it had conducted an audit that complied with professional standards and that ShengdaTech's financial statements were accurately stated. Days before the Private Placement, KPMG also negligently certified that it had no reason to doubt that its 2008 and 2009 audit reports were accurate. [redacted] Plaintiff Miller Investment Trust's claims against KPMG are brought under Section 18 of the Securities and Exchange Act of 1934 ("Section 18," and the "Exchange Act") [15 U.S.C. §78r] and common law negligent misrepresentation.

**b. Summary.**

5. KPMG was ShengdaTech's registered independent auditor. For two years, 2008 and 2009, KPMG conducted audits of ShengdaTech, and represented to investors that ShengdaTech's financial statements were accurate and that KPMG had conducted its audit in accordance with professional norms.

6. For the first, second, and third quarters of 2010, KPMG reviewed ShengdaTech's quarterly reports before they were filed with the SEC. KPMG pronounced itself satisfied by each of the financial statements.

7. In December 2010, ShengdaTech issued and sold $130 million in convertible bonds in the Private Placement (the "ShengdaTech 2015 Notes").

8. Relying on the financial statements that KPMG and Morgan Stanley said were accurate, Plaintiffs bought about $8.70 million of ShengdaTech bonds, both directly in the Private Placement and in later purchases directly from Morgan Stanley.

[redacted] ShengdaTech's financial statements were not accurate. In fact, ShengdaTech was a vast Potemkin village, whose sales to customers, purchases from suppliers, and operations, were all vastly overstated. More than 90% of the revenues it claimed were fictive, [redacted]

10. KPMG well knew that ShengdaTech was at high risk of making false statements:

[redacted] ***Restatements***: When a public company determines that its historical financial statements contain material errors, it must restate them, if it believes investors are still relying upon these erroneous statements. ShengdaTech restated its financial statements twice. But though ShengdaTech should have restated them a third time, [redacted]

(b) ***Deficient internal controls***: KPMG found that in 2008, ShengdaTech had materially deficient internal controls. KPMG found that in 2009, ShengdaTech had significantly deficient controls. ShengdaTech CEO Xiangzhi Chen is a controlling shareholder of Shandong Shengda Technology Co., Ltd. ("SST"). ShengdaTech does not own any of SST's shares. [redacted]

[redacted] An internal investigation into ShengdaTech's collapse (the "Internal Investigation") would later determine that ShengdaTech falsified its financials using transactions with companies owned by ShengdaTech's CEO Chen, like those with SST.

(c) ***Management that had lied to auditors***: SST had a subsidiary called Shandong Shengda Chemical Machinery Co., Ltd. ("SSCM"). SSCM built one of ShengdaTech's factories and supplied machinery to ShengdaTech. [redacted] and transactions with SSCM were thus not recorded as related-party transactions. [redacted] ShengdaTech CEO Xiangzhi Chen, also 51.7% owner of SST, continued also to be SSCM's CEO. And because of CEO Chen's role, SSCM had been a related party, ShengdaTech had an obligation to disclose transactions with SSCM as related-party transactions, and its 2008 financial statements thus contained material errors.

(d) ***An unqualified CFO***: Anhui Guo was ShengdaTech's CFO between March 2006 and April 2009, and again beginning on September 30, 2010, [redacted]

Indeed, in connection with Guo's initial replacement, audit committee member Mudd had observed that [redacted] (emphasis in original).

11. The evidence that ShengdaTech was committing fraud existed for KPMG and Morgan Stanley to find in ShengdaTech's 2008 and 2009 audits, and in other work KPMG had conducted as ShengdaTech's auditor:

(a) ***AIC filings***: KPMG knew that ShengdaTech's subsidiaries filed financial statements with the Chinese State Administration of Industry and Commerce (the "AIC"). In its ShengdaTech audits and reviews, KPMG obtained AIC filings as part of background checks on some of ShengdaTech's suppliers and customers. KPMG could have also obtained ShengdaTech's subsidiaries' AIC filings directly from the AIC. Yet ShengdaTech's subsidiaries' AIC filings included financial statements that showed that ShengdaTech's revenues were between 5 and 10% of what it reported in its SEC filings.

[redacted] ***Bank confirmations***: Auditors must confirm that the company they audit actually has the cash reserves it claims. This is a simple task that is performed by asking the bank to confirm the company's account information [redacted]

KPMG immediately detected ShengdaTech's fraud in 2011 merely by contacting the banks themselves. In one case, when KPMG finally called a bank in which ShengdaTech claimed to have deposits of about RMB 553 million, KPMG was told that the bank had less than RMB 200 million in all its business deposits. But the banks' correspondence addresses (including the correspondence addresses for the branches KPMG should have communicated with) were available at all times through hotlines and, for most banks, through a publicly accessible website.

And the forged confirmations KPMG received were wrong on their face. In conducting business in China, a company's "chop" or seal functions as a signature does in the U.S. Thus, a facially deficient chop is as much a red flag in China as a signature claiming to be from a company's CEO but bearing the wrong name is in the U.S. One set of forged confirmations, claiming to be from a bank in which ShengdaTech purported to have more than half its cash, changed its chop from year to year. Another bank's confirmations bore the chop of the wrong bank branch.

(c) ***Tax confirmations***: Auditors must confirm tax payments and liabilities. In China, companies pay value added taxes ("VAT"), which are evidenced by official tax invoices. Each invoice bears a unique serial number. Since at least 2008, the Chinese province in which ShengdaTech principally operates has provided an online database of these serial numbers, and the entities to which the invoices were sold, providing a quick and easy way to determine whether a tax invoice is authentic even if all one has is the invoice itself. [redacted]

[redacted]

(d) ***Accounts receivable and payable confirmation***: Auditors confirm that specific accounts payable and receivable balances (i.e., cash due and cash owed) exist and are correctly stated by asking the suppliers with whom the balance is held to confirm it. As with bank confirmation, when KPMG obtained correspondence addresses from publicly available sources and made direct contact with the customers and suppliers, it found that most of ShengdaTech's purported largest suppliers and customers denied having made ***any*** significant sales to ShengdaTech in either 2008 or 2009, if ever. Some, it found, had long ago ceased operating. Hence, not only were accounts receivable and payable misstated, ShengdaTech's revenues and expenses were as well.

12. Indeed, even before the audit of ShengdaTech's 2010 financial statements, KPMG had amassed smoking-gun evidence that ShengdaTech was engaging in wide-scale fraud:

[redacted] In conducting its audit of ShengdaTech's financial statements for the year ended December 31, 2009, [redacted]

[redacted] In early 2010, KPMG conducted a basic web search on a [redacted]

(c) In connection with the same meeting, a KPMG partner told a member of ShengdaTech's audit committee that it had received an unusually high number of confirmations. The KPMG partner sought to assure ShengdaTech's audit committee member that the confirmations were nothing to worry about, but the audit committee member nonetheless purportedly insisted that KPMG conduct a review of confirmations in its audit of ShengdaTech's 2010 financial statements. But KPMG did not conduct any review before ShengdaTech sold $130 million of its bonds to obtain assurance that the confirmations were not evidence of fraud.

(d) In or before November 2010 (i.e., before the Private Placement), KPMG became aware that ShengdaTech was allowing customers to pay with bills,[2] but was then discarding the bills. KPMG asked ShengdaTech to provide it with some checks, and ShengdaTech provided six. Five were not issued by the customers, but were actually checks that the customers had received from their own customers, which they then endorsed to ShengdaTech – for precisely the same amount as checks issued to ShendaTech. And one bill was issued on November 25, 2010, travelled north 400 miles to be endorsed, and then travelled west another 600 miles to be deposited – ***on November 26, 2010***. Indeed, when KPMG accused ShengdaTech of fraud mere months later, KPMG would cite these bills as crucial evidence for its case.

(e) ShengdaTech CEO Xiangzhi Chen owned more than 51% of SST. SST, in turn, owned SSCM. SSCM does substantial business with ShengdaTech, and because it is owned by Chen, ShengdaTech must disclose that these transactions are related-party transactions.

[redacted].

[2] Bills are a form of commercial paper used in China. They are very similar to checks, may be endorsed, and are a claim against the original signatory.

[redacted]

Had KPMG investigated ShengdaTech's implausible explanation by obtaining the purported purchaser's information from public filings, [redacted]

13. But on December 9, 2010, KPMG nonetheless certified that (a) ShengdaTech's financial statements contained no material errors, and (b) that KPMG had obtained no evidence calling into question the accuracy of ShengdaTech's financial statements. And KPMG nonetheless permitted Morgan Stanley and ShengdaTech to use KPMG's audit report in peddling ShengdaTech's bonds.

[redacted] Thus, KPMG had ample warning that ShengdaTech was committing fraud. And ShengdaTech's precipitous fall confirmed how easy it would have been for KPMG to discover that ShengdaTech was a Potemkin Village. [redacted]

[redacted]

15. Hence, on March 3, KPMG provided a memorandum to ShengdaTech's Board of Directors, who on March 4 convened an internal investigation (the "Internal Investigation")

16. On March 14, 2011, after the market closed, trading in ShengdaTech's equity securities was suspended by the NASDAQ.

17. On March 15, 2011, ShengdaTech issued a press release relating that it had appointed a special committee "to investigate potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records".

18. On March 15, 2011, NASDAQ changed the reason for the halt, stating that "trading [would] remain halted until ShengdaTech, Inc. has fully satisfied NASDAQ's request for additional information."

19. On June 9, 2011, ShengdaTech announced that it was in default on debt securities dated May 28, 2008.

20. On August 19, 2011, ShengdaTech filed a bankruptcy petition under Chapter 11 of the Bankruptcy code. (*In re ShengdaTech, Inc.*, Case No. BK-11-52649 (D. Nev.)). Plaintiffs' notes, pursuant to their terms, became immediately due and payable.

21. On August 20, 2011, ShengdaTech filed an adversary proceeding against its CEO. (*ShengdaTech, Inc. v. Chen*, 11-05082-btb (D. Nev.)).

22. On August 24, 2011, ShengdaTech obtained a Temporary Restraining Order against its CEO, preventing him from interfering with the restructuring effort.

23. On September 2, 2011, the Bankruptcy Court entered ShengdaTech's findings of fact. (*Id.* at Dkt. # 26). The Bankruptcy Court's findings confirm that ShengdaTech was a vast Potemkin village:

(a) ***Forged assets***: When KPMG discovered that ShengdaTech claimed tens of millions of dollars more in accounts than it actually had, ShengdaTech's CEO invented a category of assets – certificates of deposits. The Internal Investigation quickly showed that the certificates of deposit were amateurish forgeries.

