# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MILLER INVESTMENT TRUST and JURA LIMITED,<br><br>     Plaintiffs,<br><br>          v.<br><br>MORGAN STANLEY & CO. LLC and KPMG, a Hong Kong Partnership,<br><br>     Defendants. | **Civil Action No. 1:11-cv-12126-DPW**<br><br>**THIRD AMENDED COMPLAINT**<br><br><br>**LEAVE TO FILE GRANTED ON MARCH 4, 2015**<br><br>**REDACTED PUBLIC VERSION OF DOCUMENT**<br><br>**JURY TRIAL DEMANDED** |

I.   SUMMARY OF THE ACTION ....................................................................... 1

   A.   Claims. .................................................................................................. 1

   2.   *Morgan Stanley*.............................................................................. 8

   3.   *Defendants' violations of law caused Plaintiffs' losses.* ............... 8

   B.   Conclusion.............................................................................................. 9

II.  PARTIES AND IMPORTANT NON-PARTIES .................................................. 9

   A.   Plaintiffs. ............................................................................................... 9

   B.   Defendants............................................................................................ 10

   C.   Third parties. ....................................................................................... 11

III. JURISDICTION AND VENUE ..................................................................... 13

   A.   Personal jurisdiction and subject-matter jurisdiction based on federal question.  13

   B.   Personal jurisdiction based on minimum contacts with Massachusetts. ................ 14

IV.  KPMG'S FALSE STATEMENTS ................................................................. 14

V.   SHENGDATECH'S FINANCIAL STATEMENTS WERE NOT PRESENTED IN
CONFORMITY WITH U.S. GAAP ................................................................... 19

   A.   ShengdaTech's financial statements contained false statements. ........................... 19

   1.   *Overstated revenues and net income.* ......................................... 19

   2.   *ShengdaTech overstated its cash.* ............................................... 27

   B.   ShengdaTech failed to disclose related-party transactions. .................................... 28

   1.   *KPMG either knew that ShengdaTech's 2008 financial statements were not presented
   in conformity with GAAP or had no reasonable basis to believe that they were.* ................ 31

i

**VI.    KPMG VIOLATED PCAOB STANDARDS** .................................................................. **34**

**A.    PCAOB Standards demand that the auditor express professional skepticism at all times.** **34**

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

**C.    PCAOB Standards failures in connection with confirmations.** ............................. **46**

*1.    PCAOB Standards required KPMG to double check confirmation addresses supplied by ShengdaTech against publicly available information.* ..................................................... *46*

*2.    KPMG recognized that the confirmation rate was unusually high, but decided to put off looking into it until 2010, and then quickly discovered the high confirmation rate was due to fraud.* ............................................................................................................................ *50*

*3.    KPMG had an obligation to know enough about ShengdaTech's business to be able to detect obvious forgeries.* ............................................................................................... *51*

*4.    VAT receipts.* ........................................................................................................ *54*

**D.    KPMG ignored other red flags** ............................................................................... **55**

**E.    KPMG discovers evidence in 2010 that required it to reconsider its audit report.** **58**

███████████████████████████████████████████████

*2.    KPMG discovers that ShengdaTech has been supplying it with clearly forged bills.* *60*

*3.    KPMG learns that SSCM's general manager is Z. Chen.* ......................................... *61*

VII.    **KPMG VIOLATED PCAOB INTERNAL CONTROL AUDIT STANDARDS.** ....... 62

VIII.     **SHENGDATECH COLLAPSES** ................................................................. 63

   A.    **In December 2010, KPMG states that it did not know of any reason why ShengdaTech's financial statements were inaccurate, Morgan Stanley claims it has conducted adequate due diligence, and ShengdaTech sells $130 million of its bonds.** ...... 63

   B.    **KPMG establishes directs contact with some of ShengdaTech's customers, suppliers, and banks, and in two days unravels ShengdaTech's fraud.** ............................ 66

   C.    **ShengdaTech collapses.** .............................................................................. 68

IX.    **RELYING ON THE PPM AND SHENGDATECH'S SEC FILINGS, PLAINTIFFS PURCHASED $8.70 MILLION MILLION OF THE 2015 NOTES DIRECTLY FROM MORGAN STANLEY** ............................................................................... 72

X.    **LOSS CAUSATION** ............................................................................... 73

**COUNT I**............................................................................................................. 74

**COUNT II** ........................................................................................................... 75

**COUNT III** .......................................................................................................... 78

**PRAYER FOR RELIEF**...................................................................................... 79

**DEMAND FOR TRIAL BY JURY** ..................................................................... 80

## THIRD AMENDED COMPLAINT

Miller Investment Trust ("Miller"), on behalf of its mutual fund the Miller Convertible Fund ("MCF"),[1] and Jura Limited (the "Plaintiffs") by their undersigned attorneys, for their complaint against Defendants Morgan Stanley & Co. LLC ("Morgan Stanley") and KPMG, a Hong Kong Partnership ("KPMG") (the "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.    SUMMARY OF THE ACTION

### A.  Claims.

1.      Plaintiffs bought $8.7 million of 2015 Notes of non-party ShengdaTech, Inc., an industrial manufacturer whose operations take place entirely in China, pursuant to a $130 million offering closing in December 2010 (the "Offering"). Plaintiffs lost nearly everything when, three months later, ShengdaTech was revealed to have been simply a Potemkin Village,[2] with less than a tenth of the revenues claimed in its SEC filings and the Offering documents Plaintiffs relied upon.

2.      Morgan Stanley underwrote the Offering and drafted the Private Placement Memorandum ("PPM") used therein; KPMG was ShengdaTech's registered independent auditor. KPMG audited ShengdaTech's financial statements for the years ended December 31, 2008 and 2009. KPMG's audit report appeared in ShengdaTech's SEC filings and, with its explicit consent, in the PPM. Plaintiffs read and relied on the PPM and KPMG's audit reports.

---

[1]  The Miller Convertible Fund is a series of shares issued by the Miller Investment Trust and operates as a mutual fund.
[2]  Potemkin Villages were fake portable villages constructed by Prince Grigory Potemkin to deceive Empress Catherine II into believing that his reconstruction of Crimea following its conquest from the Ottoman Empire had been successful.

3.      Miller sues KPMG under Section 18 of the Securities and Exchange Act of 1934 (the "Exchange Act") and common law negligent misrepresentation. Both Plaintiffs sue Morgan Stanley Section 410 of the Uniform Securities Act of Massachusetts General Laws (G.L. c. 110A § 410) (the "Massachusetts Blue Sky Law").

████████████████████████████████████████████

4.      Between 2008 and 2010, ShengdaTech was a small company with between $6 million and $10 million in annual revenues. It incurred net losses in each of these years.

5.      Its SEC-filed financial statements told a completely different story. They reported revenues of about $73 million in 2008, $96 million in 2009, and $89 million in the first 9 months of 2010. They reported 2008 and 2009 net revenues of $38 million and $29 million, respectively. ████████████████████████████████████████████ ████████████████████████████████████████  A host of ShengdaTech's customers and suppliers were secretly owned by its CEO, and it used fake transactions with these entities to massively inflate its size. Its factories produced vastly less than it claimed, and one of them was not even in operation. In other words, ShengdaTech was a Potemkin Village.

6.      KPMG was the auditor that missed this enormous fraud. It did so because, contrary to its representation to investors, it did not follow audit standards enacted by the Public Company Accounting Oversight Board (the "PCAOB").

7.      Even a child knows that determining whether a liar's representation is true solely by asking the liar whether it is true is ineffective. The liar will just say the representation is true, whether or not it actually is.

8.      This principle is a cornerstone of the standards KPMG and other auditors are bound to follow. KPMG's audit report, which was published in ShengdaTech's SEC filings and

in the Offering documents, claimed that KPMG had followed these PCAOB Standards in its audits. PCAOB Standards require auditors to obtain sufficient evidence to give reasonable assurances that financial statements are materially accurate. One thing which might make financial statements inaccurate is management's fraud. Thus, PCAOB Standards require auditors to obtain reasonable assurances that financial statements do not contain errors because of fraud – it is not enough for the auditor simply to take management's word.

9.      Here, there were especially strong reasons not to take ShengdaTech's management's word: ███████████████████████████████

██████████

10.      Generally Accepted Accounting Principles ("GAAP") and SEC regulations require all related party transactions above $120,000 be fully disclosed in the financial statements. Failure to disclose such transactions renders the financial statements *per se* false and misleading.

11.      Non-party SSCM was ShengdaTech's largest supplier. It was controlled by ShengdaTech's CEO X. Chen. Thus, it was a related party, and transactions with it had to be identified as related-party transactions. Yet SSCM was not identified as a related-party in ShengdaTech's 2007 annual financial statements, nor in its three 2008 quarterly financial statements. These transactions amounted to almost $20 million.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

13.     An auditor's discovery that management may have lied to a previous or current auditor – or, here, both – is one of the most serious events in an audit. The auditor must immediately investigate the circumstances, determine whether it can ever rely on management's representations, and report the lie to the audit committee and, eventually, the SEC. ███████████ ██████████████████████████████████████

14.     PCAOB Standards do not permit auditors to rely on management's representations in any case, but KPMG also knew that ShengdaTech's managers were liars. Yet again and again, KPMG simply used ShengdaTech's representations as a substitute for reliable audit evidence:

> (a)     KPMG was required to send confirmations to ShengdaTech's banks, suppliers, and customers, to confirm various entries on ShengdaTech's financial statements. KPMG invariably simply asked ShengdaTech to provide addresses. *Every single time*, ShengdaTech provided false addresses that it controlled, and then confirmed whatever was provided in the confirmations. KPMG did not check the addresses against public information, nor did it conduct site visits, nor did it attempt to contact recipients at their public

contact information to verify addresses – a single check against public information would have been enough.

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

(c)      ShengdaTech represented that it had stopped controlling SSCM on January 1, 2009, when ShengdaTech's CEO X. Chen resigned as SSCM's CEO, severing the last of the ties between the two companies. KPMG simply accepted ShengdaTech's  representation.  ████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████  and the public corporate filings of

SSCM's owner, which showed that the same ShengdaTech insider was the owner's sole director.

15.     Beyond that, KPMG's ShengdaTech audits raised numerous red flags that under PCAOB Standards demanded follow-up:

(a)     Like many novice fraudsters, ShengdaTech assumed that the higher the third-party confirmation rate, the better. Since it controlled third-party confirmations, it responded with rates far in excess of the usual rate. But the auditing profession as a whole knows that novice fraudsters typically do not realize that many third-party confirmations are never returned; thus, an unusually high confirmation rate is a red flag for fraud demanding follow up. KPMG actually determined that the 2009 audit's confirmation rate was unusually high, but did not follow up. When ShengdaTech' audit committee chair demanded ShengdaTech conduct additional procedures and follow up, KPMG pushed the additional procedures and follow up off until the next year.

(b)     For Chinese companies, a "chop" (a sort of seal) operates in the same way as an authorized signature of an individual with the authority to bind the firm does here. Thus, a facially deficient chop is a definite warning sign for fraud. Several chops confirming ShengdaTech bank accounts containing tens of millions of dollars were facially deficient. They thus could not be relied on to support KPMG's audit conclusions, in addition to being compelling evidence of ShengdaTech's fraud.

(c)     ShengdaTech's subsidiaries filed accurate financial statements with a Chinese regulatory agency referred to as the AIC herein. These financial statements

showed that ShengdaTech's SEC-filed financial statements overstated its revenues by more than 1,000%. Though KPMG knew these filings were available, it never bothered to obtain them.

(d)  ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████.

