UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MILLER INVESTMENT TRUST and JURA LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> MORGAN STANLEY & CO. LLC and KPMG, a Hong Kong Partnership, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CIVIL ACTION
NO.  1:11-cv-12126

**REDACTED VERSION**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KPMG-HK'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

**MORGAN LEWIS & BOCKIUS LLP**

Steven W. Hansen, BBO #220820
    steven.hansen@morganlewis.com
Jeff Goldman, BBO #660870
    jeff.goldman@morganlewis.com
One Federal Street
Boston, MA  02110
617.951.8000

Jeffrey Q. Smith, *pro hac vice*
    jeffrey.smith@morganlewis.com
101 Park Avenue
New York, NY 10178
212.309.6000

*Attorneys for Defendant KPMG*

Dated: May 13, 2015

## **TABLE OF CONTENTS**

Table of Authorities ................................................................................................ iv

Introduction .............................................................................................................1

Factual Background .................................................................................................2

Argument .................................................................................................................7

I.       The TAC Fails to Plead with Specificity that KPMG-HK  Made a Statement
         Actionable Under Section 18 of the Exchange Act. ......................................7

         A.       Miller Must Plead a Plausible Claim and Must Plead Falsity with
                  Specificity. ........................................................................................7

         B.       KPMG-HK's Audit Opinions Are Opinions.........................................8

         C.       Miller Must Plead with Specificity that KPMG-HK  Did Not Believe Its
                  Audit Opinions or that They Were Misleading.....................................11

         D.       The TAC Falls Far Short Of Properly Alleging  That KPMG-HK's Audit
                  Opinions Were Either False or Misleading............................................12

                  1.       Many Of The Allegations In The TAC Are Irrelevant. ..............12

                           a.       Allegations About Activity of ShengdaTech  Personnel
                                    That KPMG-HK Did Not Know About..........................13

                           b.       Allegations About Events After the March 15, 2010 Filing..........13

                           c.       Other Irrelevant Allegations. ....................................14

                  2.       Many Allegations Fail To Meet The Heightened Pleading
                           Requirements of the PSLRA And Rule 9(b)...............................14

                  3.       ShengdaTech's 2008 Annual Financial  Statements Were
                           Presented in Conformity with GAAP. .......................................16

                  4.       The Remaining Allegations Fail to Create a Strong Inference  that
                           KPMG-HK's Audit Opinions Were False or Misleading..........................18

                           a.       Related Party Transactions. ........................................19

                           b.       AIC Filings; VAT Records. .........................................21

                           c.       Number of Confirmations. ..........................................22

II.      Miller Cannot Base a Section 18 Claim on The Offering Memorandum or
         Shendgatech's Forms 10-Q......................................................................22

III.     The TAC Fails to Plead Loss Causation. .....................................................23

IV.      The TAC Fails To State A Negligent Misrepresentation Claim Against KPMG-
         HK.......................................................................................................25

         A.       The TAC Must Plead its State Law  Misrepresentation Claim with
                  Particularity But Does Not......................................................................25

                  1.       Miller Must Plead with Particularity.......................................25

                  2.       The TAC Fails to Plead with Particularity  That KPMG-HK's
                           Audit Opinions Were False. ......................................................26

         B.       KPMG-HK Did Not Owe A Duty to  Purchasers of ShengdaTech Notes
                  Other Than the "Initial Purchasers."......................................................28

C.     Under Massachusetts Law, an Auditor Owes A Duty To Non-Clients Like Miller Only In "Very Narrow" Circumstances. ..................................................28

     1.     Miller Is Not In The "Very Narrow" Category Of Persons In "Near Privity" Who Can Sue Here. ...........................................................29

          a.     Audit Opinion in 2008 Form 10-K. ................................................30

          b.     Audit Opinion in 2009 Form 10-K. ................................................30

          c.     The Registration Statement For The Proposed 2010 Equity Offering That Never Occurred. ......................................................30

          d.     The OM For The Debt Offering. ...................................................30

V.     To The Extent Not Resolved on The Pleadings, the Court Should Dismiss the State Law Claim For Lack Of Subject Matter Jurisdiction. ...............................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175, 209 (D. Conn. 2014)................................................................24

*In re Advanced Battery Tech.*,
  781 F.3d 638 (2d Cir. 2015)...................................................................................21

*Allstate Ins. Co. v. Countrywide Financial Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) .................................................................26

*Amorosa v. Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010)....................................................................24

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007).....................................................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................8

*Athale v. Sinotech Energy*,
  No. 1:11-cv-0531, 2014 WL 687218 (S.D.N.Y. Feb. 21, 2014) ...........................22

*Bell Atl. Corp. v. Twombley*,
  550 U.S. 544, 570 (2007)..........................................................................................8

*Bily v. Arthur Young & Co.*,
  3 Cal. 4th 370 (1992) .......................................................................................25, 30

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  910 F. Supp. 2d 1199 (C.D. Cal. 2012) .................................................................11

*In re Citigroup, Inc.*,
  535 F.3d 45 (1st Cir. 2008)........................................................................................2

*In re Colonial Bancgroup, Inc. Sec. Litig.*,
  9 F. Supp. 3d 1258, 1264-65 (M.D. Ala. 2014)......................................................10

*Coyne v. Matabolix, Inc.*,
  943 F. Supp. 2d 259 (D. Mass. 2013) ....................................................................23

*Cumis Ins. Soc. v. BJ's Wholesale Club*,
  455 Mass. 458 (2009) .......................................................................................29, 31

*Dura Pharmaceuticals Inc. v. Brudo*,
 544 U.S. 336 (2005) ..................................................................................23, 25

*First Nat. Bank of Commerce v. Monco Agency Inc.*,
 911 F.2d 1053 (5th Cir. 1990) ..............................................................................27

*Giragosian v. Ryan*,
 547 F.3d 59 (1st Cir. 2008) .....................................................................................2

*Greebel v. FTP Software, Inc.*,
 194 F.3d 185 (1st Cir. 1999) ...................................................................................8

*Hanson v. Frazer, LLP*,
 No. 12 CIV. 3166 JSR, 2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013) ..................10

*Janbay v. Canadian Solar, Inc.*,
 No. 1:10-cv-4430 RWS, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ................24

*In re Lehman Bros. Sec. and ERISA Litig.*,
 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ................................................................9, 10

*Lentell v. Merrill Lynch & Co.*,
 396 F.3d 161 (2d Cir. 2005) ...................................................................................24

*Loewen v. Galligan*,
 882 P.2d 104 (Or. App. 1994) .................................................................................26

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
 910 F. Supp. 2d 561 (S.D.N.Y. 2012) ....................................................................11

*N. Am. Specialty Ins. Co. v. LaPalme*,
 258 F.3d 35 (1st Cir. 2001) .....................................................................................25

*North Am. Catholic Educ. Programming Found. v. Cardinale*,
 567 F.3d 8 (1st Cir. 2009) .......................................................................................26

*Nycal Corp. v. KPMG Peat Marwick LLP*,
 426 Mass. 491, 688 N.E.2d 1368 (1998) ...................................................... *passim*

*Oaktree Cap. Mgmt. v. KPMG*,
 963 F. Supp. 2d 1064 (D. Nev. 2013) ............................................................1, 19, 21

*Oaktree Cap. Mgmt.* v. *KPMG*,
 No. 2:12-CV-956 JCM, 2014 WL 3816392 (D. Nev. Aug. 4, 2014) .....................19

*Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services LLC*,
 700 F.3d 829 (6th Cir. 2012) ...................................................................26, 31, 32

*Omnicare Inc. v. Laborers' Dist. Council Constr. Industry Pension Fund*,
   No. 13-435 (U.S. Mar. 24, 2015)...........................................................................10, 11, 12, 26

*Perry v. Duoyuan Printing, Inc.*,
   No. 10 Civ. 7235 (GBD), 2013 WL 4505199 ................................................ *passim*

*Prime Mover Capital Partners v. Elixir Gaming Tech.*,
   793 F. Supp. 2d 651 (S.D.N.Y. 2011).....................................................................24

*In re Puda Coal Inc. Sec. Litig.*,
   30 F. Supp. 3d 230, 259-60 (S.D.N.Y. 2014) ........................................................10

*Rodriguez v. Doral Mortgage Corp.*,
   57 F.3d 1168 (1st Cir. 1995)...................................................................................32

*SEC v. Arthur Young & Co.*,
   590 F.2d 785 (9th Cir. 1979) ..................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................................8

*United Mine Workers of Am. v. Gibbs*,
   383 U.S. 715 (1966)................................................................................................33

*In re WorldCom, Inc. Sec. Litig.*,
   352 F. Supp. 2d 472 (S.D.N.Y. 2005).....................................................................18

## Statutes and Other Authorities

15 U.S.C. § 78r ................................................................................................ *passim*

15 U.S.C. § 78u - 4(b)(1) ...............................................................................8, 14, 23

28 U.S.C. § 1367.....................................................................................................32

17 CFR § 230.144A .................................................................................................31

17 CFR § 240.13a–13(d)..........................................................................................22

Fed. R. Civ. P. 9(b) ........................................................................................8, 23, 26

AU § 230.11..............................................................................................................10

AU § 230.13.......................................................................................................11, 15

AU § 315.21..............................................................................................................17

AU § 316.10..............................................................................................................15

AU § 334.04.........................................................................................................................21

FASB Statement No. 154 (May 2005).....................................................................................16, 17

**INTRODUCTION**

Miller Investment Trust ("Miller") purchased bonds issued by ShengdaTech, Inc. ("ShengdaTech"), a Chinese producer of calcium carbonate.  Later, ShengdaTech defaulted and declared bankruptcy.  Miller seeks to recover its investment losses from one of ShengdaTech's auditors, KPMG, a Hong Kong partnership ("KPMG-HK"), alleging claims under Section 18 of the Securities Exchange Act of 1934 and for common law negligent misrepresentation.

