UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MILLER INVESTMENT TRUST and     )
JURA LIMITED,                    )
                                 )
              Plaintiffs,        )
                                 )     CIVIL ACTION NO.
                                 )     11-12126-DPW
        v.                       )
                                 )
                                 )
MORGAN STANLEY & CO., LLC and    )
KPMG HONG KONG,                  )
                                 )
              Defendants.        )

<u>MEMORANDUM AND ORDER</u>
March 30, 2018

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND........................................ 4

    *A.  Shengda's Note Offering and the Plaintiffs' Purchases* .... 4

    *B.  KPMG-HK's Realization of Shengda's Overvaluation and* ......
    *Shengda's Bankruptcy* ....................................... 6

    *C.  Alleged Misrepresentations by KPMG-HK* ................... 9

    *D.  Impact of Misrepresentations on the Plaintiffs* ......... 11

II. PROCEDURAL HISTORY...................................... 12

III. STANDARD OF REVIEW..................................... 18

IV. DISCUSSION.............................................. 20

    *A.  Section 18 Claim* ....................................... 20

       1.  Pleading Requirements ............................... 20

       2.  False or Misleading Statements ...................... 23

         a.  Conformance of KPMG-HK's Audit of Shengda's Financial .
         Statements and Internal Controls with PCAOB Standards .... 29

           i. Failure to Investigate False Statements About SSCM by .
            Shengda's CFO ....................................... 33

           ii.  Internal Control Deficiencies ..................... 43

           iii.   Failure to Establish Direct Contact in the ........
           Confirmation Process .................................. 46

           iv.  Ignoring Red Flags ................................ 51

           v. Alleged Violations After March 2010 ................ 55

           vi.  Import of the Magnitude of the Fraud and the East of .
            its Discovery ....................................... 57

         b.  Conformance of Shengda's Financial Statements with.....
           GAAP ................................................ 59

         c.  Loss Causation ...................................... 66

    *B.  Negligent Misrepresentation Claim* ...................... 77

       1.  Pleading Requirements ............................... 77

       2.  False Information ................................... 80

       3.  Justifiable Reliance ................................ 83

IV. CONCLUSION............................................. 88

Plaintiffs Miller Investment Trust ("Miller") and Jura Limited ("Jura") seek to recover investment losses from purchases of $8.7 million of bonds offered by ShengdaTech, Inc. ("Shengda") made between December 2010 and February 2011. In March 2011, it was reported that Shengda had vastly overstated its revenues. Shortly thereafter, Shengda defaulted and declared bankruptcy. In December 2011, Miller brought this action alleging securities fraud against Defendants Morgan Stanley, which underwrote the offering, and KPMG Hong Kong ("KPMG-HK"), Shengda's auditor. The Plaintiffs allege that Morgan Stanley and KPMG-HK knew or should have known about misrepresentations of material fact made in the offering documents provided to the Plaintiffs on which Plaintiffs relied in deciding to purchase the Shengda bonds.

The instant motion to dismiss pertains only to those claims asserted by Miller against KPMG-HK. Following several iterations of the complaint, after each of which KPMG-HK has moved to dismiss, now before me is KPMG-HK's motion for dismissal of the two counts against it set forth in the Third Amended Complaint: negligent misrepresentation under state common law and violation of § 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r.

# I. FACTUAL BACKGROUND

I recount the facts as alleged in the Third Amended Complaint as true, focusing primarily on those allegations pertaining to KPMG-HK.

## A. Shengda's Note Offering and the Plaintiffs' Purchases

Shengda was a Nevada corporation with its principal place of business in the People's Republic of China. Third Am. Compl. (TAC) ¶ 37. Before its bankruptcy, Shengda primarily manufactured a chemical additive called nano-precipitated calcium carbonate, which is used to improve industrial materials such as paint, paper, plastic, and rubber. *Id.* It conducted its manufacturing operations through Chinese subsidiaries.[1] *Id.* ¶¶ 34, 38.

In 2010, Shengda sold an aggregate of $130 million of 6.5% senior convertible notes due in 2015 through a private placement offering closing in December 2010. TAC ¶¶ 1, 16, 219, 224. In connection with the offering, Morgan Stanley,[2] the underwriter, prepared a private placement memorandum ("PPM") that would be distributed to potential purchasers. *Id.* ¶¶ 2, 20, 23, 32, 33, 258. The PPM contained numerous financial documents relating to

---

[1] Specifically, Shengda owned Faith Bloom Limited, a Singapore corporation, which in turn owned five Chinese companies; together, these companies were the sole source of Shengda's revenues. TAC ¶ 38.
[2] Morgan Stanley is a global financial services firm with its headquarters in New York. TAC ¶ 33.

Shengda, including its 2008 and 2009 SEC Form 10-Ks, each of which contained an audit report from KPMG-HK for the respective fiscal years 2008 and 2009. *Id.* ¶¶ 2, 34, 258. Shengda retained KPMG-HK[3] to serve as its independent auditor from November 2008 until April 2011, during which time KPMG-HK completed audits for fiscal years 2008 and 2009, and partially completed an audit for 2010. *Id.* ¶¶ 34, 58.

After receiving additional assurances from KPMG-HK as to the use of its audit reports and the accuracy of Shengda's financial statements, Morgan Stanley distributed the PPM to potential buyers, including Wellesley Investment Advisors, Inc. TAC ¶¶ 2, 23, 34, 220, 243, 258. Wellesley Investment Advisors is a registered investment adviser in Massachusetts that manages Miller, a mutual fund, and has full investment authority over the funds of Jura, a Bermuda corporation. *Id.* ¶¶ 28, 30-31. Relying on the information provided in the PPM and in Shengda's SEC filings, Miller purchased approximately $8 million of Shengda bonds (Shengda's 2015 Notes) between December 10, 2010 and February 16, 2011,[4] *id.* ¶¶ 20-21, 29, 32, 243-244, from

---

[3] KPMG-HK is a Hong Kong partnership that is a member of KPMG International Cooperative. TAC ¶ 34.

[4] After its initial purchase through the private placement of $5,400,000 on December 10, 2010, Miller sold $310,000 and $1,500,000 in Shengda bonds on December 21 and December 23, 2010, respectively. TAC ¶ 244(d)-(i). Thereafter, Miller purchased $2,000,000 in Shengda bonds on January 21, 2011;

Morgan Stanley, through the private placement and four subsequent transactions. Jura, through Wellesley Investment Advisors, purchased $700,000 of Shengda convertible bonds in two purchases on December 12, 2010 and February 27, 2011. *Id.* ¶¶ 30-32, 243-245.

## B. *KPMG-HK's Realization of Shengda's Overvaluation and Shengda's Bankruptcy*

In conducting its audit for Shengda for fiscal year 2010, KPMG-HK conducted additional procedures that it had allegedly assured the chair of Shengda's Audit Committee it would perform. TAC ¶¶ 17, 166. On March 1 and 2, 2011, KPMG-HK began contacting Shengda's customers, suppliers, and banks using publicly available contact information, and learned that many of Shengda's claims regarding business relationships and financial statements were false. *Id.* ¶¶ 17, 225-226. Specifically, KPMG-HK "could not confirm sales amounts, sales terms, and outstanding balances, discovered that many documents ShengdaTech provided to KPMG were crude forgeries, discovered that certain transactions had been with related parties without necessary disclosure, and that suppliers and customers denied engaging in business with ShengdaTech." *Id.* ¶ 226. The Plaintiffs contend that KPMG-HK would have discovered these issues earlier had it

---

$410,000 on February 4, 2011; $1,000,000 on February 11, 2011; and $1,000,000 on February 16, 2011. *Id.* ¶ 244.

conducted its 2008 and 2009 audits consistent with governing
auditing standards. *Id.* ¶ 227.

Beginning on March 2, 2011, and through a series of three
memoranda thereafter, KPMG-HK informed Shengda's Audit Committee
of its discovery of "potentially serious discrepancies and
unexplained issues" during its audit of Shengda's financial
statements for fiscal year 2010. TAC ¶¶ 226-227. Shengda
immediately convened a special committee, composed of the
independent directors on the Audit Committee and advised by a
law firm and an accounting firm, to conduct an internal
investigation. *Id.* ¶¶ 228-229. On March 14, NASDAQ suspended
trading in Shengda's equity securities, thereafter stating that
it would not resume trading until Shengda had "fully satisfied
NASDAQ's request for additional information." *Id.* ¶¶ 230, 232.
The next day, Shengda issued a press release announcing the
appointment of the special committee "to investigate potentially
serious discrepancies and unexplained issues relating to the
Company and its subsidiaries' financial records." *Id.* ¶ 231.

In April 2011, KPMG-HK resigned as Shengda's auditor,
stating that it had "doubts about management's representations
provided to [KPMG-HK] in connection with [its] 2008 and 2009
audits of the consolidated financial statements and the
effectiveness of internal control over financial reporting of
the Company." TAC ¶ 233. KPMG-HK implored Shengda to make

disclosures regarding any errors in previously issued audit
reports to prevent future reliance on them. *Id.*

On May 5, Shengda filed a current report on Form 8-K with
the SEC, stating that "KPMG previously informed the Company's
Audit Committee of certain concerns arising during its
incomplete audits of the Company's consolidated financial
statements as of and for the year ended December 31, 2010, and
the effectiveness of internal control over financial reporting
as of December 31, 2010." TAC ¶ 234. It went on to identify
issues related to bank balances, supplier transactions, VAT tax
invoices, third-party sales and payments, customer sales, and
the confirmation process. *Id.*

On June 9, Shengda announced that it was in default on the
convertible bond securities issued in the 2010 private
placement; the next day, all trading of Shengda stock was
suspended by NASDAQ. TAC ¶¶ 235-236. The SEC thereafter
commenced a regulatory proceeding resulting in an order noting
potential federal securities laws violations arising from false
statements made in the 2009 Form 10-K, the 2009 Form 10-K/A, and
the 2009 and 2010 Form 10-Qs. *Id.* ¶¶ 237, 239.

On August 19, Shengda filed a Chapter 11 bankruptcy
petition and an adversary proceeding against its Chief Executive
Officer, Ziangzhi Chen, to prevent him from interfering with the

restructuring.[5]  TAC ¶¶ 238, 240-241, 251.  *See In re*

*ShengdaTech, Inc.*, BK-11-52649 (D. Nev. Aug. 19, 2011, ECF No.

1); *see also ShengdaTech, Inc.* v. *Chen*, 11-05082-BTB (D. Nev.

Aug. 23, 2011, ECF No. 12).  With this filing, the Plaintiffs'

notes became immediately due and payable by their terms.  *Id.*

¶ 238.  In bankruptcy, Shengda has been unable to satisfy the

vast majority of its liabilities. *Id.* ¶¶ 252-254.

## C.  *Alleged Misrepresentations by KPMG-HK*

The Plaintiffs allege that the offering documents in the

PPM on which they relied in purchasing the Shengda bonds

contained material misrepresentations that made Shengda appear

far more stable financially than it was.  TAC ¶¶ 22, 26, 32, 61,

62.  Further, they contend that KPMG-HK, as Shengda's auditor

(and Morgan Stanley as Shengda's underwriter), "had access to

ShengdaTech's internal reports and other data and information

about those companies' finances, operations and sales at all

relevant times," and failed to perform its auditing

---

[5] On September 2, 2011, the bankruptcy court found that Shengda's
employees prevented the independent investigation from verifying
its cash accounts, that U.S. banks against which Shengda
allegedly held certificates of deposit did not have records of
issuance, and that Shengda had entered into undisclosed related-
party transactions.  TAC ¶ 241.  Approximately nine months
later, on June 20, 2012, Shengda filed its disclosure statement
to creditors, disclosing that many of its sales had been to
related parties owned by its CEO, and that those sales were
likely overstated.  *Id.* ¶ 242.

responsibilities adequately, such that it would have discovered Shengda's fraud, in light of this information. *Id.* ¶¶ 6, 246.

Specifically, the Plaintiffs assert that KPMG-HK made two materially false statements:

First, regarding its own compliance with Public Company Accounting Oversight Board ("PCAOB") standards in auditing Shengda's financial statements; and

Second, regarding Shengda's compliance with generally accepted accounting principles ("GAAP") in preparing its financial statements. The Plaintiffs contend that KPMG-HK knew or should have known that these statements were false. TAC ¶¶ 59-61.

KPMG-HK's statement of PCAOB compliance appears in its audit reports for fiscal years 2008 and 2009, dated March 31, 2009 and March 15, 2010, respectively, and in its internal control audit report for fiscal year 2008, also dated March 31, 2009. TAC ¶¶ 34, 59-61; 2008 Audit Report; 2009 Audit Report; 2008 Internal Control Audit Report. KPMG-HK's statement of GAAP compliance also appears in its audit reports for fiscal years 2008 and 2009.[6] TAC ¶¶ 59-60; 2008 Audit Report; 2009 Audit

---

[6] The fiscal year 2008 report made this representation of GAAP compliance "as of December 31, 2008"; the fiscal year 2009 report made this representation "as of December 31, 2009 and 2008." TAC ¶¶ 59-60; 2008 Audit Report; 2009 Audit Report.

Report.  These audit reports were incorporated into Shengda's 2008 Form 10-K, filed April 1, 2009, and Shengda's 2009 Form 10-K, filed March 15, 2010, respectively, and were included in the PPM.[7]  TAC ¶ 34.

In addition, the Plaintiffs identify an allegedly false or misleading statement in a comfort letter KPMG-HK provided to Morgan Stanley in connection with the private placement, dated December 9, 2010.  TAC ¶¶ 34, 220.  In that letter, KPMG-HK consented to the use of its audit reports and its review of Shengda's 2010 quarterly financial statements in the PPM and acknowledged that purchasers would rely on the opinions expressed therein.  *Id*. ¶¶ 34, 220.  KPMG-HK also affirmed its opinion as to the accuracy of Shengda's 2010 quarterly financial statements, noting that KPMG-HK did not believe that "any material modifications should be made to the unaudited condensed consolidated financial statements" included in the PPM "for them to be in conformity with U.S. generally accepted accounting principles."  *Id.* ¶¶ 221(a), 272.

## D.   *Impact of Misrepresentations on the Plaintiffs*

The Plaintiffs allege that they relied to their detriment

---

[7] Although the Third Amended Complaint identifies numerous other instances in which KPMG-HK consented to the use of its audit reports in SEC filings in relation to an anticipated public securities offering in 2010, the statements therein are not actionable because the offering was never conducted.  TAC ¶¶ 213-218.

on the misrepresentations and omissions of KPMG-HK and Morgan Stanley in the documents that led the Plaintiffs to purchase the Shengda notes. TAC ¶¶ 20-22, 26, 32. According to the Plaintiffs, the materially false or misleading statements created "an unrealistically positive assessment of ShengdaTech" in the market, and this "fraudulently created" both a market for and an overvaluing of the notes. *Id.* ¶¶ 22, 26, 32, 61-62, 247. They contend that the notes "would never have come into the market but for the fraud," or, if they had, would have done so with more favorable terms to investors, and that the Plaintiffs would not have purchased the notes at all or on the terms they did but for the misrepresentations of KPMG-HK and Morgan Stanley. *Id.* ¶ 247.

The Plaintiffs further allege that immediately following Shengda's March 2011 press release stating that KPMG-HK had encountered discrepancies in its 2010 audit, the Plaintiffs sought to sell their convertible bonds, but the market had become illiquid. *Id.* ¶¶ 248-250. As a result, having purchased the bonds at or near par, and in many cases above par value, the Plaintiffs "lost nearly their entire investment." *Id.* ¶¶ 25, 231, 248-250, 255.