(b) ***Falsified financial records***: The vast majority of ShengdaTech's sales to customers or purchases from suppliers never happened. Thus, as the Internal Investigation quickly concluded, ShengdaTech's financial statements "may have been falsified in whole or in part."

(c) ***Undisclosed related-party transactions used to fabricate revenues and expenses***: The Internal Investigation found that some of ShengdaTech's large customers were in fact owned by ShengdaTech's CEO, and that alleged purchases from these suppliers were "vastly overstated."

24. Plaintiffs' notes, bearing an $8.70 million face value, are nearly worthless.

## II. <u>PARTIES AND IMPORTANT NON-PARTIES</u>

### a. Plaintiffs.

25. The Miller Investment Trust ("Miller") is a mutual fund managed by Wellesley Investment Advisors, Inc. ("Wellesley Advisors"). Wellesley Advisors is a registered investment adviser located in Wellesley, Massachusetts.

26. From December 2010 to February 2011, MCF purchased net $8,000,000 of ShengdaTech's 2015 Notes for Miller, all from Morgan Stanley, through the following transactions:

(a) It purchased $5,400,000 on December 10, 2010

(b) It purchased $2,000,000 on January 21, 2011;

(c) It purchased $410,000 on February 4, 2011;

(d) It purchased $1,000,000 on February 11, 2011;

(e) It purchased $1,000,000 on February 16, 2011;

(f) It sold $310,000 and $1,500,000 on December 21 and December 23, 2010, respectively.

27. Jura Limited ("Jura") is a Bermuda corporation with its principal place of business in Bermuda, and bought $700,000 of ShengdaTech convertible bonds in two purchases:

(a) It bought $600,000 of bonds on December 12, 2010; and

(b) It bought $100,000 of bonds on February 27, 2011.

28. Wellesley Advisors has full investment authority over Jura's funds, and exercised that authority to buy ShengdaTech bonds in Massachusetts.

29. Prior to those investments and during the period thereafter, Plaintiffs relied on company information necessary to purchase these notes including information and audited financial statements contained in ShengdaTech's SEC filings, and information provided in the

Private Placement Memorandum. Plaintiffs relied to their detriment on Defendants' misrepresentations and omissions.

**b. Defendants.**

30. Defendant Morgan Stanley is a global financial services firm headquartered in New York City. Morgan Stanley was the sole bookrunnner of the Private Placement and representative of the initial purchasers of the Private Placement. Morgan Stanley was also the lead underwriter for the Private Placement.

31. Defendant KPMG is a Hong Kong partnership that is a member of KPMG International Cooperative, a Swiss entity. KPMG provides audit, accounting, financial advisory, tax, and risk management services. KPMG entities make up one of the largest professional services firms in the world, and KPMG is one of the so-called Big Four auditors. KPMG served as ShengdaTech's auditor from November 11, 2008 until April 29, 2011. KPMG signed the audit reports for fiscal years 2008 and 2009 that were incorporated into ShengdaTech's 2008 Form 10-K and 2009 Form 10-K, which were included in the Private Placement Memorandum. On December 9, 2010, KPMG provided a letter formally representing that it was not aware of any reason to reconsider its 2008 and 2009 audit.

32. KPMG repeatedly consented to the use of its audit report in the Equity Offering.

33. Collectively, KPMG and Morgan Stanley are the "Defendants".

**c. Non-parties.**

34. ShengdaTech, Inc. is a Nevada corporation with its principal place of business in China. It purports to manufacture a specialty additive known as nano-precipitated calcium carbonate ("NPCC"). NPCC is used in a variety of products to enhance their durability and efficiency and has some applications in the paint, paper, plastic and rubber industries. It is also

used in some building materials. ShengdaTech conducts its manufacturing operations through several affiliated companies in China (the "PRC Subsidiaries").

35. ShengdaTech owns Faith Bloom Limited ("Faith Bloom"), a Singapore Corporation. Faith Bloom, in turn, owns five companies established under the laws of the PRC: Shandong Haize Nanomaterials Co., Ltd. ("Shandong Haize"), Shandong Bangsheng Chemical Co., Ltd. ("Shandong Bangsheng"), Shaanxi Haize Nanomaterials Co., Ltd. ("Shaanxi Haize"), Zibo Jiaze Nanomaterials Co., Ltd. ("Zibo Jiaze") and Anhui Yuanzhong Nanomaterials Co., Ltd. ("Anhui Yuanzhong"). They are ShengdaTech's sole source of revenues, and all operate in the PRC:




36. In August 2011, ShengdaTech filed for bankruptcy under Chapter 11 of the bankruptcy code.

37. Non-party Shandong Shengda Technology Co., Ltd. ("SST") is a company that at all relevant times was 51.79% owned by ShengdaTech CEO Chen.

38. Non-party Shandong Shengda Chemical Machinery Co., Ltd. ("SSCM/Haiqing") was owned by SST until August 2007, when it was acquired by Prosper Crown Limited, a Hong Kong company. Between January 25, 2008, and October 24, 2011, Prosper Crown Limited's sole

director was [redacted]

39. Non-party Xiangzhi Chen was ShengdaTech's CEO.

40. Non-party Anhui Guo was ShengdaTech's CFO between March 2006 and April 2009, and again beginning on September 30, 2010.

41. Non-parties A. Carl Mudd and Sheldon B. Saidman were ShengdaTech directors, and sat on its audit committee.

42. Non-party Andrew Chen was ShengdaTech's CFO between April 2009 and September 2010.

43. Non-party Zhen Chen was a protégé of Xiangzhi Chen. Between 1999 and 2011, he always was employed as a general manager of one or the other of the companies owned by Xiangzhi Chen.

## III. JURISDICTION AND VENUE

### a. Personal jurisdiction and subject-matter jurisdiction based on federal question

44. The federal securities claim asserted herein against KPMG arises under and pursuant to Section 18 of the Exchange Act [15 U.S.C. § 78r].

45. The Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

46. Personal jurisdiction over KPMG is proper under Section 27 of the Exchange Act as KPMG has minimum contacts with the United States. KPMG's minimum contacts include deriving approximately 19% of its revenues in 2010 from issuing audit opinions to U.S.-listed issuers in satisfaction of the issuers' obligations under the U.S. securities laws.

47. Morgan Stanley conducts substantial business in this state.

48. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

49. In connection with the acts, conduct and other wrongs alleged herein, KPMG and Morgan Stanley either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**b. Subject-matter jurisdiction based on diversity of citizenship**

50. Subject matter jurisdiction also exists based on diversity of citizenship pursuant to 28 U.S.C. § 1332(d).

51. The matter in controversy exceeds $75,000 exclusive of interests and costs.

52. Plaintiff Miller Investment Trust's principal place of business is in Massachusetts. Plaintiff Jura Limited is a citizen of a foreign state. Defendant Morgan Stanley's principal place of business is in New York. Defendant KPMG is a citizen of a foreign state.

53. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(a) because Plaintiffs received and relied upon the PPM in this District, and purchased the debt securities at issue in this lawsuit in this District.

54. The majority of the conduct and transactions giving rise to the violations of law complained of herein occurred in Massachusetts. Thus, the transactions giving rise to Plaintiffs' claims occurred in Massachusetts.

## IV. <u>AUDITORS' OBLIGATIONS</u>

55. KPMG was ShengdaTech's registered independent auditor.

56. Auditors conducting an annual audit of the client's full-year financial statements. Auditors also review a client's quarterly financial statements, press releases, and other communications to the public. Here, KPMG both audited ShengdaTech and performed a detailed review of its quarterly filings.

57. The Public Company Accounting Oversight Board (the "PCAOB") was established by the Sarbanes Oxley Act of 2002, and is responsible for establishing and maintaining standards that auditors must follow in auditing U.S. public companies like ShengdaTech ("PCAOB Standards").

58. An audit begins with an audit plan. In the audit plan, "the auditor should specifically assess the risk of material misstatement of the financial statements due to fraud." (AU s. 312.16).

59. One major object of PCAOB Standards is to attempt to root out fraud committed by management. Indeed, the independent auditor is a watch dog against its client's management. Thus, though an auditor must obtain management representations in completing an audit, the auditor cannot rest on management's representations. Rather, the auditor must obtain outside evidence that the company's financial statements are accurate.

60. When the auditors have completed the audit, they must then declare that they have conducted it in accordance with PCAOB Standards. The auditors must then report whether the financial statements were accurately stated.

61. Thus, as to ShengdaTech's 2008 financial statements, KPMG represented:

> We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries (the "Company") as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our

responsibility is to express an opinion on these consolidated financial statements based on our audit.

***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.***

62. And as to ShengdaTech's 2009 financial statements, KPMG represented:

We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.***

## V. TIMELINE

### a. ShengdaTech lists on a U.S. exchange, restates its financial, and quickly sells a hundred million dollars of its bonds

63. ShengdaTech became a U.S. publicly traded company through a process called a "reverse merger." In a reverse merger, a non-operating U.S. publicly-traded company "buys" a closely-held company. In return, the closely-held company's owners receive substantially all of the shares of the publicly-traded company. The reverse merger process, particularly where the closely-held company is Chinese, has recently raised concerns among regulators that it is too open to fraud. In a speech on April 4 2011, SEC commissioner Luis Aguilar stated that "a growing number of [Chinese reverse-merged companies] are proving to have significant accounting deficiencies or being vessels of outright fraud."[3] As of June 19, 2012, 67 China-based issuers had had their auditors resign, and 126 issuers had been delisted from U.S. exchanges or simply stopped filing reports with the SEC.[4] Even Chinese regulators have expressed contempt for these companies after many of them turned out to have been frauds, noting that the companies could not have listed on major Chinese exchanges. [5]

64. ShengdaTech's reverse merger occurred on March 31, 2006. That same day, ShengdaTech filed a registration statement for the resale of 8,312,603 shares. The SEC responded with a so-called "bedbug letter" – a letter indicating that the registration statement "is so poorly prepared or entails problems so serious that the staff will not review the statement."

[3] Full text available at: http://www.sec.gov/news/speech/2011/spch040411laa.htm

[4] Lewis H. Ferguson, Investor Protection Through Audit Oversight, Speech delivered in Shanghai SEC Conference, June 19, 2012, available at < http://pcaobus.org/News/Speech/Pages/06192012_FergusonSECConference.aspx>.

[5] Statement of Professor John C. Coffee, Jr., at Hearings Before the Subcommittee on Capital Markets and Government Sponsored Entities of the Committee on Financial Services of the United States House of Representatives, at 3, available at http://financialservices.house.gov/uploadedfiles/hhrg-112-ba16-wstate-jcoffee-20120726.pdf.