16.     In December 2010, ShengdaTech sold $130 million of bonds to investors, including Plaintiffs.

17.     In auditing ShengdaTech's 2010 financial statements, KPMG conducted the additional procedures it had promised it would run to ShengdaTech's audit committee chair. These procedures were simple – site visits to ShengdaTech's customers and suppliers, checking confirmation addressees' information against publicly-available contact information, and simply calling confirmation addressees. ██████████████████████████████ They revealed that ShengdaTech's financial statements were fabricated in whole. ShengdaTech quickly collapsed.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

19.      PCAOB Standards do not let an auditor simply rely on management's word –
especially when the auditor knows management has already lied about material facts upon which
important audit conclusions are based. They demand that an auditor follow up when it sees signs
of fraud. KPMG violated these standards, and its statement that it had conducted its audit in
accordance with PCAOB Standards was thus false.

*2.  Morgan Stanley.*

20.      Morgan Stanley underwrote the Offering. Plaintiffs bought all of their bonds
from Morgan Stanley.

21.      Plaintiffs reviewed the Offering documents before they bought any ShengdaTech
bonds.

22.      The Offering documents contained false statements. Among other things, they
contained ShengdaTech's false SEC-filed financial statements, KPMG's false audit report, and
omitted to disclose ShengdaTech's substantial related-party transactions with SSCM and other
entities owned and controlled by ShengdaTech's CEO X. Chen.

23.      Morgan Stanley authorized issuance of the Offering documents. It did not
conduct an adequate investigation before doing so.

*3.  Defendants' violations of law caused Plaintiffs' losses.*

24.      Plaintiffs relied on KPMG's representation that (a) ShengdaTech's financial
statements were fairly presented in accordance with GAAP (defined below) and (b) its own audit
was conducted in accordance with PCAOB Standards.

25.     When ShengdaTech announced in mid-March 2011 that the 2010 audit had raised red flags, the market for Plaintiffs' bonds immediately became illiquid. Plaintiffs were unable to sell their bonds before ShengdaTech filed for bankruptcy in August 2011. KPMG's false statements and negligence, and Morgan Stanley's negligent underwriting of the Offering, thus caused Plaintiffs' losses.

### B.  Conclusion.

26.     Plaintiffs bought $8.7 million of ShengdaTech's bonds *because* both KPMG and Morgan Stanley represented that they had followed rigorous professional standards and affirmed that Shengdatech's financial statements were accurate. Their work fell far short of what professional standards demanded, and they allowed ShengdaTech to sell $130 million of bonds though it was a cartoonish Potemkin Village. Three months later, Plaintiffs lost nearly everything, when, after KPMG finally began to perform the basic and proper auditing procedures, KPMG discovered, the truth and ShengdaTech collapsed into bankruptcy.

27.     It is thus no wonder that the auditor chiefly responsible for the ShengdaTech audits, ██████████, left KPMG two months after ShengdaTech's fraud was revealed. She has not worked in auditing since. ████████ had worked at KPMG for twelve years.

### II.   PARTIES AND IMPORTANT NON-PARTIES

### A.  Plaintiffs.

28.     **MCF** is a mutual fund managed by Wellesley Investment Advisors, Inc. ("**Wellesley Advisors**"). Wellesley Advisors is a registered investment adviser located in Wellesley, Massachusetts.

29.     From December 2010 to February 2011, Miller purchased net $8,000,000 of ShengdaTech's 2015 Notes (the "Notes") for MCF.

30.     **Jura** is a Bermuda corporation with its principal place of business in Bermuda, and bought $700,000 of ShengdaTech 2015 Notes.

31.     Wellesley Advisors has full investment authority over Jura's funds, and exercised that authority to buy ShengdaTech bonds. The transactions took place in Massachusetts.

32.     Prior to those investments and during the period thereafter, Plaintiffs relied on company information necessary to purchase these notes including information and audited financial statements contained in ShengdaTech's SEC filings, and information provided in the PPM. Plaintiffs relied to their detriment on Defendants' misrepresentations and omissions.

### B.  Defendants.

33.     Defendant **Morgan Stanley** is a global financial services firm headquartered in New York City. Morgan Stanley was the Offering's sole bookrunnner and lead underwriter, and was initial purchasers' representative.

34.     Defendant **KPMG** is a Hong Kong partnership and a member of KPMG International Cooperative, a Swiss entity. KPMG provides audit, accounting, financial advisory, tax, and risk management services. KPMG entities make up one of the largest professional services firms in the world, and KPMG is one of the so-called Big Four auditors.  KPMG served as ShengdaTech's auditor from November 11, 2008 until April 29, 2011. KPMG signed the audit reports for fiscal years 2008 and 2009 that were incorporated into ShengdaTech's 2008 Form 10-K and 2009 Form 10-K, which were included in the PPM. On December 9, 2010, KPMG provided a letter formally representing that it was not aware of any reason to reconsider its 2008 and 2009 audit.

35.     KPMG repeatedly consented to the use of its audit report in the Equity Offering.

36.     Collectively, KPMG and Morgan Stanley are the "Defendants".

**C.  Third parties.**

37.     **ShengdaTech** was a Nevada corporation with its principal place of business in China. It purported to manufacture a specialty additive known as nano-precipitated calcium carbonate ("NPCC"). NPCC is used in a variety of products to enhance their durability and efficiency and has some applications in the paint, paper, plastic and rubber industries. It is also used in some building materials. ShengdaTech conducted its manufacturing operations through several affiliated companies in China (the "PRC Subsidiaries").

38.     ShengdaTech owned 100% of Faith Bloom Limited, a Singapore Corporation ("**Faith Bloom**"). Faith Bloom, in turn, owned 100% of five companies established under the laws of the PRC: Shandong Haize Nanomaterials Co., Ltd. ("**Shandong Haize**"), Shandong Bangsheng Chemical Co., Ltd. ("**Shandong Bangsheng**"), Shaanxi Haize Nanomaterials Co., Ltd. ("**Shaanxi Haize**"), Zibo Jiaze Nanomaterials Co., Ltd. ("**Zibo Jiaze**") and Anhui Yuanzhong Nanomaterials Co., Ltd. ("**Anhui Yuanzhong**"). They were ShengdaTech's sole source of revenues, and all operated in the PRC:



39.     Shandong Shengda Technology Co., Ltd. ("**SST**") is a company that at all relevant times was 51.79% owned by ShengdaTech CEO X. Chen. ShengdaTech did material business with SST.

████████Shandong Shengda Chemical Machinery Co. Ltd. ("**SSCM**") was ShengdaTech's chief supplier. It was 51.79% indirectly owned by X. Chen, ShengdaTech's CEO, until July 2007, when it was acquired by Prosper Crown Limited, a Hong Kong company ("**Prosper Crown**").  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

41.     Xiangzhi Chen ("**X. Chen**") was ShengdaTech's founder and, until his ouster in August 2011, its CEO. X. Chen founded and either owned or controlled both ShengdaTech and its largest trading partners, SSCM and SST. ████████████████████

████████████████████████████████████

42.     **Anhui Guo** was ShengdaTech's CFO between March 2006 and April 2009, and again beginning on September 30, 2010. Anhui Guo is a close associate of X. Chen.

43.     **A. Carl Mudd** and **Sheldon B. Saidman** were ShengdaTech directors, and sat on its audit committee; Mudd was its chair.

44.     Andrew Chen ("**A. Chen**") was ShengdaTech's CFO between April 2009 and September 2010.

████████████████████████████████████████

████████████████████████████████████████

███████

46.     ███████████████ was the KPMG Senior Audit Manager of the ShengdaTech account. At KPMG, Senior Audit Managers are the highest ranked non-partner members of the audit team. They are the day-to-day managers of the audit. ██████████ regularly communicated with ShengdaTech's directors and officers. ███████ joined KPMG in September 1999, and her employment at KPMG was terminated in May, 2011, just two months after ShengdaTech's fraud was exposed. She did not immediately begin her next job. She has not worked in auditing or for an accounting firm since the termination of her employment at KPMG.

47.     ███████████████ was the KPMG lead audit partner of the ShengdaTech account.

48.     Hansen, Barnett & Maxwell, P.C. ("**Hansen**") was a small, Salt-Lake City-based audit firm. It was ShengdaTech's auditor for the year ended December 31, 2007. Hansen had no employees in China, and retained Baker Tilly China ("**Baker Tilly**"), an audit firm in China, to assist in the audit of ShengdaTech.

49.     ████████████ was the Hansen Partner chiefly responsible for the ShengdaTech audit.

### III.     JURISDICTION AND VENUE

**A.  Personal jurisdiction and subject-matter jurisdiction based on federal question.**

50.     The federal securities claim asserted herein against KPMG arises under and pursuant to Section 18 of the Exchange Act [15 U.S.C. § 78r].

51.     The Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C.  § 78aa].

52.     Personal jurisdiction over KPMG is proper under Section 27 of the Exchange Act as KPMG has minimum contacts with the United States. KPMG's minimum contacts include deriving approximately 19% of its revenues in 2010 from issuing audit opinions to U.S.-listed issuers in satisfaction of the issuers' obligations under the U.S. securities laws.

53.     Morgan Stanley conducts substantial business in this state.

54.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

55.     In connection with the acts, conduct and other wrongs alleged herein, KPMG and Morgan Stanley either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**B.  Personal jurisdiction based on minimum contacts with Massachusetts.**

56.     Morgan Stanley maintains an office in Massachusetts.

**IV.     KPMG'S FALSE STATEMENTS**

58.      KPMG was ShengdaTech's registered independent auditor.

59.      In connection with ShengdaTech's 2008 financial statements, KPMG issued both

an audit report and a report on ShengdaTech's internal controls over financial reporting:

[Internal controls]

>   The Board of Directors and Shareholders
>   ShengdaTech, Inc.:
>
>   We have audited ShengdaTech, Inc. and subsidiaries' internal control over
>   financial reporting as of December 31, 2008, based on criteria established
>   in *Internal Control — Integrated Framework* issued by the Committee of
>   Sponsoring Organizations of the Treadway Commission (COSO). ShengdaTech,
>   Inc. and subsidiaries' management is responsible for maintaining effective
>   internal control over financial reporting and for its assessment of the
>   effectiveness of internal control over financial reporting, included in the
>   accompanying *Management's Report On Internal Control Over Financial
>   Reporting*. Our responsibility is to express an opinion on ShengdaTech, Inc. and
>   subsidiaries' internal control over financial reporting based on our audit.
>
>   ***We conducted our audit in accordance with the standards of the Public
>   Company Accounting Oversight Board (United States).*** Those standards require
>   that we plan and perform the audit to obtain reasonable assurance about whether
>   effective internal control over financial reporting was maintained in all material
>   respects. Our audit included obtaining an understanding of internal control over
>   financial reporting, assessing the risk that a material weakness exists, and testing
>   and evaluating the design and operating effectiveness of internal control based
>   on the assessed risk. Our audit also included performing such other procedures as
>   we considered necessary in the circumstances. We believe that our audit provides
>   a reasonable basis for our opinion.
>
>   A company's internal control over financial reporting is a process designed to
>   provide reasonable assurance regarding the reliability of financial reporting and
>   the preparation of financial statements for external purposes in accordance with
>   generally accepted accounting principles. A company's internal control over
>   financial reporting includes those policies and procedures that (1) pertain to the
>   maintenance of records that, in reasonable detail, accurately and fairly reflect the
>   transactions and dispositions of the assets of the company; (2) provide
>   reasonable assurance that transactions are recorded as necessary to permit
>   preparation of financial statements in accordance with generally accepted
>   accounting principles, and that receipts and expenditures of the company are
>   being made only in accordance with authorizations of management and directors
>   of the company; and (3) provide reasonable assurance regarding prevention or

timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. ***Material weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes.***

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2008 consolidated financial statements, and this report does not affect our report dated March 31, 2009, which expressed an unqualified opinion on those consolidated financial statements.

In our opinion, because of the effect of the aforementioned material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).