Both claims are premised on the erroneous assertion that KPMG-HK's audit opinions with respect to ShengdaTech's annual financial statements for 2008 and 2009 were false or misleading.  Miller's fourth attempt to state a claim against KPMG-HK draws (selectively) on extensive discovery taken in parallel cases.  Yet the Third Amended Complaint (the "TAC"), despite its length, does not plead facts showing those audit opinions were either false or misleading.

Identically-situated ShengdaTech note purchasers asserted parallel claims against KPMG-HK in Nevada federal district court.  *See Oaktree Cap. Mgmt. v. KPMG*, 963 F. Supp. 2d 1064 (D. Nev. 2013) ("*Oaktree* I").  The court there granted KPMG-HK's motion to dismiss based on the failure of the complaint to plead facts showing that KPMG-HK's audit opinions were false holding:

> [P]laintiffs have failed to allege a false statement of material fact that can be legally attributed to defendants in Shengda[Tech]'s [] 2008, or 2009 SEC filings. . . .Plaintiffs' speculation about what defendants did or did not do in performing their audits is not a substitute for factual assertions that meet the requirements of Fed. R. Civ. P. 8(a) and 15 U.S.C. § 78u–4(b)(1).

*Id.* at 1091.[1]  The same outcome is required here.

---

[1] The Court did not reach alternative grounds for dismissal and did not rule with respect to state law claims, properly determining not to exercise supplemental jurisdiction.  *Oaktree* I, 963 F. Supp. 2d at 1091.  The *Oaktree* case has since settled as to KPMG-HK.

Miller's claims are legally insufficient for other reasons, too.  The TAC fails properly to plead loss causation, an element of the Section 18 claim.  The state law negligent misrepresentation claim, like the Section 18 claim, fails because the TAC does not allege with particularity that KPMG-HK's audit opinions were false or misleading.  That claim also fails because KPMG-HK did not owe a duty to Miller in connection with its audit opinions or with respect to any other document.  Moreover, dismissal of the federal claim would mean there is no independent basis for federal jurisdiction, and the Court should decline to exercise supplemental jurisdiction over Miller's state law claim.

Accordingly, Miller's claims against KPMG-HK should be dismissed in their entirety.  Since Miller has had four opportunities to plead and has had the benefit of extensive discovery from other, related cases, dismissal should be with prejudice.

## FACTUAL BACKGROUND

KPMG-HK is a partnership organized under the laws of Hong Kong.  TAC ¶ 34.[2]  KPMG-HK is headquartered in Hong Kong and provides audit and accounting services principally in Hong Kong and China.  *Id.*

Between November 11, 2008 and April 29, 2011, KPMG-HK was the independent auditor for ShengdaTech, Inc.  TAC ¶ 34.  ShengdaTech was incorporated in Nevada and its securities were publicly-traded in the U.S., but the company's headquarters and all of its operations were in the People's Republic of China.  TAC ¶¶ 37, 38.  ShengdaTech was organized

---

[2] The summary of facts is based on those allegations in the TAC that are well-pleaded, documents that are referenced or relied upon in the TAC, and matters of which the Court may take judicial notice.  *See, e.g., Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) ("A district court may also consider documents incorporated by reference in the complaint, matters of public record, and other matters susceptible to judicial notice.") (internal quotation marks and brackets omitted); *In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008) ("[W]e may also review documents outside of the pleadings where they are undisputed, central to plaintiffs' claims, and sufficiently referred to in the complaint or incorporated into the movant's pleadings.").

as a holding company and, through an intermediate company called Faith Bloom, held five subsidiaries, four of which manufacture precipitated calcium carbonate, a chemical compound widely used in manufacturing and a variety of other applications.  Goldman Decl. Ex. B (ShengdaTech 2009 10-K), at 3-4.

KPMG-HK completed audits of ShengdaTech's annual financial statements for each of 2008 and 2009 and issued audit opinions, dated March 31, 2009 and March 15, 2010 respectively.  KPMG-HK began, but did not complete, an audit of ShengdaTech's 2010 financial statements and never issued an audit opinion for 2010.  KPMG-HK's 2008 and 2009 audit opinions were filed with the Securities and Exchange Commission ("SEC") in connection with ShengdaTech's Form 10-K annual reports dated April 1, 2009 and March 15, 2010.  Goldman Decl. Ex. B, at F-2; and Ex. C, at F-2.  The audit opinions are reproduced in Appendix A-1 and A-2 to this memorandum.

In both 2008 and 2009, ShengdaTech's Chairman and Chief Executive Officer and its Chief Financial Officer certified that ShengdaTech's report on Form 10-K, which included its financial statements, "does not contain any untrue statement of a material fact or omit to state a material fact."  Goldman Decl. Ex. E (Certification for 2009); Ex. F (Certification for 2008).  Both further certified that ShengdaTech "disclosed . . . to [ShengdaTech's] auditors . . . .[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting . . . and . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."  *Id.*

ShengdaTech management deceived KPMG-HK, as the TAC acknowledges.  KPMG-HK first discovered this deception in 2011 during the course of KPMG-HK's audit work in

connection with the 2010 annual financial statements.  Through that work, KPMG-HK identified

and reported to the ShengdaTech audit committee "potentially serious discrepancies and

unexplained issues relating to [ShengdaTech] and its subsidiaries . . .."  TAC ¶ 226.  Among

other issues, during the 2010 audit KPMG-HK "was unable to confirm sales amounts, sales

terms, and outstanding balances."  *Id.*   Additionally, KPMG-HK reported that some of

ShengdaTech's transactions were with related parties that ShengdaTech had failed to disclose to

it.  *Id*.  KPMG-HK informed the audit committee that it "would be unable to complete its audit

until these potential discrepancies and issues were resolved."  Goldman Decl. Ex. D (Saidman

Declaration) at ¶ 19. [3]

ShengdaTech disclosed publicly on March 15, 2011 that it had appointed a special

committee of the Board of Directors to investigate "potentially serious discrepancies and

unexplained issues relating to the Company and is subsidiaries' financial records identified by

the Company's auditors in the course of their audit of the consolidated financial statements for

the fiscal year ended December 31, 2010."  *See* TAC ¶ 231.  The full text appears in

ShengdaTech's Form 8-K dated Mar. 15, 2011, at 2.  Goldman Decl. Ex. P.  KPMG-HK made

materials available to assist the special committee and its law firms and forensic accountants.

*See* Goldman Decl. Ex. G (ShengdaTech Form 8-K dated May 5, 2011) at 3.

But, thereafter, members of ShengdaTech's management attempted to stymie and

otherwise "obstruct" the inquiry.  Goldman Decl. Ex. D (Saidman Declaration) at ¶¶ 24-25.

Specifically, they stalled or otherwise sought to derail trips to the Company's banks and steer

[investigators] to specific bank employees.  *See id.* at 24.  Further, ShengdaTech's CEO, Chen,

first presented the special committee with counterfeit documents and then refused to meet with

---

[3] The Declaration of Mr. Saidman, a director of ShengdaTech, is the stated basis of the Bankruptcy Court's findings of fact, cited in the TAC at paragraph 241.

the special committee.  *Id.* at ¶¶ 25, 34.  On April 19, 2011, KPMG-HK sent a letter to

ShengdaTech's board of directors, which according to a Form 8-K later filed by ShengdaTech

stated:

> [I]n the view of KPMG, senior management of the Company has
> not taken, and the board of directors has not caused senior
> management to take, timely and appropriate remedial actions with
> respect to discrepancies and/or issues relating to the Company's
> financial records that were identified during the course of the audit
> for the year ended December 31, 2010.

Goldman Decl. Ex. M (ShengdaTech 8-K dated April 29, 2011), at 2.  KPMG-HK resigned

"effective immediately" on April 29, 2011.  Goldman Decl. Ex. G (Form 8-K dated May 5,

2011), at 2.  On May 5, 2011, KPMG-HK also instructed ShengdaTech's board of directors that

"action should be taken to prevent future reliance on their previously issued [2008 and 2009]

audit reports" and that "management's conduct during the investigation by a special committee

of the Company's Board of Directors raised doubts about management's representations

provided to KPMG-HK in connection with KPMG-HK's 2008 and 2009 audits . . . ."  *Id.* at 3.