## II. PROCEDURAL HISTORY

This case came to this session, having been before two other judges in this district previously. The motion to dismiss

now before me follows a familiar pattern for motion to dismiss practice in securities fraud litigation: successive motions to amend the pleadings creating a moving target for an extended period of time until the plaintiffs' allegations come to rest and can be examined by the court.

Miller filed its complaint on December 1, 2011, alleging one count of violation of the Massachusetts Uniform Securities Act, Mass. Gen. Laws. ch. 110A, § 410, against Morgan Stanley and one count of negligent misrepresentation under state common law against KPMG-HK. Compl. ¶¶ 1-3, 143-157. Morgan Stanley filed a motion to dismiss the original complaint on January 31, 2012 for failure to state a claim. This was denied by Judge Tauro. *See Miller Inv. Trust* v. *Morgan Stanley & Co. Inc.*, 879 F. Supp. 2d 158 (D. Mass. 2012).[8]

---

[8] Judge Tauro concluded that Miller had stated a claim against Morgan Stanley under § 410(a)(2), because Miller specifically alleged that "the Chinese and American accounting standards are substantially similar on the issue of revenue recognition, that Chinese penalties for failure to file accurate reports are more likely to affect Chinese companies incorporated in the United States than SEC penalties, and that ShengdaTech's Chinese subsidiaries were the sole source of its revenue." *See Miller Inv. Trust* v. *Morgan Stanley & Co. Inc.*, 879 F. Supp. 2d 158, 166-67 (D. Mass. 2012) (citing *Marram* v. *Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017 (Mass. 2004)). Judge Tauro also rejected Morgan Stanley's argument that the claim for purchases after the initial offering should be dismissed, because "[w]hich, if any, sales of securities resulted from the alleged misstatement contained in the private placement memorandum is a question of fact more appropriately determined at trial." *Id.* at 167.

KPMG-HK filed its first motion to dismiss on June 7, 2012, asserting insufficient service and failure to state a claim of negligent misrepresentation under Fed. R. Civ. P. 8(a) or Fed. R. Civ. P. 9(b).[9] Before ruling on the motion to dismiss, and at the joint request of Miller and KPMG-HK, Judge Tauro granted Miller leave to file an Amended Complaint to add a claim against KPMG-HK arising under § 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r (the "Exchange Act"). The earlier motion to dismiss was treated as superseded and KPMG-HK was given the opportunity to file a new motion to dismiss.

Miller filed its first Amended Complaint on August 29, 2012, preserving the original two counts and adding a third count for violation of § 18 of the Exchange Act by KPMG-HK.[10] KPMG-HK thereafter filed a motion to dismiss for insufficient service and inadequate pleading of both the § 18 claim and the negligent misrepresentation claim. Judge Tauro provided Miller with the opportunity to re-serve KPMG-HK in compliance with the

---

[9] KPMG-HK asserted that Miller failed to comply with the Hague Convention. KPMG-HK also asserted lack of personal jurisdiction, and pursuant to the authorization of an earlier pretrial order, Miller sought limited jurisdictional discovery. KPMG-HK ultimately ceased pursuing the personal jurisdiction defense.

[10] Other than adding a few additional allegations regarding jurisdiction over KPMG-HK for the federal question, and the count for violation of § 18, the Amended Complaint did not make substantive changes to the original complaint.

Hague Convention, in order to remedy the insufficient service of KPMG-HK, and denied KPMG-HK's motion to dismiss as moot.

Thereafter, in July 2013, KPMG-HK filed a renewed motion to dismiss the Amended Complaint asserting inadequacy in the pleadings. Miller moved for leave to file a Second Amended Complaint, having provided notice of its intent to do so in November 2013 in light of factual discovery it was obtaining in another matter regarding the same underlying events. Simultaneously, Jura moved to intervene as a plaintiff pursuant to Fed. R. Civ. P. 24(b)(2) with respect to only count one against Morgan Stanley. Judge O'Toole granted both the motion for leave to amend and the motion to intervene, and dismissed KPMG-HK's pending motion to dismiss as moot in light of the anticipated Second Amended Complaint, permitting KPMG-HK to file a new motion to dismiss thereafter.

The Plaintiffs filed their Second Amended Complaint on March 10, 2014.[11] That complaint preserved the three counts in the Amended Complaint and added Jura as a claimant in count one only. Second Am. Compl. ¶¶ 245-265. In addition, the

---

[11] Shortly after the filing of the Second Amended Complaint, Miller and Jura filed a nearly identical complaint in the District of Nevada against KPMG-HK alleging one count of negligent misrepresentation. *See Miller Inv. Trust* v. *KPMG*, 3:14-cv-00133-LRH-VPC (D. Nev. Mar. 13, 2014). On January 8, 2015, that case was stayed upon the joint motion of the parties, pending the resolution of this action.

reorganized Second Amended Complaint added fifty pages of new

allegations, derived largely from discovery in an action pursued

by the Plaintiffs against Shengda's directors and officers in

the Southern District of New York and from a complaint filed by

Shengda's liquidating trustee.[12]  Morgan Stanley dutifully filed

---

[12] On June 26, 2012, Miller filed a complaint against the
president and directors of Shengda and against Hansen, Barnett &
Maxwell, P.C. ("Hansen"), a financial services firm that served
as Shengda's auditor in 2007, alleging violation of Mass. Gen.
Laws ch. 110A, § 410(b); negligent misrepresentation under New
York law; negligent misrepresentation under Massachusetts law;
common law fraud; violation of Section 10(b) of the Exchange
Act, 15 U.S.C. § 78r, and Rule 10b-5, 17 C.F.R. 240.10b-5; and
violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.
*See Miller Inv. Trust* v. *Xiangchi Chen*, No. 1:12-cv-04997-LGS
(S.D.N.Y. June 26, 2012, ECF No. 1).  That case has in many ways
paralleled this one procedurally, with a series of motions to
dismiss and motions to amend.  *Id.* (S.D.N.Y. July 20, 2012, ECF
No. 6; Aug. 22, 2012, ECF No. 11; Jan. 15, 2013, ECF No. 20;
Feb. 6, 2013, ECF No. 21; Mar. 14, 2013, ECF No. 23).

     Although Hansen filed a motion to dismiss in April 2013,
which typically would stay discovery under the Private
Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.
§ 78u-4(b)(3)(B), Judge Schofield concluded that the stay did
not apply to Hansen because it was subject only to a state
negligent misrepresentation claim, and ordered discovery to
proceed.  *Id.* (May 21, 2013, ECF No. 39).  Thereafter, Judge
Schofield granted Hansen's motion to dismiss for lack of
personal jurisdiction.  *Id.* (June 21, 2013, ECF No. 40).
Discovery then continued as to the defendants subject to federal
securities law claims.  The parties reached a settlement
agreement prior to the completion of expert discovery, and the
action was dismissed without prejudice on October 22, 2014. *Id.*
(Oct. 22, 2014, ECF No. 110, 111).  It is from the discovery
completed in the *Chen* case that the Plaintiffs here drew
additional allegations for their Second and Third Amended
Complaints.

     Another lawsuit filed in June 2012 also bears noting.
Other investment managers and funds that had purchased bonds in
the 2008 and 2010 Shengda offerings brought suit in the District
of Nevada against Morgan Stanley, KPMG-HK, other KPMG entities,

an answer to the Second Amended Complaint, and KPMG-HK filed a motion to dismiss, again alleging failure to plead adequately both the § 18 claim and the negligent misrepresentation claim. Following further briefing, the case was reassigned to this session with KPMG-HK's motion to dismiss still pending.

On January 15, 2015, the Plaintiffs filed yet another motion to amend the complaint and for leave to file additional allegations, which KPMG-HK opposed. After argument on both, I granted Miller's motion to amend and denied KPMG-HK's motion to

---

and Hansen, alleging "that KPMG HK and Hansen failed to follow generally accepted accounting standards ("GAAS") in their audits of Shengda's financials, falsely stated that Shengda's financial statements complied with [GAAP]; and falsely opined that Shengda's 'internal controls' were sufficient." *Oaktree Capital Mgmt., L.P.* v. *KPMG (Oaktree I)*, 963 F. Supp. 2d 1064, 1071-72 (D. Nev. 2013). The Plaintiffs also alleged that KPMG-HK consented to the inclusion of these false statements in SEC filings. *Id.* at 1072. Accordingly, the Plaintiffs alleged violation of § 18 of the Exchange Act and negligent misrepresentation under state common law by KPMG-HK.

On KPMG-HK's motion to dismiss, Judge Mahan concluded that the Plaintiffs had failed to state a claim under § 18 as to the statements of GAAS and GAAP compliance, because the Plaintiffs did not allege objective falsity sufficiently. *Id.* at 1085-86, 1090-91. Judge Mahan accordingly granted KPMG-HK's motion to dismiss, declining to exercise supplemental jurisdiction over the remaining state law claims. *Id.* at 1091, 1092.

In a later ruling, Judge Mahan granted Hansen's motion to dismiss as well. *See Oaktree Capital Mgmt., L.P.* v. *KPMG (Oaktree II)*, No. 2:12-CV-956 JCM (GWF), 2014 WL 3816392, at *5 (D. Nev. Aug. 4, 2014). The Plaintiffs appealed that decision to the Ninth Circuit, but the matter has since settled. *See id.*, *appeal docketed sub nom. Oaktree Capital Mgmt., L.P.* v. *Hansen, Barnett & Maxwell, P.C.*, No. 14-16632 (9th Cir. Aug. 25, 2014); *see also id.* (9th Cir. Mar. 13, 2015, ECF No. 25); *id.* (9th Cir. Dec. 10, 2014, ECF No. 14).

dismiss without prejudice.  Thereafter, Miller filed its Third Amended Complaint.  Morgan Stanley again answered the complaint, and KPMG-HK filed the motion to dismiss both counts against it for inadequate pleadings now before me.

The claims relevant to the instant motion – those brought by Miller against KPMG-HK – are that the statements in the 2008 and 2009 audit reports, regarding KPMG-HK's compliance with the PCAOB standards and Shengda's compliance with GAAP, constitute negligent misrepresentation and violate § 18 of the Exchange Act, and further that the statement in KPMG-HK's comfort letter that Shengda's 2010 quarterly financial statements conformed with GAAP also constitutes negligent misrepresentation.  TAC ¶¶ 268, 272, 277, 278.

### III. STANDARD OF REVIEW

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Dismissal for failure to state a claim is appropriate when the pleadings set forth nothing more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.; see Maldonado* v. *Fontanes*, 568 F.3d 263, 268

(1st Cir. 2009); *see also Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012).

The controlling pleading is the Plaintiffs' Third Amended Complaint. Although I am "generally limited to considering facts and documents that are part of or incorporated into the complaint," *Giragosian* v. *Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation and internal quotation marks omitted), I may also consider documents to which "a complaint's factual allegations are expressly linked." *Beddall* v. *State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998); *see In re Citigroup, Inc.*, 535 F.3d 45, 52 (1st Cir. 2008). Here, I will consider the audit reports prepared by KPMG-HK for fiscal years 2008 and 2009, including the 2008 internal control audit report; the comfort letter issued by KPMG-HK in December 2010; the 2011 press releases, which have been provided by the Plaintiff; and relevant SEC filings to the extent they have been incorporated into the Third Amended Complaint and provided by the parties.[13]

---

[13] KPMG-HK submits a wealth of additional evidentiary material in an attempt to rebut factual assertions made in the Third Amended Complaint. If I rely on evidentiary material beyond "the complaint, documents annexed to it," "other materials fairly incorporated within it," and "matters that are susceptible to judicial notice," the motion to dismiss must be converted into a Rule 56 motion for summary judgment under Rule 12(d). *Rodi* v. *So. New Eng. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004); *see Garita Hotel Ltd. P'ship* v. *Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 18-19 (1st Cir. 1992); *see also Giragosian*, 547 F.3d at 65. It is premature to do so in this case, where no discovery has been conducted. Accordingly, I limit my consideration of

## IV. DISCUSSION

### A.    *Section 18 Claim*

#### 1.    Pleading Requirements

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Claims under § 18 of the Exchange Act are subject to the heightened "clarity and basis" pleading requirement of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  *See generally In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 195*,* (1st. Cir. 2005) ("The clarity-and-basis requirement of the PSLRA . . . seem to apply equally to claims under . . . § 18.").  Under this requirement, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B)*; see In re Stone & Webster, Inc.*, 414 F.3d at 194-95, 199.  Where the allegations are made on the basis of information and belief, plaintiffs must specifically identify the sources used in investigating the claims that form the basis for their allegations.  *See Special*

additional materials to those fairly incorporated within the Third Amended Complaint.

*Situations Fund III, L.P.* v. *Am. Dental Partners, Inc.*, 775 F.
Supp. 2d 227, 238-39 (D. Mass. 2011).

Since the passage of the PSLRA, the First Circuit has
observed that the PSLRA pleading standards are "congruent and
consistent" with its own prior interpretation of Federal Rule of
Civil Procedure 9(b), and that both essentially impose the same
requirements. *Greebel* v. *FTP Software, Inc.*, 194 F.3d 185, 193-
94 (1st Cir. 1999); *see In re Stone & Webster, Inc.*, 414 F.3d at
195, 199. Consistent with *Greebel*, other judges in this
district have concluded that Rule 9(b) applies to § 18 claims.
*See Lindner Dividend Fund, Inc.* v. *Ernst & Young*, 880 F. Supp.
49, 57 (D. Mass. 1995) (collecting cases and finding Rule 9(b)
applicable to § 18 claims).[14] Accordingly, I hold that Miller's
§ 18 claim must satisfy the pleading standards of both the PSLRA
and Rule 9(b), which requires Miller to "state with

---

[14] Miller suggests that the guidance of *Greebel* and the Rule 9(b)
heightened pleading standards do not apply here because the
relevant issue is falsity, not scienter. This approach is
consistent with Judge Mahan's conclusion in *Oaktree I*, 963 F.
Supp. 2d at 1074-75, that Rule 8(a)(2), rather than Rule 9(b),
sets the pleading standards, accompanied by those imposed by the
PSLRA, because a § 18 claim does not require scienter and
therefore does not require fraud. I must, however, decline to
depart from this district's consistent response to *Greebel*,
which is contrary to Judge Mahan's approach.
   Nevertheless, I do note that other pleading requirements
imposed by the PSLRA regarding the required state of mind (i.e.,
the "strong inference requirement") do not apply here, because
§ 18 lacks a scienter requirement. *See In re Stone & Webster,
Inc.*, 414 F.3d at 195-96; *see also* 15 U.S.C. § 78u-4(b)(2).

particularity the circumstances constituting fraud or mistake."
*See McGinty* v. *Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980) (Rule 9(b) requires "specification of the time, place, and content of an alleged false representation"), *superseded in part by the PSLRA,* Pub. L. No. 104-67, 109 Stat. 737 (1995).

To make a claim under § 18(a), Miller must plead that "(i) the defendant made a [materially] false or misleading statement, (ii) the statement was contained in a document 'filed' pursuant to the Exchange Act or any rule or regulation thereunder, (iii) reliance on the false statement, and (iv) resulting loss to [Miller]." *In re Stone & Webster, Inc.*, 414 F.3d at 193; *see* 15 U.S.C. § 78r; *Special Situations Fund*, 775 F. Supp. 2d at 245. Proof of scienter is not required. *In re Stone & Webster, Inc.*, 414 F.3d at 193, 202.