On August 31, 2006, the Company refiled its registration statement. After multiple rounds of comments and revisions back-and-forth with the SEC, the registration statement was declared effective on January 16, 2007.

65. On May 14, 2008, ShengdaTech restated financial statements for the year ended December 31, 2007.[6]

66. The day it issued the restatement, ShengdaTech announced an offering of an aggregate of $100 million of 6.0% senior convertible notes.

67. On June 25, 2008, ShengdaTech sold $100 million of debt securities, convertible into common stock at a fixed ratio (the "2008 Offering"). The 2008 Offering was underwritten by Oppenheimer & Co, Inc., Roth Capital Partners, LLC, and Brean Murray, Carret & Co., LLC.

b. **ShengdaTech lies to its auditor, and both Ernst & Young and KPMG determine that ShengdaTech has materially deficient internal controls on financial reporting. KPMG assists ShengdaTech in covering up materially false statements in its SEC filings.**

68. [redacted] n January 2008, [redacted] sole director, a position she would keep until October 2011.

[6] A restatement is a drastic accounting remedy; it is to be used for material accounting errors that existed at the time the financial statements were prepared. See Statement of Financial Accounting Standards ("SFAS") 154 and APB Opinion No. 20. Changes in accounting principles or changes in accounting estimates do not result in a restatement of financial statements. SFAS 154 ¶B10, pg. 25. Since ShengdaTech issued a restatement, it therefore admitted that all of the changes required by the restatement were the result of accounting *errors*.

[redacted]

[redacted]

[redacted]

[redacted]

71. On April 1, 2009, ShengdaTech filed its annual report on Form 10-K. The report contained financial statements for FY 2008 and an audit opinion by KPMG. The financial statements vastly overstated ShengdaTech's true financial performance in FY 2008. KPMG certified that ShengdaTech's financial statements were stated in accordance with Generally Accepted Accounting Principles ("GAAP") and that its audit met PCAOB Standards.

72. KPMG also certified that ShengdaTech's internal controls had material weaknesses "related to the lack of policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes."

73. If an issuer discovers that its previous financial statements contained materially false statements, it ***must*** restate them. An issuer may not change its previous financial statements without calling attention to the change, letting investors know they should no longer rely upon the incorrect statements in previous financial statements.

[redacted]

75. Hence [redacted], instead of alerting investors that ShengdaTech's financial statements for FY 2007 contained false statements, ShengdaTech merely discreetly observed that "[a]s of December 31, 2007, the Company owed [SST] $1,121,230, comprised primarily of $869,179 for rent expense and $199,621 for purchase of property, plant and equipment"[7] in its 2008 10-K.

[7] 2008 10-K at F-19.

[redacted]

[redacted]

[redacted]

**c. KPMG blesses ShengdaTech's 2009 financial statements.**

78. On March 15, 2010, ShengdaTech filed its annual report on Form 10-K for FY 2009. The annual report contained financial statements for fiscal years 2008 and 2009 and an audit opinion by KPMG.

79. The 10-K filed on March 15, 2010 included an opinion by KPMG that stated that ShengdaTech's financial statements comported with U.S. Generally Accepted Accounting Principles ("GAAP"). KPMG added that it had conducted its audit in accordance with PCAOB Standards:

> We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of [December 31, 2008, or December 31, 2009], and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. [...] ***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States)***. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes

[redacted]

> examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. [...] In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries [...] ***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles***.[9]

[Emphasis added].

80. In conducting the audit of ShengdaTech's financial statements for the year ending December 31, 2009, KPMG became aware that [redacted] KPMG noted the statement in its files.

**d. ShengdaTech discovers that one of ShengdaTech's purported top ten customers for 2009 had been bankrupted and deregistered in 2008.**

[redacted]

[9] The 10-K contained two statements by KPMG: one about ShengdaTech's 2008 financial statements, and the other about ShengdaTech's 2009 financial statements. KPMG also made the statement concerning ShengdaTech's 2008 financial statements in ShengdaTech's 10-K for the year ended December 31, 2008.

[redacted] Under PRC law, if [redacted] AIC registration was revoked, the People's Bank of China[10] required that its bank accounts be closed.[11] And without a business license, [redacted] could not legally conduct business in the PRC. Hence, because [redacted]

[redacted]

84. [redacted]. ShengdaTech recognizes revenues, identically with GAAP, when "(1) it has persuasive evidence of an arrangement, (2) delivery has occurred, (3) the sales price is fixed or determinable, and (4) ***collectability is reasonably assured***." (Emphasis added).[12]

85. Since ShengdaTech had been selling product [redacted] Hence, ShengdaTech should not have recognized revenues from sales to [redacted] in the just-filed 10-K.

**e. In December 2010, KPMG states that it did not know of any reason why ShengdaTech's financial statements were inaccurate, Morgan Stanley claims**

---

[10] The Central Bank (i.e., Federal Reserve equivalent) of the People's Republic of China.

[11] Measures for the Administration of RMB Bank Settlement Accounts, issued in April 2003 (No.5 [2003]), Article 49.

[12] ShengdaTech, Inc., 2009 10-K, at 41, available at < http://www.sec.gov/Archives/edgar/data/1160165/000114420410013515/v177358_10k.htm>.

**it has conducted adequate due diligence, and ShengdaTech sells $130 million of its bonds.**

86. On June 15, 2010, ShengdaTech filed a shelf registration statement on Form S-3. The shelf registration statement was for the sale of $100 million in equity securities, with net proceeds going to ShengdaTech. That day, KPMG expressly consented to the use of its audit reports in ShengdaTech's registration statement.

87. On August 10, 2010, ShengdaTech restated its financial statements for the six and nine month periods ending June 30 and September 30, 2008.

88. On October 20, 2010, ShengdaTech filed an amended shelf registration statement on Form S-3.

89. The registration statement filed October 20, 2010, provided:

> **Mr. Zhen Chen** has served as general manager of Shaanxi Haize Nano since September 2010. He served as general manager of Shandong Haize Nano from July 2010 to August 2010. From October 2003 to June 2010, he served as general manager of ***[SSCM] a subsidiary of [SST], a related party of the Company***. [Emphasis added].

90. On October 20, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement filed October 20.

91. On November 8, 2010, ShengdaTech amended its Shelf Registration statement on Form S-3 to a registration statement on Form S-1. A registration statement on Form S-1 is used to immediately sell securities. Therefore, ShengdaTech aimed to sell the securities covered in the registration statement – $100 million of equity securities – as soon as the SEC declared its registration statement effective. The November 8 2010 registration statement repeated the statement that "[SSCM] was a subsidiary of [SST], a related party of the Company." On

November 8, 2010, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement.

92. On November 18, 2010 ShengdaTech filed an amended shelf registration statement on Form S-1. On November 18, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement, and again stated that "[SSCM] was a subsidiary of [SST], a related party of the Company."

93. ShengdaTech had been accepting checks or bills to settle its customers' purchases. ShengdaTech had not been preserving these checks or bills. In November 2010, KPMG requested that ShengdaTech keep evidence of payments it actually received to settle accounts receivable, and obtained fourteen such bills before ShengdaTech told it in December 2010 that it no longer accepted checks or bills as payments. The bills were obvious forgeries, and when KPMG accused ShengdaTech of fraud mere months later, it would point to these bills as evidence of the fraud.

94. Having abandoned its plan to sell its shares in a public offering, ShengdaTech instead sold $130 million of convertible bonds through the Private Placement closing in December 2010.

95. In connection with this private placement, on December 9, 2010, KPMG provided to the underwriters of the private placement a comfort letter. In this comfort letter, KPMG represented that:

(a) It was aware that ShengdaTech planned to sell convertible bonds through a private placement;

(b) It had reviewed a Private Placement Memorandum;[13]

[13] The Private Placement Memorandum KPMG reviewed was substantially identical to

(c) It was aware that KPMG's audit report and review of ShengdaTech's 2010 quarterly financial would be used in the Private Placement, and consented to this use; and

(d) It was aware that purchasers in the Private Placement Memorandum would rely on KPMG's opinions of ShengdaTech's financial statements.

96. As to ShengdaTech's financial statements, KPMG represented in the comfort letter that:

(a) "Nothing came to our [i.e., KPMG's] attention as a result of the [review of ShengdaTech's 2010 quarterly financial statements] however, that caused us to believe that [1)] any material modifications should be made to the unaudited condensed consolidated financial statements [] included in the Preliminary Offering Memorandum for them to be in conformity with U.S. generally accepted accounting principles [or 2)] the unaudited condensed consolidated financial statements [for the first three quarters of 2010] do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC"; and

(b) "In our opinion, the consolidated financial statements audited by us and included in the Preliminary Offering Memorandum, comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC."

---

the final PPM.

97. KPMG also represented "[f]or purposes of this [comfort] letter, we have read the 2010 minutes of the meetings of the board of directors and committees of directors, including the audit committee of the Company."

98. On December 9, 2010, ShengdaTech issued a press release announcing plans to offer an aggregate of $90 million of senior convertible notes due 2015 in a private placement, instead of the previously planned public offering of equity securities. The Company also announced that it intended to grant the initial note purchasers an option to purchase an additional $30 million of such notes.

99. On December 10, 2010, ShengdaTech announced that it entered into a purchase agreement with Morgan Stanley, relating to the sale by the Company of $130 million aggregate principal amount of ShengdaTech's 6.50% Senior Convertible Notes due 2015 (the "2015 Notes"), in a private placement. ShengdaTech also announced that it intended to use some of the net proceeds from the Private Placement to repurchase $67 million of the Company's 2018 Notes, and also to finance its NPCC production capacity expansion, research and development activities and other working capital requirements.

[redacted]

[redacted]

[redacted]

[redacted] On March 2, 2011, KPMG informed ShengdaTech's Audit Committee of "potentially serious discrepancies and unexplained issues" KPMG had discovered in auditing ShengdaTech's financial statements for FY 2010 [redacted]

102. On March 3, 2011, KPMG provided a memorandum to ShengdaTech's audit committee, outlining specific evidence of fraud that KPMG had uncovered on March 1-2, 2011:

[redacted]

[redacted]

g. **ShengdaTech quickly collapses.**

103. On March 4, 2011, ShengdaTech formed a special committee (the "Special Committee") to oversee the Internal Investigation. The Special Committee was composed of ShengdaTech's independent directors who made up the Audit Committee.

104. The Special Committee engaged the law firm O'Melveny & Myers LLP ("OMM") to conduct an independent investigation into the potential issues raised by KPMG. In turn, OMM retained PricewaterhouseCoopers LLP ("PwC") to provide forensic accounting support for its investigation.