/s/ KPMG
Hong Kong, China
March 31, 2009

[Financial statements]
The Board of Directors and Shareholders
ShengdaTech, Inc.:

We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries (the "Company") as of December 31, 2008, and the related

16

consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

***In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.***

[]

/s/ KPMG
Hong Kong, China
March 31, 2009

60.     In connection with ShengdaTech's 2009 financial statements, KPMG issued both an audit report and a report on ShengdaTech's internal controls over financial reporting, the latter of which is included below:

The Board of Directors and Shareholders
ShengdaTech, Inc.:

We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

*We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)*. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.*

[]

KPMG
Hong Kong, China
March 15, 2010

61.     Collectively, the emphasized statements are the "False Statements", and they are false for the following reasons, among others:

(a)     The 2008 and 2009 statements that KPMG had conducted its audit in accordance with standards enacted by the Public Company Accounting Oversight Board (the "PCAOB", and "PCAOB Standards") was false because KPMG's audit violated PCAOB Standards, as set out below in Paragraphs 108-208, below.

(b)     The 2008 and 2009 statements that ShengdaTech's consolidated financial statements present fairly, in all material respects, ShengdaTech's financial position, result of operations, and cash flows, in conformity with U.S. generally accepted accounting principles ("U.S. GAAP") was false because ShengdaTech's financial statements, among other things, wildly overstated

virtually every financial metric, including revenues, net income, income tax, assets, and cash, and omitted to disclose material related-party transactions, as set out in Paragraphs **Error! Reference source not found.**-107, below

(c)     The 2008 statement that KPMG's audit of internal controls complied with standards enacted by the PCAOB ("PCAOB Internal Control Audit Standards") was false because in direct violation of these standards, KPMG omitted to disclose a material internal weakness that its audit had identified, as set out in Paragraphs 209-212, below.

## V.     SHENGDATECH'S FINANCIAL STATEMENTS WERE NOT PRESENTED IN CONFORMITY WITH U.S. GAAP

### A.  ShengdaTech's financial statements contained false statements.

#### 1.   Overstated revenues and net income.

62.     Both ShengdaTech's 2008 and 2009 financial statements wildly overstated its revenues and net income.

63.     PRC companies are required to submit annual financial reports to the Chinese Administration of Industry and Commerce ("AIC") – a Chinese government agency that regulates businesses, grants business licenses, and obtains and provides ownership information and financial statements of Chinese businesses. ShengdaTech's subsidiaries filed financial statements with the AIC which provided that all its subsidiaries, in total had sales, income, assets, and liabilities of:

| | For the Year Ended Dec. 31, | | |
|---|---|---|---|
| in USD[3] | **2008** | **2009** | **2010** |

---

[3] Exchange rates used are those from the PPM:
  2008 average: 6.9511
  2009 average: 6.8330
  2010 Dec. average: 6.66.

| Net sales | $9,504,107 | $6,071,697 | $8,154,054 |
| Net income | ($1,998,863) | ($6,232,503) | ($10,171,640) |
| Total assets | $113,018,941 | $165,893,756 | $177,474,216 |
| Total liabilities | $36,754,809 | $79,022,029 | $84,911,036 |

*(Source: combined financials of ShengdaTech's five PRC indirect subsidiaries filed with the AIC.)*

64.     ShengdaTech's AIC filings show that the financial statements issued by ShengdaTech in the PPM were vastly overstated:

**Overstatement by percentage: PPM/AIC -100%**

|  | For the Year Ended Dec. 31, | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010 (at least)[4]** |
| Net sales | 767% | 1582% | 1100% |
| Net income | from negative to positive | from negative to positive | from negative to positive |
| Total assets | 116% | 63% | 66% |
| Total liabilities | 163% | 27% | 17% |

**Overstatement by amount: PPM - AIC**

|  | For the Year Ended Dec. 31, | | |
|---|---|---|---|
| in USD | **2008** | **2009** | **2010 (at least)[5]** |
| Net sales | $72,915,582 | $96,050,107 | $89,727,701 |
| Net income | $38,027,165 | $29,337,110 | $30,820,237 |
| Total assets | $130,787,888 | $105,160,603 | $117,951,802 |
| Total liabilities | $60,003,639 | $21,428,912 | $14,138,241 |

65.     The figures reported by ShengdaTech's subsidiaries in their AIC filings are accurate – rather than those reported to the SEC – for three reasons.

66.     First, as a practical matter, ShengdaTech's China-based officers and China-based operating companies suffer few consequences if it misrepresents its finances in SEC filings. China does not extradite its nationals,[6] U.S. judgments are not enforced in China,[7] and because

---

[4] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.

[5] The comparison for FY 2010 is between nine months of PPM v. full year of AIC.

[6] Extradition Law of the People's Republic of China, Article 8(1).

[7] Donald C. Clark, The Enforcement of United States Court Judgments in China: A Research Note, 2004, at 1, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=943922 ("At

service of process depends on the cooperation of authorities in China,[8] whose cooperation is not always forthcoming, the SEC is rarely even able to serve defendants in China.[9] Thus, China-based defendants have a diminished fear of criminal or civil sanctions.[10]

67.     Under PRC law, penalties for filing false AIC filings include fines and revocation of the entity's business license.[11] If an entity's business license is revoked, the People's Bank of China[12] requires the bank account of that entity to be closed.[13] Without a business license the entity cannot legally conduct business in the PRC. Thus, ShengdaTech's subsidiaries had a strong incentive to file accurate annual reports with the AIC because ShengdaTech's business could be shut down if it was caught filing false financial statements with the AIC.

68.     Reflecting their importance, AIC filings must be signed by the legal representative of the entity submitting it. The legal representative must state "I confirm that the content of the submitted company's annual inspection report is true."

69.     Second, professionals who conduct due diligence in China regularly obtain AIC filings and rely upon them because they are accurate. For example, attorney Dan Harris "strongly

---

present, at least, the answer is straightforward: U.S. judgments will not be enforced [in China].")
[8] U.S. Department of State, International Judicial Assistance – China (noting that service must be made through the Chinese Central Authority for the Hague Service Convention <available at http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/china.html>
[9] *Securities and Exchange Commission v. Zhao*, 12 Civ. 1318-DLC-HBP, Dkt. # 50, at ¶4 (noting that the Chinese Central Authority had only executed 16 of the SEC's 70 requests for service of process in China).
[10] *See* Erica Fund, Regulatory Competition in International Capital Markets: Evidence from China in 2004-2005, 3 N.Y.U. J. L. & Bus. 243, 271 (2006) ("Overall, Chinese issuers' concern over liability issues are still limited to the extent that many of them have assets that are largely, if not totally, in China.").
[11] "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20.
[12] The People's Bank of China in PRC is China's Central Bank.
[13] "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 (No.5 [2003]), Article 49.

suggest[s]" that due diligence include obtaining the entire AIC file.[14] Forays to the AIC office "usually give us a massive amounts [sic] of documents in Chinese, which we then either translate for our clients or, more typically, summarize."[15] Dan Harris is co-head of the China practice at the law firm Harris Moure, where he advises U.S. companies on doing business in China. He has been quoted by The Economist, The Wall Street Journal, and the New York Times, and blogs on the "indispensable" China Law Blog.[16] He has testified before the Congressional U.S.-China Economic and Securities Review Commission.

70.     Third, after its fraud was discovered, ShengdaTech conducted an internal investigation. ShengdaTech's internal investigation was conducted by its Special Committee, consisting of its directors Mudd and Saidman. The Special Committee retained the law firm O'Melveny & Myers, LLP, and the accounting firm PricewaterhouseCoopers, LLP.

71.     ShengdaTech's internal investigation determined that its SEC-filed financial statements were fabricated. This internal investigation established that :

(a)     Many of ShengdaTech's purported customers had not bought anything from ShengdaTech, had bought less than ShengdaTech reported, or in some cases, had never heard of ShengdaTech at all. Yet ShengdaTech recognized revenues from these imaginary transactions, and its SEC-filed financial statements thus overstated its revenues. *See* Dkt. # 126-1, 2, incorporated by reference.

---

[14] Dan Harris, How to Really Really Investigate a Chinese Company, posted on June 7, 2011, available at < http://www.chinalawblog.com/2011/06/how_to_detect_fake_chinese_companies_public_and_private.html>.

[15] *Id.*

[16] Sara Mui, 2013 Blawg 100 Hall of Fame, ABA Journal, available at <http://www.abajournal.com/magazine/article/2013_blawg_100_hall_of_fame/>

(b)     Many of ShengdaTech's large customers and suppliers were in fact owned and controlled by ShengdaTech's CEO, and transactions with these entities as they appeared in ShengdaTech's SEC filings were "vastly overstated". *In re ShengdaTech, Inc.*, Case No. BK-11-52649, First Amended Disclosure Statement For First Amended Chapter 11 Plan of Reorganization (dkt. # 540), at 15 (Bank. D. Nev., June 26, 2012).

(c)     ShengdaTech's SEC-filed financial statements were based on records that "may have been falsified in whole or in part." *ShengdaTech, Inc. v. Chen*, 11-05082-btb, Findings of Fact and Conclusions of Law (dkt. # 26), at ¶¶ 12, 13, and 20 (Bankr. D. Nev. Sept. 2, 2011) (the "Findings of Fact").

(d)     ShengdaTech's 2009 and 2010 financial statements reflected revenues from Zibo Jiaze, a subsidiary it claimed produced 13,350 metric tons of NPCC in 2009, against total production of about 170,000 metric tons. In fact, Zibo Jiaze needed an environmental permit to produce any NPCC, and only applied for a permit to begin in June 2010.  ShengdaTech reported that in 2009, its average selling price for NPCC was $481.70 per metric tons, meaning that Zibo Jiaze's purported production accounted for about $6.4 million in falsified revenues.

72.     Later, ShengdaTech sued KPMG for its reckless audit. ShengdaTech's complaint was based on its own internal investigation. ShengdaTech's complaint was previously filed on this Court's public docket at #97-1, pages 76-124, and is incorporated by reference. ShengdaTech alleged that its own financial statements were "far from accurate" because it had

"materially overstated its sales figures" through, in part, "fictitious transactions". Dkt. # 97-1, entry beginning at page 76, at ¶¶41, 64.

73.    Thus, ShengdaTech's AIC filings, and not its SEC filings, accurately set out its financial position.

74.    Further, differences in accounting standards cannot explain the discrepancies. ShengdaTech's financial statements purported to have been presented in accordance with U.S. GAAP. ShengdaTech's subsidiaries' AIC filings' financial statements were presented in accordance with Chinese GAAP.

75.    The Committee of European Securities Regulators, in a paper entitled CESR's advice on the equivalence of Chinese, Japanese and US GAAPs (2007), noted that there were no significant differences between US GAAP and International Financial Reporting Standards ("IFRS").  Pg. 25, at 2nd entry on page. There are no significant differences between IFRS and Chinese GAAP on revenue recognition. *Id.* at 35, 6th entry on page. Thus, there are no significant differences between U.S. GAAP and Chinese GAAP on revenue recognition.

76.    The law firm K & L Gates LLP has represented to the U.S. Securities & Exchange Commission in an October 27, 2010 letter that: "The basic accounting principles and practice of Chinese GAAP are similar to US GAAP. There are no substantial differences between Chinese GAAP and U.S. GAAP."