On August 19, 2011, ShengdaTech's special committee fired Chen as CEO and filed a

bankruptcy petition in Nevada.  TAC ¶ 113; Goldman Decl. Ex. D (Saidman Dec.), at ¶ 37.  The

next day, ShengdaTech's special committee asked the Nevada bankruptcy court to take the

extraordinary measure of barring Chen, the former CEO and controlling shareholder, from

exercising his power to name members of the board of directors.  *Id*. at ¶¶ 42-44.  In a

declaration accompanying the request to the Bankruptcy Court, a member of the special

committee stated that Chen effectively deadlocked the ShengdaTech board of directors and was

attempting to add an additional member of the board in order to interfere with the special

committee.  *Id*. at ¶ 44.  The same declaration also stated that "Mr. Chen and former managers

who . . . have been acting in concert with him" obstructed the special committee's work and

prevented the completion of its investigation.  *Id.* at ¶ 34.

ShengdaTech's assets are now held by the ShengdaTech Liquidating Trust.  The Liquidating Trust filed a Form 10-K with the SEC for its fiscal year ending December 31, 2014. *See* Goldman Decl. Ex. R.  The Trust reported that it has initiated efforts in the People's Republic of China to enforce judgments giving it control over facilities owed by the several subsidiaries of Faith Bloom but "[b]ecause of the significant uncertainties associated with estimating the probability and timing of realizing value from the Faith Bloom equity (including the value generated through the sale of Shaanxi Haize and the value generated if any of the other factories are recovered), it is not practical to estimate its fair value."  *Id.* at F-8.  According to the Form 10-K, "[o]ther than Shandong Bangsheng Chemcial, Ltd. . . . all of the other PRC subsidiaries are believed to be operating entities. . . ."  *Id.*

<center>*     *     *</center>

Miller, the sole plaintiff claiming against KPMG-HK, operates as an SEC-registered mutual fund.  TAC ¶ 28.  In its SEC filings in 2010 and 2011, Miller presented itself as a general-purpose convertible bond fund, investing in a wide range of companies, both in the U.S. and abroad.  Goldman Decl. Ex. H (Summary prospectus); Goldman Decl. Ex. I (quarterly holdings report).  Miller alleges that it purchased convertible notes issued by ShengdaTech. Originally, ShengdaTech had sold the notes to a group of broker-dealers referred to as the "initial purchasers," who, in turn, offered these notes to qualified purchasers in a Rule 144A offering pursuant to an Offering Memorandum ("OM") dated December 10, 2010.[4]  Although Miller alleges that it purchased the notes from one of the "initial purchasers," defendant Morgan Stanley & Co., LLC, the record shows that Miller bought some notes in the December 10

---

[4] The OM is referenced extensively in the TAC and was filed with the Court previously as Exhibit 1 to the Declaration of John Bueker (docket no. 14).

offering, but then sold a portion of those notes on December 21 and 23, 2010, and purchased additional notes on January 21 and February 4, 11 and 6, 2011. TAC ¶ 244. Thus, a majority of the relevant purchases were not in the December 10, 2010 offering or pursuant to the OM. TAC ¶ 244; *see also* Docket no. 16-1 (copies of trade confirmations as filed by Miller).

KPMG-HK's 2009 audit opinion was reproduced in the OM, but the OM did not contain any new or other statement by KPMG-HK. KPMG-HK provided a letter addressed to the "initial purchasers" of the notes ███████████████████████████. *See* TAC ¶ 220; Goldman Decl. Ex. J (letter referenced in TAC). It emphasizes: ████████████████ ███████████████ . . . ." Goldman Decl. Ex. J, at ¶ 13. Miller was not an initial purchaser, and the TAC does not allege that Miller received or read the letter prior to its purchases. The TAC does not allege that Miller had any contact whatsoever with KPMG-HK.

## ARGUMENT

### I. The TAC Fails to Plead with Specificity that KPMG-HK Made a Statement Actionable Under Section 18 of the Exchange Act.

To state a claim under Section 18, Miller must plead, with specificity, that KPMG-HK made a statement in a filing with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934 ("Exchange Act") that was false or misleading when filed. 15 U.S.C. § 78r. (The full text is set forth in Appendix B to this Memorandum.) With respect to Miller's Section 18 claim, the TAC asserts that Miller relied on two statements by KPMG-HK, its audit opinions dated March 31, 2009 and March 15, 2010 (Goldman Decl. Ex. B, at F-2; and Ex. C, at F-2). TAC ¶ 278. However, the TAC fails to plead specific facts showing that either audit opinion was false or misleading when filed with the SEC.

### A. Miller Must Plead a Plausible Claim and Must Plead Falsity with Specificity.

A pleading must "contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007).  Characterizations, conclusions and

inconsistent allegations are irrelevant in satisfying pleading requirements.  *Id.*  Section 18 claims

are subject to the further heightened "clarity and basis" pleading requirements of the Private

Securities Litigation Reform Act ("PSLRA"), codified in relevant part in Section 21D of the

Exchange Act, 15 U.S.C. § 78u-4(b)(1). These requirements are "congruent and consistent" with

the requirement to plead with "particularity" under Fed. R. Civ. P. 9(b), *Greebel v. FTP*

*Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999), a requirement that "[t]his circuit has been

notably strict and rigorous" in enforcing.  *Id.*  Accordingly, in order to allege that a statement

was false or misleading, a complaint must plead with particularity "the reason or reasons why the

statement is misleading."  15 U.S.C. § 78u-4(b)(1).

The PSLRA further distinguishes between allegations based on the plaintiff's personal

knowledge and those pleaded "on information and belief."  Many of the TAC's allegations

against KPMG-HK fall into the latter category.  These allegations are entitled to weight only to

the extent that the TAC sets forth the "basis" for the belief by "stat[ing] with particularity all

facts on which that belief is formed."  15 U.S.C.A. § 78u-4(b)(1).  Allegations lacking a basis,

and there are many in the TAC, are to be disregarded.  *Id.*

The PSLRA also requires that any claim asserting that a defendant acted with a particular

state of mind must give rise to a strong inference of the existence of that state of mind.  *See*

Section 21D(b)(2))(A).  A strong inference, in turn, means an inference that is "at least as

compelling as any opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 313 (2007).

### B.     KPMG-HK's Audit Opinions Are Opinions.

KPMG-HK's audit opinions were expressed as opinions.  The March 15, 2010 opinion

8

states:

> *In our opinion*, the consolidated financial statements referred to
> above present fairly, in all material respects, the financial position
> of ShengdaTech, Inc. and subsidiaries as of December 31, 2009
> and 2008, and the results of their operations and its cash flows for
> the year then ended, in conformity with U.S. generally accepted
> accounting principles.

Appendix A-2; *see* Exhibit 1 to the Declaration of John Bueker (docket no. 14) (emphasis

added).  The text of the March 31, 2009 opinion varies only by date of the referenced financial

statements.  *See* Appendix A-1.  It is well-accepted that such statements are to be viewed as an

opinion for purposes of determining whether a plaintiff has pleaded a false statement.  *See*, *e.g.*,

*In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 303 (S.D.N.Y. 2011) (leading

recent case treating auditor statement concerning GAAP as one of opinion).

Each of KPMG-HK's audit reports expressly sets forth the basis for its opinion that

ShengdaTech's financial statements are presented in conformity with GAAP—namely, KPMG-

HK's underlying opinion that its audit provides a reasonable basis for that view:

> We conducted our audits in accordance with the standards of the
> Public Company Accounting Oversight Board (United States).
> Those standards require that we plan and perform the audit to
> obtain reasonable assurance about whether the financial statements
> are free of material misstatement. An audit includes examining, on
> a test basis, evidence supporting the amounts and disclosures in the
> financial statements. An audit also includes assessing the
> accounting principles used and significant estimates made by
> management, as well as evaluating the overall financial statement
> presentation. *We believe* that our audits provide a reasonable basis
> for our opinion.

*Id.* (emphasis added).  KPMG-HK's audit opinions dated March 15, 2010 and March 31, 2009

are identical in this respect.  *See* Appendix A-1 & A-2.[5]

---

[5] The Public Company Accounting Oversight Board ("PCAOB"), which regulates
auditors of public companies, maintains Generally Accepted Auditing Standards, or "GAAS,"
which are available on the PCAOB website, http://pcaobus.org.

This statement is also phrased as one of opinion.  *See Omnicare Inc. v. Laborers' Dist. Council Constr. Industry Pension Fund,* No. 13-435 (U.S. Mar. 24, 2015), slip op. at 3 (statements preceded by "we believe . . ." acknowledged to be opinions).  Moreover, GAAS compliance is inherently a matter of judgment:

> The independent auditor's objective is to obtain sufficient
> appropriate evidential matter to provide him or her with a
> reasonable basis for forming an opinion. The nature of most
> evidence derives, in part, from the concept of selective testing of
> the data being audited, which involves judgment regarding both the
> areas to be tested and the nature, timing, and extent of the tests to
> be performed. In addition, judgment is required in interpreting the
> results of audit testing and evaluating audit evidence.