Miller has identified three specific SEC filings in which it contends that KPMG-HK made false statements: (a) the 2008 audit report accompanying Shengda's 2008 Form 10-K, (b) the 2008 internal control audit report accompanying Shengda's 2008 Form 10-K, and (c) the 2009 audit report accompanying Shengda's 2009 Form 10-K.[15] These filings were included in the PPM on which the

---

[15] Any review KPMG-HK may have conducted of Shengda's interim or quarterly 2010 financial statements — and which was conducted on a Form 10-Q — cannot serve as the basis for a § 18 claim, and Miller does not appear to plead as much in its Third Amended

Plaintiffs relied in deciding to purchase the Shengda bonds in 2010. KPMG-HK asserts that Miller has failed to satisfy elements (i) that any statements therein were false or misleading, and (iv) that Miller's loss was caused by KPMG-HK's false representations for each of these documents.[16]

## 2. False or Misleading Statements

What is required to plead and prove falsity under federal securities laws depends on whether the statement at issue is one of fact or opinion. The Supreme Court clarified the distinction between these types of statements and when they may be actionable for their falsity in *Omnicare, Inc.* v. *Laborers*

---

Complaint. *See* 17 C.F.R. § 240.13a-13(d) (specifically excluding "the financial information required by Part I of Form 10-Q" from § 18 liability); INTERIM AUDITING STANDARDS, PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD (hereinafter "AU") § 722.07; *see also Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 96 F. Supp. 3d 325, 346-47 (S.D.N.Y. 2015) (allegedly false portions of financial statements in Form 10-Q filings are not actionable under § 18), *aff'd*, 645 F. App'x 72 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 186 (2016).

[16] At the hearing on this motion, and in a footnote in its supplemental briefing filed after that hearing, KPMG-HK asserted that Miller has not alleged reliance on KPMG-HK's 2008 internal control audit report. I am satisfied that Miller has adequately alleged, at least generally, that it relied on the documents contained in the PPM, including the audit reports appearing in the 2008 and 2009 Form 10-Ks, in purchasing the Shengda notes. TAC ¶¶ 20-22, 26, 32, 279. *See generally In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005) (discussing reliance element).

*District Council Construction Industry Pension Fund*, 135 S. Ct.

1318 (2015).[17]

In *Omnicare*, the Supreme Court reasoned that:

> A fact is "a thing done or existing" or "[a]n actual
> happening" . . . [whereas] [a]n opinion is "a belief[,]
> a view," or a "sentiment which the mind forms of persons
> or things." . . . Most important, a statement of fact
> ("the coffee is hot") expresses certainty about a thing,
> whereas a statement of opinion ("I think the coffee is
> hot") does not.

---

[17] *Omnicare* involved a claim under § 11 of the Securities Act.
*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension
Fund*, 135 S. Ct. 1318, 1323 (2015). Although § 18 employs a
meaningfully different legal standard from other federal
securities laws, the element of a false or misleading material
statement is consistent across the securities laws that require
it, including § 11 of the Securities Act and § 18 of the
Exchange Act. *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510,
527 (S.D.N.Y. 2015) ("existence of a false or misleading
statement or omission of material fact" is common element for
claims under §§ 10(b), 18, and 20(a) of Exchange Act and §§ 11
and 12(a)(2) of the Securities Act); *see also Fed. Hous. Fin.
Agency* v. *Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 555
n.170 (S.D.N.Y. 2015) (observing that "test for whether a
statement is materially misleading" is identical for claims
under various securities laws), *aff'd*, 873 F.3d 85 (2d Cir.
2017); *Hill* v. *State St. Corp.*, Master Docket No. 09-cv-12146-
NG, 2011 WL 3420439, at *22-23 (D. Mass. Aug. 3, 2011) (citing
*Plumbers' Union Local No. 12* v. *Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011), a case involving false opinions
under Securities Act, in analysis of Exchange Act claim).
Accordingly, case law discussing the requirements for a
materially false statement from across the securities landscape
is instructive. Cases arising under § 11 are particularly
instructive for § 18 claims because neither section requires
proof of scienter. *See Ernst & Ernst* v. *Hochfelder*, 425 U.S.
185, 211, n.31 (1976); *cf. Herman & MacLean* v. *Huddleston*, 459
U.S. 375, 382 (1983) (absence of scienter requirement for § 11
claim places "relatively minimal burden" on plaintiff compared
to § 10(b) claim); *In re Stone & Webster, Inc.*, 414 F.3d at 193
(§ 18 is unlike § 10(b) because state of mind is a defense
rather than a necessary element).

*Omnicare*, 135 S. Ct. at 1325 (citations omitted; some alterations in original). The Court observed that § 11 liability – like § 18 liability - is limited to untrue statements of *fact*;[18] it generally does not encompass "a sincere statement of pure *opinion* . . . regardless whether an investor can ultimately prove the belief wrong." *Id.* at 1325-26, 1327 (emphasis added).

However, statements of opinion may be actionable when the fact affirmed by the statement of opinion, namely "that the speaker actually holds the stated belief," is untrue. *Id.* at 1326. A statement of opinion accordingly may be the basis for § 11 liability if the stated belief is both inaccurate (i.e., not true) and not held by the speaker. *See id.* at 1326 & n.2 (adopting reasoning of *Virginia Bankshares, Inc*. v. *Sandberg*, 501 U.S. 1083, 1096 (1991), that "inadvertently correct assessment" relieves speaker of liability). In addition, a statement of opinion that contains any "embedded statements of

---

[18] Section 11 of the Securities Act, codified as 15 U.S.C. § 77k(a), imposes liability if "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Section 18 of the Exchange Act, codified as 15 U.S.C. § 78r(a), imposes liability for "any statement in any application, report, or document filed pursuant to [securities laws] or any undertaking contained in a registration statement . . . which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact."

fact" is actionable if the supporting fact itself is untrue, because the statement "affirm[s] not only the speaker's state of mind . . . but also an underlying fact." *Id.* at 1327.

The *Omnicare* Court also explained that under the separate material omissions clause of § 11, a pure statement of opinion may be actionable if the "statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 1329. Liability thus "may result from omission of facts – for example, the fact that the speaker failed to conduct any investigation – that rebut the recipient's predictable inference." *Id.* at 1330.[19]

*Omnicare*'s framework for claims arising under § 18 has been deployed in the lower courts. *See, e.g.*, *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 96 F.

---

[19] Although § 18 does not have a separate omissions clause, numerous courts have recognized that material omissions can be actionable under § 18 if the speaker failed "to include material information in a necessary document," resulting "in a false and misleading statement." *In re Caesars Palace Sec. Litig.*, 360 F. Supp. 366, 386 n.19 (S.D.N.Y. 1973); *see Motient Corp.* v. *Dondero*, 529 F.3d 532, 536 (5th Cir. 2008); *Magna Inv. Corp.* v. *John Does 1-200*, 931 F.2d 38, 39 (11th Cir. 1991) (per curiam); *Ross* v. *A.H. Robins Co.*, 607 F.2d 545, 556 (2d Cir. 1979); *In re Sanofi*, 87 F. Supp. 3d at 527; *Transit Rail, LLC* v. *Marsala*, No. 05-CV-0564(C), 2007 WL 2089273, at *8 n.6 (W.D.N.Y. July 20, 2007); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005); *Lindner Dividend Fund, Inc.* v. *Ernst & Young*, 880 F. Supp. 49, 55 (D. Mass. 1995).

Supp. 3d 325, 347 (S.D.N.Y. 2015) (citing *Omnicare*, 135 S. Ct. at 1327), *aff'd*, 645 F. App'x 72 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 186 (2016).  The Supreme Court's parsing of statements in *Omnicare* is consistent with much of the prior case law for claims of false statements under § 11 and § 18, albeit permitting a slightly more expansive reach.  *See, e.g.*, *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, Civ. Action Nos. 05-1151(SRC), 05-2367(SRC), MDL No. 1658(SRC), 2015 WL 2250472, at *21 (D.N.J. May 13, 2015) (*Omnicare* is consistent with prior Third Circuit and district court precedent); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 726-29 (S.D.N.Y. 2015) (*Omnicare* is consistent with much of Second Circuit precedent), *reconsideration denied*, 2015 WL 3540736 (S.D.N.Y. June 5, 2015).

Existing precedent, read in light of *Omnicare*, illustrates the following pleading requirements for a material misstatement or omission under § 18.  For a statement of fact, the plaintiff need only plead that the statement itself is untrue or lacked a reasonable basis (i.e., objective falsity).  *See Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  If the allegation is the omission of a material fact, the plaintiff must plead that "disclosure of [the omitted] information is 'necessary to make . . . [the] statements made, in the light of the circumstances under which they were made, not misleading.'"  *In*

*re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015)

(quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27,

44, 131 S. Ct. 1309 (2011) (internal quotation marks and

citation omitted)).

For a statement of opinion, the plaintiff must plead that

the statement falsely represented the speaker's belief at the

time it was made (i.e., that the speaker did not sincerely

believe the statement) and that it was untrue; that a statement

of fact embedded within the opinion is untrue; or that the

speaker omitted material facts that would make the statement

misleading to a reasonable investor. *See Omnicare*, 135 S. Ct.

at 1325-27, 1329-30; *Plumbers' Union Local No. 12 Pension Fund*

v. *Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir.

2011); *see also Corban* v. *Sarepta Therapeutics, Inc.*, No. 14-cv-

10201-IT, 2015 WL 1505693, at *6 (D. Mass. Mar. 31, 2015); *In re

BioScrip*, 95 F. Supp. 3d at 728-29; *In re Sanofi*, 87 F. Supp. 3d

at 527-28.  An adequate pleading of falsity for an opinion

therefore requires subjective falsity only in the absence of

allegations that an embedded statement of fact was untrue at the

time or that there was a material omission in the opinion. *See

Omnicare*, 135 S. Ct. at 1326 & n.2; *Plumbers' Union*, 632 F.3d at

775; *In re Credit Suisse First Bos. Corp.*, 431 F.3d 36, 47 (1st

Cir. 2005), *overruled on other grounds by Tellabs, Inc.* v. *Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *see also Fait*, 655
F.3d at 110.

> a. *Conformance of KPMG-HK's Audit of Shengda's*
> *Financial Statements and Internal Controls with*
> *PCAOB Standards*

Miller first challenges as false KPMG-HK's statements, in
its 2008 and 2009 audit reports and in its 2008 internal control
audit report, that it "conducted [its] audit[s] in accordance
with the standards of the [PCAOB] (United States)." TAC ¶¶ 59-
61(a), (c), 108-208; 2008 Report; 2008 Internal Control Report;
2009 Report. The PCAOB, created by the Sarbanes Oxley Act of
2002, establishes and maintains standards that auditors must
follow in auditing U.S. public companies. *See Free Enter. Fund*
v. *Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484-85
(2010). Among these standards are "generally accepted auditing
standards" ("GAAS"), codified as AU § 150 in the PCAOB
standards.

The parties dispute whether KPMG-HK's statement of
compliance is one of fact or opinion. Many courts, following a
decision by Judge Kaplan in the Southern District of New York,
have concluded that statements regarding GAAS compliance in an
audit report are opinions.[20] *See In re Lehman Bros. Sec. & ERISA*

---

[20] The classification in *In re Lehman Brothers* of auditor
statements of GAAS compliance as opinions has been consistently
followed within the Southern District of New York. *See, e.g.*,
*In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 259

*Litig.*, 799 F. Supp. 2d 258, 302 (S.D.N.Y. 2011) ("[Auditor's] statement regarding GAAS compliance inherently was one of opinion."); *see also In re Colonial Bancgroup, Inc. Sec. Litig.*, 9 F. Supp. 3d 1258, 1264-65 (M.D. Ala. 2014); *Buttonwood Tree Value Partners, LP* v. *Sweeney*, No. SACV 10-00537-CJC, 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012). KPMG-HK urges adherence to this interpretation.

Several other courts have implied that they would be open to considering a statement of PCAOB/GAAS compliance to be a statement of fact. *See, e.g.*, *Deephaven Private Placement Trading, Ltd.* v. *Grant Thornton & Co.*, 454 F.3d 1168, 1175-76 (10th Cir. 2006); *Edward J. Goodman Life Income Trust* v. *Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1282 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010); *see also MHC Mut. Conversion Fund, L.P.* v. *Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1117 n.6 (10th Cir. 2014) (clarifying that *Deephaven* did not hold whether statement was one of fact or opinion).[21]

---

(S.D.N.Y. 2014), *aff'd*, *Querub* v. *Hong Kong*, 649 F. App'x 55 (2d Cir. 2016); *Hanson* v. *Frazer, LLP*, Nos. 12 Civ. 3166(JSR), 12 Civ. 4222(JSR), 2013 WL 5372749, at *8 (S.D.N.Y. Sept. 24, 2013); *Perry* v. *Duoyuan Printing, Inc.*, No. 10 Civ. 7235(GBD), 2013 WL 4505199, at *5 (S.D.N.Y. Aug. 22, 2013); *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 580 (S.D.N.Y. 2012).

[21] In the parallel litigation described in *supra* note 12, Judge Mahan declined to resolve the classification of the statement of GAAS compliance, because objective falsity was not adequately alleged, and therefore the statement would not be actionable as a statement of fact or opinion. *See Oaktree I*, 963 F. Supp. 2d

The parties' research – and my own – has found only one case in which a judge has actually concluded that a statement of an audit's compliance with the PCAOB standards or GAAS is a statement of fact. *See In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) ("Whether or not [auditor] employed the PCAOB standards is a verifiable factual statement that is material to those relying on its certification of [plaintiff's] internal controls").

In the wake of *Omnicare*, I have come to agree with Judge Pechman that statements by auditors of their own compliance with the PCAOB standards or GAAS are statements of fact. *See In re Wash. Mut.*, 694 F. Supp. 2d at 1224. Because the auditor itself is the one tasked with complying with the standards, the statement that an auditor has so complied in conducting its audit is best understood as one of fact. *Compare In re Credit Suisse*, 431 F.3d at 47 (analysts' stock ratings are "best understood as statements of opinion, not as unadulterated statements of objective fact," because "they rest upon

---

at 1086; *see also In re Stone & Webster, Inc.*, 414 F.3d at 209 (considering only objective falsity of statement of GAAS compliance). This option of declining to classify is no longer available in light of the broader permissible bases for liability of an opinion statement following *Omnicare*. In a later decision in the same case, Judge Mahan considered only the objective falsity of a statement of GAAS compliance but explicitly classified a statement of GAAP compliance as one of opinion, and accordingly considered both objective and subjective falsity. *Oaktree II*, 2014 WL 3816392, at *4–5.

outsiders' views about a corporation rather than upon a corporate insider's factual assertions regarding his or her own company").  There is no reason that an auditor cannot state with certainty that it followed the PCAOB standards and the GAAS therein as it understood them, including that it exercised the independent judgment that is required by those standards.  *Cf. Omnicare*, 135 S. Ct. at 1325 (statement of fact is expression of "certainty about a thing").