105. On March 14, 2011, after market close, trading in ShengdaTech's common stock was suspended by NASDAQ.

106. On March 15, 2011, ShengdaTech issued a press release relating that it had appointed a special committee "to investigate potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records."

107. On March 15, 2011, NASDAQ changed the reason for the halt, stating that "trading [would] remain halted until ShengdaTech, Inc. has fully satisfied NASDAQ's request for additional information."

108. On April 29, 2011, KPMG informed ShengdaTech of its resignation as the Company's independent registered public accounting firm effective immediately, saying that "[t]he manner of management's conduct during the investigation by a special committee of the Board of Directors raises doubts about management's representations provided to [KPMG] in

connection with [its] 2008 and 2009 audits of the consolidated financial statements and the effectiveness of internal control over financial reporting of the Company." KPMG added that "disclosures should be made and action should be taken to prevent future reliance on [KPMG's] previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and related consolidated statements of income, shareholder's equity and comprehensive income, and cash flows for the years then ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009."

109. On May 5, 2011, ShengdaTech filed a current report on Form 8-K, providing that:

> KPMG previously informed the Company's Audit Committee of certain concerns arising during its incomplete audits of the Company's consolidated financial statements as of and for the year ended December 31, 2010, and the effectiveness of internal control over financial reporting as of December 31, 2010. These concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT [Value-Added Tax] invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

110. On June 8, 2011, the NASDAQ Listing Qualifications Panel confirmed its decision to delist ShengdaTech's common stock. All trading of the Company's stock was suspended on June 10, 2011.

111. On June 9, 2011, ShengdaTech announced that it was in default on convertible bonds securities issued in the Private Placement and in an earlier private placement.

112. The SEC commenced a regulatory proceeding, *In re ShengdaTech, Inc.* (LA-3397) on August 11, 2011. The proceeding resulted in an SEC Order which noted potential

violations of the federal securities laws arising from false statements made in the 2009 Form 10-K, the 2009 Form 10-K/A, and the 2009 and 2010 Form 10-Qs.

113. On August 19, 2011, ShengdaTech fired CEO Chen and filed a bankruptcy petition under Chapter 11 of the Bankruptcy code. Plaintiffs' Notes, pursuant to their terms, became immediately due and payable.

114. Also on August 19, 2011, SEC enforcement staff served ShengdaTech a subpoena requesting documents relating to ShengdaTech's finances, taxes, bank accounts, sales, financial statements, internal auditing, and professional services rendered in connection therewith, as well as hiring, firing and compensation of its officers and directors. ShengdaTech complied and provided the information to the SEC.

115. On August 24, 2011, ShengaTech obtained a Temporary Restraining Order against its CEO. ShengdaTech also sought a preliminary injunction confirming the terms of the Temporary Restraining Order. The court granted both.

116. Pursuant to this request for a preliminary restraining order, on September 2, 2011, the Bankruptcy Court entered an order approving ShengdaTech's findings of fact (previously filed on the Court's public docket at Dkt. # 2). The bankruptcy court found:

(a) That ShengdaTech's employees prevented the independent investigation from verifying ShengdaTech's cash accounts, giving rise to an inference that ShengdaTech had fabricated those accounts. (*Id.* at ¶ 12);

(b) That U.S. banks against which ShengdaTech purportedly held certificates of deposit had no record of issuing any of them. (*Id.* at ¶ 13).

(c) That ShengdaTech had entered into undisclosed related-party transactions, and that the sales to the undisclosed related parties were "vastly overstated." (¶ 20).

117. On June 20, 2012, ShengdaTech filed its disclosure statement to creditors, disclosing that many of ShengdaTech's sales had been to related-parties owned by its CEO Chen, and those sales are "not supported" and likely "vastly overstated". (*In re ShengdaTech, Inc.*, 11-52649-bt (D. Nev.), Dkt. # 540, at 15.)

## VI. KPMG FALSELY STATED THAT ITS AUDIT COMPLIED WITH PCAOB STANDARDS.

118. KPMG represented that its audit of ShengdaTech complied with standards promulgated by the Public Company Accounting Oversight Board (the "PCAOB", and "PCAOB Standards"). *See* ¶¶ 61-62, above.

119. PCAOB Standards require of auditors that they obtain independent confirmation of certain financial statement entries. An auditor obtains a confirmation by writing a letter to an entity identified in the client's books as being the counterparty for an entry (the "Confirming Entities"). Thus, for example, to confirm that ShengdaTech held a bank balance, KPMG should have written to the bank, asking it to confirm that ShengdaTech's bank account existed and that the balance on ShengdaTech's purported account statement was accurate.

120. But KPMG never directly communicated with the Confirming Entities. Instead, KPMG corresponded with ShengdaTech insiders, who fraudulently confirmed ShengdaTech's statements.

121. Separately, ShengdaTech's subsidiaries provided accurate financial statements to the AIC. AIC-filed financial statements can be obtained by a company's agents. KPMG knew of

AIC filings; indeed, in auditing ShengdaTech, KPMG in several instances used other companies' AIC filings to confirm or contest ShengdaTech representations made about these other companies. However, ShengdaTech's subsidiaries' AIC-filed financial statements showed total revenue from all of them of less than $10 million

[redacted]

**a. KPMG culpably conducted third party confirmations.**

123. The purpose of confirmation is ***independently*** to verify the client's representations concerning its business affairs. Thus, PCAOB Standards provide that auditors should "establish[] direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses." AU § 330.28.[14] Establishing direct communication with the Confirming Entities is a "fundamental" and "elementary" auditing requirement, and auditors have been fined and barred by the SEC for not doing so.[15] To ensure that it has direct contact, the auditor should not provide the client the confirmation form, to be forwarded to the Confirming Entity, but should mail the form itself. And where the source of a response is uncertain – the PCAOB Standards use as an example an auditor who receives a faxed response – the auditor should take further precautions to verify that it is directly communicating with the Confirming Entity, such as verifying the response with a phone call to the known telephone number of the purported sender. AU § 330.29.

[14] Citations to AU § __ are to the relevant provisions of the standards promulgated by the PCAOB.

[15] Securities and Exchange Commission, SEC Charges India-Based Affiliates of PWC for role in Satyam Accounting Fraud, April 1, 2011, available at < http://www.sec.gov/news/press/2011/2011-82.htm>.

124. To obtain an address at which to mail a confirmation letter, the auditor should take reasonable steps to ensure that it is sending the confirmation request to the intended recipient. Such steps should include, at a minimum, seeking to obtain or confirm a correspondence address from publicly available sources. The auditor should also include a return envelope, addressed to the auditor – not to the client – to ensure that the auditor receives the Confirming Entity's response.

125. KPMG was required to confirm at least four entries in ShengdaTech's financial statements: (a) bank accounts and balances; (b) accounts payable; (c) accounts receivable; and (d) tax payments and liability. But KPMG never mailed any of these confirmations directly to the Confirming Entities. As a result, KPMG failed to establish direct communications with the Confirming Entities, violating PCAOB Standards.

126. Moreover, in many cases, KPMG obtained confirmations that were inauthentic on their face. For example, confirmations purportedly received from a bank bore the wrong bank branch's chop, and one bank's chop varied from year to year.

*i. Cash balances.*

127. A statement of the company's cash is a crucial component of its financial statements, and financial statements include an entry for cash and cash equivalents. A company committing fraud will, broadly, claim revenues or cash it did not have. Cash must be placed somewhere; thus, companies engaging in fraud frequently must overstate the cash they have in their bank accounts, because they had not earned the cash they claimed to have. Thus, verifying cash balances provides a check on other fraud, because if a company is fraudulently inflating its cash flow and revenues, an independent confirmation may detect that the company did not have the cash it said it had earned.

128. Auditors confirm the existence and amount of bank balances by sending the banks confirmation letters. The confirmation letter provides the bank a bank statement, and asks the bank to confirm, at least, account numbers, the account balance as of the last day of the fiscal period, and their interest rate.

129. ShengdaTech claimed to have about $116 million in cash as of December 31, 2009, including in the following bank accounts:

| | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| Agricultural Bank of China – Qianxian Branch | $17,293,625 (ACTUALLY HELD: $30,894.56)[16] | $48,639,836 (ACTUALLY HELD: $73,783.64) | $83,042,350 |
| China Merchants Bank – Jinan Branch | $33,049,917 | $31,829,551 | $73,118,638 |
| Bank of China – Tai'an Branch | $35,936 (ACTUALLY HELD: $1,385.85) | $1,793,218 (ACTUALLY HELD $22,387) | $1,994,382 |
| Three Bank total | $51,159,012 | $82,262,606 (ACTUALLY HELD $2.8 MILLION) | $158,155,369 |
| ShengdaTech total cash | $114,287,073 | $115,978,763 | Never filed |
| Percentage of ShengdaTech cash purportedly held at Three Banks | 44.8% | 70.9% | Never filed |

[redacted]

130. In reality, ShengdaTech dramatically overstated the cash reserves it held at each of the banks:

(a) ***Agricultural Bank of China – Qianxian Branch***: An entity purporting to be the Agricultural Bank of China confirmed ShendaTech's purported account balances as of December 31, 2008, 2009, and 2010. However, the confirmations KPMG received in 2009 and 2010 bore different chops than the one it received in 2008.

In February 2011, KPMG received a letter from an entity claiming to be the Agricultural Bank of China, confirming ShengdaTech's balances there. But on March 1, 2011, KPMG obtained the Agricultural Bank's phone number from a public service, and attempted to confirm that the bank had received KPMG's confirmation request. The bank informed KPMG that it had never received the confirmation KPMG had purportedly sent. When KPMG sent the request directly to the bank, the bank informed KPMG that ShengdaTech could not have had an $83 million bank account because the bank only had about $30[17] million in all its business accounts.

[redacted]

[17] RMB 200,000,000.

(b) ***China Merchants Bank – Jinan Branch***: ShengdaTech claimed to have a U.S. dollar denominated offshore account at China Merchants Bank. KPMG received confirmations for fiscal years 2008, 2009, and 2010 from an entity purporting to be China Merchants Bank. The confirmations were from China Merchant Bank's Jinan Branch, and the chops purported to be those of the Jinan Branch.

On March 2, 2011, KPMG called China Merchant Bank - Jinan Branch's customer service department. The representative informed KPMG that China Merchants Bank had not received KPMG's confirmation request, and that all offshore accounts were confirmed through the bank's head office. KPMG then called the China Merchant Bank's hotline, which confirmed that the head office itself responds to any confirmation request concerning an offshore account, affixing its own chop. Thus, the confirmations bearing a chop purporting to be from the Jinan Branch were fraudulent on their face.