77.    The Chinese accounting standard governing revenue recognition for ShengdaTech's PRC subsidiaries -- ASBE 14 -- provides, identically to U.S. GAAP:

> Chapter II Revenue from Selling Goods
> Article 4.  No revenue from selling goods may be recognized unless the following conditions are met simultaneously:

(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;
(2) The enterprise retains neither continuing management involvement to the degree usually associated with ownership, nor effective control over the goods sold;
(3) The relevant amount of revenue can be measured in a reliable way;
(4) The relevant economic benefits associated with the transaction will flow to the enterprise; and
(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

78.     Similarly, there are no differences between U.S. GAAP and PRC GAAP that could account for the vast differences between ShengdaTech's SEC-reported financial numbers and those of its subsidiaries filed with the AIC. There are some immaterial differences between U.S. GAAP and PRC GAAP in calculating net income, such as accounting for intangible assets, assets impairment, capitalization of borrowing costs, R&D expenses, non-monetary transactions and deferred tax. These differences principally are:

|  | PRC GAAP | US GAAP |
| --- | --- | --- |
| Intangible assets amortization | All intangible assets should be amortized over the shorter of its expected useful life and the contractual or legal life, starting in the month in which it is obtained.  If there is no contractual or legal life, the expected useful life should be not more than 10 years. | For long-lived intangible assets that are deemed to have infinite lives, they are not amortized. However, they should be reviewed for impairment at least annually. |
| Assets impairment | Impairment tests should be carried out annually regardless of whether there are triggering events or not. | Except for impairment of goodwill and other long-lived assets, impairment test on assets should be carried out if there is a triggering event. |
| Borrowing cost | Borrowing costs on project-specific borrowings should be capitalized as part of the cost of acquiring or constructing a | Borrowing costs (specific or indirect) relating to the acquisition, construction or production of a qualifying asset |

| | | |
|---|---|---|
| | tangible fixed asset. | must be capitalized. |
| R&D expenses | All research and development costs should be recognized as an expense as incurred.  The only costs that are capitalized and amortized relating to a self-created intangible are registration fees and legal costs incurred to obtain a legal right to the asset, such as a patent. | Expenditures on research should be recognized as an expense when incurred.  An intangible asset arising from development should be capitalized if certain criteria are met. |
| Non-monetary transactions | No distinction is made between exchange of similar or dissimilar assets and profit or loss is generally not recognized. | Exchange of similar assets: no gains or losses should be recognized; Exchange of dissimilar assets: gains and losses are recognized based on fair value of goods received less any cash transferred. |
| Taxation | Three methods are allowed in the accounting for income tax: 1) tax payable method; 2) tax effect accounting - deferral method; 3) tax effect accounting - liability method.  Under tax payable method, no deferred tax asset or liability needs to be recognized. | Liability method should be used to account for income tax.  Deferred tax asset and liability must be calculated on all temporary differences.  Deferred tax asset must be calculated in full; if not realizable, then a valuation allowance is made. |

79.     Indeed, in a peer-reviewed academic publication, Hu et al[17] conducted an empirical study of the impact of these small differences between U.S. GAAP and Chinese GAAP. The authors examined a control group of eight companies listed on both Chinese and American stock exchanges, who because of their dual listings reported their financials under both Chinese GAAP and either U.S. GAAP or International Financial Reporting Standards ("IFRS").

---

[17] The four authors of  Hu et al include Professor Gang Hu, who teaches finance in Hong Kong, Professor Ling Lin, who teaches accounting, and Professor Min Xiao, who teaches finance at Xiamen University, China.

The authors then calculated the difference between for the underlying data reported under U.S. GAAP and Chinese GAAP, arriving at a mean difference in net income of just 2.1% - nothing like ShengdaTech's enormous differences.

80.     Thus, there are no significant differences between U.S. GAAP and Chinese GAAP that can explain the differences between ShengdaTech's SEC-reported revenues and net income, and its subsidiaries' AIC-reported revenues and net income.

### 2.  ShengdaTech overstated its cash.

81.     ShengdaTech claimed to have about $116 million in cash and cash equivalents as of December 31, 2009, and about $114 million as of December 31, 2008. ShengdaTech's principal reserves of cash were its accounts at local branches of three Chinese banks – the Bank of China ("BOC"), the Agricultural Bank of China ("ABC"), and China Merchants Bank ("CMB", and collectively, the "Three Banks"). As of December 31 2008 and 2009, respectively, ShengdaTech claimed to have accounts holding $51 million and $82 million with the Three Banks. Similarly, ShengdaTech's financial statements as of December 31, 2010, reported that it held $158 million in its accounts with the Three Banks.

82.     Plaintiffs obtained ShengdaTech's bank statements at each of the local branches of the Three Banks as of December 31, 2008 and 2009. Collectively, they show that ShengdaTech overstated its cash as of December 31, 2008 and 2009, respectively, by at least $50,347,268 and $82,166,434:

|  | As of December 31, 2008 | As of December 31, 2009 | As of December 31, 2010 |
|---|---|---|---|
| ABC – Qianxian Branch – amount claimed | $17,293,625 | $48,639,836 | $83,042,350 |
| ABC – Qianxian Branch – amount actually held | $30,894.56 | $73,783.64 | Less than $29 million |
| CMB – Jinan Branch – amount claimed | $33,049,917 | $31,829,551 | $73,118,638 |

| | | | |
|---|---|---|---|
| CMB – Jinan Branch – amount held | $0 | $0 | $0 |
| BOC – Tai'an Branch – amount claimed | $35,936 | $1,793,218 | $1,994,382 |
| BOC – Tai'an Branch – amount actually held | $1,385.85 | $22,387 | $13,628.71 |
| Three Bank total – amount claimed | $51,159,012 | $82,262,606 | $158,155,370 |
| Three Bank total – amount actually held | $32,210.41 | $96,170.64 | Unknown |
| Overstatement of total cash and cash equivalents based only on overstatement of cash held at local branches of Three Banks ($) | $50,347,268 | $82,166,434 | Unknown |
| All cash held in all bank accounts with all Chinese banks | $1,480,994.72 | $2,803,814.38 | Unknown |
| ShengdaTech total cash and cash equivalents – amount claimed | $114,287,073 | $115,978,763 | Unknown |

**B.  ShengdaTech failed to disclose related-party transactions.**

83.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

84.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

85.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

86.     SEC and NASDAQ rules and regulations require that publicly traded companies such as ShengdaTech include financial statements that comply with GAAP in their annual and

quarterly reports filed with the SEC.  *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

87.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

88.     GAAP Statement of Financial Accounting Standards ("SFAS") and SEC regulation S-K required the Company to disclose all material related party transactions.

89.     SFAS No. 57 and No. 850[18] provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.

90.     "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20. Related party transactions include transactions between the company and entities managed by its management.

91.     Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of

---

[18] SFAS are Statements of Financial Accounting Standards, AU are pre-existing standards adopted as interim standards by the PCAOB, and AS are standards formally adopted by the PCAOB. References to any auditing standards are to those standards in place at the time of KPMG's conduct complained of.

the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

92.     SSCM was a related party of ShengdaTech at all times, for three separate reasons:

(a)     Before July 2007, X. Chen indirectly owned 51.79% of SSMC. At that time, it was sold to Prosper Crown.

(b)     Before January 2009, its CEO was X. Chen.



93.     ShengdaTech's books and records report material transactions with and payments to SSCM:

94.     Similarly, ShengdaTech's internal investigation reported that it "is reported to have engaged in transactions with entities owned by Mr. Chen but which were not reported to be related parties." Findings of Fact, at ¶20.

95.     The internal investigation established that financial records relating to transactions with these entities were fabricated "in whole or in part." *Id.* Mudd, who chaired the internal investigation, has specifically testified that transactions with SSCM were among those whose records were fabricated.

96.     Accordingly, transactions with SSCM (a) should have been recorded as related-party transactions, and (b) were vastly overstated on ShengdaTech's books and records.

97.     Accordingly, ShengdaTech's 2008 and 2009 financial statements were not presented in conformity with GAAP.

> 1.   *KPMG either knew that ShengdaTech's 2008 financial statements were not presented in conformity with GAAP or had no reasonable basis to believe that they were.*

98.     Related party transactions must be identified as such in an issuer's financial statements. *See* Paragraphs 83-91 above. ShengdaTech's 2007 and 2008 transactions with SSCM greatly exceeded the $120,000 threshold requiring disclosure. *See* Paragraph 93, above. Accordingly, they were required to be disclosed.

99.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

───────────────────────

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

101.     SFAS No. 154 imposes disclosure obligations on auditors and issuers when they discover errors in previously-issued financial statements. Paragraphs 25-26 provide that in addition to providing correct information, the financial statements must disclose: (a) that previous years' financial statements were restated or corrected; (b) the nature of the error; (c) the effect of the correction on various financial statement items. Accordingly, ShengdaTech's 2008 10-K was required to disclose (but did not) that: (a) ShengdaTech's 2007 10-K and 2008 10-Qs had omitted to disclose related party transactions with SSCM, and (b) as a result, these financial statements omitted to disclose that over $19 million of ShengdaTech's purchases were from its related party, SSCM. Thus, ShengdaTech's 2008 financial statements, were not presented in accordance with GAAP.

---

████████████████████████████████████████████████████

[20] 2008 10-K, at F-21.

102.     Typically, when an issuer discovers that its financial statements contain false statements, the issuer will file with the SEC a current report on Form 8-K to announce the restatement. These announcements are very visible to investors, and publicly and visibly call attention to the errors.

103.     If the errors are discovered shortly before the issuer is due to file new financial statements, the issuer will sometimes be allowed to correct the error in its new financial statements, so long as it calls attention to the error as required by SFAS No. 154 ¶¶ 25-26.

104.     The SEC typically reviews important filings after the issuer files them. If the SEC finds that the issuer should make a separate filing to announce the restatement that calls attention to the errors, the SEC will order them the issuer do so after reviewing the newly-filed financial statements.

105.     But the SEC typically does not compare past disclosures with the filing it is reviewing to determine whether there were any errors in past filings.

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

## VI.   KPMG VIOLATED PCAOB STANDARDS

**A.  PCAOB Standards demand that the auditor express professional skepticism at all times.**

108.    The auditor must plan and perform the audit to obtain reasonable assurances that the financial statements it audits do not contain material misstatements. AU § 110.02. This includes misstatements caused by management's fraud. *Id.*

109.    Professional skepticism is especially important when considering fraud risks. AU §316.13. The auditor must design and carry out audit procedures with the mindset that management may be committing fraud. *Id.* The auditor must also continually reexamine audit evidence to determine whether all information and evidence obtained to date suggest that fraud is afoot. *Id.* At all times, the auditor must express professional skepticism.

110.    Warning signs of fraud including the following, among others:

(a)    Significant operations conducted in jurisdictions where differing business environments and cultures exist. AU §316 A2 a.

(b)    Domination of management by a single person or small group. *Id.*

(c)    Exertion of dominant influence over a related party. *Id.*

111.    Management's representations are a complement to, and not a substitute for, independent audit procedures. AU §333.02-03.

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████
████████████████

112.    As noted above, SSCM was a related party of ShengdaTech even after it was sold to Prosper Crown in July 2007 because, among other things, X. Chen continued to be SSCM's CEO.

113.    Before July 2007, ShengdaTech's CEO X. Chen had indirectly owned SSCM through his ownership interest in its parent, SST. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

114.    In conjunction with Mudd and Saidman's appointments to ShengdaTech's board, ShengdaTech had adopted a policy requiring audit committee approval of related-party transactions. ████████████████████████████

████████████████████████████████████

████████████████████████

115.    In addition to being ShengdaTech's CEO and owner of 44% of its shares, it was publicly disclosed that X. Chen owned several entities with which ShengdaTech did business. These were chiefly SSCM's parent and its other subsidiaries. ██████████████████

████████████████████████████████████

████████████████████████████████████





[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

130.    After identifying a related-party transaction, the auditor must determine whether the transaction was approved by the client's board of directors. AU 334.09c. ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

     ███████████████████████████████████████████████████████

███████████████████████████████

     ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

     ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

[redacted]

[redacted]

[redacted]

136.     KPMG would continue to ignore SSCM's related party status. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████

138.     As alleged above in Paragraph 96, ShengdaTech's transactions with SSCM were, in fact, vastly overstated. As alleged below in Paragraph 150, had KPMG treated transactions with SSCM as related-party transactions, it would have been required to conduct additional audit work which would have shown that ShengdaTech was a Potemkin Village.