AU § 230.11 (*Due Professional Care in the Performance of Work*) (pre-December 15, 2010); *see also SEC v. Arthur Young & Co.,* 590 F.2d 785, 788-89 & n.2 (9th Cir. 1979) ("Generally Accepted Auditing Standards (GAAS) are general standards of conduct relating to the auditor's professional qualities as well as to the judgments exercised by him in the performance of his examination and issuance of his report.").  Accordingly, in his widely cited *Lehman* decision, Judge Kaplan recognized that an auditor's statement regarding GAAS is one of opinion, reasoning:

> Many of those standards [comprising GAAS] are couched in rather
> general and in some cases inherently subjective terms.  They
> require, for example, that the auditor plan the audit engagement
> properly, use 'due processional care,' exercise 'professional
> skepticism' and 'asses the risk of material misstatement due to
> fraud'—all matters as to which reasonable professionals planning
> or conducting an audit reasonably . . . could disagree.

*Lehman*, 799 F. Supp. 2d at 300 (S.D.N.Y. 2011); a*ccord, e.g., In re Puda Coal Inc. Sec. Litig.*, 30 F. Supp. 3d 230, 259-60 (S.D.N.Y. 2014) (following *Lehman* and holding that statements concerning GAAS in audit opinions are statements of opinion); *In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1264-65 (M.D. Ala. 2014) (same); *Hanson v. Frazer, LLP*, No.

12 CIV. 3166 JSR, 2013 WL 5372749, at *8 (S.D.N.Y. Sept. 24, 2013) (same); *Perry v.*

*Duoyuan Printing, Inc.*, No. 10 Civ. 7235 (GBD), 2013 WL 4505199, at *5 & n.5 (same); *In re*

*Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012) ("*Longtop I*")

(same); *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1208 (C.D. Cal.

2012) (same).

### C.    Miller Must Plead with Specificity that KPMG-HK Did Not Believe Its Audit Opinions or that They Were Misleading.

The Supreme Court held in *Omnicare* that an opinion is a false statement of fact only if

the speaker does not believe the expressed opinion. *Omnicare, supra,* slip op. at 7 - 8.[6]  That an

opinion may prove to be wrong does not render it false.  *See id.* at 9 ("a sincere statement of pure

opinion is not an 'untrue statement of material fact,' regardless whether an investor can

ultimately prove the belief wrong.")[7]

Under *Omnicare*, an opinion that is not false may be misleading—but only if the

complaint "call[s] into question the . . . [speaker's] basis for offering the opinion."  *Id.* at 17.

Even in the context of Section 11, which is not subject to heightened pleading requirements,

"That is no small task for an investor."  *Id.* at 18.[8]  The task is even greater here because the

---

[6] *Omnicare* was decided under Section 11, which the Court found applies in part to misleading statements—"including both fact and opinion." slip op. at 10, n. 4.  Section 18, however, creates a cause of action only for false or misleading statements of *fact*.  *See* 15 U.S.C. § 78r (full text in Appendix B).

[7] *See also* AU § 230.13 (*Due Professional Care in the Performance of Work*) ("[T]he subsequent discovery that either a material misstatement, whether from error or fraud, exists in the financial statements or a material weakness in internal control over financial reporting exists does not, in and of itself, evidence (a) failure to obtain reasonable assurance, (b) inadequate planning, performance, or judgment, (c) the absence of due professional care, or (d) a failure to comply with the standards of the Public Company Accounting Oversight Board (United States)" on the part of the auditor. )

[8] Although portions of the PSLRA apply to the claims under the Securities Act as well as the Exchange Act, the "clarity and basis" pleading requirements do not.

basis for KPMG-HK's opinion that the ShendgdaTech financial statements were presented in conformity with GAAP is itself an opinion:  that KPMG-HK "conducted our audits in accordance with [GAAS]" and "believe[d] that our audits provide a reasonable basis for our opinion."  Accordingly, the TAC must plead facts showing either that KPMG-HK did not believe it had conducted a GAAS audit that supported its opinion or that it was misleading for KPMG-HK to state that it held that opinion.  It does not.

### D.     The TAC Falls Far Short Of Properly Alleging That KPMG-HK's Audit Opinions Were Either False or Misleading.

Even with the benefit of discovery, the TAC fails to set forth well-pleaded facts sufficient to create a strong inference that KPMG-HK disbelieved its opinions that ShengdaTech's annual financial statements were presented in accordance with GAAP and that it had conducted a GAAS-compliant audit that was sufficient to support that opinion.  Nor do the well-pleaded facts show that KPMG-HK's opinions were misleading.

Many of the TAC's allegations are wholly irrelevant or are "threadbare recitals" or "conclusory statements" and thus not compliant with even Rule 8.  Other allegations are without specificity or a stated basis, as required by the heightened pleading requirements applicable here. The remaining allegations fall well short of *Omnicare*'s requirements for pleading that the audit opinions were false or misleading.

### 1.     Many Of The Allegations In The TAC Are Irrelevant.

Many of the TAC's allegations are not relevant to the Section 18 claim.  These include allegations about conduct by ShengdaTech and its directors rather than about KPMG, and allegations about information KPMG-HK allegedly learned *after* ShengdaTech's March 15, 2010 filing of its Form 10-K containing the later of KPMG-HK's audit opinions.

### a.     Allegations About Activity of ShengdaTech Personnel That KPMG-HK Did Not Know About.

The TAC contains numerous allegations of communications *within* ShengdaTech—but no corresponding allegation that KPMG-HK knew anything about them.  *See*, *e.g.*, TAC ¶ 187 n.24 (███████████████████████ TAC ¶¶ 122-123 (email among ShengdaTech directors and personnel).  These allegations are necessarily irrelevant to KPMG's beliefs or whether the audits were GAAS compliant.  *See*, *e.g.*, *Perry*, 2013 WL 4505199, at *5 (allegation of auditor's access to contrary information does not aid in pleading falsity of audit opinion).

### b.     Allegations About Events After the March 15, 2010 Filing.

Equally irrelevant are allegations about events or information supposedly learned by KPMG-HK *after* March 15, 2010, when the more recent of its audit opinions was filed with the SEC.  *See*, *e.g.*, TAC ¶¶ 208, 215 (Zhen Chen became general manager of Shaanxi Haize in late 2010); TAC ¶ 224 (December 2010 offering); TAC ¶ 172 (confirmations allegedly being sent to the wrong KPMG-HK "team," during 2010 audit); TAC ¶ 69 (publications released in 2011 or later).

Based on a presentation made on █████████████████████████ the TAC asserts that KPMG-HK ████████████████████████████████████ ██████████.  TAC ¶¶ 196-200.  But the TAC does not allege that KPMG-HK knew this information on or prior to March 15, 2010.[9]  Likewise, Miller asserts that ShengdaTech's acceptance of "bills" to settle accounts receivable was suspicious.  But the purportedly suspicious bills were not even alleged to have been received by ShengdaTech until late

---

[9] KPMG-HK did not issue an opinion with respect to ShendgaTech's 2010 annual financial statements (or any quarterly financial statements).  The TAC does not allege facts showing that KPMG-HK was required to do more than it did with respect to this information. *See infra* at 26.

November 2010, more than eight months after the last audit opinion was filed.  TAC ¶¶ 196-200.

### c.  Other Irrelevant Allegations.

A host of allegations about events prior to March 15, 2010 are equally irrelevant.

Allegations that a ████████████████████████████████████████████████

████████████████  TAC ¶ 187, are not linked to any misstatement or knowledge by KPMG-HK.

Nor is it alleged to have been improper or suspect as a matter of accounting for ███████████████

████████████████████████████████  *id.*, or for ████████████████████████████████████

████ , *id*.

The allegation that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████  is hardly the smoking gun that Miller suggests.  TAC ¶ 189.  Miller does not allege

that the KPMG-HK employee was wrong in any way, ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████

### 2.  Many Allegations Fail To Meet The Heightened Pleading Requirements of the PSLRA And Rule 9(b).

Other allegations in the TAC are not well-pleaded because they fail to satisfy the

PSLRA's pleading requirements.  The TAC's allegations, except those about Miller (and Jura),

are pleaded on "information and belief." (*see* TAC Introductory ¶), meaning that Miller must

plead their basis and allegations must be made with specificity.  15 U.S.C. § 78u-4(b)(1).  Many

of the TAC's allegations fall well short of that mark.

For example, the TAC asserts that ████████████████  was "terminated" from her job at

KPMG, apparently seeking to suggest—without basis and contrary to fact—that KPMG-HK

asked her to leave and was dissatisfied with her work.  Likewise, the TAC asserts in misleading

fashion that ███████████ has not worked in public accounting since leaving KPMG-HK, ignoring that she has worked in a series of senior financial positions with a major public company, which Miller surely knows.  This sort of misleading and disparaging pleading is entitled to no weight.

With respect to the confirmation process, the TAC asserts that KPMG-HK ████████ ████████████████████████████████████████████████████████████████████████ ████████████████.”  TAC ¶ 227(b). Relatedly, the TAC asserts “[t]o Plaintiffs' knowledge, every single confirmation was fraudulent.”  TAC ¶ 166.  Miller does not state any basis for these assertions, which therefore must be disregarded.  Under GAAS, an auditor may elect to investigate addresses, generally on a sample basis, and may use a variety of mechanisms.  The TAC does not allege facts showing that KPMG-HK determined that it needed to investigate addresses for the 2008 or 2009 audits, or, indeed, that KPMG-HK did not investigate addresses.