The rationale for the classification of such statements as opinions appears to stem from the nature of the GAAS themselves, which Judge Kaplan in *In re Lehman Brothers* characterized as "broadly stated" and "couched in rather general and in some cases inherently subjective terms."  *In re Lehman Bros.*, 799 F. Supp. 2d at 300; *see Buttonwood*, 2012 WL 2086607, at *2.  That applying and following the GAAS requires the exercise of discretion, *see, e.g.*, AU § 230.11, does not make them any less identifiable as guiding standards, however.  The PCAOB codifies its standards and sets forth the GAAS, which consist of ten general standards and are themselves codified by the American Institute of CPAs ("AICPA") as AU § 150.  *See SEC* v. *Arthur Young & Co.*, 590 F.2d 785, 788 n.2 (9th Cir. 1979); *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 479 (S.D.N.Y. 2005).  Although one auditor may apply the standards differently from another, there is sufficient uniformity that a fact-finder

may assess compliance using a reasonable person standard, asking "whether a reasonable auditor *would* have taken such steps under the circumstances." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 259 (S.D.N.Y. 2014), *aff'd*, *Querub* v. *Hong Kong*, 649 F. App'x 55 (2d Cir. 2016); *see also Omnicare*, 135 S. Ct. at 1332 ("Numerous legal rules hinge on what a reasonable person would think or expect."); *cf. In re WorldCom*, 352 F. Supp. 2d at 481.[22]

Because a statement of compliance with the PCAOB standards is one of fact, Miller need only show, through well-pleaded allegations satisfying the heightened standards of the PSLRA and Rule 9(b), that KPMG-HK failed to perform its audits in compliance with the PCAOB standards.

### i.  Failure to Investigate False Statements About SSCM by Shengda's CFO

Miller identifies numerous GAAS and other PCAOB requirements that it alleges KPMG-HK knowingly failed to satisfy.  The largest collection of such allegations involves

---

[22] KPMG-HK makes much of the fact that the 2008 and 2009 audit reports in which this statement appears frequently refer to KPMG-HK's "opinion."  But the opinion contained in those reports is regarding the consolidated financial statements of Shengda, and the basis for those opinions, as the reports indicate, is KPMG-HK's audit of those financial statements.  *See* 2008 Report; 2009 Report.  There is no qualification of the statement of PCAOB compliance with "we believe" or "in our opinion." Instead, "[i]n our opinion" precedes only the statement that Shengda's consolidated financial statements conform with GAAP. 2008 Report; 2009 Report.

KPMG-HK's conduct following its discovery of a misrepresentation by management regarding a related party.

In August 2007, Shengda's Chief Financial Officer, Anhui Guo, reported to Shengda's previous auditor, Hansen, and to Shengda's board that Shengda had sold its interest in Shandong Shengda Chemical Machinery Co. Ltd. ("SSCM") in an arm's length transaction to Prosper Crown Limited, and that SSCM was no longer a related party. TAC ¶¶ 40, 112-114. This was inaccurate, because Shengda's CEO, Xiangzhi Chen ("X. Chen"), continued to serve as the CEO of SSCM, making it a related party requiring disclosure. TAC ¶¶ 41, 112-113, 120. Hansen expressed skepticism over Guo's representation and investigated further, but Guo falsely affirmed by email to Hansen on February 18, 2008, that there was no relationship between SSCM and any parties related to Shengda. *Id.* ¶¶ 115-118. Guo made the same representations to Shengda's Audit Committee throughout the year. *Id.* ¶¶ 120-124. As a result, the Audit Committee did not review transactions with SSCM for approval under its related-party transaction policy. *Id.* ¶ 125. King & Shine Partners, Ltd., a law firm that conducted due diligence for Shengda, was similarly unaware that SSCM remained a related party. *Id.* ¶ 133.

Miller alleges that when KPMG-HK became Shengda's auditor, it inquired about related parties and, like those inquiring

before it, did not receive an indication from management that SSCM was a related party after July 2007. TAC ¶ 126. But on February 14, 2009, Michael Tse, a KPMG-HK auditor, learned from A. Carl Mudd, the chair of Shengda's Audit Committee, that X. Chen continued to be SSCM's CEO. *Id.* ¶¶ 127, 130. In addition, KPMG-HK knew that Prosper Crown had paid only $9.3 million for SSCM, despite SSCM's 2007 revenues of $45 million. *Id.* ¶ 137. Both of these facts suggested that the sale to Prosper Crown was not an arm's length transaction, and that SSCM remained a related party.

Miller alleges that what KPMG-HK did upon its discovery that Guo had misrepresented SSCM's status, and that SSCM remained a related party, did not comply with the PCAOB standards in several respects.

First, Miller alleges that KPMG-HK did not adequately confirm the precise nature of the relationship between SSCM and Shengda through extrinsic evidence. TAC ¶¶ 134, 150-152. Because KPMG-HK knew that SSCM was a related party, it was required under the PCAOB standards to obtain assurances from the board that the related-party transaction was approved; to obtain information about the related party and other significant information from intermediaries, other agencies, and the prior auditor; and to confirm the transactions between Shengda and SSCM, among other responsibilities. AU §§ 315.09, 334.08-.10;

*see* AS No. 18.  TAC ¶¶ 130, 150-151.  Miller identifies two specific sources that it contends KPMG-HK should have consulted but did not: Prosper Crown's public corporate records filed in Hong Kong and available on the internet at a cost, and SSCM's AIC filings.  *Id.* ¶¶ 134, 151(a), (d).  These sources would have revealed that a Shengda executive, Pu Li, was Prosper Crown's sole director, and its general manager was Zhen Chen ("Z. Chen"), an individual whom Miller describes as "a protégé" of Shengda's CEO X. Chen.  *Id.* ¶¶ 134, 151(a), (d).  But these allegations are not sufficient to establish that KPMG-HK failed adequately to satisfy the directives of the PCAOB standards Miller cites.  TAC ¶¶ 130, 150-151.

Additional allegations assert that KPMG-HK corresponded with Hansen, King & Shine, Mudd, Shengda management, and the Shengda board generally about the transactions between SSCM and Shengda.  *Id.* ¶¶ 99-101, 128-134, 209.  Miller's allegation that KPMG-HK would have learned something new from consulting the foreign document filings is belied by its allegation that the same names were disclosed in Guo's email to Hansen on February 18, 2008, in which Guo expressly represented that these individuals "have no relationship with ShengdaTech, Inc."  *Id.* ¶¶ 118, 151(a).  Miller does not specifically allege that the Hong Kong corporate records and AIC filings would have revealed the connections these individuals had to Shengda.  Nor does

Miller's additional allegation that KPMG-HK should have confirmed transactions with the banks that processed payments from Shengda to SSCM indicate what more that investigation would have provided to KPMG-HK on this issue. *Id.* ¶ 151(b). *See Oaktree Capital Mgmt., L.P.* v. *KPMG (Oaktree I)*, 963 F. Supp. 2d 1064, 1086-87 (D. Nev. 2013); *Lindner Dividend Fund*, 880 F. Supp. at 58.

Second, Miller alleges that KPMG-HK's discovery that SSCM remained a related party required it to investigate whether Guo's prior representations were lies – and illegal acts – or mere mistakes. TAC ¶¶ 131-146. Investigation following suspicion of a possible illegal act is required under both federal securities laws and the PCAOB standards to determine whether a corrective disclosure is needed and whether the auditor can continue to rely on management's representations on any matter, and generally in furtherance of an auditor's obligation to employ professional skepticism. *See* 15 U.S.C. § 78j-1(b)(1)(B); AU §§ 110.02, 316.13, .16; 317.10, .11, .16, .19-.20; 333.02-.04; *see also* TAC ¶¶ 108-111, 141-144, 147-150.

Although determining whether an act is illegal is "normally beyond the auditor's professional competence," AU § 317.03, the auditor must make some attempt to determine the act's illegality. In detecting and reporting misstatements resulting from illegal acts relevant to financial statements, auditors are

guided by both AU § 317 and AU § 110. The PCAOB standards
suggest that an auditor read minutes, inquire of management and
the client's legal counsel, examine supporting documents, and
test the details of transactions and balances with third
parties. AU §§ 317.08, .10, .11. If an auditor is unable to
determine if an act is illegal, the auditor need only "consider
the effect on his report," and may need to disclaim an opinion
on the financial statements. AU §§ 317.19, .21. If the auditor
has concluded that "an illegal act has a material effect on the
financial statements" and has not been disclosed, the auditor
should "express a qualified opinion or an adverse opinion on the
financial statements taken as a whole, depending on the
materiality of the effect on the financial statements," AU
§ 317.18, and should inform the Audit Committee and senior
management. 15 U.S.C. § 78j-1(b)(1)(B). TAC ¶¶ 143-144.

Miller alleges that KPMG-HK's investigation into whether
Guo's prior representations were intentionally or inadvertently
false was inadequate under these standards. TAC ¶¶ 137, 145.
In a March 23, 2009 memorandum summarizing its investigative
efforts, KPMG-HK indicated that it had corresponded with Hansen
and King & Shine regarding their knowledge and asked Shengda's
management to represent that SSCM was not a related party;
however, KPMG-HK did not indicate that it asked specifically

whether Guo had lied to any of them.[23]  *Id.* ¶¶ 128–135, 145.

KPMG-HK argues that it is unreasonable to infer that this

memorandum encompassed the full scope of its investigation into

Guo; rather, it continued to gather information consistent with

its obligation under AU § 317, as demonstrated by Miller's

allegation that KPMG-HK communicated about the related-party

disclosures with Guo by email several days after the

memorandum.[24]  *Id.* ¶ 100.

In addition, although Miller alleges that KPMG-HK did not

consult third-party records to confirm transactions, Miller does

allege that KPMG-HK consulted many of the sources suggested by

the PCAOB standards, including legal counsel and the prior

auditor.  *See* AU §§ 317.08-.11.  These source lists are merely

suggestions; an exhaustive exploration of them is not required

by the standards.  *See, e.g.*, AU § 317.11 ("The additional audit

procedures considered necessary, if any, might include

procedures such as the following . . . .").  Instead, auditors

_____

[23] To the extent Miller alleges that KPMG-HK did not satisfy its
obligation to inquire of its predecessor, Hansen, as required by
AU §§ 315.02 and .09, the allegations show that KPMG-HK did
correspond with Hansen on this issue and obtained what
information Hansen had regarding Guo's representations at the
time.  TAC ¶¶ 115-123, 128, 135, 145, 152.
[24] KPMG-HK also points to additional facts beyond the Third
Amended Complaint.  At this stage — particularly after multiple
repleadings — I see no reason to indulge the Plaintiffs'
invitation to look beyond the well-pleaded allegations,
construed in Miller's favor, to determine whether Miller has
sufficiently stated a claim upon which relief may be granted.

are required to apply "those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit[,]" and are to consider "representations from management" as only "part of the evidential matter" they obtain. AU § 333.02. Miller's allegations do not support the conclusion that KPMG-HK's audit was so inadequate in its assessment of related-party transactions and the representations of management that it failed to meet these open-textured standards. *Compare McCurdy* v. *SEC*, 396 F.3d 1258, 1260-61 (D.C. Cir. 2005) (audit of receivable did not comport with GAAS because auditor did not speak with any board member or with CEO and did not examine or test the financial data CEO presented to the board, even though auditor reviewed meeting minutes, spoke to attorney, and reviewed company's prior decision).

Miller further alleges that, following its investigation, KPMG-HK neither brought the possibility that Guo had lied to the attention of the Audit Committee, as evidenced by board meeting minutes and the attestation of two Shengda board members, nor disclaimed an opinion on Shengda's 2008 financial statements. TAC ¶¶ 135, 145. Both of these allegations are belied by other allegations in the Third Amended Complaint. Mudd, the chair of the Audit Committee, had a conversation with KPMG-HK demonstrating that he knew he had incorrectly understood SSCM no longer to be a related party because of earlier

misrepresentations by Guo.  TAC ¶ 130.  The PCAOB standards and federal securities laws require only that the auditor "assure himself that the audit committee is adequately informed as soon as practicable and prior to the issuance of the auditor's report."  AU § 317.17; *see* 15 U.S.C. § 78j-1(b)(1)(B).  Surely the Audit Committee, with this knowledge, could infer that Guo's representations regarding SSCM were inaccurate and could respond accordingly.  KPMG-HK also communicated directly with Guo after its discovery of the error, informing Guo that Shengda's "failure to disclose related-party transactions meant that its financial statements contained material errors" and discussing how to proceed appropriately with 2008 reporting.  TAC ¶ 100. Both of these interactions occurred prior to the issuance of KPMG-HK's 2009 audit report.

For the same reasons, Miller's allegations regarding KPMG-HK's obligation to convince Shengda to restate its 2007 financials fail.[25]  TAC ¶¶ 100-101.  SSCM was disclosed as a related party in Shengda's 2008 Form 10-K, after KPMG-HK informed Shengda of this necessity, and KPMG-HK's internal control audit report filed along with the 10-K further identified internal control weaknesses.  *Id.* ¶¶ 59, 100, 209;

---

[25] Shengda's 2007 financials failed to disclose SSCM as a related party.  SFAS No. 154, a GAAP standard, requires disclosure of errors discovered in previously issued financial statements. TAC ¶¶ 100-101.

2008 Form 10-K at F-19. Miller has not identified any PCAOB standard requiring further action on KPMG-HK's part with regard to corrective disclosure of SSCM's related-party status for its 2008 financial statements.[26] Similarly, KPMG-HK's ultimate discovery and appropriate representation of the related-party status, despite Guo's contrary representations, is consistent with the PCAOB standards requiring auditors not to trust the representations of management blindly.[27] TAC ¶ 111; AU §§ 333.02–.04.

In sum, although Miller has made "specific allegations about the steps an auditor took, the way in which it planned its audit, and the procedures it employed," *Oaktree I*, 963 F. Supp. 2d at 1086, it has not demonstrated that these steps and procedures were non-compliant with the PCAOB standards requiring investigation of a potential illegal act, disclosure of a prior

---

[26] Even if KPMG-HK had a duty to convince Shengda to issue a corrective disclosure regarding its 2007 financial statements and SSCM's related-party status (despite not serving as Shengda's auditor for 2007), Miller could not adequately allege loss causation, because SSCM's status as a related party in fiscal year 2007 was fully disclosed in 2009, prior to Miller's purchase of the Shengda bonds. TAC ¶¶ 100, 209.

[27] To the extent Miller contends that KPMG-HK did not comply with the PCAOB standards because it continued to rely on representations from Guo after discovering that Guo had incorrectly represented SSCM's status, Miller offers no allegations of KPMG-HK's continued reliance. *See* AU § 220.02-.04 (auditor must be independent), § 333.01 *et seq.* (guidance for reliance on management representations).

material misstatement, skepticism of representations by management, and disclosure of related-party transactions.

> ii.  Internal Control Deficiencies

Miller next alleges that KPMG-HK's acknowledgment of material weaknesses in Shengda's internal controls in its 2008 internal control audit report did not satisfy the PCAOB standards.  Under AS No. 5.91, "[w]hen expressing an adverse opinion on internal control over financial reporting because of a material weakness, the auditor's report must include . . . [t]he definition of a material weakness . . . [,] [a] statement that a material weakness has been identified and an identification of the material weakness described in management's assessment."  TAC ¶ 210.

In its 2008 report, KPMG-HK stated that "[m]aterial weaknesses have been identified and included in management's assessment related to the lack of adequate policies, procedures and personnel to address the accounting for and disclosures of non-routine transactions and the Company's internal control over the accounting for income taxes."[28]  TAC ¶¶ 59, 61(c), 209-212; 2008 Internal Control Report.  The report goes on to say that "[i]n our opinion, because of the effect of the aforementioned

---

[28] Although Miller challenges this statement as it appears in a final report from Tse to Shengda's Audit Committee, it is actionable only as it appears in the audit report accompanying Shengda's 2008 Form 10-K.  TAC ¶¶ 59, 209.

material weaknesses on the achievement of the objectives of the control criteria, ShengdaTech, Inc. and subsidiaries have not maintained effective internal control over financial reporting as of December 31, 2008." 2008 Internal Control Report.