(c) ***Bank of China – Tai'an Branch***: KPMG sent the bank a confirmation for the balance in the year ended December 31, 2010. On March 1, 2011, KPMG called the bank's Customer Account Management Services, who informed KPMG that the bank had never received a confirmation. The bank responded to KPMG's confirmation request, sent March 1, 2011, on March 9, 2011, indicating that ShengdaTech's account held RMB 90,000 and $68.

131. The Bank of China, China Merchants Bank, and the Agricultural Bank of China (the "Three Banks") are all large Chinese banks. The Three Banks have, and had since much earlier than 2008, hotlines that members of the public can call to obtain information, including a correspondence address for each of the branches at which ShengdaTech purportedly held accounts. Similarly, each of Bank of China (since at least June 2006), China Merchants Bank (since at least 2006), and the Agricultural Bank of China (since at least January 14, 2010) have websites on which they list all their branches' correspondence addresses and contact information.

132. KPMG's audit work, conducted in two days (March 1-2, 2011), allowed it to quickly determine that ShengdaTech had committed fraud and that the documents ShengdaTech had provided to KPMG were forged and bore obvious errors:

| Bank | True contact information obtained through | Forgery evidence in confirmation documents obtained by KPMG in 2008 and 2009 |
|---|---|---|
| ***Agricultural Bank of China – Qianxian Branch*** | Public information hotline | Documents bore different chops |
| ***China Merchants Bank – Jinan Branch*** | Unknown; contact information was available on bank's website or through bank's hotline | Documents bore chop of wrong branch |
| ***Bank of China – Tai'an Branch*** | Unknown; contact information was available on bank's website or through bank's hotline | Unknown |

133. KPMG did not establish direct communication with the Banks in connection with its audits of ShengdaTech's 2008 and 2009 financial statements.

134. When KPMG established direct communication with the Banks, they informed KPMG that ShengdaTech's bank balances were vastly smaller than ShengdaTech represented in its SEC filings.

*ii. Accounts payable and expenditures.*

135. Auditors must confirm that accounts payable on a company's balance sheet are accurately stated.

136. Accounts payable are confirmed by sending confirmations to the companies listed as being owed cash in the company's financial statements – typically its largest suppliers.

137. Because accounts payable are owed to the company's large suppliers, if the auditor cannot confirm accounts payable, it is possible that the client's cost of goods sold, an entry on the client's income statement, is incorrect. Since cost of goods sold is a critical financial metric, if costs of goods sold is incorrect, then so are earnings.

138. In its audit of the 2010 financial statements, KPMG decided to conduct a physical site visit to two suppliers – Xianyiang Chuangfa and Xintai Guangfa. ShengdaTech told KPMG that these customers would not consent to a site visit. Then, aided only by a web search, KPMG sought to contact the suppliers:

(a) **Xianyang Chuangfa Trading Co., Ltd**, was ShengdaTech's purported largest supplier in 2009, and its second-largest supplier in 2008. In 2008, it purportedly accounted for $9,487,147 in expenditures (about 20.6% of ShengdaTech's total 2008 expenditures). In 2009, it purportedly accounted for $8,603,647 in expenditures (about 16.3% of ShengdaTech's purported 2009 expenditures). On February 17, 2011, ShengdaTech informed KPMG that Xianyang would not agree to a site visit. KPMG then obtained Xianyang's phone number from Xianyang's website, and called it on March 1, 2011 to confirm accounts payable and 2010 sales to ShengdaTech. Xianyang staff

answered that ShengdaTech did not have an accounts payable balance, and quickly confirmed that Xianyang had not made any sales to ShengdaTech after Xianyang had sent a few samples in 2006 or 2007. Xianyang refused to provide a written confirmation of the accounts payable and 2010 transactions, because there were none.

(b) **Xingtai Guangfa** was a purported substantial supplier to ShengdaTech in 2009. Its sales to ShengdaTech in 2009 were purportedly $4,152,490, or about 7.9% of ShengdaTech's total sales. KPMG conducted a web search but found no contact information. KPMG then sought the company's records from the AIC office. When KPMG called the contact number it obtained from the AIC, the automatic message said the number was unregistered.

(c) ***Shouguang Shileda Steel Structure Engineering Co., Ltd.***, built ShengdaTech's Shanxi Haize plant in 2007 and 2008, and made no other sales to ShengdaTech. The Shaanxi Haize plant transaction amount was about $1.29 million. But ShengdaTech recorded purchases from Shouguang Steel of about $7.49 million, an overstatement of about $6.2 million. The Internal Investigation team discovered the overstatement merely by calling Shouguang Shileda.

*iii. Accounts receivable and revenues.*

139. Auditors are required to confirm that accounts receivable on a company's balance sheet are accurately stated.

140. Accounts receivable are confirmed by sending confirmations to the companies listed as owing accounts receivable in the company's financial statements – typically its largest customers.

141. Because accounts receivable are owed by the company's large customers, an inability to confirm accounts receivable may also cast doubt on whether the company's revenues are accurately stated.

[redacted]

*iv. Taxes paid and tax liabilities.*

143. China imposes a Value-Added Tax ("VAT") on purchases, acceptance or provision of services, and certain other business activities in the PRC. China also imposes an income tax.

144. The Chinese government requires that certificates of payment or receipt (called "fapiao") be issued in most scenarios in which a sale is made (in ShengdaTech's case, every time a purchase or sale was made). The seller issues a fapiao to memorialize the tax it has collected in the sale. After receiving the invoice, the parties may not alter the sales and payment terms.

Chinese authorities use fapiao to monitor the tax paid on all transactions to prevent tax avoidance and related fraud and strictly police it.

145. Fapiao are printed by the local tax authorities, and taxpayers must purchase enough fapiao to be able to issue one in all transactions requiring a fapiao. Each fapiao has a unique combination of code and number. And Chinese tax authorities keep records of all fapiao issued, and the persons who bought them. Persons may not give or sell fapiao they have obtained from tax authorities to other persons. Thus, if the code and number are known, it is possible to determine which person has bought, and therefore should issue, the fapiao. If it is not that person who issues the fapiao, then the fapiao is, at least prima facie, inauthentic. Both the invoice received by the purchaser and the invoice kept by the seller bear this code and number.

146. Since July 24, 2008, Shandong province – in which ShengdaTech conducted most of its operations – has been providing a service to verify fapiao. The well-publicized service[18] is available through on the Shandong National Taxation Bureau's website, boasts its own dedicated maintenance and question response staff, and had received about 100 million visits by November 2011.

147. Shandong Province issued an advisory article on October 22, 2009, providing simple instructions on how to determine if a VAT invoice is authentic: visit the Shandong Province National Taxation Bureau's website (www.sd-n-tax-gov.cn), click on a link titled "Invoice Verification" directly available on that page, and then enter the VAT invoice code and the VAT invoice number, which appear on the fapiao itself. The website will then provide the name of the issuer to whom the Shandong Province government had sold the fapiao; if the

[18] The platform was publicized, for example, in various Chinese-language articles issued by the National Burea of Shandong Province, found at <http://www.sd.xinhuanet.com/news/2008-07/24/content_13920836.htm>, <http://www.taxlawyer.com.cn/nc/3ECCE.html>, and <http://www.chinesetax.net/index/SingleInfoShow.asp?InfoID=88737>.

invoice is authentic, the issuer name displayed will match the issuer name on the face of the invoice being tested. If not, the advisory article advises the user to bring the invoice to a local national taxation office to obtain a final verification and/or report the crime.

[redacted]

*v. General evidence of fraud from the confirmation process.*

149. The documents received by KPMG in the confirmation process should have alerted it that ShengdaTech was interfering with confirmations to protect its fraud.

150. ShengdaTech has major subsidiaries and operations in two Chinese provinces – Shandong and Shaanxi – separated by about 500 miles. Because of this distance, KPMG created two different audit teams, one for Shandong and one for Shaanxi.

151. The audit teams each sent confirmations relating to their respective audits. Thus, to confirm ShengdaTech sales made by Shaanxi subsidiaries, KPMG's Shaanxi team sent confirmations to the Shaanxi Confirming Entities. To confirm ShengdaTech sales made by its Shandong subsidiaries, the Shandong team sent confirmations to the Shandong Confirming Entities.

152. The two KPMG audit teams provided the Confirming Entities with self-addressed envelopes, but the envelopes were addressed to the specific *team* rather than to KPMG more generally. Thus, the Shaanxi teams provided envelopes addressed to the Shaanxi team, and the Shandong team provided envelopes addressed to the Shandong team.

153. In its audit of ShengdaTech's 2010 financial statements, KPMG began to take note that the confirming entities were responding with incorrect envelopes. Thus, it quickly found five purported ***Shandong*** customers who collectively "confirmed" about $5.4 million of purchases from ShengdaTech but responded with an envelope provided by and addressed to the KPMG ***Shaanxi*** team. Because those customers had actually been sent a confirmation package and envelope addressed to the KPMG ***Shandong*** team, they should not have had access to a Shaanxi-addressed envelopes, as KPMG pointed out to ShengdaTech when it began to take note of these obvious discrepancies.

**b. KPMG culpably represented that ShengdaTech's financial statements did not contain errors even though these financial statements omitted to disclose material related-party transactions.**

*i. Auditors must ensure their client discloses all related-party transactions, and must conduct additional review to verify that such transactions were not fraudulent.*

154. In SEC filings, issuers must report all material transactions with related parties. Related parties are companies that are partly or wholly owned, directly or indirectly, by certain members of management or directors. SEC Regulation S-K ("Reg. S-K"), together with the General Rules and Regulations under the Securities Act and the Exchange Act and the forms under these Acts, states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and Registration Statements on Form S-1. See Reg. S-K. [17 C.F.R. §229.10].

155. Reg. S-K Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or

any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." [17 C.F.R. §229.404]

156. Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

157. A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

158. Auditors must ensure that all related-party transactions are disclosed in (among other places) the issuer's annual reports. Auditors accomplish this disclosure by ensuring that they have a complete and accurate list of related parties, and ensuring that all transactions with these related parties are disclosed.

159. It is an auditing common-place that related-party transactions merit further scrutiny, in part because management can use such transactions to conceal fraud. For example, as the related party's owners, management can use transactions with related parties to overstate revenues or conceal liabilities. Thus, having identified related-party transactions, the auditor should examine them with care to determine whether they are fraudulent:

[AU Section 334.09]

> After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient appropriate evidential matter and should extend beyond inquiry of management. Procedures that should be considered include the following:

*a.* Obtain an understanding of the business purpose of the transaction. [FOOTNOTE: Until the auditor understands the business sense of material transactions, he cannot complete his audit. If he lacks sufficient specialized knowledge to understand a particular transaction, he should consult with persons who do have the requisite knowledge.]
*b.* Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents.
*c.* Determine whether the transaction has been approved by the board of directors or other appropriate officials.
*d.* Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements.
*e.* Arrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.
*f.* Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral.