████████████████████████████████████████████████████████

139.     The SEC's rules are incorporated by reference into PCAOB Standards. AU § 150 note 1. This includes the SEC's rules on reporting illegal acts. AU § 317 n.3, n.4

140.     The SEC's rules prohibit "officer[s]" of public companies from "mak[ing] or caus[ing] to be made a materially false or misleading statement to an accountant in connection with [] any audit." 17 C.F.R. § 240.13b2 2(a)(1). Penalties include a fine of not more than $5,000,000 and imprisonment of not more than 20 years. 15 U.S.C. §78ff(a). ████████████

████████████████████████████████████

---

[22] ████████ claimed, falsely, that the identification was an error.

141.     Section 10A of the Exchange Act provides that when in the course of auditing a public company, an auditor discovers information suggesting that an illegal act has occurred, it must immediately determine whether the illegal act, in fact, took place. False statements to an auditor are "illegal acts" within the meaning of Section 10A. *See* Securities and Exchange Commission, Influence on Conduct of Audits, 68 FR 31820-01, 2003 WL 21148349, at *10 (May 20, 2003) (attempt to mislead an auditor, which is codified in the same section of the Code of Federal Regulations as lying to an auditor, is an illegal act under Section 10A). ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

142.     Further, Chinese Generally Accepted Accounting Principles ("Chinese GAAP") are substantially the same as GAAP as they both require disclosure of material related party transactions. ABSE 36 (the applicable Chinese GAAP) requires disclosure in the financial statements of related party transactions. The definition of related parties is materially the same as SFAS 57. Thus, not even cultural differences could explain that Guo's statement to Hansen was a mistake, rather than a lie.

143.     If the auditor determines that an illegal act was committed, it must, among other things, inform the company's audit committee. 15 U.S.C. § 78j-1(b)(1)(B). The auditor must then determine whether the audit committee has taken appropriate remedial action and, if not, inform the SEC.

144.     If the auditor is precluded from obtaining sufficient evidential matter to determine whether an illegal act has occurred, the auditor must disclaim an opinion on the

financial statements. AU § 317.19. If the client refuses to accept a report disclaiming the auditor's opinion, the auditor must noisily resign. AU § 317.20.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

146.     Section 10A explicitly contemplates that audit committees may not take appropriate action. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████████
████

147.     An auditor's finding that a client may have lied to it or to another auditor is the single most alarming red flag an auditor can ever discover. The discovery imposes several obligations on the auditor.

148.     *First*, the auditor must investigate the circumstances and consider the reliability of the specific representations management made. AU §333.04. █████████████████████████

██████████   *See* Paragraphs 129-138, 145, above. Accordingly, KPMG violated PCAOB Standard AU § 333.04.

149.   ***Second***, the auditor must determine whether it can continue to rely on management's representations on any matter. *Id*.; *see also* AU §317.16 (same). At all times, the auditor must maintain the professional skepticism a prudent auditor would express ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████   Instead, KPMG continued to accept management's bare representations, even in the presence of red flags. For example, as more fully alleged in Paragraphs 156 and 158, below, KPMG directed all third-party confirmations to addresses provided by ShengdaTech's management. Management provided KPMG with addresses it controlled. Had KPMG checked even a single address against a confirmation addressee's publicly-available information, it would have determined that management had lied to it again, this time about the addresses. And like many inexperienced fraudsters, in responding to the confirmation requests, ShengdaTech's management simply confirmed everything. With these fraudsters in mind, PCAOB Standards provide that an unusually high confirmation rate is a red flag that should alert the auditor. KPMG's lead audit partner ██████ acknowledged in connection with the 2009 audit that the confirmation rate was unusually high, but did not take any action in response.

150.   ***Third***, PCAOB Standards ordinarily impose on the auditor heightened responsibilities when dealing with related-party transactions. Even without a client's lie, PCAOB Standards impose upon the auditor the obligation to determine whether all related-party transactions are disclosed. These include:

(a)     The auditor cannot simply rely on inquiring and obtaining representations from management. AU § 334.09.

(b)     Confirm significant information with intermediaries, including banks, to better understand the transaction. AU § 334.10 c.

(c)     Obtain information about the related party's financial capabilities, including from audited financial statements, unaudited financial statements, income tax returns, or reports issued by regulatory agencies, taxing authorities, or credit agencies. AU § 334.10e.

(d)     Review SEC filings and comparable data filed with other regulatory agencies. AU § 334.08c.

151.    KPMG did not conduct any of these steps:



(b)     Confirming transactions with the banks that processed payments from ShengdaTech to SSCM would have revealed that the transactions were "vastly overstated." KPMG did not confirm transactions with these banks.

(c)    Like ShengdaTech, SSCM was a Potemkin village, and it could not possibly have earned $19 million in revenue from ShengdaTech in 2007-2008. KPMG did not obtain SSCM's financial statements.

(d)    AIC filings are comparable to SEC filings. SSCM made filings with the AIC that showed that (1) Z. Chen was its Chairman and General Manager, and (2) its financials showed it could not possibly have earned $19 million in revenue from ShengdaTech in 2007-2008. Yet KPMG did not obtain SSCM's AIC filings.

152.    *Fourth*, AU § 315.09 imposed on KPMG an obligation to make inquiries of its predecessor, Hansen. The obligations continue throughout the engagement. AU § 315.02. They specifically include information that might bear on the integrity of management – including, obviously, management's lies to its previous auditor. AU § 315.09. ██████████ ████████████████████████████████████████████████████████████████ ████████████████

### C.  PCAOB Standards failures in connection with confirmations.

*1.    PCAOB Standards required KPMG to double check confirmation addresses supplied by ShengdaTech against publicly available information.*

153.    PCAOB Standards require auditors to obtain independent confirmation of certain financial statement entries. An auditor obtains a confirmation by writing a letter to an entity identified in the client's books as being the counterparty for an entry. Thus, for example, to confirm that ShengdaTech held a bank balance, KPMG should have written to the bank, asking it to confirm that ShengdaTech's bank account existed and that the balance on ShengdaTech's purported account statement was accurate. KPMG was required to confirm at least four entries in ShengdaTech's financial statements: (a) bank accounts and balances; (b) accounts payable; (c)

accounts receivable; and (d) tax payments and liability. Accordingly, it was required to address confirmations to ShengdaTech's banks, suppliers, and customers.

154.    The purpose of confirmation is ***independently*** to verify the client's representations concerning its business affairs. Thus, PCAOB Standards provide that auditors should "establish[] direct communication between the intended recipient and the auditor to minimize the possibility that the results will be biased because of interception and alteration of the confirmation requests or responses." AU § 330.28. Establishing direct communication with the confirmation addressees is a "fundamental" and "elementary" auditing requirement, and auditors have been fined and barred by the SEC for not doing so.[23] To ensure that it has direct contact, the auditor should not provide the client the confirmation forms, to be forwarded to the confirmation addressees, but should mail the form itself. And where the source of a response is uncertain – the PCAOB Standards use as an example an auditor who receives a faxed response – the auditor should take further precautions to verify that it is directly communicating with the confirmation addressees, such as verifying the response with a phone call to the known telephone number of the purported sender. AU § 330.29.

155.    As alleged above, the auditor must express professional skepticism when designing audit procedures. Further, as alleged above, if the auditor discovers audit evidence inconsistent with management's representations, it must evaluate whether it can continue to rely on management's representations. Further, as alleged above, KPMG had uncovered evidence that management had already lied to Hansen, to its board of directors, and to KPMG itself, about a material matter.

---

[23] Securities and Exchange Commission, SEC Charges India-Based Affiliates of PWC for role in Satyam Accounting Fraud, April 1, 2011, available at < http://www.sec.gov/news/press/2011/2011-82.htm>.

156.     KPMG obtained the confirmation addressees' addresses by asking ShengdaTech to provide them. KPMG never once checked even a single one of ShengdaTech's representations as to these addresses against publicly available information.

157.     ShengdaTech did not provide accurate confirmation addresses. Rather, it provided KPMG addresses ShengdaTech controlled. Thus, when KPMG mailed the confirmations, ShengdaTech insiders received them. ShengdaTech insiders then confirmed every claim in the confirmations, even though the claims were false, and mailed the completed confirmations to KPMG.

158.     KPMG made no attempts to check the information ShengdaTech provided against public records. This information was available and would have contradicted the information provided by ShengdaTech. For example:

(a)     Each of the Three Banks maintained toll-free hotlines. These hotlines provided branch addresses. Similarly, the Three Banks' websites permitted users to locate particular branches. KPMG could have checked the addresses provided by ShengdaTech against branch addresses provided by either the hotlines or the websites, and determine that the information provided by ShengdaTech was false. In 2010, KPMG contacted the Three Banks using this publicly available contact information. The Three Banks readily told KPMG that the confirmations it had received that purported to be from them were inauthentic.

(b)     ShengdaTech's purported suppliers and customers were substantial companies with websites or other publicly available contact information. For example, in connection with the audit of ShengdaTech's 2010 financial statements, KPMG

attempted to find the contact information of 12 ShengdaTech suppliers from public searches. KPMG's basic search found contact information for all 12. KPMG similarly easily found contact information from public sources for two suppliers it had selected.

(c)     Following the fraud's discovery, PwC was retained to assist in conducting the internal investigation. PwC had no difficulty using public sources to find contact information for dozens of ShengdaTech's suppliers and customers.

(d)     KPMG never conducted any site visits to any of ShengdaTech's suppliers or customers. Nor did it even conduct in-person visits to banks to confirm ShengdaTech's massive purported bank accounts.

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

161.     When KPMG finally called the confirmation addressees at their publicly available phone numbers, as set out in several memoranda prepared by KPMG and PricewaterhouseCoopers, all or nearly all of them disclaimed ShengdaTech's claims or refused to answer. Thus, banks denied that ShengdaTech's bank accounts held as much money as ShengdaTech claimed, suppliers denied that ShengdaTech had bought from them as much as ShengdaTech claimed, and customers denied that ShengdaTech had sold to them as much as ShengdaTech claimed. Several stated they'd never even heard of ShengdaTech. A memorandum documenting PricewaterhouseCoopers's calls to the entities that had purportedly provided positive confirmations was previously filed on the Court's public docket, # 126-1, 2, and is incorporated by reference.

> ### 2.     *KPMG recognized that the confirmation rate was unusually high, but decided to put off looking into it until 2010, and then quickly discovered the high confirmation rate was due to fraud.*

162.     Many inexperienced fraudsters assume that the higher the confirmation rate, the better the evidence the company is not committing fraud. Since the fraudsters are attempting to convince auditors that they are not committing fraud, they will cause every confirmation over which they have control to be returned to the auditor with a positive response.

163.     But the auditing profession well knows from decades of experience that many confirmation addressees will not return completed confirmations to the auditor, for reasons ranging from commercial suspicion to inability to obtain the correct records toi simple apathy. After all, the addressee has no stake in the confirmation.

164.     Thus, one of the canonical signs of fraud is an unusually high confirmation rate, resulting from this common fraudster misperception. AS 14 Appendix C1.b.(14).

165.     KPMG actually determined that the 2009 audit confirmation rate was unusually high. In a discussion with Mudd taking place May 2010, ███████ casually mentioned that the

2009 audit's confirmation rate was exceptionally high. Though this was a canonical red flag, KPMG had conducted no additional procedures to obtain reasonable assurances that it was not a sign of fraud. KPMG's failure to conduct additional procedures violated PCAOB Standards.