To the extent that confirmation responses were inaccurate, as Miller asserts, there are no allegations in the TAC that KPMG-HK did not believe that it was communicating in good faith with banks, customers and suppliers of ShengdaTech.[10]   The TAC's baseless assertion that KPMG-HK should have seen that confirmations received from banks were “defective on their face,” TAC, ¶ 170, rests on the (unpleaded and also baseless) assumptions that confirmation could not occur through a branch and that a main branch may not alter its chop. There is no allegation that either chop bore indications of irregularity, that any standard or guideline requires

---

[10] Collusion by insiders at the confirming party or even interception of a confirmation request does not mean that there was an absence of “direct communication.”  GAAS recognizes that, “Fraud also may be concealed through collusion among management, employees, or third parties. . . . As another example, the auditor may receive a false confirmation from a third party that is in collusion with management.” AU §316.10 (*Consideration of Fraud in a Financial Statement Audit*).  As a result, “[E]ven a properly planned and performed audit may not detect a material misstatement resulting from fraud.”  *Id.* at .12; *see also* AU § 230.13 (*Due Professional Care in the Performance of Work*).

an auditing firm to compare bank chops from year-to-year, or that any difference was in fact noticed during the audits.

Similarly, the TAC asserts that ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ TAC ¶ 190.  Yet, at no point does the TAC allege that the ████████████ statement was accurate— nor could it.[11]  Further, the TAC *does not* allege that KPMG-HK failed to investigate the alleged 2009 statement and *does not* allege that KPMG-HK acted inconsistently with GAAS.  And, once again, there is no explanation about why the allegation shows KPMG-HK's audit opinion to be misleading.

### 3.   ShengdaTech's 2008 Annual Financial Statements Were Presented in Conformity with GAAP.

The TAC asserts that KPMG-HK "did not actually believe . . . or had no reasonable basis to believe. . ." that ShengdaTech's 2008 financial statements were presented in conformity with GAAP with respect to a related party referred to in the TAC as "SSCM."  *See* TAC ¶ 107.  Miller's strained argument is that ShengdaTech's *2007* annual financial statements—*which KPMG-HK did not audit*—incorrectly stated that at year-end SSCM was no longer a related party and that ShendgaTech did not properly correct that error under SFAS 154.  TAC ¶ 101.

But KPMG-HK was not retained by ShendgaTech until November 11, 2008.  TAC ¶ 34.

---

[11] ShengdaTech reported production capacity of 250,000 metric tons per year in 2009. Goldman Decl. Ex. B, at 7.  According to a Roskill Information Services Ltd. research report, global demand for precipitated calcium carbonate as of 2012 was approximately 14 million tons or roughly *56 times* ShengdaTech's reported capacity in 2009.  *See* Goldman Decl. Ex. N, at 31. In 2009, ShengdaTech reported company-wide total net sales of approximately $100 million. Goldman Decl. Ex. B, at 37.  The FY 2009 Form 10-K for the leading US domestic precipitated calcium carbonate manufacturer shows net sales of at least $530 million in each of 2007, 2008, and 2009.  Goldman Decl. Ex. O, at 3, 20.

Another accounting firm, Hansen, Barnett & Maxwell ("Hansen"), audited the 2007 financial statements and issued an opinion with respect to them.  *See* Goldman Decl. Ex. C at F-3.  Hansen also reviewed ShengdaTech's 2008 quarterly reports.  Miller has asserted no claim against KPMG-HK based on ShengdaTech's 2007 financial statements or 2008 quarterly reports, nor could it.

ShengdaTech did not retain KPMG-HK to determining whether a restatement, or other action, was required with respect to the 2007 financial statements.  That responsibility rested with ShengdaTech and Hansen, ShengdaTech's auditor in 2007.  *See* AU § 315.21.  Although subsequently informed that SSCM continued to be a related party at year-end 2007, Hansen did not alter its audit opinion for 2007.  ShendgaTech and Hansen appear reasonably to have determined that restatement was not required in light of the absence of impact on the 2007 financial staements as appearing in that year's Form 10-K, *see* n.13 *infra*, and the correct presentation of information about SSCM in the 2008 financial statements.  *See* FASB Statement No. 154 (May 2005), at 11 ("The provisions of this Statement need not be applied to immaterial items.")[12]

In all events, whether correction of the 2007 financial statements should have involved additional disclosure is irrelevant to whether the 2008 financial statements were fairly presented with respect to SSCM.   They were.  They correctly stated, in accordance with GAAP governing

---

[12] The TAC's suggestion (at ¶ 211 and elsewhere) that KPMG-HK had an interest in helping ShengdaTech avoid SEC review is belied by the fact that KPMG-HK rendered an adverse opinion on ShengdaTech's internal controls over financial reporting and reported control deficiencies that "we consider to be material weaknesses."  *See* Goldman Decl.  Ex. B (2008 Form 10-K), F-54 (full text of internal control opinion).  Such a control opinion is likely to do anything but avoid review.

Miller complains that KPMG-HK's internal control opinion did not use the term "related party transactions."  TAC ¶ 210.   Read in the context of the immediately preceding management report on internal control, it is crystal clear that the "non-routine transactions" referred to in that opinion included "errors and omissions in related party disclosures."  *See* Goldman Decl. Ex. B (2008 Form 10-K) at 53.

related party transactions, *see* SFAS 57, that SSCM was a related party in 2008 (and 2007) , the

amount due to SSCM at year end 2008 (and 2007), and the amount of transactions with SSCM in

2008 (and 2007).  *See* Goldman Decl. Ex. B (2008 for 10-K), at F-4 & F-19; Goldman Decl. Ex. L

(comparison between 2007 and 2008 Forms 10-K).[13]  Miller does not allege that GAAP required a

different treatment.

> **4.**      **The Remaining Allegations Fail to Create a Strong Inference
> that KPMG-HK's Audit Opinions Were False or Misleading.**

When the irrelevant and the inadequately pleaded allegations are set aside, what remains

is a hindsight-driven claim that KPMG-HK should have discovered ShengdaTech's fraud sooner

than it did.  Repeatedly, the TAC asserts that KPMG-HK did not take a certain action but fails to

show that GAAS required that action.  There is good reason for this repeated failure.  GAAS in

the main is a set of general standards, not express requirements.  It affords an accountant latitude

in addressing the standards and expects the exercise of judgment.  "[T]here are different

methodologies for conducting a GAAS-compliant audit."  *In re WorldCom, Inc. Sec. Litig.*, 352

F. Supp. 2d 472, 481 (S.D.N.Y. 2005).

Judge McMahon dismissed a claim against Hansen, the auditor for ShengdaTech through

November 10, 2008, brought by other purchasers of ShengdaTech notes precisely because

factual allegations of the very type made here were insufficient to show noncompliance with

---

[13] The opening balance sheet for 2008 was appropriately adjusted to reflect that SSCM continued to be a related party. That adjustment to the 2007 balance sheet to reflect reclassification of approximately $60,000 from "accounts payable" to "amounts due to related parties" had no impact on reported total liabilities or shareholders equity. *Compare* ShendgdaTech's 2008 financial statement, which make that adjustment, to ShengdaTech's 2007 financial statements. *See* Goldman Decl. Ex. L.   No adjustment to the income statement was needed.  In note 2 to the financial statements, there is a heading, "Reclassification and other adjustments" followed by text stating that "certain prior year balance sheet items have been reclassified to conform to the current year's presentation." Goldman Decl. Ex. B (2008 Form 10-K) at F-13.

GAAS. *Oaktree Cap. Mgmt.* v. *KPMG*, No. 2:12-CV-956 JCM, 2014 WL 3816392 (D. Nev.

Aug. 4, 2014)("*Oaktree* II").[14]   The Court pointed out:

> These arguments, while more thorough than the previous
> complaint, still suffer from the same malady that led to their
> previous dismissal. *The problem with these allegations is that they*
> *are merely consistent with, not indicative of, a failure to follow*
> *GAAS standards.* Plaintiffs allege that KPMG's discoveries
> demonstrate that Hansen could not have performed its audit in
> compliance with GAAS.  GAAS prescribes very general and broad
> requirements for an auditor.
>
> <div align="center">* * *</div>
>
> With such a broad requirement, it is very possible that Hansen both
> complied with GAAS and did not discover the fraudulent activities
> that may have been occurring.
>
> <div align="center">* * *</div>
>
> *Without specifying the steps Hansen took during the audit process,*
> *plaintiff is unable to show that Hansen's audit did not conform to*
> *GAAS.*
>
> This court specifically held that in order to adequately allege
> claims under § 18 plaintiffs must allege particular actions that
> Hansen did or did not take while conducting the audit of Shengda.
> Plaintiffs have failed to do so, and again rely on "had defendant
> truly done x, it would have been discovered that y" arguments.
> (Doc. 151 at 29).

*Oaktree* II*, 2014 WL 3816392, at *3-4 (emphasis added).   The TAC similarly fails to allege that

KPMG-HK's audits in 2008 and 2009 were not GAAS-compliant.