Miller alleges that KPMG-HK did not specifically identify as a material weakness "critical failure[s]" regarding disclosure of related-party transactions with SSCM, and instead disclosed "much more innocuous failures." TAC ¶¶ 61(c), 211-212. KPMG-HK, for its part, contends that "accounting for and disclosures of non-routine transactions" encompasses related-party transactions; Miller responds that Shengda's transactions with SSCM were in fact routine.

Drawing all reasonable inferences from the allegations in Miller's favor, I find Miller has adequately pled that KPMG-HK's internal control audit report omitted a material weakness that was known to it at the time, and that required specific disclosure under AS No. 5.91.[29] *See Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[A]n omission is actionable under the securities laws only when the corporation

---

[29] Although there is some case law suggesting that the duty to report internal control weaknesses requires reporting to management only, and not in the audit report itself, *see Allied Inv. Corp.* v. *KPMG Peat Marwick*, 872 F. Supp. 1076, 1084 (D. Me. 1995) (citing *Monroe* v. *Hughes*, 31 F. 3d 772, 775 (9th Cir. 1994)), I am of the view that AS No. 5.90 and .91 now require an adverse opinion from the auditor.

is subject to a duty to disclose the omitted facts." (citation omitted)). The disclosure of weaknesses concerning non-routine transactions does not discharge the obligation to disclose a weakness concerning related party transactions. AS No. 5.14 specifically identifies certain categories of controls that an auditor can identify, including controls over "significant unusual transactions" (i.e., non-routine transactions) and controls over related party transactions. By listing these separately, the PCAOB standards suggest that they are not synonymous, and that disclosure of weaknesses in one area does not constitute disclosure of weaknesses in another.

The Third Amended Complaint identifies particular facts that tie a discrete auditing requirement to information known to KPMG-HK at the time. *Compare In re BioScrip*, 95 F. Supp. 3d at 726-27 (statements suggesting that defendant "routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request," was misleading, "because the inference is available that a reasonable investor could have read them to mean that [defendant] was not already in receipt of just such a request for information"). *Edward J. Goodman*, 595 F. Supp. 2d at 1282. A reasonable investor would expect that inadequate related-party transaction disclosures would be identified as a material weakness in this context, and therefore the absence of this

identification is actionable as a material omission.  *See Omnicare*, 135 S. Ct. at 1330, 1332.

>             iii. Failure to Establish Direct Contact in the
>                  Confirmation Process

Miller next alleges that KPMG-HK performed an inadequate confirmation process.  Under the PCAOB standards, auditors may employ a confirmation process "to obtain evidence from third parties about financial statement assertions made by management" as one procedure in the audit risk assessment.  AU § 330.06; *see* AU §§ 330.04-.09; *see also* AU § 150.02 (Standards of Field Work No. 3) ("Sufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.").  When there is a greater "combined assessed level of inherent and control risk," the auditor generally needs greater assurances, which can be obtained through confirmation procedures.  AU § 330.07.  Contrary to Miller's assertion, the PCAOB standards do not require auditors to obtain independent confirmation of specific financial statement entries; rather, whether and to what extent to engage in a confirmation process is left to the discretion of the auditor based on its assessment of inherent and control risk.  *See* AU §§ 330.05-.10.  TAC ¶¶ 14(a), 153-154.

When an auditor chooses to perform a confirmation process, "the auditor should maintain control over the confirmation requests and responses" to minimize the chance of biased results due to interception or alteration. AU § 330.28. This entails "establishing direct communication between the intended recipient and the auditor." AU § 330.28. Further follow up, such as a phone call, to ensure the validity of a confirmation response is recommended by the PCAOB standards only when the response comes in a form other than a written communication mailed to the auditor. AU § 330.29.

Miller alleges that KPMG-HK did not comply with the PCAOB standards when it engaged in its confirmation process because it obtained the addresses for the confirmation addressees from Shengda and did not check them against publicly available information. TAC ¶¶ 156-158. Had KPMG-HK checked the addresses, it would have discovered that Shengda had provided the addresses of "insiders" who falsely confirmed every claim. *Id.* ¶¶ 157-158. In addition, KPMG-HK did not conduct any site visits to Shengda's suppliers, customers, or banks. *Id.* ¶ 158(d). When KPMG-HK did ultimately call the confirmation addressees at publicly available phone numbers, it learned that "nearly all" of Shengda's claims regarding its bank accounts, accounts payable, and accounts receivable were inaccurate. *Id.* ¶ 161. Miller alleges that, in light of KPMG-HK's prior

discovery "that management had already lied to Hansen, to its board of directors, and to KPMG itself, about a material matter" – presumably SSCM's related-party status – KPMG-HK's obligation to employ professional skepticism should have made it distrustful of the information provided by Shengda and led it to engage in these additional confirmatory steps. *Id*. ¶¶ 149, 155; *see* AU § 330.15.

This is a classic "should have, had they, must have" allegation. *See Oaktree I*, 963 F. Supp. 2d at 1086-87. Nothing in the PCAOB standards explicitly requires verifying confirmation addresses against public records or making on-site visits. As Judge Mahan observed, "[a]n auditor is not tasked with checking over every single document and making contact with every company that its client does business with . . . ." *Oaktree Capital Mgmt., L.P.* v. *KPMG (Oaktree II)*, No. 2:12-CV-956 JCM (GWF), 2014 WL 3816392, at *4 (D. Nev. Aug. 4, 2014), *see supra* note 12 for subsequent history of *Oaktree II*. Miller has not alleged that any of the confirmations were received by facsimile or orally, thereby triggering a need for confirmation of their validity; to the contrary, Miller alleges that the Shengda insiders mailed the completed confirmation forms back to KPMG-HK as instructed. TAC ¶¶ 154, 157; *see* AU § 330.29

In *Oaktree I*, Judge Mahan concluded that "[a] number of other explanations, including a failure by Shengda's internal

accountants to detect management fraud, [or] a remarkably well-covered management fraud scheme, . . . are equally or more likely to have resulted in the inaccurate financial reporting alleged by plaintiffs." *Oaktree I*, 963 F. Supp. 2d at 1087. Miller's vague reference to an earlier "lie" by Shengda is not sufficiently specific to give rise to the conclusion that KPMG-HK should have distrusted all information coming from Shengda, or that it should have suspected that addresses supplied by Shengda for its banks, suppliers, and customers would be inaccurate. The only identifiable culprit in the misrepresentation of SSCM's related-party status is Guo, and Miller does not allege that it was Guo who provided the addresses to KPMG-HK. Indeed, Miller does not identify who at Shengda supplied the addresses. TAC ¶¶ 156-157.

In addition, although the auditing standards call for "a heightened degree of professional skepticism" in certain circumstances, such as when confirming "significant, unusual year-end transactions that have a material effect on the financial statements," AU § 330.27, Miller does not identify the timing of the confirmation process in relation to the SSCM discussions or any other allegedly fraudulent conduct at Shengda – including allegedly "vastly overstated" transactions – that

could have formed a basis for such heightened skepticism.[30]  As a result, Miller does not allege that KPMG-HK determined that it needed to conduct additional verification procedures in its confirmation process.[31]  TAC ¶¶ 155-161.  "[B]are allegations that fraud discovered years later speaks for itself" are insufficient.  *Oaktree I*, 963 F. Supp. 2d at 1086.  These allegations are inadequate to render KPMG-HK's statement of compliance with the PCAOB standards false or misleading.[32]

---

[30] In fact, Miller alleges that in March 2011 – after other red flags came to KPMG-HK's attention – KPMG-HK engaged in the additional confirmation procedures suggested by the PCAOB standards.  TAC ¶¶ 161, 225, 227(b); *see* AU § 330.

[31] Miller's discussion of the June 2011 SEC interview of KPMG-HK is irrelevant.  TAC ¶¶ 159-160.  In that interview, KPMG-HK indicated that, as a general practice, it checks public sources to verify addresses when the circumstances require it.  *Id.*  There is no allegation that KPMG-HK believed that such verification was necessary in this case.  *Id.*

[32] Miller's additional allegation that KPMG-HK should have investigated for potential fraud when it determined that the confirmation rate was "unusually high" is not supported by the PCAOB standards as they existed at the time.  TAC ¶¶ 15(a), 162-166.  Miller relies on AS No. 14, Appendix C1.b.(14).  TAC ¶ 164.  Such a standard was not adopted until August 2010 and applies only to audits of fiscal periods beginning on or after December 15, 2010, five months after KPMG-HK submitted its 2009 audit report indicating that it had complied with the PCAOB standards.  *See* PCAOB Release No. 2010-004 (Aug. 5, 2010).  Moreover, Miller alleges that KPMG-HK revealed its belief that the 2009 confirmation rate was unusually high to Shengda in May 2010 – well after its March 2010 audit report – and does not specifically allege that KPMG-HK held this view at the time that it prepared its audit report.  TAC ¶¶ 165-166; *see* 15 U.S.C. § 78r(a) (statement must have been false or misleading "at the time" it was made).

#### iv.  Ignoring Red Flags

Miller next identifies discrepancies in the documentation supporting Shengda's financial statements that it alleges KPMG-HK should have observed while conducting its 2008 and 2009 audits.  TAC ¶¶ 167-208.  It contends that KPMG-HK's failure to notice or act on these "red flags" violated the PCAOB standards directing auditors to exercise due care and employ professional skepticism, to assess the nature of the audited business adequately, to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion," and to respond to signals of potential fraud.  AU §§ 110, 150.02, 230.07, 316.86; *see* TAC ¶¶ 19, 167.

Miller alleges that KPMG-HK did not recognize deficiencies in the "chops" or seals that appeared on the confirmations sent back to KPMG-HK in 2008 and 2009 by two banks where Shengda allegedly held accounts.  TAC ¶¶ 168-171.  Miller alleges that "a facially deficient chop is as much a red flag in China as a signature claiming to be from a company's CEO but bearing the wrong name is in the U.S."  However, Miller makes no allegations that KPMG-HK was required to check the chops against one another in subsequent years in order to perform a PCAOB-compliant audit, or that KPMG-HK would have possessed the requisite knowledge to understand *why* the chops of the identified banks were deficient at the time.  *Id*. ¶¶ 15(b), 167-171.  Furthermore, the PCAOB

standards recognize that "[a]n audit conducted in accordance with GAAS rarely involves the authentication of such documentation, nor are auditors trained as or expected to be experts in such authentication." AU § 316.09.[33]

Miller alleges that during the audit of Shengda's 2010 financial statements, when KPMG-HK employed additional confirmation procedures, KPMG-HK discovered that Shengda was meddling with the confirmation process on behalf of its subsidiaries.[34] TAC ¶¶ 172-182. Once again, a mere allegation

---

[33] In addition, Miller does not specifically allege that KPMG-HK did not attempt to confirm the validity of the chops at the time; it alleges only that when KPMG-HK contacted the banks by phone in 2010 in auditing Shengda's 2010 financial statements, it discovered that Shengda did not hold accounts at those banks of the size Shengda had represented. TAC ¶¶ 169-171. Miller merely implies that KPMG-HK did not inspect the chops, because "had it done so" in its 2008 and 2009 audits, "it would have detected the fraud." *Id.* ¶¶ 18, 227(f). All that Miller has presented is an unsupported inference and a claim that KPMG-HK failed to figure out that it was being duped. *See In re Puda Coal*, 30 F. Supp. 3d at 260. Such allegations are not actionable. *Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 44 (1st Cir. 2012) ("'Information and belief' does not mean pure speculation.").

[34] These allegations pertain to two discoveries during the 2010 audit: switched confirmation envelopes and forged Value Added Tax ("VAT") receipts. TAC ¶¶ 172-182.

In conducting its audit, KPMG-HK created two separate audit teams, one responsible for auditing Shengda's operations in the Shandong province, and one responsible for auditing Shengda's operations in the Shaanxi province. TAC ¶ 172. The audit teams sent envelopes to the confirmation addressees that included response envelopes directed to the specific team. *Id.* ¶¶ 173-174. Miller alleges that "ShengdaTech caused purported Shandong addressees to respond to KPMG in envelopes addressed to KPMG's Shanxi team, and vice versa," which clearly signaled fraudulent conduct. *Id.* ¶¶ 175-176.

that fraud was discovered, by conducting the procedure at a later date, is not enough to demonstrate that KPMG-HK did not adequately conduct its audit. Specific allegations (and an identified basis for them) demonstrating that such a procedure was required for the 2008 and 2009 audits or that, had it been employed, it necessarily would have revealed fraud at the time, are required. *Cf. Oaktree I*, 963 F. Supp. 2d at 1086-87 ("misstated financial statements from 2010 do not necessarily reflect anything about financial statements made in 2008 and 2009").

To the extent Miller identifies other red flags that should have put KPMG-HK on notice of Shengda's fraud — including Shengda's repeated accounting restatements, KPMG-HK's alleged urging of Shengda not to put certain things in writing, and the receipt of a warning of potential fraud from a third party[35] —

---

Also during its audit of the 2010 financials, KPMG-HK selected six fapiao – certificates of payment or receipt – to test and verify through a VAT invoice verification system operated by one of the provinces in which Shengda did business. *Id.* ¶¶ 177-182. In so doing, KPMG-HK discovered that all of them were forged. *Id.* ¶ 182, 227(c).

Miller also suggests that KPMG-HK should have consulted Shengda's AIC filings to verify another red flag, an alleged tip from someone concerning the implausible demand for Shengda's products. These allegations are barely pleaded and fail for the same reasons. TAC ¶¶ 15(c), 62-65, 191; *see In re Puda Coal*, 30 F. Supp. 3d at 259; *Perry*, 2013 WL 4505199, at *5.

[35] Miller alleges that during its fiscal year 2009 audit, KPMG-HK became aware that "[a] person with some familiarity with the market for ShengdaTech's product [had said that] he thought the

these allegations are not tied to any applicable PCAOB standards and speak only to KPMG-HK's subjective knowledge. TAC ¶¶ 188-191. Proof of subjective knowledge is not required here, and its introduction as part of the analysis does not add to the determination whether the pleadings demonstrate that KPMG-HK failed to comply with the PCAOB standards in conducting its audits.[36] *Id.* ¶¶ 183-191.

The vast majority of Miller's allegations of red flags fail for the simple reason that "an unseen red flag cannot be heeded." *Stephenson* v. *PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 573 (S.D.N.Y. 2011). The PCAOB standards

---

company's overall sales figures exceeded what he understood to be the likely global market demand." TAC ¶ 190.

The PCAOB standard Miller alleges that KPMG-HK violated in not further pursuing this tip is the same it identifies in relation to KPMG-HK's failure to investigate the unusually high confirmation rate. TAC ¶¶ 15(a), 162-166, 190. That auditing standard was not introduced to the PCAOB standards until after KPMG-HK filed its last actionable document in March 2010. *See supra* note 34.

Even assuming that the PCAOB standards required follow-up investigation, Miller has not satisfied the clarity and basis requirement for this allegation. Miller implies but does not specifically allege that KPMG-HK did not investigate this warning. Miller's allegations regarding KPMG-HK's general auditing practices do not establish whether KPMG-HK followed them in its Shengda audits. TAC ¶¶ 18, 159, 190. Miller also does not identify the source of the tip, how KPMG-HK received it, or whether the statement in the tip was true. *Id.* ¶ 190.