[AU Section 334.10]

When necessary to fully understand a particular transaction, the following procedures, which might not otherwise be deemed necessary to comply with generally accepted auditing standards, should be considered. [Footnote omitted]

*a.* Confirm transaction amount and terms, including guarantees and other significant data, with the other party or parties to the transaction.
*b.* Inspect evidence in possession of the other party or parties to the transaction.
*c.* Confirm or discuss significant information with intermediaries, such as banks, guarantors, agents, or attorneys, to obtain a better understanding of the transaction.
*d.* Refer to financial publications, trade journals, credit agencies, and other information sources when there is reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.
*e.* With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transaction. Such information may be obtained from audited financial statements, unaudited financial statements, income tax returns, and reports issued by regulatory agencies, taxing authorities, financial publications, or credit agencies. The auditor should decide on the degree of assurance required and the extent to which available information provides such assurance.

160. In sum, the auditor should understand the business sense of transactions with related-parties, examine primary documents, determine whether it is Board-approved, inspect documents held by the related party, and discuss with third parties. And if transactions with a

related appear to be too large considering the related party's business scope, the auditor should investigate the related party to determine whether the transactions are shams.

1. *ShengdaTech management lie about their positions at SSCM/Haiqing, and then spin an implausible story when they are caught.*

161. ShengdaTech CEO Xiangzhi Chen was also 51.79% shareholder of ShengdaTech supplier SST. SST, in turn, wholly owned Shandong Shengda Chemical Machinery Co., Ltd. ("SSCM"), which was also a ShengdaTech supplier. Thus, both SST and SSCM are related parties.

162. Until at least December 31, 2008, ShengdaTech CEO Xiangzhi Chen was SSCM's CEO. In addition, SSCM's legal representative[19] and general manager, and CEO, was at all times a highly-placed ShengdaTech employee, the general manager of one of ShengdaTech's subsidiaries.

163. In August 2007, SSCM changed its name to Shandong Haiqing Chemical Co. Ltd. ("Haiqing"). Accordingly, this Complaint refers to the entity interchangeably as "SSCM," "Haiqing," or "SSCM/Haiqing".

164. ShengdaTech represented to its then-auditor that in August 2007, SST sold its interest in SSCM. Based on ShengdaTech's representation, SSCM was not disclosed as a related party in ShengdaTech's 2007 financial statements, and transactions with it were not disclosed as

[19] A company's legal representative is the person tasked with running the company's affairs. The legal representative must be authorized to perform all acts regarding the general administration of the company, including acting to preserve the company's assets, executing powers of attorney, authorizing legal representation of and litigation by the company, and executing any transaction. A company is liable for unauthorized actions of a legal representative.

related party transactions. Nevertheless, Xiangzhi Chen continued to be SSCM's CEO until at least December 31, 2008.

[redacted]

166. And throughout, Xiangzhi Chen's protégé Zhen Chen continued to be the legal representative and general manager of SSCM/Haiqing.

[redacted] Moreover, SST had purportedly sold SSCM to Prosper Crown Limited. Prosper Crown Limited is a Hong Kong company, and its corporate filings are available, for a small fee, from a website open to the public. Prosper Crown's corporate filings show that in January 2008, [redacted] became its sole director, which she remained until October 2011. [redacted]

[redacted]

170. And ShengdaTech's claim that SST had sold its interest in SSCM/Haiqing in July 2007 was implausible; both SSCM and ShengdaTech have extensive operations, and being their CEO is a full time job, so why would Xiangzhi Chen agree to be both their CEOs? [redacted]

171. Yet KPMG merely asked ShengdaTech to represent that SSCM was not a related party. With that representation in hand, it skipped the exacting process an auditor must engage in to review related party transactions.

[redacted]

172. If an auditor discovers that a client has made materially false statements, it cannot simply make the client correct the mistakes going forward; it must make the client withdraw and restate the financial statements containing the false statements.

[redacted]

[redacted]

[redacted]

[redacted]

180. On April 1, 2009, ShengdaTech filed its 10-K for the year ended December 31, 2008. The 10-K did not restate ShengdaTech's 2007 financial statements, as it was required to, and stated that SSCM was not a related party as of January 1, 2009.

[redacted]

[redacted]

[redacted]

[redacted]

184. Documents available to ShengdaTech at the time of the audit of ShengdaTech's 2009 financial statements showed that [redacted] was a related party:

(a) A recruiting website ad put out by [redacted] stated it was a subsidiary of SST.

(b) AIC filings showed that [redacted], legal representative and general manager of [redacted], is the general manager of Shaanxi Haize, one of ShengdaTech's Chinese subsidiaries.

(c) The corporate filings of Prosper Crown Limited show that [redacted] was its sole director.

185. In late 2010, SSCM/Haiqing manager Zhen Chen became general manager of Shaanxi Haize. Then, in its SEC filings, ShengdaTech provided a short description of Zhen Chen:

> **Mr. Zhen Chen** has served as general manager of Shaanxi Haize Nano since September 2010. He served as general manager of Shandong Haize Nano from July 2010 to August 2010. From October 2003 to June 2010, he served as general manager of Shandong Haiqing Chemical Co., Ltd., ***a subsidiary of Shandong Shengda Technology Co., Ltd., a related party of the Company***.[20]
> [Second emphasis added].

[20] See, e.g., Registration Statement on Form S-3/A, filed October 20, 2013, available at < http://www.sec.gov/Archives/edgar/data/1160165/000114420410054583/v199228_s1a.htm>.

186. Auditors must exercise additional care when reviewing related party transactions, because management can use related parties to hide its fraud. Auditors should obtain a list of related parties prior to conducting the audit, so that they can more closely monitor transactions with these entities. At a minimum, an auditor should list as related parties all companies identified as related parties in the client's public filings.

187. On March 1-2, 2011, KPMG obtained SSCM/Haiqing's SAIC filings, which showed that Zhen Chen was SSCM/Haiqing's general manager and legal representative. Based on this finding, KPMG accused ShengdaTech of fraud. That KPMG accused ShengdaTech of fraud for concealing a related-party transaction implies that KPMG did not know that SSCM/Haiqing was a related party prior to its audit. Hence, KPMG had not conducted the additional audit work necessary to evaluate related-party transactions.

[redacted]

| | | | | |
|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

189. ShengdaTech has admitted that many of its suppliers were owned by its CEO Chen. ShengdaTech has admitted that purchases from these suppliers reflected in its books appeared "vastly overstated."

**c. KPMG had evidence available to it before the Private Placement that showed that ShengdaTech was engaging in fraud.**

*i. ShengdaTech's purported revenues exceeded the likely global market for ShengdaTech's products.*

190. In conducting the audit of ShengdaTech's financial statements for the year ending December 31, 2009, KPMG became aware that [redacted] KPMG noted the statement in its files, and later cited it as evidence that ShengdaTech was engaged in fraud.

*ii. KPMG discovers that one of ShengdaTech's purported largest customers in 2009 had been bankrupted and deregistered in 2008, and thus could not lawfully conduct business in 2009.*

191. In early 2010, KPMG conducted what it called a brief "web search," and thus discovered information that [redacted]

| | [redacted] | [redacted] | [redacted] |
|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

192. According to the ShengdaTech financial records reviewed by KPMG, in 2009, [redacted] was one of ShengdaTech's top ten customers.

[redacted]

*iii. KPMG mentions in passing to a ShengdaTech board member that it had received more confirmations than it usually did, the ShengdaTech director urges KPMG to review the matter, and KPMG agrees to review the matter in its next audit but not before.*

195. In connection with the May 2010 audit committee meeting, a KPMG partner told a member of ShengdaTech's audit committee that it had received an unusually high number of confirmations. The KPMG partner sought to assure ShengdaTech's audit committee member that the confirmations were not a red flag. The ShengdaTech audit committee member nonetheless purportedly insisted that KPMG conduct a review of confirmations in its audit of ShengdaTech's 2010 financial statements. But KPMG did not conduct any review before ShengdaTech sold $130 million of its bonds to obtain assurance that the confirmations were not evidence of fraud.

*iv. In November 2010, KPMG discovers that ShengdaTech is providing clearly forged bills to evidence transactions to KPMG; KPMG cites these bills in March 2011 as evidence that ShengdaTech is engaged in fraud.*

[redacted]

[redacted]

[redacted]

*v. ShengdaTech's AIC filings, available to KPMG, showed that ShengdaTech was engaged in fraud.*

201. PRC companies are required to submit annual financial reports to the Chinese Administration of Industry and Commerce ("AIC") – a Chinese government agency that regulates businesses, grants business licenses, and obtains and provides ownership information and financial statements of Chinese businesses. ShengdaTech's subsidiaries filed financial statements with the AIC which provided that all its subsidiaries, in total had sales, income, assets, and liabilities of:

| | **For the Year Ended Dec. 31,** | | |
|---|---|---|---|
| in USD[21] | **2008** | **2009** | **2010** |
| Net sales | $9,504,107 | $6,071,697 | $8,154,054 |
| Net income | ($1,998,863) | ($6,232,503) | ($10,171,640) |
| Total assets | $113,018,941 | $165,893,756 | $177,474,216 |
| Total liabilities | $36,754,809 | $79,022,029 | $84,911,036 |

*(Source: combined financials of ShengdaTech's five PRC indirect subsidiaries filed with the AIC.)*

202. ShengdaTech's AIC filings show that the financial statements issued by ShengdaTech in the PPM were vastly overstated:

[21] Exchange rates used are those from the PPM:
2008 average: 6.9511
2009 average: 6.8330
2010 Dec. average: 6.66.

**Overstatement by percentage: PPM/AIC -100%**

| | For the Year Ended Dec. 31, | | |
|---|---|---|---|
| | **2008** | **2009** | **2010 (at least)**[22] |
| Net sales | 767% | 1582% | 1100% |
| Net income | from negative to positive | from negative to positive | from negative to positive |
| Total assets | 116% | 63% | 66% |
| Total liabilities | 163% | 27% | 17% |

**Overstatement by amount: PPM - AIC**

| | For the Year Ended Dec. 31, | | |
|---|---|---|---|
| in USD | **2008** | **2009** | **2010 (at least)**[23] |
| Net sales | $72,915,582 | $96,050,107 | $89,727,701 |
| Net income | $38,027,165 | $29,337,110 | $30,820,237 |
| Total assets | $130,787,888 | $105,160,603 | $117,951,802 |
| Total liabilities | $60,003,639 | $21,428,912 | $14,138,241 |

1. AIC filings are reliable.

203. Reflecting their importance, AIC filings must be signed by the legal representative of the entity submitting it. The legal representative must state "I confirm that the content of the submitted company's annual inspection report is true."