166.    Indeed, KPMG recognized that additional procedures were necessary, and agreed to carry them out – when it would audit ShengdaTech's 2010 financial statements. These procedures were simple, easy, and obvious steps. For example, KPMG contacted confirmation addressees using their publicly-available contact information, and then asked them to check either their own addresses against ShengdaTech's representation or the content of the confirmations themselves.  To Plaintiffs' knowledge, every single confirmation was fraudulent.

> *3.   KPMG had an obligation to know enough about ShengdaTech's business to be able to detect obvious forgeries.*
> i.   Bank chops.

167.    PCAOB Standards impose on the auditor the obligation to be familiar with the client and its industry. The auditor's knowledge should be sufficient to enable it to plan and perform its audit in accordance with PCAOB Standards. Similarly, the auditor should consult previous years' audit working papers to obtain familiarity with the business.

168.    In conducting business in China, a company's "chop" or seal functions as a signature does in the U.S. Documents issued by a company will bear the company's chop. An agreement affixed with the company's chop is binding, regardless of who signed on behalf of the company. Each company chop has a unique identification number. Chops are issued with a business license. Except under extraordinary circumstances, a business's chop will not change. Thus, a facially deficient chop is as much a red flag in China as a signature claiming to be from a company's CEO but bearing the wrong name is in the U.S.

███████████████████████████████████████████████████

████████████████████████████████████████

170.    KPMG issued confirmations to ABC in both 2008 and 2009, and received positive confirmations. The confirmations were sent to an address ShengdaTech claimed was that of the branch at which it held a large account, though the address actually was one controlled by ShengdaTech. The chops on the 2008 and 2009 confirmations were visibly different, a red flag. In its audit of ShengdaTech's 2010 financial statements, KPMG called the ABC local branch, whose number they obtained through public sources, and the ABC branch responded incredulously to KPMG's request that it confirm that ShengdaTech had an $83 million bank account, because the local branch had only about $30 million in deposits in *all* of its business accounts *combined*. KPMG then placed the visibly different 2008 and 2009 confirmations side by side, and quickly detected the forgery. Thus, the ABC confirmations were defective on their face. ABC is an enormous bank with about $15 trillion in deposits across all of its branches. KPMG regularly sends confirmations to ABC.

171.    KPMG issued confirmations to CMB in both 2008 and 2009, and received positive confirmations. The confirmations were sent to an address ShengdaTech claimed was that of the branch at which it held a large offshore account. The chop purported to be that of the CMB branch in which ShengdaTech held an account, rather than that of CMB's head office. In its audit of ShengdaTech's 2010 financial statements, KPMG called the CMB branch's customer service department. The representative told KPMG that all CMB confirmations of offshore accounts are done by CMB's head office and bear the CMB head office's chop. CMB's head office's chop states on its face that it is that of CMB's head office. Thus, the CMB chop is

defective on its face. CMB is an enormous bank with about $764 billion in assets. KPMG regularly sends confirmations to CMB.

ii.  Switched envelopes.

172.     ShengdaTech has major subsidiaries and operations in two Chinese provinces – Shandong and Shaanxi – separated by about 500 miles. KPMG thus created two separate audit teams, one responsible for auditing ShengdaTech's Shandong operations, the other its Shaanxi operations.

173.     The audit teams each sent confirmations relating to their respective audits. Thus, to confirm ShengdaTech sales made by Shaanxi subsidiaries, KPMG's Shaanxi team sent confirmations to Shaanxi addressees. To confirm ShengdaTech sales made by its Shandong subsidiaries, the Shandong team sent confirmations to the Shandong addressees.

174.     The two KPMG audit teams provided the confirmation addressees with self-addressed envelopes, but the envelopes were addressed to the specific ***team***, not to a central KPMG office. Thus, the Shaanxi teams provided envelopes addressed to the Shaanxi team, and the Shandong team provided envelopes addressed to the Shandong team.

175.     Addressees that had received confirmation requests from the Shandong team should not have had access to envelopes addressed to the Shaanxi team, and vice versa. Yet ShengdaTech was never able to keep the two straight. ShengdaTech caused purported Shandong addressees to respond to KPMG in envelopes addressed to KPMG's Shanxi team, and vice versa.

176.     Using the additional procedures KPMG agreed to conduct in auditing ShengdaTech's 2010 financial statements, KPMG easily discovered five purported ***Shandong*** customers who collectively "confirmed" about $5.4 million of purchases from ShengdaTech but responded in envelopes addressed to the KPMG ***Shaanxi*** team. KPMG examined only a small

sample of confirmation responses for discrepancies between envelopes provided to addressees and envelopes in which the addressees mailed their responses, suggesting that there were many more such errors.

### 4. VAT receipts.

177.    China imposes a Value-Added Tax ("VAT") on purchases, acceptance or provision of services, and certain other business activities in the PRC.

178.    The Chinese government requires that certificates of payment or receipt (called "fapiao") be issued in most scenarios in which a sale is made (in ShengdaTech's case, every time a purchase or sale was made). The seller issues a fapiao to memorialize the tax it has collected in the sale. After receiving the invoice, the parties may not alter the sales and payment terms. Chinese authorities use fapiao to monitor the tax paid on all transactions to prevent tax avoidance and related fraud and strictly police it.

179.    Fapiao are printed by the local tax authorities, and taxpayers must purchase enough fapiao to be able to issue one in all transactions requiring a fapiao. Each fapiao has a unique combination of code and number. Chinese tax authorities keep records of all fapiao issued, and the persons who bought them. Purchasers may not give or sell fapiao they have obtained from tax authorities. Thus, if the code and number are known, it is possible to determine which person has bought, and therefore should issue, the fapiao. If it is not that person who issues the fapiao, then the fapiao is inauthentic. Both the fapiao received by the purchaser and the fapiao kept by the seller bear this code and number.

180.    Since July 24, 2008, Shandong province – in which ShengdaTech conducted most of its operations – has been providing a service to verify fapiao. The well-publicized service has been available through the Shandong National Taxation Bureau's website, boasts its

own dedicated maintenance and question response staff, and had received about 100 million visits by November 2011.

181.    Shandong Province issued an advisory article on October 22, 2009, providing simple instructions on how to determine if a fapiao is authentic: visit the Shandong Province National Taxation Bureau's website (www.sd-n-tax-gov.cn), click on a link titled "Invoice Verification" directly available on that page, and then enter the VAT invoice code and the VAT invoice number, which appear on the fapiao itself. The website will then provide the name of the issuer to whom the Shandong Province government had sold the fapiao; if the invoice is authentic, the issuer name displayed will match the issuer name on the face of the invoice being tested. If not, the advisory article advises the user to bring the invoice to a local national taxation office to obtain a final verification and/or report tax fraud.

182.    On March 2, 2011, KPMG selected six fapiao and tested them through Shandong Province's VAT invoice verification system. KPMG immediately discovered that the six fapiao were forged; the issuer name on the invoice never matched the name found in the Shandong Province government's records.

### D.  KPMG ignored other red flags

183.    PCAOB Standards provide that a company's poor internal controls over financial reporting is a red flag, and heightens the risk of fraud. AU § 316.07, .42, .85.

██████████*KPMG knew that ShengdaTech had poor internal controls over financial reporting*. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



[redacted]

185. As alleged above, KPMG concluded that there were material deficiencies in ShengdaTech's internal controls over financial reporting as of December 31, 2008.

[redacted]

[redacted] ***Repeated accounting restatements are a red flag***. ShengdaTech restated its financial statements on May 14, 2008. [redacted]

---

24 [redacted]

25 Somewhat surprising since ShengdaTech claimed to be "the largest Chinese manufacturer of NPCC products in terms of production capacity." 2009 10-K, at 7, available at <http://www.sec.gov/Archives/edgar/data/1160165/000114420410013515/v177358_10k.htm>.



[redacted]

[redacted]

[redacted]

[redacted]

191. Indeed, KPMG knew that ShengdaTech's subsidiaries filed financial statements with the Chinese State Administration of Industry and Commerce (the "AIC"). In its ShengdaTech audits and reviews, KPMG obtained AIC filings as part of background checks on some of ShengdaTech's suppliers and customers. In following up on the claim that ShengdaTech's sales purportedly exceeded global demand for its product, KPMG could have also obtained ShengdaTech's subsidiaries' AIC filings directly from the AIC. Yet

ShengdaTech's subsidiaries' AIC filings included financial statements that showed that ShengdaTech's revenues were between 5 and 10% of what it reported in its SEC filings.

**E.   KPMG discovers evidence in 2010 that required it to reconsider its audit report.**

*1.   KPMG discovers that one of ShengdaTech's purported top 10 2009 customers was bankrupted and dissolved in 2008.*

192.     If, after an audit report is issued, an auditor discovers evidence inconsistent with its audit report – for example that financial statements may contain material misstatements – the auditor must investigate. AU § 561.01, .04. The investigation cannot await the next year's audit. *Id.*

193.     PCAOB Standards require that an auditor establish a materiality threshold in conducting an audit. ██████████████████████████████████ ███████ But in any case, when the auditor encounters evidence of potential fraud, regardless of its materiality, the auditor should consider the implications for the integrity of management or employees and the possible effect on other aspects of the audit. AU § 312.10.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

[redacted]

[redacted]

[redacted]

[redacted]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

   2.   *KPMG discovers that ShengdaTech has been supplying it with clearly*
        *forged bills.*

200.   KPMG had found that ShengdaTech did not provide KPMG with evidence that certain sales documented on its financial statements had happened. Then, when asked to provide such evidence, ShengdaTech told KPMG that it did not keep checks or bills issued by its customers as payments, but only bank in-slips (i.e., records purportedly showing ShengdaTech's deposit of funds at the bank, but no records showing the receipt of funds from the customers).

201.   In November 2010, KPMG asked ShengdaTech to retain some of those checks or bills obtained directly from the customer.

202.   ShengdaTech only provided six bills, stating that it had forgotten to keep the remainder. Five of the six were in fact, bills that had been issued by entities that were not ShengdaTech's customer, and that ShengdaTech's customer had merely endorsed ("endorsed bills").  In all five cases, the endorsed bills were identical to the values of the sales invoices to be settled by ShengdaTech's customers, an implausible coincidence. It would require, for example, that the customer received from *its* customer a bill for $13,245.39, at the same time as it  owed ShengdaTech $13,245.39 – an unlikely coincidence that would not be repeated five times. Moreover, the bill issuer ShengdaTech had listed on the bank-in slip was always the customer, not the customer's customer that had actually issued the bill, as would have been required. Further, one of the bills was issued on November 25, 2010, by a customer located in Shandong province was endorsed by a customer located in Jiangsu province – about 400 miles away – and deposited by Shaanxi Haize – another 620 miles away – on November 26, 2010.

203.    KPMG immediately demanded more bills and checks, and obtained eight more. Three were endorsed bills.

204.    Thereafter, in late November or early December 2010, Guo told KPMG that it had determined that allowing customers to settle invoices with bills was too risky, and accordingly had asked its customers to settle their invoices by tele-transfer, to be effective December 2010.

205.    KPMG later cited this evidence to ShengdaTech as evidence that it was committing fraud. Yet at the time, KPMG conducted no further investigation. Nor did it take any action to ensure that investors no longer relied upon its audit reports for each of 2008 and 2009.

### 3.   KPMG learns that SSCM's general manager is Z. Chen.

206.    As more fully set out in Paragraphs 213-227, between October 20 and mid-December 2010, ShengdaTech issued three Registration Statements, as well as the PPM. KPMG read all four documents, and consented to its designation as an expert in all four. KPMG expressly represented that it had read the PPM.

207.    Each of the four documents provided:

> **Mr. Zhen Chen** has served as general manager of Shaanxi Haize Nano since September 2010. He served as general manager of Shandong Haize Nano from July 2010 to August 2010.  From October 2003 to June 2010, he served as general manager of ***[SSCM] a subsidiary of [SST], a related party of the Company***.
> [Emphasis added].