<div align="center">

a.       **Related Party Transactions.**

</div>

Miller asserts that KPMG-HK's audit work with respect to related parties did not comply

with GAAS.  TAC ¶¶ 112-152. The TAC, however, concedes that KPMG-HK's inquiries

determined that SSCM was a related party in 2008 and does not dispute that ShengdaTech's

---

[14] Judge McMahon also dismissed claims against KPMG-HK based in part on the same
reasoning.  *Oaktree* I, 963 F. Supp. 2d at 1091.

financial statements properly disclose that fact and the level of transactions with SSCM in 2008. *See* Goldman Decl. Ex. B (Form 10-K) at F-19.  The TAC also concedes that the financial statements audited by KPMG-HK correctly treated SSCM as a related party.



 The TAC characterizes ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  TAC ¶ 119.  But that says nothing about whether she was misinformed about the facts, perhaps incorrectly believing that X. Chen had been expected to step down from his position with SSCM following its sale to Prosper Crown in 2007.[15] Whatever ████████ state of mind, the TAC does not plead facts that show that KPMG-HK failed to respond in a fashion consistent with GAAS.

 To the contrary, the TAC itself affirmatively alleges that KPMG-HK identified that SCCM was still a related party at year-end 2007, TAC ¶¶ 99, 209, ████████████████████ ████████████████, TAC ¶¶ 133-134, ████████████████████  TAC ¶¶ 12, 116, ████████████████████████████████████  TAC ¶ 128, and ████████████ ████████████████████████████████████████, TAC ¶ 209.  The allegations of the TAC that have an adequate basis do not show the KPMG-HK did not make other inquiries.  Moreover, ShengdaTech undertook to retain additional personnel with the requisite technical knowledge to address its handling of non-routine transactions (including

---

[15] The TAC says that Ms. Guo should have informed Hansen that Z. Chen and Pu Li were persons related to ShengdaTech.  TAC ¶ 120.  Even if Z. Chen was a "protégé" of X Chen, that might quite understandably not be viewed as a "relationship" with ShengdaTech.  Indeed, being a protégé is not a status that makes one a "related party" under SFAS 54.  Only later, in 2010, did Z. Chen became an officer of ShengdaTech.  There is also no allegation that KPMG-HK became aware of any inaccuracy in Ms. Guo's response with respect to Pu Li.

The TAC asserts, conclusorily, that the sale price of SSCM to Prosper Crown was suspicious in light of its reported revenues.  TAC ¶ 137.  But revenues alone do not imply the profitability, or value, of a business.

related party transactions).  *See* Goldman Ex. B (2008 Form 10-K) at 53.   It also identified

SCCM as a related party in its 2008 financial statements and provided information about

transactions with SSCM in 2007.  Hansen permitted use of that opinion in the 2008 Form-10-K.

*Id.* at F-3.  Under these circumstances neither GAAS nor separate SEC reporting provisions

required more of  KPMG-HK.  There was no knowing failure to follow GAAS.

The TAC makes similar assertions with respect to KPMG-HK's work in connection with

the audit of the 2009 financial statements, arguing that it should have determined that SSCM

continued to be a related party.  These allegations are insufficient to show that KPMG-HK did

not believe it had followed GAAS (or that it had not).  *See* AU § 334.04 (*Related Parties*) ("An

audit performed in accordance with generally accepted auditing standards cannot be expected to

provide assurance that all related party transactions will be discovered.").  According to the TAC,

KPMG-HK obtained a representation from management, but management lied.  The TAC says

KPMG-HK did nothing more but offers no support for this assertion.

### b.    AIC Filings; VAT Records.

Miller asserts that KPMG-HK supposedly would have found inconsistencies with

ShengdaTech's records if only it had obtained AIC filings of ShengdaTech's subsidiaries from

the local governments or if it had looked at a certain set of value added tax ("VAT") records.

TAC ¶¶ 177-182.  But the TAC does not allege, nor could it, that GAAS required either step in

light of KPMG-HK's overall audit plan.

In the parallel case brought by note purchasers in the District of Nevada, the court found

no duty of inquiry under GAAS had been pleaded and rejected the argument about the AIC

filings made by Miller here.  *Oaktree* I, 963 F. Supp. 2d at 1088 (plaintiffs "fail to allege a

GAAS rule stating that the two types of documents should have been compared during an

audit").  The Second Circuit recently concluded the same.  *See In re Advanced Battery Tech.,*

781 F.3d 638, 645 (2d Cir. 2015) (explicitly rejecting allegation that "'no reasonable auditor

would have failed to obtain . . . AIC filings'"); *see also Athale v. Sinotech Energy*, no. 1:11-cv-

0531, 2014 WL 687218, at *9 (S.D.N.Y. Feb. 21, 2014) (no duty to review AIC filings) ;

*Duoyuan Printing*, 2013 WL 4505199, at *6-7 (same).   Similarly, the TAC does not allege that

anything in GAAS required verification against a specific tax record or that whatever steps

KPMG-HK did take to confirm balances, such as reviewing returns with official stamps, were

inconsistent with GAAS.

### c.    Number of Confirmations.

Similarly, the TAC asserts that in May 2010, after KPMG-HK had issued its 2009 audit

opinion, a KPMG-HK mentioned to a member of the board the unusual level of confirmations

received in connection with the 2009 audit.  TAC ¶ 165.  The TAC asserts that "KPMG had

conducted no additional procedures to obtain reasonable assurances that it was not a sign of

fraud," *id.*, but does not plead facts supporting the assertion.  Certainly, the TAC does not allege

facts remotely suggesting that KPMG-HK believed that the level of response was indicative of

fraud or called its opinion into question.

## II.    Miller Cannot Base a Section 18 Claim on
## The Offering Memorandum or Shendgatech's Forms 10-Q.

Miller claims to have relied only on KPMG-HK's two audit opinions.  TAC ¶ 278.  The

TAC, however, also refers to the OM associated with the December 10, 2010 notes offering and

to certain of ShengdaTech's Forms 10-Q, which contain unaudited financial statements.  *See,

e.g.,* TAC ¶ 260.  The OM was not filed with the SEC.  See Goldman Decl. Ex. A (index to

ShengdaTech filings from SEC's EDGAR system).  Although available on the SEC's EDGAR

system, ShengdaTech's quarterly financial statements are not deemed to be filed with the SEC.

*See* 17 CFR § 240.13a–13(d) ("[T]he financial information required by Part I of Form 10–Q shall

not be deemed to be 'filed' for the purpose of Section 18 of the Act.").  (Further, KPMG-HK is not alleged to have issued an audit opinion in connection with those quarterly financial statements.)

### III.    The TAC Fails to Plead Loss Causation.

Section 21D(b)(4) of the Exchange Act requires Miller to show that the alleged misstatements in KPMG-HK's 2008 and 2009 audit opinions "caused [its] resulting losses."  To properly plead loss causation, Miller must plead facts showing that the alleged misstatements, when revealed to the market, caused a decline in the market price of the notes that Miller purchased.  *See Dura Pharmaceuticals Inc. v. Brudo,* 544 U.S. 336  (2005)  (allegation of inflated purchase price insufficient to allege loss causation under Section 21D(b)(4) in a case brought under Section 10(b) of the Exchange Act).[16]

As a matter of law, Miller may *not* plead loss causation by showing that the market reacted negatively to ShengdaTech*'s* disclosure on March 15, 2011, that it had appointed a special committee of the Board of Directors to investigate "potentially serious discrepancies and unexplained issues relating to the Company and is subsidiaries' financial records identified by the Company's auditors in the course of their audit of the consolidated financial statements for the fiscal year ended December 31, 2010."  *See* TAC ¶ 226.  (The full text appears in ShengdaTech's Form 8-K dated Mar. 15, 2011, at 2, Goldman Decl. Ex. P.)  This disclosure was directed to 2010.  It did not address KPMG-HK's 2008 and 2009 audit opinions and, certainly, did not purport to "correct" an alleged misrepresentation by KPMG-HK.  *See In re AOL Time*

---

[16] Although the pleading standard to be applied to allegation of loss causation was left open in *Dura*, this Court has suggested it would apply Rule 9(b) to determine the sufficiency of a pleading asserting loss causation in a case under Section 10(b) of the Exchange Act.  *Coyne v. Matabolix, Inc.*, 943 F. Supp. 2d 259, 273-74 (D. Mass. 2013).  Since Miller's claim sounds in fraud, Rule 9(b) should be applied here, though the choice of standard is not determinative.

*Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007) (corrective disclosure allegations insufficient because they did not "reveal to the market the falsity of the prior E&Y audit opinions") (citation omitted).[17]

To establish loss causation, Miller must show that the notes Miller purchased fell in price because of the later disclosure on May 5, 2011, that KPMG-HK had informed ShengdaTech "that disclosures should be made and actions taken to prevent future reliance on their previously issued audit reports related to the consolidated [financial statements] . . . of ShengdaTech, Inc. and its subsidiaries as of December 31, 2008 and December 31, 2009" (Goldman Dec. Ex. G). *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 363 (S.D.N.Y. 2010)  (requiring showing that market reacted negatively "to some disclosure correcting the falsity in the . . . auditor's statements (and not simply the underlying fraud)").