[36] Miller's emphasis on *New Mexico State Investment Council* v. *Ernst & Young LLP*, 641 F.3d 1089, 1097-98 (9th Cir. 2011), is misplaced for this reason. That case discusses the relationship between the number of red flags and how "cogent and compelling" the inference of scienter is in evaluating a claim under § 10(b) of the Exchange Act and Rule 10b-5 thereunder. *Id.* at 1098.

explicitly contemplate that "a properly planned and performed audit may not detect a material misstatement resulting from fraud," and offer auditors direction in the reasonable steps they can take to attempt to detect such issues. AU § 316.12. Miller's allegations fail to demonstrate with specificity how KPMG-HK's missing these red flags at the time and under the circumstances violated the PCAOB standards. *Cf. In re Stone & Webster, Inc.*, 414 F.3d at 214 (finding clarity-and-basis pleading standard not satisfied where complaint "lacks concreteness as to how the conduct of the audit related to the missed warning signs."); *In re Cabletron Sys.*, 311 F.3d at 36.

### v.  Alleged Violations After March 2010

Miller alleges that KPMG-HK made numerous discoveries between May and November 2010 that revealed that several of Shengda's purported customers were false or non-existent and that Shengda had been supplying KPMG-HK with forged checks and bills of customer transactions. TAC ¶¶ 192-208. Miller also alleges that KPMG-HK discovered additional information about SSCM's related-party status during this time, and that it failed to act in accordance with the PCAOB standards in responding to this information. *Id.*

The PCAOB standards set forth procedures for an auditor to employ when it obtains material information it did not previously possess. AU § 561.04. If the auditor determines

through further investigation that the information is reliable, that "the facts existed at the date of his report," and that the information is such that "action should be taken to prevent further reliance on his report," the PCAOB standards instruct auditors to advise their clients to make an appropriate disclosure, and if the client refuses, to do so itself. AU § 561.04-.08; *see In re Cabletron Sys., Inc.*, 311 F.3d 11, 36 (1st Cir. 2002) (recognizing duty to correct). Such disclosure may include issuing revised financial statements and auditor's reports. AU § 561.06(a).

Although these standards, in light of KPMG-HK's discoveries in late 2010, may have required such action, they cannot serve to render KPMG-HK's earlier statements in March 2009 and March 2010 of compliance with the PCAOB standards false or misleading for purposes of § 18, which requires that the statement was false or misleading "at the time and in the light of the circumstances under which it was made." 15 U.S.C. § 78r(a); *cf. In re Cabletron Sys.*, 311 F.3d at 36 (complaint must demonstrate that eventual problems were known to defendants at time statements were made).[37]

---

[37] To the extent Miller identifies KPMG-HK's December 2010 comfort letter – in which KPMG-HK acknowledged that Shengda's bond purchasers would rely on KPMG-HK's audit report - as a missed opportunity to correct issues in the prior disclosures, I note only that the letter is not actionable under § 18.

Finally, Miller alleges that the ease with which KPMG-HK eventually uncovered such a large fraud shows a failure to comply with PCAOB standards.  Miller contends that KPMG-HK's own behaviors illustrate how central these above-described investigative actions are to discovering fraud and why they should have been undertaken during the annual audits.  KPMG-HK performed many of these investigative actions in March 2011 – at which point it learned of the significant issues in Shengda's financial statements – and used these sources as evidence of Shengda's fraudulent activity.

In some cases, particularly where scienter is at issue, the size of the fraud can "strongly suggest[]" that an audit did not comply with the PCAOB standards.  *See McIntire* v. *China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 134 (S.D.N.Y. 2013); *cf. In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000) (auditor's ability to identify and correct violations for two years of contracts in two weeks supported inference of scienter stemming from magnitude of restatement and simplicity of GAAP principles violated).  *But see In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2012) (in context of proving scienter, "fraud's large size, standing alone, is insufficient to show

recklessness," as is "rapidity with which [the] fraud
unraveled").

Here, these considerations are not sufficiently compelling
to stand in as a proxy for the particularized allegations needed
to state a claim. To be sure, "[a]t the pleading stage, courts
have recognized that allegations of GAAS violations, coupled
with allegations that significant 'red flags' were ignored, can
suffice to withstand a motion to dismiss." *In re Suprema
Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006);
*see Greebel*, 194 F.3d at 203-04. But as described above, the
red flags identified in the Third Amended Complaint are neither
actionable nor significant.

Miller's claim that KPMG-HK did not perform its audits in
accordance with the PCAOB standards and GAAS rests primarily on
"a litany of conclusory allegations of failure to conform to
various GAAS standards," *In re Stone & Webster, Inc.*, 414 F.3d
at 214, suggesting only that KPMG-HK was duped throughout its
performance of facially PCAOB-compliant audits. That KPMG-HK
could have performed a more robust audit does not render the
audit it did perform non-compliant. *See In re Puda Coal*, 30 F.
Supp. 3d at 259-60. In light of the information KPMG-HK had at
the time and the relevant pleading standards, Miller's
allegations can establish only that KPMG-HK's statement of
compliance with the PCAOB standards in conducting its 2008

internal control audit was materially false or misleading because it did not disclose a known material weakness.

> b. *Conformance of Shengda's Financial Statements with GAAP*

Miller also challenges as false the following statement that appeared in KPMG-HK's 2008 and 2009 audit reports:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of ShengdaTech, Inc. and subsidiaries as of [December 31, 2008, and December 31, 2009 and 2008, respectively], and the results of their operations and their cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles.

TAC ¶¶ 59-61(b), ¶¶ 62-107; 2008 Report; 2009 Report.

Miller concedes that the statement of compliance with GAAP is a statement of opinion. For reasons that bear brief explanation, I agree.

The GAAP themselves are broad, inherently subjective standards, as Judge Kaplan and the other judges following his opinion in *In re Lehman Brothers* characterize them; unlike the PCAOB standards and the GAAS therein, however, the GAAP are not rigorous codifications. *See Buttonwood*, 2012 WL 2086607, at *2; *In re WorldCom*, 352 F. Supp. 2d at 478. GAAP "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." *Young* v. *Lepone*, 305 F.3d 1, 5 n.1 (1st Cir. 2002); *see Shalala* v. *Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995). The Supreme Court has observed

that GAAP "are far from being a canonical set of rules," *Thor Power Tool Co.* v. *Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979), and are not compiled in "a single-source accounting rulebook." *Shalala*, 514 U.S. at 101. Instead, there are "19 different GAAP sources," and an accountant must "consult an elaborate hierarchy of GAAP sources to determine which treatment to follow." *Shalala*, 514 U.S. at 101. Because the GAAP are meant to embody contemporary conventions and procedures, "GAAP changes and, even at any one point, is often indeterminate." *Id.* This is in contrast to the PCAOB standards that, although requiring the exercise of discretion, can be identified from one source, and for which a statement of compliance is less a statement of belief than an assertion carrying some certainty. *See In re WorldCom*, 352 F. Supp. 2d at 479.

More significantly, this statement does not affirm the auditor's own conduct, but rather expresses the auditor's opinion on the conduct of a third-party: the entity whose financial statements are being audited.[38] *See Deephaven*, 454 F.3d at 1174-76 (auditor does not "guarantee" or "insure"

---

[38] The language of the audit reports themselves supports this interpretation by explicitly couching this particular statement as an opinion. *See Edward J. Goodman Life Income Trust* v. *Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1281-82 (M.D. Fla. 2009). *But see In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 399 (S.D.N.Y. 2013) (whether statement is one of opinion cannot "turn[ ] on th[e] semantic choice" of the maker).

accuracy of audited financial statements); *see also Omnicare*, 135 S. Ct. at 1325.

That an auditor's assurances of GAAP compliance in the audited statements is an opinion is clearly supported by the auditing standards themselves, and by the very objective of an audit "to express an opinion on the fairness, in all material respects, with which a company's financial statements present the financial position, results of operations, and cash flows of the company in conformity with GAAP." *In re WorldCom*, 352 F. Supp. 2d at 479-80.

For this reason, many courts have classified GAAP compliance statements as opinions. *See Deephaven*, 454 F.3d at 1174-75; *In re Colonial Bancgroup*, 9 F. Supp. 3d at 1265; *Buttonwood*, 2012 WL 2086607, at *2; *Belmont Holdings Corp.* v. *SunTrust Banks, Inc.*, 896 F. Supp. 2d 1210, 1229 n.17 (N.D. Ga. 2012); *In re Lehman Bros.*, 799 F. Supp. 2d at 303; *Edward J. Goodman*, 595 F. Supp. 2d at 1282. This is also the position taken by Judge Mahan in the *Oaktree* litigation. *See Oaktree II*, 2014 WL 3816392, at *5; *Oaktree I*, 963 F. Supp. 2d at 1090.

As a preliminary matter, I find Miller has adequately alleged with the specificity required by both the PSLRA and Rule 9(b) that the underlying assertion that Shengda's 2008 and 2009 financial statements fairly represented Shengda's financial

position in conformity with GAAP was materially false.[39]  2008

Audit Report; 2009 Audit Report.  *Contrast Oaktree I*, 963 F.

Supp. 2d at 1087-88, 1090 (concluding that plaintiffs did not

adequately plead objective falsity of the GAAP conformance

statement to satisfy Rule 8, in part because they alleged that

financials were "vastly overstated" but did not provide accurate

numbers).  The allegations demonstrate meaningfully different

revenue, sales, income, assets, and liability numbers in the AIC

filings of Shengda's subsidiaries.  They also demonstrate that

the banks at which Shengda purportedly had accounts held far

less cash – if any – on Shengda's behalf than it had reported.

This is sufficient to satisfy the clarity and basis requirements

for these allegations.  TAC ¶¶ 62-82.  *See Special Situations*

*Fund*, 775 F. Supp. 2d at 237.  Miller also adequately alleges

that Shengda violated GAAP by failing to disclose fully its

related-party transactions with SSCM, as required by Statement

---

[39] In considering whether Miller's pleadings are adequate, I
recognize Judge Tauro's earlier determination in this case that
Miller had alleged sufficient facts to state a plausible claim
for relief under Massachusetts securities law against Morgan
Stanley, which included adequately alleging that Shengda had
made false and misleading statements in its 2008 and 2009 SEC
filings.  *See Miller*, 879 F. Supp. 2d at 165.  Judge Tauro
concluded that the allegations satisfied both Rule 8 and Rule
9(b) in asserting liability based on "a misstatement of material
facts that Defendants either knew, or in the exercise of due
diligence should have known."  *Id.* at 165-66.

of Financial Accounting Standards ("SFAS") No. 57 and No. 850. TAC ¶¶ 83-107.

To state a claim for § 18 liability, Miller must also plead with specificity either that KPMG-HK did not sincerely believe that Shengda's financial statements conformed with GAAP at the time it issued the audit reports, or that KPMG-HK omitted material facts that made the statement of compliance misleading to a reasonable investor in context. *See Omnicare*, 135 S. Ct. at 1329-30; *Plumber's Union*, 632 F.3d at 775. In other words, the claim hinges on what KPMG-HK knew when it offered its opinion on Shengda's GAAP compliance.

Miller first points to Shengda's frequent restatements to posit that KPMG-HK was on notice that Shengda was not keeping its books properly. TAC ¶¶ 206, 213-227. This proposition has been rejected by the First Circuit as a basis for alleging subjective falsity. *See In re Credit Suisse*, 431 F.3d at 49 ("[T]hat a speaker changes his or her mind and decides after the fact that an earlier opinion was ill-advised is insufficient to support an averment of subjective falsity.").

Miller's allegations that KPMG-HK knew about Shengda's ongoing relationship with SSCM, which was not fully disclosed in Shengda's 2007 financial statements as required by GAAP, fail to establish subjective falsity for similar reasons. TAC ¶¶ 88-89, 92, 96-107, 208. As discussed above, the allegations show that

KPMG-HK took steps in conjunction with Shengda to ensure that these related-party transactions were disclosed in the 2008 financial statements.  TAC ¶¶ 100, 130, 209; *id.* ¶¶ 128-135, 145.  Miller pleads that the 2008 Form 10-K did not disclose that Shengda had previously falsely stated that SSCM was not a related party; the pleadings also imply but do not explicitly allege that Shengda did not issue an additional corrective disclosure through a Form 8-K for its 2007 financial statements. *Id.* ¶¶ 100, 102, 106.  However, Miller does allege that the 2007 issues were identified by KPMG-HK to Shengda's Audit Committee and its management.  *Id.* ¶¶ 130, 209.  A restatement of the 2007 financial statements as required by SFAS No. 154 ¶¶ 25-26 could be accomplished through disclosure in the 2008 Form 10-K *or* through an alternative disclosure; this determination was the responsibility of Shengda, perhaps in consultation with Hansen, its 2007 auditor.  In any event, Miller does not allege how this failure to correct the *2007* error bore on compliance of Shengda's *2008* financial statements with GAAP.  TAC ¶ 101; *cf. DiLeo* v. *Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("Although accountants must exercise care in giving opinions on the accuracy and adequacy of firms' financial statements, they owe no broader duty to search and sing. . . .  Such a duty would prevent the client from reposing in the accountant the trust that is essential to an accurate audit." (citation omitted)).

Miller next asserts that KPMG-HK's awareness that Shengda had poor internal controls over financial reporting, as indicated in its correspondence to the Audit Committee on March 31, 2009 and in its 2008 internal control audit report, should have alerted KPMG-HK to the likelihood that Shengda was committing fraud.  AU §§ 316.07, .85 (internal control problems signal "an *opportunity* for a fraud to be perpetrated").  TAC ¶¶ 59, 183, 184, 209.  But as discussed above, these allegations go to whether KPMG-HK's audit was sufficient under the PCAOB standards, and do not establish that KPMG-HK had or should have had specific knowledge that Shengda's financial statements were not GAAP-compliant.

Miller's other allegations of KPMG-HK's knowledge of Shengda's purportedly blatant fraudulent accounting practices do not rise to the level of specificity required by the pleading standards.  The allegations here are similar to those in *In re Longtop*:

> At base, Lead Plaintiffs' argument is that DTTC's audit reports contained material misstatements because they erroneously certified that Longtop's financials were prepared in accordance with GAAP.  No facts alleged show that DTTC was aware, or should have been aware, of wrongdoing on Longtop's part at the time DTTC issued the audit reports.  Instead, the allegations in the Complaint lead to the compelling and stronger inference that DTTC performed a diligent audit, only to be duped by Longtop's fraud.  Accordingly, Lead Plaintiffs have failed to plead a material misstatement.

*In re Longtop*, 910 F. Supp. 2d at 581; *see In re Puda Coal*, 30 F. Supp. 3d at 259-60. Miller has not pled that KPMG-HK knew enough at the time that it could not have believed its statement of GAAP compliance, or that KPMG-HK failed to take critical steps in its audit such that there is no reasonable basis on which it could have believed that Shengda's financial statements complied with GAAP at the time it opined that they did. As the First Circuit has acknowledged, "[s]imply pleading that the defendant knew of the falsity, without providing any factual basis for that knowledge, does not suffice." *Ezra Charitable Trust* v. *Tyco Int'l, Ltd.*, 466 F.3d 1, 12-13 (1st Cir. 2006); *see In re Cabletron*, 311 F.3d at 34.