[redacted] In connection with its audit of ShengdaTech, KPMG itself repeatedly consulted some of ShengdaTech's customers' and suppliers' AIC filings. For example, KPMG consulted the [redacted]

[22] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.
[23] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.

205. ShengdaTech's PRC subsidiaries are subject to serious penalties for making false statements in their AIC filings, including fines and revocation of the entity's business license. See ¶ 82.

206. Because ShengdaTech's PRC subsidiaries are foreign-owned, the financial statements its PRC subsidiaries file with the AIC must be audited by a Chinese certified public accountant in accordance with Chinese GAAP.[24]

207. When KPMG and independent professionals finally attempted to confirm the numbers cited in ShengdaTech's SEC filings, they found that ShengdaTech had invented customers, suppliers, bank accounts, and asset classes, and found that ShengdaTech's financial statements may have been falsified "in whole or in part".

208. Unlike SEC filings, filings with the AIC are not publicly available without authorization of the submitting company. To obtain the annual report, and in particular the financial information contained therein, a person (unless previously authorized by the company to obtain the information) must engage local Chinese attorneys to submit requests to the AIC and must pay certain fees to the local office of the AIC.

209. As further evidence of the reliability of AIC filings, well-known auditing firm Deloitte & Touche Tomatsu LLP noisily resigned as registered independent auditor to Chinese-based company China MediaExpress Holdings, Inc., citing in part the fact that MediaExpress's AIC filings did not match its SEC filings.

[24] For example, Shaanxi Haize's 2008 AIC annual filing was audited by Shanxi Xinyuan CPA Firm and signed by its legal representative Yong Zhao. Zibo Jiaze's 2008 and 2009 AIC annual filings were audited by Tianjin Zhongshenlian CPA Firm and Shandong Xincheng CPA Firm respectively, and both were signed by its legal representative Fei Chi. Anhui Yuanzhong: ShengdaTech acquired it in December 2009. Its 2009 and 2010 AIC annual filings were both audited by Chaohu Guangsheng CAP Firm and signed by its legal representative Zhengdong Li.

210. AIC filings are, however, readily available to a company's authorized agents, *e.g.*, auditors and underwriters. Neither Morgan Staley nor KPMG asked ShengdaTech to provide its AIC financial statements or engaged a local attorney to obtain ShengdaTech's filings with PRC regulatory authority to verify its purported financials in the PPM and SEC filings.

2. There are no significant differences in accounting standards between the U.S. and China that could account for the vast differences between AIC- and SEC-filed revenue numbers.

211. On revenue recognition for manufacturers, there are no significant differences between U.S. GAAP and Chinese GAAP.[25]

212. Revenue recognition for the sale of goods in China is governed by Accounting Standards for Enterprises No. 14,[26] which provides (identically to U.S. GAAP):

> No revenue from selling goods may be recognized unless the following conditions are met simultaneously:
>
> (1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;
>
> (2) The enterprise retains neither continuous management right that usually keeps relation with the ownership nor effective control over the sold goods;
>
> (3) The relevant amount of revenue can be measured in a reliable way;
>
> (4) The relevant economic benefits may flow into the enterprise; and

---

[25] *See, e.g.*, Ernst & Young, Conducting Successful Transactions in China, at 11, (available at <http://www2.eycom.ch/publications/items/china/tas_successful_transactions_20051114/en.pdf>); Roy J. Hinkamper et al, Issues Relating to Accounting Practices in China: Implications to International Entrepreneurs, at 8 (available at <http://www.sbaer.uca.edu/research/usasbe/2008/pdf/PaperID176.pdf>) (Mr. Hinkamper, a KPMG Managing Director, heads its U.S. Mining Industry practice).

[26] Revenues; Promulgation date: 02-15-2006; Effective date: 01-01-2007; Department: China Ministry of Finance; Subject: Accounting.

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

213. Authoritative bodies have specifically noted that there are no differences between U.S. GAAP and Chinese GAAP on revenue recognition. Thus, the Committee of European Securities Regulators ("CESR") noted that there are no differences between U.S. GAAP and International Financial Reporting Standards ("IFRS"). CESR's advice on the equivalence of Chinese, Japanese and US GAAPs 25 (2007), 2nd entry on page. The Committee further noted that there are no significant differences between IFRS and Chinese GAAP on revenue recognition. *Id.* at 35, 6th entry on page. Thus, by inference, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition

214. Hence, ShengdaTech's subsidiaries' AIC filings are reliable, and no differences in accounting rules can explain away the differences between AIC-reported and SEC-reported numbers.

3. ShengdaTech claimed one of its subsidiaries produced 13,350 metric tons of NPCC in 2009, though the subsidiary only applied for the government permits necessary to start production in June 2010.

215. The PPM falsely stated that "Our Phase I NPCC facility in Zibo started production in late August 2009. The facility reached 90% capacity utilization at the end of 2009 and 100% capacity in January 2010." It also falsely stated that the Zibo facility produced 13,350 Metric Tons of NCPP in 2009.

216. Zibo Jiaze's AIC filings indicated that Zibo Jiaze had no production in 2009. Zibo Jiaze's 2009 AIC filings submitted on June 23, 2010 stated that 1) in 2009 Zibo Jiaze's sole facility was still under preparation and construction, and had not started operating; and 2) its

revenue was $0 for all of 2009. In addition, the AIC filings include a petition for an environmental permit to begin Phase I production in Zibo Jiaze's sole facility, dated June 2010. The petition states that the facility's construction was completed in September 2009.

*vi. ShengdaTech threw up red flags that should have alerted KPMG that it was committing fraud.*

217. Auditors must consider and appropriately respond to the risk that a company's financial statements contain misstatement because the company is engaging in fraud. (AU §110, AU § 316). If the company presents risks factors, called "red flags," the auditor must exercise professional skepticism in following up on such red flags to provide reasonable assurance that the company is not engaged in fraud.

218. ShengdaTech presented many red flags:

[redacted]

(c) ShengdaTech claimed to have an account with $83 million at a bank branch so small it had less than $30 million in business deposits;

(d) The confirmation documents ShengdaTech provided to KPMG bore numerous obvious errors and discrepancies, indicating that they were forgeries;

[redacted]

(f) KPMG was aware that AIC filings existed and used them frequently in its audit of ShengdaTech, but ShengdaTech's subsidiaries' AIC filings showed ShengdaTech vastly overstated its revenues;

(g) Though Zibo Jiaze had not even applied for a permit to operate until June 2010, ShengdaTech claimed to have produced 13,350 tons of NPCC in 2009;

[redacted]

[redacted] ShengdaTech restated its financial statements twice, [redacted]

(j) ShengdaTech outsourced it internal audit work to a related company, and until some time in 2009, its CEO and CFO's salaries were paid by that company;

(k) ShengdaTech's CFO as of the Private Placement was not qualified;

(l) According to KPMG, ShengdaTech's internal controls were deficient;

[redacted]

1. Months before the Private Placement, ShengdaTech's CFO resigned, and was replaced by an interim CFO who ShengdaTech's directors and management believed was unqualified.

[redacted]

[redacted]

[redacted]

220. Ms. Guo continued as ShengdaTech's CFO until April 2009, when she was replaced by Andrew Chen. But Chen resigned on or around September 30, 2010 – mere months before the Private Placement – and Guo replaced him as interim CFO.

2. ShengdaTech's internal controls were deficient.

221. PCAOB Standards provide that a company's poor internal controls over financial reporting is a red flag, and heightens the risk of fraud. AU § 316.07, .42, .85.

222. KPMG concluded that in 2008, ShengdaTech's internal controls had been deficient "related to the lack of policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes."

223. KPMG, concluded and represented that in 2009, ShengdaTech's internal controls had been "significantly" – rather than "materially" – deficient.

224. And the internal control weaknesses were indeed significant:

[redacted] **Audit outsourcing**: though auditors review financial statements, it is management's responsibility to prepare them. Yet in or around October 10, 2009, ShengdaTech contracted to outsource its internal audit function to SST, a company 51.3% owned by ShengdaTech CEO Chen but *not* owned by ShengdaTech. [redacted]

[redacted]

(b) **ShengdaTech's officers' salaries were paid by a related party**: Until a time in 2009, SST paid the salaries of certain of ShengdaTech's top officials, including its CEO and CFO. ShengdaTech agreed to reimburse SST for some of the payments to ShengdaTech's employees, but even after the agreement, delayed reimbursement. That ShengdaTech's officers were paid by a company with which ShengdaTech conducted business was a potent conflict of interest.

(c) [redacted]

It is especially suspicious because ShengdaTech, were its SEC filings accurate, would have been a prominent producer of NPCC. Indeed, ShengdaTech claimed to be "the largest Chinese manufacturer of MPCC products in terms of production capacity."[27]

---

[27] 2009 10-K, at 7, available at <http://www.sec.gov/Archives/edgar/data/1160165/000114420410013515/v177358_10k.htm>.

(d) [redacted]

[redacted]

[redacted] under header Use of Proceeds, the PPM indicated that:

> We estimate that the net proceeds from the sale of the notes in this offering will be approximately $123.5 million, after deducting the initial purchasers' discounts and commissions. We intend to use the net proceeds from this offering for the following purposes:
>
> • approximately $67 million for the repurchase of a portion of the Notes due 2018; and
>
> • ***the remainder to finance NPCC production capacity expansion, research and development activities and other working capital requirements.***

> ***We do not have any specific agreements or commitments for the above purposes.*** The amount and timing of our actual expenditures will depend on numerous factors, including our ability to identify acquisition candidates and to complete these transactions on satisfactory terms, and the amount of cash generated or used by our operations. We may find it necessary or advisable to use portions of the net proceeds for other purposes, and we will have broad discretion in the application of the net proceeds. Additionally, we may choose to expand our current business through acquisitions of other complementary businesses, products or technologies, using cash or shares of our common stock. Pending these uses, the proceeds will be invested in short-term bank deposits

Hence, the Bond offering PPM falsely stated that the proceeds would be used for expansion and research, and that it did not have any specific agreements or commitments for the funds. [redacted]

[redacted].