208.    As more fully alleged above, ShengdaTech's 2009 financial statements did not identify transactions with SSCM as related-party transactions. The description of Z. Chen revealed that ShengdaTech's 2009 financial statements were materially inaccurate as they omitted to disclose that ShengdaTech's transactions with SSCM were related-party transactions. KPMG was thus required to immediately reevaluate ShengdaTech's 2009 financial statements,

and its report thereon, based on this information. AU § 561.01, .04. KPMG could not allow purchasers in the Offering to rely upon its opinion. AU § 561.06c.

## VII. KPMG VIOLATED PCAOB INTERNAL CONTROL AUDIT STANDARDS.

[redacted]

[redacted]

210. If an auditor discovers a material weakness in the client's internal controls, PCAOB Internal Control Audit Standards demand that the auditor specifically identify that weakness. AS 5.91. [redacted]

[redacted]

[26] KPMG's report also listed two other failures to disclose related party transactions.

████████████████████████████████████████

████████████████████████████████████████

212.     As noted in Paragraphs 60-61, KPMG's statements that ShengdaTech's internal controls over financial reporting contained material weaknesses did not disclose this critical failure. Instead, KPMG chose to disclose much more innocuous failures concerning policies to address non-routine transactions and internal control over accounting for income taxes. KPMG thus violated AS 5.91.

## VIII.     SHENGDATECH COLLAPSES

**A.  In December 2010, KPMG states that it did not know of any reason why ShengdaTech's financial statements were inaccurate, Morgan Stanley claims it has conducted adequate due diligence, and ShengdaTech sells $130 million of its bonds.**

213.     On June 15, 2010, ShengdaTech  filed a shelf registration statement on Form S-3. The shelf registration statement was for the sale of $100 million in equity securities, with net proceeds going to ShengdaTech. That day, KPMG expressly consented to the use of its audit reports in ShengdaTech's registration statement.

214.     On October 20, 2010, ShengdaTech filed an amended shelf registration statement on Form S-3.

215.     The registration statement filed October 20, 2010, provided:

**Mr. Zhen Chen** has served as general manager of Shaanxi Haize Nano since September 2010. He served as general manager of Shandong Haize Nano from July 2010 to August 2010.  From October 2003 to June 2010, he served as general manager of *[SSCM] a subsidiary of [SST], a related party of the Company*. [Emphasis added].

216.     On October 20, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement filed October 20. KPMG read the October 20 registration statement before giving its consent.

217.     On November 8, 2010, ShengdaTech amended its Shelf Registration statement on Form S-3 to a registration statement on Form S-1. A registration statement on Form S-1 is used to immediately sell securities. Therefore, ShengdaTech aimed to sell the securities covered in the registration statement – $100 million of equity securities – as soon as the SEC declared its registration statement effective. The November 8 2010 registration statement repeated the statement that "[SSCM] was a subsidiary of [SST], a related party of the Company." On November 8, 2010, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement. KPMG read the November 8 registration statement before giving its consent.

218.     On November 18, 2010 ShengdaTech filed an amended shelf registration statement on Form S-1. On November 18, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement, and again stated that "[SSCM] was a subsidiary of [SST], a related party of the Company." On November 18, 2010, KPMG again expressly consented to the use of its audit reports in ShengdaTech's registration statement. KPMG read the November 18 registration statement before giving its consent.

219.     Having abandoned its plan to sell its shares in a public offering, ShengdaTech instead sold $130 million of convertible bonds through the Private Placement closing in December 2010.

220.     In connection with this private placement, on December 9, 2010, KPMG provided to the underwriters of the private placement a comfort letter. In this comfort letter, KPMG represented that:

(a)     It was aware that ShengdaTech planned to sell convertible bonds through a private placement;

(b)     It had reviewed the PPM;

(c)     It was aware that KPMG's audit report and review of ShengdaTech's 2010 quarterly financial would be used in the Offering, and consented to this use; and

(d)     It was aware that purchasers in the Offering would rely on KPMG's opinions of ShengdaTech's financial statements.

221.     As to ShengdaTech's financial statements, KPMG represented in the comfort letter that:

(a)     "Nothing came to our [i.e., KPMG's] attention as a result of the [review of ShengdaTech's 2010 quarterly financial statements] however, that caused us to believe that [1)] any material modifications should be made to the unaudited condensed consolidated financial statements [] included in the Preliminary Offering Memorandum for them to be in conformity with U.S. generally accepted accounting principles [or 2)] the unaudited condensed consolidated financial statements [for the first three quarters of 2010] do not comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC"; and

(b)  "In our opinion, the consolidated financial statements audited by us and included in the Preliminary Offering Memorandum, comply as to form in all material respects with the applicable accounting requirements of the Act and the related rules and regulations adopted by the SEC."

222.  KPMG also represented "[f]or purposes of this [comfort] letter, we have read the 2010 minutes of the meetings of the board of directors and committees of directors, including the audit committee of the Company."

223.  On December 9, 2010, ShengdaTech issued a press release announcing plans to offer an aggregate of $90 million of senior convertible notes due 2015 in a private placement, instead of the previously planned public offering of equity securities. The Company also announced that it intended to grant the initial note purchasers an option to purchase an additional $30 million of such notes.

224.  On December 10, 2010, ShengdaTech announced that it entered into a purchase agreement with Morgan Stanley, relating to the sale by the Company of $130 million aggregate principal amount of ShengdaTech's 6.50% Senior Convertible Notes due 2015 (the "2015 Notes"), in a private placement.  ShengdaTech also announced that it intended to use some of the net proceeds from the Private Placement to repurchase $67 million of the Company's 2018 Notes, and also to finance its NPCC production capacity expansion, research and development activities and other working capital requirements.

**B.  KPMG establishes directs contact with some of ShengdaTech's customers, suppliers, and banks, and in two days unravels ShengdaTech's fraud.**

225.  On March 1 and 2, 2011, KPMG called certain of ShengdaTech's customers and suppliers, as well as banks in which it purportedly held deposits. KPMG obtained the telephone

numbers predominantly through web searches and calls to public hotlines, though KPMG sometimes also obtained the information from publicly available filings known to KPMG. The customers, suppliers, and banks then informed KPMG that ShengdaTech's claims to have engaged in substantial business with them were false.

226.    On March 2, 2011, KPMG informed ShengdaTech's Audit Committee of "potentially serious discrepancies and unexplained issues" KPMG had discovered in auditing ShengdaTech's financial statements for FY 2010. These issues included, among other things, that KPMG could not confirm sales amounts, sales terms, and outstanding balances, discovered that many documents ShengdaTech provided to KPMG were crude forgeries, discovered that certain transactions had been with related parties without necessary disclosure, and that suppliers and customers denied engaging in business with ShengdaTech.



[redacted]

**C. ShengdaTech collapses.**

228. On March 4, 2011, ShengdaTech formed a special committee (the "Special Committee") to oversee the Internal Investigation. The Special Committee was composed of ShengdaTech's independent directors who made up the Audit Committee.

229.    The Special Committee engaged the law firm O'Melveny & Myers LLP ("OMM") to conduct an independent investigation into the potential issues raised by KPMG. In turn, OMM retained PricewaterhouseCoopers LLP ("PwC") to provide forensic accounting support for its investigation.

230.    On March 14, 2011, after market close, trading in ShengdaTech's common stock was suspended by the NASDAQ.

231.    On March 15, 2011, ShengdaTech issued a press release relating that it had appointed a special committee "to investigate potentially serious discrepancies and unexplained issues relating to the Company and its subsidiaries' financial records."

232.    On March 15, 2011, NASDAQ changed the reason for the halt, stating that "trading [would] remain halted until ShengdaTech, Inc. has fully satisfied NASDAQ's request for additional information."

233.    On April 29, 2011, KPMG informed ShengdaTech of its resignation as the Company's independent registered public accounting firm effective immediately, saying that "[t]he manner of management's conduct during the investigation by a special committee of the Board of Directors raises doubts about  management's representations provided to [KPMG] in connection with [its] 2008 and 2009 audits of the consolidated financial statements and the effectiveness of internal control over financial reporting of the Company." KPMG added that "disclosures should be made and action should be taken to prevent future reliance on [KPMG's] previously issued audit reports related to the consolidated balance sheets of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and 2009, and related consolidated statements of income, shareholder's equity and comprehensive income, and cash flows for the years then

ended and the effectiveness of internal control over financial reporting as of December 31, 2008 and 2009."

234.    On May 5, 2011, ShengdaTech filed a current report on Form 8-K, providing that:

> KPMG previously informed the Company's Audit Committee of certain concerns arising during its incomplete audits of the Company's consolidated financial statements as of and for the year ended December 31, 2010, and the effectiveness of internal control over financial reporting as of December 31, 2010.  These concerns included serious discrepancies and unexplained issues relating to, among others: (i) the Company's bank balances; (ii) transactions with major suppliers; (iii) VAT [Value-Added Tax] invoices and payments; (iv) sales and payments for sales by third parties; (v) sales to the Company's second largest customer; (vi) discrepancies between KPMG's direct calls to customers and confirmations returned by mail; and (vii) concerns raised by directly confirming customer sales and accounts receivables.

235.    On June 8, 2011, the NASDAQ Listing Qualifications Panel confirmed its decision to delist ShengdaTech's common stock. All trading of the Company's stock was suspended on June 10, 2011.

236.    On June 9, 2011, ShengdaTech announced that it was in default on convertible bonds securities issued in the Private Placement and in an earlier private placement.

237.    The SEC commenced a regulatory proceeding, *In re ShengdaTech, Inc.* (LA-3397) on August 11, 2011. The proceeding resulted in an SEC Order noting potential violations of the federal securities laws arising from false statements made in the 2009 Form 10-K, the 2009 Form 10-K/A, and the 2009  and 2010 Form 10-Qs.

238.    On August 19, 2011, ShengdaTech fired CEO Chen and filed a bankruptcy petition under Chapter 11 of the Bankruptcy code.  Plaintiffs' Notes, pursuant to their terms, became immediately due and payable.

239.    Also on August 19, 2011, SEC enforcement staff served ShengdaTech a subpoena requesting documents relating to ShengdaTech's finances, taxes, bank accounts, sales,

financial statements, internal auditing, and professional services rendered in connection therewith, as well as hiring, firing and compensation of its officers and directors. ShengdaTech complied and provided the information to the SEC.

240.    On August 24, 2011, ShengaTech obtained a Temporary Restraining Order against its CEO.  ShengdaTech also sought a preliminary injunction confirming the terms of the Temporary Restraining Order. The court granted both.

241.    Pursuant to this request for a preliminary restraining order, on September 2, 2011, the Bankruptcy Court entered an order approving ShengdaTech's findings of fact (previously filed on the Court's public docket at Dkt. # 2).  The bankruptcy court found:

(a)    That ShengdaTech's employees prevented the independent investigation from verifying ShengdaTech's cash accounts, giving rise to an inference that ShengdaTech had fabricated those accounts.  (*Id.* at ¶ 12);

(b)    That U.S. banks against which ShengdaTech purportedly held certificates of deposit had no record of issuing any of them.  (*Id.* at ¶ 13).

(c)    That ShengdaTech had entered into undisclosed related-party transactions, and that the sales to the undisclosed related parties were "vastly overstated." (¶ 20).

242.    On June 20, 2012, ShengdaTech filed its disclosure statement to creditors, disclosing that many of ShengdaTech's sales had been to related-parties owned by its CEO Chen, and those sales are "not supported" and likely "vastly overstated". (*In re ShengdaTech, Inc.*, 11-52649-bt (D. Nev.), Dkt. # 540, at 15.)