But the TAC does not plead *any* facts showing how, if at all, the market reacted to the May 5, 2011 disclosure.  Rather, it alleges that "virtually immediately" after the March 15 statement, there was no liquid market for the bonds.  TAC ¶¶ 249-250.  The absence of specific allegations substantiating an adverse market reaction to the May 5 disclosure is fatal to the Section 18 claim.  *See Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 175 (2d Cir. 2005) (affirming dismissal because "[t]here is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's "buy" and "accumulate" recommendations"); *see also*, *e.g.*, *Prime Mover Capital Partners v. Elixir Gaming Tech.*, 793 F. Supp. 2d 651, 665-66 (S.D.N.Y. 2011) (dismissing securities claim because plaintiff "fails to

---

[17] *Accord Abuhamdan v. Blyth, Inc*., 9 F. Supp. 3d 175, 209 (D. Conn. 2014) (rejecting loss causation theory because "the disclosures upon which plaintiffs rely do not actually disclose the alleged fraud"); *Janbay v. Canadian Solar, Inc.*, no. 1:10-cv-4430 RWS, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) (announcement that did not "reveal the truth" about "wrongdoing asserted in the Complaint" irrelevant to loss causation).

allege with any specificity what effect any disclosure had on the market value of EGT's stock).[18]

## IV.    The TAC Fails To State A Negligent Misrepresentation Claim Against KPMG-HK.

The TAC's single common law claim against KPMG-HK is for negligent misrepresentation.[19]   The elements of a negligent misrepresentation claim against an accountant by a person who did not contract with the accountant are well-established and stringent under Massachusetts law.[20]   Miller must show that inaccurate information, was negligently supplied, in the course of an accountant's professional endeavors, to a third person or limited group of third persons whom the accountant actually intends or knows will receive the information, for a transaction that the accountant actually intends to influence (or for a substantially similar transaction), with the result that the third party justifiably relies on such misinformation to his detriment. *N. Am. Specialty Ins. Co. v. LaPalme*, 258 F.3d 35, 41 (1st Cir. 2001); *see Nycal Corp. v. KPMG Peat Marwick LLP,* 426 Mass. 491, 496, 688 N.E.2d 1368 (1998). The TAC fails to plead properly that KPMG-HK made a false statement or that KPMG-HK owed Miller a duty of care.

### A.    The TAC Must Plead its State Law Misrepresentation Claim with Particularity But Does Not.

#### 1.    Miller Must Plead with Particularity.

The TAC sounds in fraud and, as a result, the negligent misrepresentation claim must

---

[18]   As a fall-back, the TAC contains a formulaic and conclusory recitation that "fraud" created the market for the notes and that but for "Defendants' materially false and misleading statements,". . .  "the Notes never would have come to market or, at a minimum, would have come to market at substantially lower prices and/or on terms far more favorable to investors." *Id.   Dura* makes clear that an allegation that a security was overpriced at the time of purchase does not suffice to allege loss causation. *Dura*, supra, 544 U.S. at 341.

[19]   At some points, the TAC reads as though it is seeking to base claims on a negligence theory.  It cannot. *See, e.g*, *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 406 (1992).

[20]   For purposes of this motion only, KPMG-HK assumes that Massachusetts law applies to Miller's common law claim as alleged by the TAC.  KPMG-HK reserves the right to argue that the common law claim should be governed by the law of another jurisdiction.

satisfy the heightened pleading requirements of Rule 9(b).  *See, e.g., North Am. Catholic Educ. Programming Found. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009) (Rule 9(b) applies where complaint effectively charges fraud).

### 2. The TAC Fails to Plead with Particularity That KPMG-HK's Audit Opinions Were False.

Although it has not yet reached the issue, the Supreme Judicial Court can be expected to follow the *Omnicare* approach with respect to opinions.  *See, e.g., Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services LLC*, 700 F.3d 829, 842 (6th Cir. 2012) (analogous Ohio and New York common law require subjective falsity for statements of opinion to give rise to negligent misrepresentation claim); *Loewen v. Galligan*, 882 P.2d 104, 120 & n.29 (Or. App. 1994) ("[W]e conclude that the analysis in *Virginia Bankshares* is applicable" to state law claim as "exception[] to the general rule that . . . statements of opinion are not actionable."); *see also See Allstate Ins. Co. v. Countrywide Financial Corp*., 824 F. Supp. 2d 1164, 1185 (C.D. Cal. 2011) (noting that while state law analyses generally do not use the term "subjective falsity," the common law rule is the same as that expressed in *Virginia Bankshares.*  Thus, "[s]aying that 'the home is worth X' is an opinion" and not itself actionable, while "saying that 'I believe that the home is worth X' is a fact" but actionable only if the speaker "did not subjectively believe the opinion[].")

As a result, the TAC must plead facts showing either that KPMG-HK did not believe its audit opinions or that it was misleading for KPMG-HK to state that it held those opinions.   For the same reasons that the TAC's allegations fail to plead falsity for the Section 18 claim, those facts do not plead falsity for the negligent misrepresentation claim.

The same conclusion follows even if the TAC's post-March 15, 2010 allegations are considered relevant to the negligent misrepresentations claim —though they should not be;

KPMG-HK's last statement relied upon by Miller was dated March 15, 2010.[21]

The principal post-March 2010 allegations involve information in a ████████ ████████ presentation ███████████████████████████, TAC ¶¶ 14(b), 195-199; an unresolved dialogue between KPMG-HK and ShengdaTech; and knowledge about acceptance by ShengdaTech of bank bills in payment for receivables, TAC ¶¶ 200-205.

Miller cherry-picks statements from a ████████ presentation to create the misimpression ██████████████████████████████████████. *See* TAC ¶ 195-199. Miller simply ignores the portion ████████████ that contradicts its allegation:



Goldman Decl. Ex. Q (Presentation referenced in TAC).  Thus, contrary to the allegations in the TAC, ShengdaTech informed KPMG-HK ████████████████████████████████ ████████████████████.  The TAC asserts that ShengdaTech's response should not have been believed ███████████████████████.  TAC ¶ 198.  The assertion is apparently that ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████.  Miller, of course, does not allege otherwise.

As the TAC recites, KPMG-HK brought the six bills referred to in paragraph 202 to the

[21] Under *Nycal*, an auditor's "liability is fixed by the accountants' particular knowledge at the moment the audit [report] is published." *Nycal*, 426 Mass at 498 (quoting *First Nat. Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1059 (5th Cir. 1990)) (emphasis added).

attention of the Audit Committee in 2011.  However, the TAC fails to allege when KPMG-HK

first became aware of the potential significance of these bills and, in particular, the TAC does not

allege that this occurred prior to the December 10, 2010 offering.

Equally flawed, because they do not demonstrate any knowledge by KPMG-HK, are the

TAC's allegations about information supposedly indicating that SSCM was a related party of

ShengdaTech, TAC ¶ 215; and about the status of the Zibo Jiaze plant, TAC ¶ 71(d).  *See*, *e.g.*,

*Perry*, 2013 WL 4505199, at *5.  Moreover, none of these allegations show a failure to follow

GAAS.  A GAAS-compliant audit does not result in knowledge of every fact about a company.

*Id.*

> **B.**     **KPMG-HK Did Not Owe A Duty to**
>             **Purchasers of ShengdaTech Notes Other Than the "Initial Purchasers."**

Miller was but one of thousands of persons in the U.S. and abroad who could have

elected to purchase the notes issued by ShengdaTech from the underwriters in the note offering.

The notes were corporate debt, issued by an exchange-listed company, and available to any

institutional investor with $100 million under management.

Miller does not allege that it retained KPMG-HK to provide information in connection

with its purchase decisions—Miller does not allege that it ever communicated with KPMG-HK

about the ShengdaTech notes.  Miller's claim is that because the KPMG-HK audit opinion

appeared in the OM, KPMG-HK owed it and all other note purchasers a duty of care.  That

theory is wrong.

> **C.**     **Under Massachusetts Law, an Auditor Owes A**
>             **Duty To Non-Clients Like Miller Only In "Very Narrow" Circumstances.**

"[L]iability of an accountant to non-contractual third parties," such as Miller here, exists

only if plaintiff can demonstrate "actual knowledge on the part of accountants of the limited—

though unnamed—group of potential [third parties] that will rely upon the [report], as well as

actual knowledge of the particular financial transaction that such information is designed to influence." *Nycal*, 426 Mass. at 498 (internal citations omitted).[22]  The accountant's knowledge is measured "at the moment the audit [report] is published, not by the foreseeable path of harm envisioned by [litigants] years following an unfortunate business decision."  *Id.*

The Supreme Judicial Court recently emphasized that, under Massachusetts law, only the "very narrow" category of persons in "near privity" to an auditor can sue for negligent misrepresentation.  *Cumis Ins. Soc. v. BJ's Wholesale Club*, 455 Mass. 458, 475 n.26 (2009) (citing *Nycal*) (emphasis added).