### c. Loss Causation

In order to survive a motion to dismiss on the one statement I have found actionable — KMPG-HK's statement of compliance with PCAOB standards in conducting its internal control audit — Miller must also adequately allege that its losses were caused by this false statement. *See* 15 U.S.C. § 78u-4(b)(4) (plaintiff bears burden of proving that act or omission "caused the loss for which the plaintiff seeks to recover damages" (codifying § 21D(b)(4) of the Exchange Act)). The First Circuit has declined to decide whether loss causation must meet the heightened pleading standard of Fed. R. Civ. P. 9(b) or merely the basic standard of Fed. R. Civ. P. 8(a). *See*

*Coyne*, 943 F. Supp. 2d at 273 (citing *Mass. Ret. Sys*. v. *CVS Caremark Corp*., 716 F.3d 229, 239 n.6 (1st Cir. 2013)).  My own view is that Rule 9(b) applies to allegations of loss causation; therefore, a party must plead "with particularity the circumstances constituting fraud," even where, as here, scienter is not required.  *See id.* at 274.

To establish loss causation, a plaintiff must show "a causal connection between the material misrepresentation and the loss."  *Dura Pharm., Inc*. v. *Broudo*, 544 U.S. 336, 342 (2005).  This means that the loss must be proximately caused "by a disclosure that reveals something about the fraudulent misstatement or omission."  *In re Credit Suisse-AOL Sec. Litig*., 465 F. Supp. 2d 34, 46-47 (D. Mass. 2006) (citing *Lentell* v. *Merrill Lynch & Co*., 396 F.3d 161, 173 (2d Cir. 2005)); *In re Polaroid Corp. Sec. Litig*., 134 F. Supp. 2d 176, 188 (D. Mass. 2001).  In other words, a plaintiff must "allege that it was the *subject* of the omission or fraudulent statement that caused the actual loss."  *In re Credit Suisse*, 465 F. Supp. 2d at 46 (citing *Lentell*, 396 F.3d at 173); *see Dura Pharm.*, 544 U.S. at 344-45.

As a threshold matter, Miller has adequately pled a loss. Miller purchased $8 million in bonds from what is now a bankrupt company that cannot satisfy Miller's claims in full.  TAC ¶¶ 20-21, 25, 29, 32, 243-244, 252-254.  These securities have no

resale value.  *Id.* ¶¶ 235-236, 248-250, 255.  I find these pleadings satisfactory.  However, Miller has not alleged a sufficient, specific causal connection between the loss and the subject of the otherwise actionable omission.[40]  *See Bricklayers*, 752 F.3d at 86; *In re Credit Suisse*, 465 F. Supp. 2d at 47; *see also Lentell*, 396 F.3d at 173; *Suez Equity Inv'rs, L.P.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001).

Miller primarily pursues a corrective disclosure theory, that is, that "a corrective disclosure . . . led directly to a drop" in the value of the bonds.  *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 95 (D. Mass. 2010).  To establish loss causation based on an inflated purchase price revealed by a disclosure, "the stock market must have reacted to the subsequent disclosure of the misconduct," *Bricklayers & Trowel Trades Int'l Pension Fund* v. *Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014), and not to a "tangle of [other] factors affecting price," such as "changed

---

[40] Although I focus my analysis on the question of loss causation, coincident with the parties' briefing, I note that the Third Amended Complaint seems unlikely to satisfy the parallel requirement of transaction causation.  *See In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 51-54 (D. Mass. 2006); *see also Vanleeuwen* v. *Keyuan Petrochemicals, Inc.*, No. CV 11-9495 PSG JCGZ, 2013 WL 2247394, at *19 (C.D. Cal. May 9, 2013).  It would be difficult to conclude that Miller would not have purchased the notes but for the single omission I have found potentially actionable, particularly where other sections of the 2008 Form 10-K appear to acknowledge issues with related-party transactions.  *See, e.g.*, 2008 Form 10-K at 53.

investor expectations, [or] new industry-specific or firm-specific facts, conditions, or other events." *Dura Pharm.*, 544 U.S. at 343. This "inflation-disclosure-deflation cycle" is a common scenario – but not the only one – in which loss causation may be established, provided the disclosure is sufficiently connected to the misstatement or omission. *See Bricklayers*, 752 F.3d at 86; *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (citing *Dura Pharm.*, 544 U.S. at 346).

The corrective disclosure Miller identifies as the cause of its loss is the March 15, 2011 Shengda press release. Miller contends that immediately following this press release, the Shengda bonds became illiquid, as evidenced by Miller's own attempt to sell shortly thereafter. TAC ¶¶ 25, 231, 234-235, 247-255. Even assuming that the loss can be tied to this disclosure, which is arguably belied by other allegations in the Third Amended Complaint,[41] Miller has not identified a sufficient

---

[41] The day before the March 15 press release, NASDAQ halted trading in Shengda stocks after market close. TAC ¶ 230. Miller acknowledges that the March 15 press release could not have caused the trading halt, and speculates in its briefing – without reference to pleaded facts – why the halt may have occurred. On March 15, NASDAQ changed the reason for the halt, and on June 10, NASDAQ suspended trading in Shengda stocks. *Id.* ¶¶ 230, 232, 235. These allegations demonstrate that there were other market events that could have caused Miller's loss, and — because Miller has not alleged the reason for the halt (whether publicly known or not) — prevent Miller from arguing that the halt occurred as a result of KPMG-HK's failure to disclose that Shengda had a particular internal control deficiency. *Cf. Vanleeuwen*, 2013 WL 2247394, at *19 (finding allegations

connection between this disclosure and the allegedly fraudulent

omission in the 2008 internal control audit report regarding

---

connecting trading halt to failure to disclose, coupled with
allegations that stock value decreased, sufficient to plead loss
causation even though precise issue that had been concealed was
not revealed until later).

In an attempt to salvage its § 18 claim, Miller now claims
– in argument, but not in its pleadings – that the actual loss
was not felt until Shengda's announcement of default on the
bonds on June 9, the suspension of trading on June 10 (at which
point Miller surely could not sell the bonds), or Shengda's
filing for bankruptcy on August 19, when the notes became due
and payable, in part because the bonds could have regained their
value before the date they came due, and Miller had an
investment strategy of holding corporate bonds to maturity.
Presumably, this argument is meant to attribute the loss to
other disclosures made between March 15 and August 10 by
Shengda, namely its May 5, 2011 Form 8-K and its May 5, 2011
press release explaining the reasons for KPMG-HK's resignation
and identifying issues in the 2008 and 2009 audit reports and
with internal control deficiencies specifically.  TAC ¶¶ 233-
234.  Had Miller alleged that the loss followed these corrective
disclosures, Miller arguably would have demonstrated a
sufficient connection between the disclosure and the alleged
omission in the 2008 audit report regarding internal control
deficiencies (leaving aside the challenges of alleging causation
in light of the earlier NASDAQ changes).

But Miller has had numerous opportunities to amend its
complaint, and its pleadings clearly identify the March 2011
press release as the cause of the loss.  *See id.* ¶¶ 25 ("When
ShengdaTech announced in mid-March 2011 that the 2010 audit had
raised red flags, the market for Plaintiffs' bonds immediately
became illiquid.  Plaintiffs were unable to sell their bonds
before ShengdaTech filed for bankruptcy in August 2011."), 249-
250 ("Plaintiffs determined to sell their convertible bonds
virtually immediately after ShengdaTech's initial announcement
that KPMG had encountered unexplained discrepancies in its audit
of ShengdaTech's 2010 financial statements. . . .  Then,
however, there was no liquid market for ShengdaTech's
convertible bonds; thus, Plaintiffs could not sell their
bonds.").  Miller's arguments when pressed in service of the
loss causation issue cannot serve to revise express language in
its pleadings.

internal control deficiencies.  In the March 15 press release,
which is incorporated by reference into the Third Amended
Complaint, Shengda announced the appointment of a committee "to
investigate potentially serious discrepancies and unexplained
issues relating to [Shengda] and its subsidiaries' financial
records" that KPMG-HK had identified "in the course of [its]
audit of the consolidated financial statements for fiscal year
ended December 31, 2010."  TAC ¶ 231; March 15, 2011 Press
Release.  There are any number of "discrepancies and unexplained
issues" that could arise in financial statements, including ones
that impact the financial stability of the company and its
issued bonds, and ones that do not.  *Cf. Coyne*, 943 F. Supp. 2d
at 275 ("There are potentially an infinite number of reasons why
a company's financial returns might be 'uncertain' . . . .").
In addition, the March 15 press release made no mention of
Shengda's 2008 and 2009 financial statements or KPMG-HK's audit
of them.  March 15, 2011 Press Release; TAC ¶¶ 231, 234-235,
247-255.

    The March press release, therefore, did not "reveal[ ] to
the market the pertinent truth that was previously concealed or
obscured by the company's fraud," *Mass. Ret. Sys.*, 716 F.3d at
237 (citation omitted), that is, the undisclosed internal
control issues, or "reveal[] to the market that defendants'
[representations] were knowingly false."  *In re Credit Suisse*,

465 F. Supp. 2d at 45.  Nor did it necessarily reveal that
Shengda's financial status was not as robust as it had
represented.  *Cf. Mass. Ret. Sys.*, 716 F.3d at 240 (although
corrective disclosure need not contain "a direct admission that
a previous statement is untrue," there must be some shared
subject matter between disclosure and misrepresentation such
that disclosure "as a whole, plausibly revealed [problems] to
the market").  The press release simply did not "*connect* the
current, present, negative information to the earlier false or
misleading statement." *Coyne*, 943 F. Supp. 2d at 273.  Contrary
to Miller's suggestion otherwise, the March press release cannot
be said even to have "partially disclosed what the alleged
misrepresentations had concealed from the market." *Omanoff* v.
*Patrizio & Zhao LLC*, No. 14-723, 2015 WL 1472566, at *6 (D.N.J.
Mar. 31, 2015) (quoting *In re Bradley Pharm., Inc. Sec. Litig.*,
421 F. Supp. 2d 822, 829 (D.N.J. 2006)).

It was not until after the March disclosure that the
specific concerns, and their relevance to earlier accounting
periods – including discrepancies in bank balances, supplier
transactions, VAT invoices, third-party sales and payments, and
customer information – were made known through the filing of a
Form 8-K in May 2011 and subsequent announcements by Shengda.
TAC ¶¶ 236-238, 251-253.  Miller therefore cannot succeed on a
claim that it suffered a loss caused by the revelation to the

public of the specific misrepresentation or omission, because it alleges that its loss occurred *before* that revelation. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005); *see also Urman* v. *Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 197 (D. Mass. 2012) (lack of temporal relationship between change in stock price and public revelation of alleged misrepresentation can defeat loss causation); *cf. In re Evergreen*, 705 F. Supp. 2d at 95 (allegations that "[w]hen the defendants' alleged misstatements were ultimately revealed, the [shares] declined in value, resulting in losses" were sufficient to demonstrate loss causation). In placing the loss before the identified disclosure, Miller has failed to "eliminat[e] other possible explanations for th[e] price drop." *Mass. Ret. Sys.*, 716 F.3d at 238 (citation omitted).

In the alternative, Miller argues that the March disclosure was a materialization of a "zone of risk" that KPMG-HK's misrepresentation concealed. *See Lentell*, 396 F.3d at 173 ("a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor"); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010). Under this theory, the loss alleged must "be caused by the

materialization of the concealed risk." *Lentell*, 396 F.3d at 173.

Whether this "zone of risk" theory is recognized in the First Circuit is unresolved. *See In re Credit Suisse*, 465 F. Supp. 2d at 47 & nn.13-14. *But see Tutor Perini Corp.* v. *Banc of Am. Sec. LLC*, No. 11-10895-NMG, 2013 WL 5376023, at *20 (D. Mass. Sept. 24, 2013). Even if it were, the March press release did not disclose anything more than a possibility of a problem with the 2010 financials. *Cf. Stratte-McClure* v. *Morgan Stanley*, No. 09Civ.2017(DAB), 2013 WL 297954, at *12-13 (S.D.N.Y. Jan. 18, 2013), *aff'd*, 776 F.3d 94 (2d Cir. 2015). Although Miller clearly perceived in March 2011 that it had suffered a loss, a reasonable investor reading the press release would not suspect, at least at the outset, that KPMG-HK had made a misstatement in its 2008 internal control audit report that was somehow tied to the loss.[42] The allegations fail to demonstrate a sufficient causal relationship between what KPMG-HK's omission hid – that it had identified a material weakness not disclosed in its 2008 internal control audit report – and Miller's loss. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d

---

[42] Similarly, a reasonable person reading the press release would not connect the identified potential discrepancies in the 2010 financial statements to other potential misrepresentations by KPMG-HK or by Shengda regarding its financial position in 2008 and 2009.

553, 587 (S.D.N.Y. 2014) ("The number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed."); *see also Suez Equity*, 250 F.3d at 96 ("[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss"); *cf. In re Credit Suisse*, 465 F. Supp. 2d at 47 (loss causation could be established by alleging that value of stock declined after product failed to receive FDA approval if analyst had concealed information suggesting that new product might not receive approval).

*In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 305-07 (S.D.N.Y. 2005), a case on which Miller relies, is distinguishable here. In that case, the auditor similarly issued reports certifying that the financial statements of Parmalat fairly presented its financial position as of December 31, 2001. *Id.* at 306-07. However, the plaintiffs alleged that these reports concealed "that Parmalat had massive undisclosed debt and was unable to service it" – this was the concealed risk that ultimately caused the plaintiffs' loss. *Id.* at 307. The parallels to the instant case end there. What happened next was a direct materialization of the risk: Parmalat suffered a liquidity crisis in December 2003 and could not pay the bonds as they came due. *Id.* The very risk that the auditor had concealed came to fruition. Trading in Parmalat securities was

suspended in Italy, followed by a sharp drop in prices of
Parmalat stock and bonds on other exchanges. *Id.* Although "the
true extent [of] the fraud was not revealed to the public until
February," this was "immaterial where, as here, the risk
allegedly concealed by defendants materialized during that time
and arguably caused the decline in shareholder and bondholder
value." *Id.*

In contrast to *In re Parmalat*, the foreseeable risks
theoretically concealed by KPMG-HK's allegedly false statement
in its audit report – that Shengda would not have the resources
to pay its debts – were not what materialized in the March 2011
disclosure. Rather, that disclosure articulated potential
financial discrepancies, not inability to pay outstanding bonds,
years before the notes Miller held were to come due. While the
March disclosure may have been a contributor to the decline in
value and Miller's loss, there is no identifiable connection
between this report and the omission in KPMG-HK's 2008 internal
control audit report.[43]

---

[43] *Tutor Perini Corp.* v. *Banc of America Securities LLC*, No. 11-
10895-NMG, 2013 WL 5376023 (D. Mass. Sept. 24, 2013), another
case on which Miller relies, is distinguishable for the same
reason. In that case, "the very risk that the defendants had
concealed from [the plaintiff] materialized: the market for the
[auction rate securities] held by [the plaintiff] collapsed."
*Id.* at *21. The defendants had concealed, by way of misleading
statements, that there was an "increasingly severe risk of
illiquidity associated with such investments" and were
themselves "engaged in a strategy to reduce [their] own

Regardless of the theory Miller pursues, the Third Amended Complaint does not plead or permit the inference that KPMG-HK's alleged violation of PCAOB standards, its failing to identify a specific internal control deficiency in its 2008 internal control audit report, "was a substantial factor in the decline" in value of the bonds and a proximate cause of Miller's loss. *In re Polaroid Corp.*, 134 F. Supp. 2d at 188-89. Accordingly, regardless of Miller's ability to plead and prove the falsity of KPMG-HK's statements, it has not adequately pled loss causation, and its claim under § 18 must be dismissed.