[redacted] ***Repeated, uncorrected internal control deficiencies***: ShengdaTech continued internal control violations even after KPMG drew attention to them. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## VII. RELYING ON THE PPM AND SHENGDATECH'S SEC FILINGS, PLAINTIFFS PURCHASED $8.70 MILLION MILLION OF THE 2015 NOTES DIRECTLY FROM MORGAN STANLEY

225. Through Wellesley Advisors, Plaintiffs read the PPM, including the financial statements and other business information contained therein, and ShengdaTech's SEC filings, including KPMG's audit reports. In reliance thereon, Plaintiffs bought ShengdaTech's 2015 Notes.

226. From December 2010 to February 2011, MCF purchased net $8,000,000 of ShengdaTech's 2015 Notes, all from Morgan Stanley, through the following transactions:

(a) Purchased $5,400,000 on December 10, 2010

(b) Purchased $2,000,000 on January 21, 2011;

(c) Purchased $410,000 on February 4, 2011;

(d) Purchased $1,000,000 on February 11, 2011;

(e) Purchased $1,000,000 on February 16, 2011;

(f) Sold $310,000 and $1,500,000 on December 21 and December 23, 2010, respectively.

227. Wellesley Advisors also exercised its authority as investment manager of the Jura to make the following purchases:

(a) Jura bought $600,000 of ShengdaTech bonds on December 12, 2010;

(b) Jura bought $100,000 of ShengdaTech bonds on February 27, 2011.

228. As the underwriter and auditor, respectively, Morgan Stanley and KPMG had access to ShengdaTech's internal reports and other data and information about those companies' finances, operations and sales at all relevant times and should have conducted adequate due diligence on ShengdaTech's PRC Companies, but did not.

## VIII. LOSS CAUSATION

229. As described herein, Defendants made or caused to be made a series of materially false or misleading statements about ShengdaTech's financial condition, and in the case of KPMG, its audits' compliance with PCAOB Standards. These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects and operations, thus fraudulently creating a market for the Notes and causing the Notes to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements resulted in Plaintiffs' purchasing Notes that would never have come into the market but for the fraud or, at a minimum, would have come into the market at substantially lower prices and/or on terms far more favorable to investors. But for Defendants' misrepresentations, Plaintiffs would not have purchased the Notes at all, or would not have purchased them on the terms and at the artificially inflated prices at which they entered the market. As the truth about ShengdaTech began to be revealed, the inflation caused by these misrepresentations was eliminated from the price of the Notes and ShengdaTech defaulted on the Notes, causing damages to Plaintiffs.

230. Plaintiffs purchased Convertible Bonds in the Private Placement and through Morgan Stanley at or near par, and in many cases above par value.

231. Plaintiffs determined to sell their convertible bonds virtually immediately after ShengdaTech's initial announcement that KPMG had encountered unexplained discrepancies in its audit of ShengdaTech's 2010 financial statements.

232. Then, however, there was no liquid market for ShengdaTech's convertible bonds; thus, Plaintiffs could not sell their bonds.

233. On June 9, 2011, ShengdaTech announced that it was in default on its debt securities, and on August 19, 2011, ShengdaTech fired its CEO Chen and filed a bankruptcy petition under Chapter 11 of the Bankruptcy code.

234. The Internal Investigation revealed that ShengdaTech had far less cash and revenues to service its obligations under the convertible bonds than it needed, and that it had told investors. Accordingly, ShengdaTech filed for bankruptcy.

235. In bankruptcy, ShengdaTech has paid $4.2 million to its creditors, and has $1.5 million left, against liabilities of at least $164,184,811.88 from noteholders alone.

236. ShengdaTech defaulted on both the 6.0% Notes and the 6.5% Notes. ShengdaTech was allowed to sell the convertible bonds, and Plaintiffs bought them, because ShengdaTech claimed to have substantial cash and revenues it did not have. Then, when it became apparent that ShengdaTech did not have the cash and revenues it had claimed to have had, ShengdaTech declared bankruptcy. In bankruptcy, ShengdaTech has only been able to pay a small fraction of its liabilities because it did not have the cash and revenues it had claimed to have had.

237. Hence, Plaintiffs lost nearly their entire investment because ShengdaTech never had any ability to pay its obligations, which KPMG and Morgan Stanley concealed.

## COUNT I
## VIOLATION OF M.G.L. 110A §410

**(Against Morgan Stanley)**

238. Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

239. Morgan Stanley is a broker-dealer. Morgan Stanley sold ShengdaTech's debt securities to Plaintiff in Massachusetts.

240. The PPM through which Morgan Stanley sold the securities to Plaintiffs contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

241. Plaintiffs were unaware of the untrue statements of material fact and could not have discovered them in the exercise of reasonable care.

242. Morgan Stanley knew, or in the exercise of reasonable care should have known, that the Private Placement Memorandum contained untrue statements of material facts and omissions whose disclosure was necessary to make other statements not misleading.

243. Plaintiffs are entitled to damages as provided by M.G.L. 110A §410(a)(2).

244. This action is brought less than four years after the discovery of the materially untrue statements.

## COUNT II

## NEGLIGENT MISREPRESENTATION

**(By Miller Investment Trust, against KPMG)**

245. This Count is brought by Miller Investment Trust alone.

246. Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

247. KPMG owed Plaintiff a duty. KPMG explicitly consented in writing to the use of its audit reports of ShengdaTech's financial statements in conducting conduct a financing of approximately $100 million in late 2010. KPMG intended that investors in that financing rely on KPMG's audited reports of ShengdaTech's financial statements in deciding whether to purchase the ShengdaTech 2015 Notes. KPMG engaged in conduct linking KPMG to investors in the ShengdaTech 2015 Notes financing, which evinced KPMG's understanding of investors' reliance. Plaintiff was such an investor.

248. KPMG issued audit letters that certified that ShengdaTech's 2009 and 2008 financial statements "represent[ed] fairly, in all material respects," ShengdaTech's financial position. KPMG certified that its audits had complied with PCAOB Standards. The purpose of the audit letters was to induce reliance on the part of, among others, Plaintiff.

249. KPMG breached its duty by, among other things, negligently performing its audits and its nine months review, as set forth above. KPMG also failed to take reasonable care in obtaining relevant information and in communicating it to investors, and was therefore negligent.

250. Plaintiff acted in direct reliance on the representations made by KPMG in its audit certifications, including but not limited to the statements made in ShengdaTech's 2008 10-K filed April 1, 2009 and 2009 10-K filed on March 15, 2010, and the audited financials contained within these 10-Ks.

251. As a direct and proximate result of KPMG's wrongful conduct, Plaintiff suffered damages in connection with its purchase of the ShengdaTech's 2015 Notes.

252. Plaintiff would not have purchased ShengdaTech's 2015 Notes at the prices it paid, or at all, if it had been aware of the true facts concealed by Defendants' and ShengdaTech's false and misleading statements.

253. KPMG had a duty to ShengdaTech to (a) audit the 2008 and 2009 Financial Statements and internal controls, review ShendgaTech's 2009 and 2010 Quarterly Financial Statements, in accordance with GAAS and PCAOB; (b) use the skill and care normally implemented by members of the professional accounting and auditing profession; (c) learn and become familiar with ShengdaTech's business operations and reporting methods; (d) reduce audit risk by planning and performing its audits; (e) collect evidence needed to complete thorough audits; (f) after collecting sufficient information, decide whether there was any ongoing concern about ShengdaTech's viability; (g) determine whether the 2008 and 2009 Financial Statements were calculated in accordance with GAAP and were accurately portrayed ShendgaTech's financial condition; (h) analyze 2009 and 2010 Quarterly Financial Statements to determine if any changes or modifications were needed to be made to have them conform to GAAP; (i) immediately notify the ShengdaTech Board about material weaknesses in ShendgaTech's internal controls, poor management and evaluation of the controls, and any irregularities regarding financial reporting.

254. KPMG was negligent when it stated that the 2008 and 2009 Financial Statements and the 2009 and 2010 Quarterly Financial Statements were comported with GAAP, that its audit comported with PCAOB Standards, and that as of December 2010, it had come into no evidence that ShengdaTech's financial statements were inaccurate.

255. As a result of the allegations listed above, KPMG breached its duty by not exercising reasonable care as other auditors and accountants would do in similar situations.

256. KPMG's actions, or lack thereof, were a direct and proximate cause of plaintiff's damages.

**COUNT III**

**VIOLATION OF SECTION 18 OF THE EXCHANGE ACT**

**(against KPMG)**

257. This count is brought by the Miller Investment Trust alone.

258. The Miller Investment Trust incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

259. As set forth above, KPMG made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts, in the Company's 2008 and 2009 10-Ks.

260. In connection with the purchase of the Company's notes, the Miller Investment Trust read and relied upon the Company's 2008 and 2009 10-Ks. Specifically, the Miller Investment Trust read and relied on the Company's 2008 and 2009 financial statements contained in the 2008 and 2009 10-Ks. The Miller Investment Trust also read and relied upon the unqualified audit opinion issued by KPMG in connection with those financial statements, in which KPMG stated that the 2008 and 2009 financial statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP and that KPMG had conducted its audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).

261. The Miller Investment Trust reasonably relied on those statements not knowing that they were false or misleading.

262. When the truth emerged about the false and misleading statements in the Company's 2008 and 2009 10-Ks, the Miller Investment Trust was significantly damaged by the resulting loss in the value of the notes and the Company's default on its obligations under the notes.

263. As a direct and proximate result of Defendant KPMG's wrongful conduct, the Miller Investment Trust suffered damages in connection with its purchase of the notes.

264. This Count relates back to the filing of the Miller Investment Trust's Complaint on December 1, 2011, because it arises out of the same conduct, transaction, or occurrence set out in the original complaint.

265. The Miller Investment Trust initial Complaint was brought within one year of the discovery of the misleading statements and within three years of when Plaintiff's cause of action accrued.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

Against Defendants and in favor of the Plaintiffs for damages, in an amount determined to have been sustained by Plaintiffs;

Against Defendants and in favor of the Plaintiffs for all general and special damages necessary to make the Plaintiffs whole;

Against Defendants and in favor of the Plaintiffs for pre-judgment and post-judgment interest;

Against Morgan Stanley for statutory legal fees and interest as provided by M.G.L. c. 110A §410; and

Awarding Plaintiffs costs of this suit, including experts' fees and other costs and disbursements; and such and other further relief as may be just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated: March 10, 2014

By its attorneys,

**/s/ Laurence M. Rosen**

Laurence M. Rosen, Esq.
The Rosen Law Firm, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

-and-

Thomas G. Shapiro (BBO # 454680)
tshapiro@shulaw.com
Adam M. Stewart (BBO # 661090)
astewart@shulaw.com
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134

***Attorneys for Plaintiffs***

**Certificate of Service**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 10, 2014.

**__/s/ Laurence M. Rosen___________________**