**IX.   RELYING ON THE PPM AND SHENGDATECH'S SEC FILINGS, PLAINTIFFS PURCHASED $8.70 MILLION MILLION OF THE 2015 NOTES DIRECTLY FROM MORGAN STANLEY**

243.   Through Wellesley Advisors, Plaintiffs read the PPM, including the financial statements and other business information contained therein, and ShengdaTech's SEC filings, including KPMG's audit reports.   In reliance thereon, Plaintiffs bought ShengdaTech's 2015 Notes.

244.   From December 2010 to February 2011, MCF purchased net $8,000,000 of ShengdaTech's Notes, all from Morgan Stanley, through the following transactions:

     (d)     Purchased $5,400,000 on December 10, 2010

     (e)     Purchased $2,000,000 on January 21, 2011;

     (f)     Purchased $410,000 on February 4, 2011;

     (g)     Purchased $1,000,000 on February 11, 2011;

     (h)     Purchased $1,000,000 on February 16, 2011;

     (i)     Sold $310,000 and $1,500,000 on December 21 and December 23, 2010, respectively.

245.   Wellesley Advisors also exercised its authority as investment manager of the Jura to make the following purchases:

     (j)     Jura bought $600,000 of ShengdaTech bonds on December 12, 2010;

     (k)     Jura bought $100,000 of ShengdaTech bonds on February 27, 2011.

246.   As the underwriter and auditor, respectively, Morgan Stanley and KPMG had access to ShengdaTech's internal reports and other data and information about those companies'

finances, operations and sales at all relevant times and should have conducted adequate due diligence on ShengdaTech's PRC Companies, but did not.

## X.   LOSS CAUSATION

247.     As described herein, Defendants made or caused to be made a series of materially false or misleading statements about ShengdaTech's financial condition, and in the case of KPMG, its audits' compliance with PCAOB Standards. These material misstatements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of ShengdaTech and its business, prospects and operations, thus fraudulently creating a market for the Notes and causing the Notes to be overvalued and artificially inflated at all times relevant hereto. Defendants' materially false and misleading statements resulted in Plaintiffs' purchasing Notes that would never have come into the market but for the fraud or, at a minimum, would have come into the market at substantially lower prices and/or on terms far more favorable to investors. But for Defendants' misrepresentations, Plaintiffs would not have purchased the Notes at all, or would not have purchased them on the terms and at the artificially inflated prices at which they entered the market. As the truth about ShengdaTech began to be revealed, the inflation caused by these misrepresentations was eliminated from the price of the Notes and ShengdaTech defaulted on the Notes, causing damages to Plaintiffs.

248.     Plaintiffs purchased Convertible Bonds in the Private Placement and through Morgan Stanley at or near par, and in many cases above par value.

249.     Plaintiffs determined to sell their convertible bonds virtually immediately after ShengdaTech's initial announcement that KPMG had encountered unexplained discrepancies in its audit of ShengdaTech's 2010 financial statements.

250.     Then, however, there was no liquid market for ShengdaTech's convertible bonds; thus, Plaintiffs could not sell their bonds.

251.     On June 9, 2011, ShengdaTech announced that it was in default on its debt securities, and on August 19, 2011, ShengdaTech fired its CEO Chen and filed a bankruptcy petition under Chapter 11 of the Bankruptcy code.

252.     The Internal Investigation revealed that ShengdaTech had far less cash and revenues to service its obligations under the convertible bonds than it needed, and that it had told investors. Accordingly, ShengdaTech filed for bankruptcy.

253.     In bankruptcy, ShengdaTech has paid $4.2 million to its creditors, and has $1.5 million left, against liabilities of at least $164,184,811.88 from noteholders alone.

254.     ShengdaTech defaulted on both the 6.0% Notes and the 6.5% Notes. ShengdaTech was allowed to sell the convertible bonds, and Plaintiffs bought them, because ShengdaTech claimed to have substantial cash and revenues it did not have. Then, when it became apparent that ShengdaTech did not have the cash and revenues it had claimed to have had, ShengdaTech declared bankruptcy. In bankruptcy, ShengdaTech has only been able to pay a small fraction of its liabilities because it did not have the cash and revenues it had claimed to have had.

255.     Hence, Plaintiffs lost nearly their entire investment because ShengdaTech never had any ability to pay its obligations, which KPMG and Morgan Stanley concealed.

## COUNT I

## VIOLATION OF M.G.L. c. 110A §410

### (Against Morgan Stanley)

256.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

257.     Morgan Stanley is a broker-dealer.  Morgan Stanley sold ShengdaTech's debt securities to Plaintiff in Massachusetts.

258.     The PPM through which Morgan Stanley sold the securities to Plaintiffs contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading.

259.     Plaintiffs were unaware of the untrue statements of material fact and could not have discovered them in the exercise of reasonable care.

260.     Morgan Stanley knew, or in the exercise of reasonable care should have known, that the Private Placement Memorandum contained untrue statements of material facts and omissions whose disclosure was necessary to make other statements not misleading.

261.     Plaintiffs are entitled to damages as provided by M.G.L. c. 110A §410(a)(2).

262.     This action is brought less than four years after the discovery of the materially untrue statements.

## COUNT II

## NEGLIGENT MISREPRESENTATION

### (By Miller Investment Trust, against KPMG)

263.     This Count is brought by Miller Investment Trust alone.

264.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

265.     KPMG owed Plaintiff a duty. KPMG explicitly consented in writing to the use of its audit reports of ShengdaTech's financial statements in conducting conduct a financing of approximately $100 million in late 2010.  KPMG intended that investors in that financing rely on KPMG's audited reports of ShengdaTech's financial statements in deciding whether to purchase the ShengdaTech 2015 Notes. KPMG engaged in conduct linking KPMG to investors in the ShengdaTech 2015 Notes financing, which evinced KPMG's understanding of investors' reliance.  Plaintiff was such an investor.

266.     KPMG issued audit letters that certified that ShengdaTech's 2009 and 2008 financial statements "represent[ed] fairly, in all material respects," ShengdaTech's financial position.  KPMG certified that its audits had complied with PCAOB Standards. The purpose of the audit letters was to induce reliance on the part of, among others, Plaintiff.

267.     KPMG breached its duty by, among other things, negligently performing its audits and its nine months review, as set forth above. KPMG also failed to take reasonable care in obtaining relevant information and in communicating it to investors, and was therefore negligent.

268.     Plaintiff acted in direct reliance on the representations made by KPMG in its audit certifications, including but not limited to the statements made in ShengdaTech's 2008 10-K filed April 1, 2009 and 2009 10-K filed on March 15, 2010, and the audited financials contained within these 10-Ks.

269.     As a direct and proximate result of KPMG's wrongful conduct, Plaintiff suffered damages in connection with its purchase of the ShengdaTech's 2015 Notes.

270.     Plaintiff would not have purchased ShengdaTech's 2015 Notes at the prices it paid, or at all, if it had been aware of the true facts concealed by Defendants' and ShengdaTech's false and misleading statements.

271.     KPMG had a duty to ShengdaTech to (a) audit the 2008 and 2009 Financial Statements and internal controls, review ShendgaTech's 2009 and 2010 Quarterly Financial Statements, in accordance with GAAS and PCAOB; (b) use the skill and care normally implemented by members of the professional accounting and auditing profession; (c) learn and become familiar with ShengdaTech's business operations and reporting methods; (d) reduce audit risk by planning and performing its audits; (e) collect evidence needed to complete thorough audits; (f) after collecting sufficient information, decide whether there was any ongoing concern about ShengdaTech's viability; (g) determine whether the 2008 and 2009 Financial Statements were calculated in accordance with GAAP and were accurately portrayed ShengdaTech's financial condition; (h) analyze 2009 and 2010 Quarterly Financial Statements to determine if any changes or modifications were needed to be made to have them conform to GAAP; (i) immediately notify the ShengdaTech Board about material weaknesses in ShengdaTech's internal controls, poor management and evaluation of the controls, and any irregularities regarding financial reporting.

272.     KPMG was negligent when it stated that the 2008 and 2009 Financial Statements and the 2009 and 2010 Quarterly Financial Statements were comported with GAAP, that its audit comported with PCAOB Standards, and that as of December 2010, it had come into no evidence that ShengdaTech's financial statements were inaccurate.

273.     As a result of the allegations listed above, KPMG breached its duty by not exercising reasonable care as other auditors and accountants would do in similar situations.

274.     KPMG's actions, or lack thereof, were a direct and proximate cause of plaintiff's damages.

## COUNT III

## VIOLATION OF SECTION 18 OF THE EXCHANGE ACT

### (by Miller Investment Trust against KPMG)

275.     This count is brought by the Miller Investment Trust alone.

276.     The Miller Investment Trust incorporates by reference the allegations of the preceding paragraphs as if fully set forth herein.

277.     As set forth above, KPMG made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts, in the Company's 2008 and 2009 10-Ks.

278.     In connection with the purchase of the Company's notes, the Miller Investment Trust read and relied upon the Company's 2008 and 2009 10-Ks. Specifically, the Miller Investment Trust read and relied on the Company's 2008 and 2009 financial statements contained in the 2008 and 2009 10-Ks. The Miller Investment Trust also read and relied upon the unqualified audit opinion issued by KPMG in connection with those financial statements, in which KPMG stated that the 2008 and 2009 financial statements fairly presented the Company's financial condition and the results of its operations in accordance with GAAP and that KPMG had conducted its audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).

279.     The Miller Investment Trust reasonably relied on those statements not knowing that they were false or misleading.

280.    When the truth emerged about the false and misleading statements in the Company's 2008 and 2009 10-Ks, the Miller Investment Trust was significantly damaged by the resulting loss in the value of the notes and the Company's default on its obligations under the notes.

281.    As a direct and proximate result of Defendant KPMG's wrongful conduct, the Miller Investment Trust suffered damages in connection with its purchase of the notes.

282.    This Count relates back to the filing of the Miller Investment Trust's Complaint on December 1, 2011, because it arises out of the same conduct, transaction, or occurrence set out in the original complaint.

283.    The Miller Investment Trust initial Complaint was brought within one year of the discovery of the misleading statements and within three years of when Plaintiff's cause of action accrued.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against defendants as follows:

Against Defendants and in favor of the Plaintiffs for damages, in an amount determined to have been sustained by Plaintiffs;

Against Defendants and in favor of the Plaintiffs for all general and special damages necessary to make the Plaintiffs whole;

Against Defendants and in favor of the Plaintiffs for pre-judgment and post-judgment interest;

Against Morgan Stanley for statutory legal fees and interest as provided by M.G.L. c. 110A §410; and

Awarding Plaintiffs costs of this suit, including experts' fees and other costs and

disbursements; and such and other further relief as may be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury of all issues that may be so tried.

Dated:  April 29, 2015                    By its attorneys,


                                          **/s/ Laurence M. Rosen**
                                          Laurence M. Rosen, Esq.
                                          The Rosen Law Firm, P.A.
                                          275 Madison Avenue, 34th Floor
                                          New York, NY  10016
                                          Phone: (212) 686-1060
                                          Fax: (212) 202-3827
                                          Email: lrosen@rosenlegal.com

                                          -and-

                                          Thomas G. Shapiro (BBO # 454680)
                                          tshapiro@shulaw.com
                                          Adam M. Stewart (BBO # 661090)
                                          astewart@shulaw.com
                                          SHAPIRO HABER & URMY LLP
                                          Seaport East
                                          Two Seaport Lane
                                          Boston, MA 02210
                                          Telephone: (617) 439-3939
                                          Facsimile: (617) 439-0134

                                          *Attorneys for Plaintiffs*

## **Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 29, 2015. I hereby certify that I served an unredacted version of this document by electronic mail to all counsel of record on April 29, 2015.

### **/s/ Jonathan Horne**