   **1. Miller Is Not In The "Very Narrow"<br>    Category Of Persons In "Near Privity" Who Can Sue Here.**

The TAC refers to the KPMG-HK opinions on four occasions:  (1) the audit opinion included in the 2008 Form 10-K (TAC ¶ 268); (2) the audit opinion included in the 2009 Form 10-K (*id.*); (3) the audit opinion as included in the registration statement associated with the cancelled 2010 equity offering (TAC ¶ 213); and (4) the 2008 and 2009 audit opinions as included in the OM (TAC ¶ 221).  None of these created a duty to purchasers of notes such as Miller.[23]

---

[22] In *Nycal,* the SJC followed much of the prevailing approach in New York but said it was not adopting the requirement that there be a "special relationship" between the plaintiff and the auditor.  *Nycal*, 426 Mass. at 495.  As under New York law, however, the plaintiff must be "a known party" that the accountant "intended to rely" on the audit opinion.  *Nycal* 426 Mass. at 497-98; *see Cumis*, 455 Mass. at 475 n.26;

[23] Miller cannot assert a negligent misrepresentation claim based on the letter ▮▮▮ KPMG-HK owed no duty to Miller in connection with that letter, which expressly stated ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Goldman Decl. Ex. K.  Further, Miller does not allege that it saw the letter before its purchases and could not have relied upon it.

        **a.**       **Audit Opinion in 2008 Form 10-K.**

KPMG-HK's opinion in the 2008 ShengdaTech Form 10-K is not actionable because, like the audit opinion at issue in *Nycal*, it was prepared simply to accompany the financial statements of a public company, and not for use in any particular transaction.  Under these circumstances, Massachusetts law absolutely bars a suit for negligent misrepresentation based on the audit report.  "[A]n auditor retained to conduct an annual audit and to furnish an opinion for no particular purpose generally undertakes no duty to third parties."  *Nycal*, 426 Mass. at 500 (quoting *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 393 (1992)).

        **b.**       **Audit Opinion in 2009 Form 10-K.**

KPMG-HK's opinion in the 2009 ShengdaTech Form 10-K is not actionable for the same reason the 2008 audit opinion published with the 2008 Form 10-K is not.

        **c.**       **The Registration Statement For The**
                         **Proposed 2010 Equity Offering That Never Occurred.**

Miller notes that KPMG-HK consented in a public filing to the use of its 2008 and 2009 audit opinions in preliminary registration statements prepared for a proposed ShengdaTech equity offering in 2010.   TAC ¶ 213.  But, purchasers in a registered offering are far from a "limited class."  Moreover, Miller was not even a purchaser in that offering; indeed, the equity offering was "abandoned" and never happened.  TAC ¶ 219.  Further, the TAC does not allege that Miller relied on the papers prepared for the aborted equity offering, much less that any such reliance was justifiable.

        **d.**       **The OM For The Debt Offering.**

This leaves the fourth circumstance, the 2009 audit opinion's appearance in the OM. While KPMG-HK's 2009 audit opinion was reproduced in the OM, but the OM did not contain any new or other statement by KPMG-HK.

Regardless, the purchasers of the notes (other than the initial purchasers themselves) were not members of a "limited class' in "near privity" with KPMG-HK. There was a huge universe of potential note purchasers in the U.S. and abroad. [24]   Their identities were not knowable, let alone known, by KPMG-HK.  The Sixth Circuit, following an Ohio legal standard parallel to that enunciated in *Nycal* and *Cumis*, squarely held that there is no "near privity" in these circumstances.  *See Ohio Police*, 700 F.3d at 841.  In *Ohio Police* the court recognized that the "near privity" test and its requirement that liability be extended only to a "limited" and "intended" set of persons means that a private note offering is too diffuse to support a negligent misrepresentation claim.  Even if a "private" offering were limited to "'qualified investors,' such a class includes thousands of investors . . . and is not 'limited' in the sense understood by [the leading Ohio Supreme Court case]."  *Id.* at 842.

In short, under Massachusetts law, KPMG-HK did not owe a duty to a class of all purchasers in the 2010 note offering; such a class is not "limited" and is not in "near privity"

---

[24] Per the OM, the offering was pursuant to Securities Act Rule 144A, 17 CFR § 230.144A, and was open to any buyer qualifying under that Rule.  The market for Rule 144A securities is open to any institutional investor with at least $100 million in assets under management.  This is not a restrictive categorization.  For example, according to Bloomberg, there are over 4500 US open-ended mutual funds with $100 million in assets, of which Miller is one.  *See* Goldman Decl. Ex. R.  In addition, according to a recent SEC release, "As of December 2012, there were 10,870 Commission-registered investment advisers . . . [and] the median size of assets under management for these registered investment advisers is $258 million."  Goldman Decl. Ex. S at 77.  These numbers do not include the thousands of exempt investment managers and "private" hedge funds, such as Jura that qualify as Rule 144A purchasers.  *Id.*  And there are innumerable 144A market participants from beyond the world of investment funds.  For example, any bank with a net worth of at least $25 million and at least $100 million in securities under management qualifies, as does any corporation or other business entity with $100 million to invest.

As a consequence of the huge pool of investors in Rule 144A securities, the market for those securities is enormous.  According to the SEC, roughly $750 *billion* was raised in 144A offerings in 2010 alone, of which the ShengdaTech note offering constituted approximately 0.02%.  *See* Goldman Decl. Ex. S at 66.  An offering into this market is by no means "very limited."

with KPMG-HK.

*A fortiori*, KPMG-HK did not owe a duty to purchasers outside of the offering, in the after-market.  Several of Miller's purchases, totaling approximately $4.5 million, were in the after-market, rather in the offering.[25]  The offering is described in the OM upon which Miller purportedly relied and which expressly stated that it "has been prepared by us *solely for use in connection with the placement of the notes*."  OM, at ii (emphasis added).  Indeed, the OM stated that, "Distribution of this offering memorandum to any person other than the offeree and any person retained to advise that offeree is unauthorized."  *Id*.  Quite clearly, the OM, including the KPMG-HK audit opinion quoted there, was *not* intended for use by after-market purchasers.  Indeed, the TAC does not allege, and could not allege, that prior to the offering, any particular after-market transactions were contemplated.

**V.     To The Extent Not Resolved on The Pleadings, the Court Should Dismiss the State Law Claim For Lack Of Subject Matter Jurisdiction.**

If Miller's Section 18 claim against KPMG-HK is dismissed, there will be only supplemental subject matter jurisdiction over this case under 28 U.S.C. § 1367.  The prevailing approach in the First Circuit is for a court, pursuant to Section 1367(c)(3), to decline supplemental jurisdiction if federal question jurisdiction is lost at the pleading stage or shortly thereafter.  *See, e.g., Rodriguez v. Doral Mortgage Corp*., 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims.").  As the Supreme Court observed in the pre-statutory era, "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state

---

[25] Approximately $4.5 million of notes  purchased by Miller were purchased on or after January 21, 2011 and after Miller had made *sales* of notes to Morgan Stanley, both facts which indicate that the placement was complete by the time of those purchases.  *See* TAC ¶ 244.

claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966).

## Conclusion

Both of Miller's claims against KPMG-HK should be dismissed for failure to state a

claim.  In the alternative, if the Section 18 claim is dismissed, the Court should decline to retain

jurisdiction over the negligent misrepresentation claim against KPMG-HK.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Steven W. Hansen
Steven W. Hansen, BBO #220820
  steven.hansen@morganlewis.com
Jeff Goldman, BBO #660870
  jeff.goldman@morganlewis.com
One Federal Street
Boston, MA  02110
617.951.8000

Jeffrey Q. Smith, *pro hac vice*
  jq.smith@morganlewis.com
101 Park Avenue
New York, NY 10022
212.309.6000

**MORGAN, LEWIS & BOCKIUS LLP**
*Attorneys for Defendant KPMG-HK*

</div>

Dated:  May 13, 2015

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system to be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to any person indicated on ECF as a non-registered participant on May 13, 2015.

<div style="margin-left: 40%;">

/s/ Jeff Goldman, BBO #660870
jeff.goldman@morganlewis.com

</div>

# APPENDIX A-1

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders
ShengdaTech, Inc.:

We have audited the accompanying consolidated balance sheet of ShengdaTech, Inc. and subsidiaries (the "Company") as of December 31, 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2008, and the results of their operations and their cash flows for the year then ended, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2008, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 31, 2009 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG
Hong Kong, China
March 31, 2009

# **APPENDIX A-2**

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders
ShengdaTech, Inc.:

We have audited the accompanying consolidated balance sheets of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of income, shareholders' equity and comprehensive income, and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of December 31, 2009 and 2008, and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

As discussed in Notes 3 and 11 to the consolidated financial statements, the Company retrospectively changed its method of accounting for convertible notes due to the adoption of a new accounting standard issued by the Financial Accounting Standards Board Accounting Standards Codification Subtopic 470-20, *Debt with Conversion and Other Options*, as of January 1, 2009.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), ShengdaTech Inc.'s internal control over financial reporting as of December 31, 2009, based on criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 15, 2010 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

KPMG
Hong Kong, China
March 15, 2010

F-2

# APPENDIX B

**§ 78r. Liability for misleading statements**

**(a) Persons liable; persons entitled to recover; defense of good faith; suit at law or in equity; costs, etc.**

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.

**(b) Contribution**

Every person who becomes liable to make payment under this section may recover contribution as in cases of contract from any person who, if joined in the original suit, would have been liable to make the same payment.

**(c) Period of limitations**

No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

(June 6, 1934, ch. 404, title I, § 18, 48 Stat. 897; May 27, 1936, ch. 462, § 5, 49 Stat. 1379.)