**B.  *Negligent Misrepresentation Claim***

1.  Pleading Requirements

Some but not all judges in this district have "clearly held that Rule 9(b) applies to claims of negligent misrepresentation" because the "same rule against pleadings on 'information and belief' and the same policy against allowing 'strike suits' apply to negligent misrepresentation claims as apply to outright claims of fraud." *In re Stratus Comput., Inc. Sec. Litig.*, No. 89-2075-Z, 1992 WL 73555, at *6 (D. Mass. Mar. 27, 1992); *see Advanced Card Sys., Inc.* v. *Hewlett-Packard Co.*, No. 1:04-CV-12295, 2005 WL 6433203, at *5 (D. Mass. Oct. 28, 2004); *Lindner*,

---

inventory of [auction rate securities]." *Id.* at *1. Here, the risk Miller allegedly concealed was not that Shengda could not pay its issued bonds, but that it had an internal control issue regarding related-party transactions.

880 F. Supp. at 57.  *But see Fed. Home Loan Bank of Bos.* v. *Ally Fin., Inc.*, No. 11-10952-GAO, 2013 WL 5466631, at *1-2 (D. Mass. Sept. 30, 2013) (concluding that Rule 9(b) does not apply to negligent misrepresentation claims because they do not sound in fraud).

My own view, as expressed above, is that Rule 9(b) applies where the complaint and the claims overall sound in fraud, and that a claim of negligent misrepresentation in this context so sounds, even absent a scienter element.  *See Softub, Inc.* v. *Mundial, Inc.*, 53 F. Supp. 3d 235, 256 (D. Mass. 2014); *cf. N. Am. Catholic Educ. Programming Found., Inc.* v. *Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009).  Accordingly, I will apply Rule 9(b) in assessing the pleadings.[44]

Under Massachusetts common law,[45] a defendant is liable for negligent misrepresentation "if in the course of his business, he supplies false information for the guidance of others in

---

[44] I am cognizant that, in an earlier motion to dismiss by Morgan Stanley, Judge Tauro applied Rule 8 to the claim of a violation of the Massachusetts securities law, which also does not require scienter, in part because the complaint did not sound in fraud in his view.  *See Miller*, 879 F. Supp. 2d at 165-66. Nonetheless, Judge Tauro concluded that the claims set forth in the complaint "would be sufficient to satisfy Rule 9(b)."  *Id.* at 166.  Accordingly, my application of Rule 9(b) does not create internal inconsistencies in the legal standards imposed in this case.

[45] KPMG-HK does not dispute the application of Massachusetts law solely for the purposes of resolving the motion to dismiss as Miller has framed it.

their business transactions, causing and resulting in pecuniary loss to others by their justifiable reliance on the information, with failure to exercise reasonable care or competence in obtaining or communicating the information." *Marram* v. *Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 n.25 (Mass. 2004) (citations omitted).

The statements at issue here are the same as those at issue in the § 18 claim: KPMG-HK's representations, in its 2008 and 2009 audit reports, first that it complied with the PCAOB standards in conducting its audits, and second that Shengda complied with GAAP in its financial statements.[46] KPMG-HK

---

[46] Although Miller attempts to pursue a claim based on statements regarding Shengda's 2010 quarterly financial statements appearing in the December 2010 comfort letter from KPMG-HK to Morgan Stanley, these statements are not actionable. Miller has pled that KPMG-HK expressed awareness in the letter that purchasers in the offering would rely on its opinions, but it has not pled that the letter itself was intended to be or indeed was provided to potential Shengda bond purchasers by Morgan Stanley in the PPM. TAC ¶¶ 220-222, 268. Indeed, the letter, which is incorporated by reference into the Third Amended Complaint, is addressed to Morgan Stanley and several other financial companies and indicates that the letter "is solely for the information of the addressees" to assist in conducting an investigation in connection with the securities offering, "and it is not to be used, circulated, quoted or otherwise referred to . . . for any other purpose, including, but not limited to, the registration, purchase, or sale of securities."
    In addition, KPMG-HK's consent to the use of its 2008 and 2009 audit opinions in preliminary registration statements prepared for a proposed Shengda equity offering in 2010 that never occurred is not actionable, because Miller was not a purchaser of the inchoate offering and has not alleged how it could have relied on the papers prepared for it. TAC ¶¶ 213, 219.

contends that Miller has not pled sufficiently particular facts
to establish that KPMG-HK provided false information, or that
KPMG-HK owed a duty to Miller such that Miller's reliance on
KPMG-HK's statements was justified.

   2.  False Information

   KPMG-HK asserts that claims of negligent misrepresentation
under state common law must meet the same falsity standards as
§ 18 claims, and that Miller has failed to plead with
particularity that KPMG-HK's audit opinions were false.  Miller
does not dispute this proposition but instead contends, as
above, that KPMG-HK is incorrect in characterizing audit reports
as statements of opinion rather than fact.

   Although not precisely aligned, there are sufficient
similarities between the falsity standards for negligent
misrepresentation and § 18 to warrant equivalent analyses.
Under Massachusetts case law, statements of opinion cannot give
rise to a negligent misrepresentation claim.  *Softub*, 53 F.
Supp. 3d at 255 (citing *Zimmerman* v. *Kent*, 575 N.E.2d 70, 75
(Mass. App. Ct. 1991)); *see Cummings* v. *HPG Int'l, Inc.*, 244
F.3d 16, 21 (1st Cir. 2001) (citing *Logan Equip. Corp.* v. *Simon
Aerials, Inc.*, 736 F. Supp. 1188, 1199 (D. Mass. 1990));
*Commonwealth* v. *Quinn*, 111 N.E. 405, 408 (Mass. 1916).

   Massachusetts courts look to the Restatement (Second) of
Torts to determine whether a statement is one of opinion:

> [A] statement that in form is one of opinion "may
> constitute a statement of fact if it may reasonably be
> understood by the recipient as implying that there are
> facts to justify the opinion or at least that there are
> no facts that are incompatible with it."

*Cummings*, 244 F.3d at 22 (quoting *McEneaney* v. *Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. Ct. 1995)). A defendant's knowledge of the accuracy of the statement is not determinative of whether the statement is one of opinion, because negligent misrepresentation "does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff." *Marram*, 809 N.E.2d at 1031 n.25 (quoting *Kitner* v. *CTW Transp., Inc.*, 762 N.E.2d 867, 874 (Mass. App. Ct. 2002)); *see Epstein* v. *C.R. Bard, Inc.*, No. Civ. A.03-12297-RWZ, 2004 WL 1598912, at *3 (D. Mass. July 19, 2004) (knowledge of statement's falsity by defendant is not required). Yet as I have acknowledged elsewhere, statements that "are inflected with opinion" are actionable if they "imply underlying facts that [the plaintiff] alleges [the defendant] knew were false." *Softub*, 53 F. Supp. 3d at 256 (citing *Cummings*, 244 F.3d at 22). As with § 18, for a negligent misrepresentation claim, an auditor's "knowledge is to be measured 'at the moment the audit [report] is published.'" *Nycal* v. *KPMG Peat Marwick LLP*, 688 N.E.2d 1368, at 1372-73 (Mass. 1998) (quoting *First Nat'l Bank*

*of Commerce* v. *Monco Agency Inc.*, 911 F.2d 1053, 1059 (5th Cir. 1990)); *see* 15 U.S.C. § 78r.

This framework appears to parallel closely that in which a statement of opinion may be actionable under federal securities laws following *Omnicare*.  *Cf. Corban*, 2015 WL 1505693, at *6 (statements of opinion are not actionable under federal securities laws unless plaintiffs allege that (1) opinions were objectively and subjectively false, "(2) self-embedded facts within the opinion are untrue, or (3) 'material facts about the [opinion holder's] inquiry into or knowledge concerning a statement of opinion' were omitted" (quoting *Omnicare*, 135 S. Ct. at 1329)).  Nonetheless, there is some indication of a potential divergence.  For example, a judge of the Massachusetts Superior Court concluded that statements of compliance with GAAS or GAAP were statements of fact because the speaker held itself out as "having a level of expertise with respect to both GAAS and GAAP that the [listener] could not be expected to have." *Bank of Am., N.A.* v. *BDO Seidman, LLP*, 29 Mass. L. Rptr. 513, 2012 WL 806007, at *36 (Mass. Super. Ct. 2012).  In *Bank of America*, Judge Fabricant acknowledged that federal case law classifies such statements as opinions, but reasoned that classifications should be made based on "specific claims in specific circumstances," taking into account "the departures from GAAS" that are alleged.  *Id.* at *36 n.74; *see Bily* v.

*Arthur Young & Co.*, 3 Cal. 4th 370, 407-08, 834 P.2d 745 (Cal. 1992) (employing similar reasoning). This is a meaningful departure from the framework employed under § 18.

If the falsity standard for negligent misrepresentation is indeed aligned with the standard employed under § 18, my findings that Miller has not adequately pled falsity – but for the statement of PCAOB compliance in the 2008 internal control audit – stand as set forth above in my discussion of the § 18 claim. If, in contrast, the contours of falsity for negligent misrepresentation are different, I need not resolve whether Miller's pleadings are satisfactory, because I conclude that Miller has not adequately pled justifiable reliance.

### 3. Justifiable Reliance

KPMG-HK contends that Miller cannot establish that it owed a duty to Miller – and therefore that Miller justifiably relied on KPMG-HK's audit reports – because KPMG-HK did not supply the audit reports "for a transaction that [it] actually intend[ed] to influence." *N. Am. Specialty Ins. Co.* v. *Lapalme*, 258 F.3d 35, 41-42 (1st Cir. 2001). A plaintiff must establish that the auditor "knew (or intended) that the plaintiff, or any limited group of which the plaintiff was a member, would rely on the audit report in connection with an investment in [the company whose financial statements were the subject of the audit report]." *Nycal*, 688 N.E.2d at 1373. Massachusetts case law

makes clear that, on the facts as pled, Miller has not satisfied this element.

In *Nycal*, 688 N.E.2d at 1369, 1373, a case involving a plaintiff's alleged reliance on an auditor's report in purchasing stock in a company that later declared bankruptcy and rendered the plaintiff's investment worthless, the Supreme Judicial Court affirmed that the plaintiff had not demonstrated justifiable reliance, because the defendant had not "prepare[d] the audit report for the plaintiff's benefit." Additionally, the Supreme Judicial Court reasoned:

> [T]he plaintiff was not a member of any "limited group of persons" for whose benefit the report was prepared. . . . At the time the audit was being prepared, the plaintiff was an unknown, unidentified potential future investor in [the company]. The defendant was not aware of the existence of the transaction between the plaintiff and [the company] until after the stock purchase agreement had been signed and only a few days before the sale was completed.

*Id.* Similarly, in *Cumis Insurance Society, Inc.* v. *BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 50 n.26 (Mass. 2009), the Supreme Judicial Court noted that the plaintiffs would not be able to establish the necessary "foreseeable reliance" where the defendants had "had no direct communication or connection with any of the 16,000 Visa issuers or the 20,0000 MasterCard issuers, and had no knowledge that any particular issuer was relying on any particular provision in the confidential merchant

agreements."[47]  Both "near privity" and actual knowledge by the
defendant that the plaintiff would rely on defendant's
professional services were required.  *Id.*

Similarly here, there was no direct relationship between
Miller and KPMG-HK.  Rather, KPMG-HK had an agreement with
Shengda to conduct audits of its financial statements.  Miller
has not alleged that KPMG-HK prepared these audit reports for
any purpose other than inclusion by Shengda in its annual Form
10-K filings with the SEC.  Absent more, this lack of privity
would be enough to preclude Miller's negligent misrepresentation
claim.  *See Nycal*, 688 N.E.2d at 1373-74 (noting that in
conducting annual audit and issuing resulting opinion, auditor
"generally undertakes no duty to third parties" when unaware of
any particular purpose for audit, and concluding that
accountants are not required "to ensure the commercial decisions
of nonclients where . . . [they] did not know that their work
product would be relied on by [a] plaintiff in making its
investment decision").

Miller does allege that KPMG-HK gave permission to Morgan
Stanley to include these audit reports in the PPM that Morgan
Stanley distributed to potential Shengda bond purchasers in a

---

[47] Miller argues that *Cumis* misinterpreted *Nycal* and inaccurately
states the law.  However, *Cumis* has not been overruled or even
disavowed by the Supreme Judicial Court, and I am obliged to
apply it.

private placement.  Arguably, this creates a potential hook for reliance by permitting the inference that KPMG-HK was aware that its audit reports might be relied upon by investors.  But there are two infirmities here.  First, KPMG-HK gave Morgan Stanley permission to include its audit reports in the PPM *after* they were prepared.  *See Nycal*, 688 N.E.2d at 1372 (auditor's knowledge measured at time audit report is published).  Miller has not alleged that KPMG-HK had any knowledge prior to issuing its opinions that they would be used for this purpose.  *See id.; see also Fed. Home Loan*, 2013 WL 5466631, at *6 (plaintiff must plead that auditor had "actual knowledge of the particular financial transaction that such information [was] designed to influence" (internal quotation marks omitted) (quoting *Nycal*, 688 N.E.2d at 1372)).  In addition, despite making an *argument* to the contrary,[48] Miller has not pled any *facts* that would

---

[48] Miller points to a case from the Southern District of Ohio as support for its assertion that KPMG-HK owed a duty to it as a member of a limited group of investors invited to participate in the private placement.  *See In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 640 (S.D. Ohio 2008).  *In re National Century* discusses the credit rating provided by a credit rating agency for certain notes issued by a privately-held company and offered "to a select class of institutional investors with the resources to invest tens of millions of dollars in the notes," but does so in the context of addressing First Amendment concerns raised by the credit rating agency regarding its right to disseminate information to the investing public.  *Id.*  This fundamentally different concern renders *In re National Century* unpersuasive with respect to the issues before me.

permit the inference that the private placement was made available to a "limited group of persons," as that term is contemplated by *Nycal* and its progeny. *See Fed. Home Loan*, 2013 WL 5466631, at *6 (noting that plaintiff "must adequately allege that the defendants knew of a limited group of investors that would rely on the offering documents in purchasing securities," but also recognizing that this limited group of potential third parties can be "unnamed"); *cf. Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 841-42 (6th Cir. 2012) (concluding that, under Ohio law, scope of liability for professional negligence, even where it extends to those in "near privity," did not extend to investors who purchased securities through a private placement offered only to "qualified institutional buyers" who invest "at least $100 million in securities" (internal quotation marks and citations omitted)).[49] In the absence of such allegations, Miller has not

---

[49] The parties direct me to additional cases taking different approaches to this issue outside of Massachusetts. *Compare Guenther* v. *Cooper Life Scis., Inc.*, 759 F. Supp. 1437, 1443 (N.D. Cal. 1990) (concluding that auditor owed duty under Minnesota law to plaintiffs as member of "clearly defined group" consisting generally of "potential investors"), *with In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Ret. Accounts) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 556 (D. Del. 1994) (Delaware case law does not "extend[ ] liability for negligent misrepresentation to the general investing public"). I do not find these cases either persuasive or instructive on Massachusetts law.

stated a claim for negligent misrepresentation.[50]

### IV. CONCLUSION

For the reasons set forth above, I GRANT Defendant KPMG-HK's motion to dismiss for failure to state a claim, Dkt. No. 169.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[50] I do not reach the issue whether I should exercise supplemental jurisdiction over the negligent misrepresentation claim on the basis of diversity jurisdiction, because it has not been developed, and because I conclude, in any event, that Miller has not adequately pled a claim for negligent misrepresentation.